RECORD NO. 17-1145

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

ALEXIS DEGIDIO, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED
*Plaintiff-Appellees*

V.

CRAZY HORSE SALOON AND RESTAURANT, INC.,
THEE NEW DOLLHOUSE
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA, FLORENCE DIVISION

JOINT APPENDIX
VOLUME I
PAGES i-253

| | |
|---|---|
| **James L. Holt, Jr. (TN Bar #012123)** | **Jamisen A Etzel (Penn. Bar 311554)** |
| **JACKSON, SHIELDS, YEISER & HOLT** | **Carlson Lynch (Penn. Bar 56887)** |
| **262 German Oak Drive** | **CARLSON LYNCH SWEET KILPEA & CARPENTER, LLP** |
| **Memphis, TN 38018** | **1133 Penn Avenue, 5th Floor** |
| **901-754-8001 (telephone)** | **Pittsburgh, PA 15222** |
| **901-754-8524 (facsimile)** | **412-322-9243** |
| *jholt@jsyc.com* | **Fax: 412-231-0246** |
| | jetzel@carlsonlynch.com |
| **Attorney for Defendant-Appellant** | glynch@carlsonlynch.com |
| **Crazy Horse Saloon & Restaurant, Inc.** | |
| | **Counsel for Plaintiff Alexis Degidio** |

# TABLE OF CONTENTS

## Volume I

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

First Amended Complaint filed May 29, 2014 . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant's Answer to First Amended Complaint
filed June 13, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Defendant's Brief in Opposition to Plaintiff's Motion
for Conditional Collective Action Certification and
Judicial Notice filed January 19, 2015 with attachments . . . . . . . . . . . . . . . . . 31

Defendant's Refiled Motion for Summary Judgment
filed May 4, 2015 with attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

## Volume II

Continuation of attachments to Defendant's Refiled
 Motion for Summary Judgment filed May 4, 2015 . . . . . . . . . . . . . . . . . . . . 254

Conditional Certification Opinion and Order filed
September 30, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431

Defendant's Motion to Dismiss and/or for Summary
Judgment on Plaintiff's Claim Under State Law For
Deductions From Tips filed October 26, 2015 with
attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 484

## Volume III

Continuation of attachments to Defendant's Motion
to Dismiss and/or for Summary Judgment on Plaintiff's
Claim Under State Law For Deductions From Tips filed
October 26, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 498

Order and Opinion Denying Motion to Dismiss and/or
for Summary Judgment on Plaintiff's Claim Under State
Law For Deductions From Tips filed June 3, 2016 . . . . . . . . . . . . . . . . . . . . . 501

Defendant's Brief in Opposition to Plaintiff's Renewed
Motion for Rule 23 Class Certification filed August 11,
2016 with attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

## Volume IV

Continuation of attachments to Defendant's Brief in
Opposition to Plaintiff's Renewed Motion for Rule 23
Class Certification filed August 11, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . 686

Defendant's Motion to Dismiss Claims of Opt-ins
to Conditionally Certified FLSA Action and to Compel
Arbitration filed October 31, 2016 with attachments . . . . . . . . . . . . . . . . . . . 726

Plaintiff's Response in Opposition to Defendants Motion
to Dismiss Claims and to Compel Arbitration Against
Those Opt-in Plaintiffs Who Signed Mandatory
Arbitration Agreements filed November 17, 2016
with attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 848

Defendant's Reply in Support of Its Motion to Dismiss
Claims and to Compel Arbitration Against Those Opt-in
Plaintiff Who Signed Mandatory Arbitration Agreements
filed November 30, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 883

Order Appealed (Denying Defendant's Motion to Dismiss
Claims of Opt-ins to Conditionally Certified FLSA
Action and to Compel Arbitration) filed January 26, 2017. . . . . . . . . . . . . . . 896

Notice of Appeal filed February 1, 2017. . . . . . . . . . . . . . . . . . . . . . . . . . . 932

APPEAL,JURY,LC 2

# U.S. District Court
## District of South Carolina (Florence)
## CIVIL DOCKET FOR CASE #: 4:13-cv-02136-BHH

Degidio v. Crazy Horse Saloon and Restaurant Inc
Assigned to: Honorable Bruce Howe Hendricks
related Case: 4:13-cv-03399-BHH
Case in other court: 4CCA, 17-00134
Cause: 29:201 Fair Labor Standards Act

Date Filed: 08/08/2013
Jury Demand: Both
Nature of Suit: 710 Labor: Fair
Standards
Jurisdiction: Federal Question

**Plaintiff**

**Alexis Degidio**
*individually and on behalf of all others
similarly situated*

represented by  **James L Ward , Jr**
McGowan Hood and Felder LLC
321 Wingo Way
Suite 103
Mt Pleasant, SC 29464
843-388-7202
Fax: 843-388-3194
Email: jward@mcgowanhood.com
*TERMINATED: 01/25/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Christopher Tuck**
Richardson Patrick Westbrook and
Brickman
PO Box 1007
Mt Pleasant, SC 29465
843-727-6500
Fax: 843-216-6509
Email: ctuck@rpwb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edwin J Kilpela , Jr**
Carlson Lynch Sweet and Kilpela
PNC Park
115 Federal Street
Suite 210
Pittsburgh, PA 15212
412-322-9243
Fax: 412-231-0246
Email: ekilpela@carlsonlynch.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

i

**Gary F Lynch**
Carlson Lynch
PNC Park
115 Federal Street
Suite 210
Pittsburgh, PA 15212
412-322-9243
Email: glynch@carlsonlynch.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamisen A Etzel**
Carlson Lynch
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222
412-322-9243
Fax: 412-231-0246
Email: jetzel@carlsonlynch.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**R Bruce Carlson**
Carlson Lynch
PNC Park
115 Federal Street
Suite 210
Pittsburgh, PA 15212
412-322-9243
Email: bcarlson@carlsonlynch.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Crazy Horse Saloon and Restaurant**      represented by  **Alice Fountain Paylor**
**Inc**                                                    Rosen Rosen and Hagood
*doing business as*                                        PO Box 893
Thee New Dollhouse                                         Charleston, SC 29402
                                                           843-577-6726
                                                           Fax: 843-724-8036
                                                           Email: apaylor@rrhlawfirm.com
                                                           *TERMINATED: 10/31/2013*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **William Paul Young**                    **ii**

PO Box 4213
N Myrtle Beach, SC 29597
843-249-9999
Email: pyoung4213@frontier.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James L Holt , Jr**
Jackson Shields Yeiser and Cantrell
262 German Oak Drive
Cordova, TN 38018
(901) 754-8001
Email: jholt@jsyc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell Britton Kelly**
Kelly Law Firm LLC
180 Spring Street
Charleston, SC 29403
843-991-4128
Fax: 843-724-8036
Email: britt@kellylawsc.com
*TERMINATED: 10/31/2013*
*ATTORNEY TO BE NOTICED*

**Stephen L Shields**
Jackson Shields Yeiser and Cantrell
262 German Oak Drive
Cordova, TN 38018
901-754-8001
Email: sshields@jsyc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy A Perkins**
Jackson Shields Yeiser and Cantrell
262 German Oak Drive
Cordova, TN 38018
901-754-8001
Email: tperkins@jsyc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ThirdParty Plaintiff**

**Crazy Horse Saloon and Restaurant Inc**
*TERMINATED: 12/02/2014*

represented by **Alice Fountain Paylor**
(See above for address)
*TERMINATED: 10/31/2013*
*LEAD ATTORNEY*

iii

*ATTORNEY TO BE NOTICED*

**William Paul Young**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James L Holt , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Russell Britton Kelly**
(See above for address)
*TERMINATED: 10/31/2013*
*ATTORNEY TO BE NOTICED*

**Stephen L Shields**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy A Perkins**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**ThirdParty Defendant**

**Joseph B Hargadon**                 represented by   **William James Luse**
*TERMINATED: 12/02/2014*                               William J Luse Law Office
                                                       1601 Oak Street
                                                       Suite 201
                                                       Myrtle Beach, SC 29577
                                                       843-455-6049
                                                       Email: lusewilliam@yahoo.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/08/2013 | 1 | COMPLAINT against Crazy Horse Saloon and Restaurant Inc (filing fee $400 receipt number 0420-4868427), filed by Alexis Degidio. Service due by 12/9/2013. (hcic, ) See 8 for additional attachment (hcic, ). (Entered: 08/08/2013) |
| 08/08/2013 | 3 | Local Rule 26.01 Answers to Interrogatories with jury demand by Alexis Degidio.(hcic, ) (Entered: 08/08/2013) |
| 08/08/2013 | 4 | Summons Issued as to Crazy Horse Saloon and Restaurant Inc. (hcic, ) (Entered: 08/08/2013) |

iv

| 08/28/2013 | 5 | MOTION to Appear Pro Hac Vice by R. Bruce Carlson ( Filing fee $ 250 receipt number 0420-4907614) by Alexis Degidio. Response to Motion due by 9/16/2013. (Attachments: # 1 Affidavit) Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) Modified on 8/28/2013 to delete proposed order(mcot, ). (Entered: 08/28/2013) |
| 08/28/2013 | 6 | MOTION to Appear Pro Hac Vice by Jamisen A. Etzel ( Filing fee $ 250 receipt number 0420-4907719) by Alexis Degidio. Response to Motion due by 9/16/2013. (Attachments: # 1 Affidavit)Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 08/28/2013) |
| 08/28/2013 | 7 | MOTION to Appear Pro Hac Vice by Gary F. Lynch ( Filing fee $ 250 receipt number 0420-4907768) by Alexis Degidio. Response to Motion due by 9/16/2013. (Attachments: # 1 Affidavit)Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 08/28/2013) |
| 08/29/2013 | 8 | Additional Attachments to Main Document 1 Complaint. First attachment description: Consent To Become Party Plaintiff *by Alexis Degidio*. (Ward, James) (Entered: 08/29/2013) |
| 08/29/2013 | 9 | **ORDER granting 5 Motion to Appear Pro Hac Vice for R. Bruce Carlson. Signed by the Honorable R Bryan Harwell on 8/29/2013. (hcic, )** (Entered: 08/29/2013) |
| 08/29/2013 | 10 | **ORDER granting 6 Motion to Appear Pro Hac Vice for Jamisen A. Etzel. Signed by the Honorable R Bryan Harwell on 8/29/2013. (hcic, )** (Entered: 08/29/2013) |
| 08/29/2013 | 11 | **ORDER granting 7 Motion to Appear Pro Hac Vice for Gary F. Lynch. Signed by the Honorable R Bryan Harwell on 8/29/2013. (hcic, )** (Entered: 08/29/2013) |
| 08/30/2013 | 12 | SUMMONS Returned Executed by Alexis Degidio. Crazy Horse Saloon and Restaurant Inc served on 8/27/2013, answer due 9/17/2013. (Attachments: # 1 Exhibit Affidavit of Service)(Ward, James) (Entered: 08/30/2013) |
| 09/10/2013 | 14 | NOTICE of Appearance by Alice Fountain Paylor on behalf of Crazy Horse Saloon and Restaurant Inc (Paylor, Alice) (Entered: 09/10/2013) |
| 09/11/2013 | 16 | MOTION to Appear Pro Hac Vice by Stephen L. Shields ( Filing fee $ 250 receipt number 0420-4928572) by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 9/30/2013. (Attachments: # 1 Exhibit Shields Application for pro hac vice admission)Proposed order is being emailed to chambers with copy to opposing counsel.(Paylor, Alice) Modified on 9/11/2013 to remove proposed order (hcic, ). (Entered: 09/11/2013) |
| 09/11/2013 | 17 | MOTION to Appear Pro Hac Vice by James L. Holt, Jr. ( Filing fee $ 250 receipt number 0420-4928662) by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 9/30/2013. (Attachments: # 1 Exhibit Holt application for pro hac admission) Proposed order is being emailed to chambers with copy to opposing counsel.(Paylor, Alice) Modified on 9/11/2013 to remove proposed order (hcic, ). (Entered: 09/11/2013) |
| 09/11/2013 | 18 | |

| | | |
|---|---|---|
| | | MOTION to Appear Pro Hac Vice by Timothy A. Perkins ( Filing fee $ 250 receipt number 0420-4928684) by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 9/30/2013. (Attachments: # 1 Exhibit Perkins application for pro hac admission) Proposed order is being emailed to chambers with copy to opposing counsel.(Paylor, Alice) Modified on 9/11/2013 to remove proposed order (hcic, ). (Entered: 09/11/2013) |
| 09/12/2013 | 19 | **ORDER granting 16 Motion to Appear Pro Hac Vice for Stephen L. Shields. Signed by the Honorable R Bryan Harwell on 9/12/2013. (hcic, ) (Entered: 09/12/2013)** |
| 09/12/2013 | 20 | **ORDER granting 17 Motion to Appear Pro Hac Vice for James L Holt Jr. Signed by the Honorable R Bryan Harwell on 9/12/2013. (hcic, ) (Entered: 09/12/2013)** |
| 09/12/2013 | 21 | **ORDER granting 18 Motion to Appear Pro Hac Vice Timothy A. Perkins. Signed by the Honorable R Bryan Harwell on 9/12/2013. (hcic, ) (Entered: 09/12/2013)** |
| 10/08/2013 | 23 | ANSWER to Complaint by Crazy Horse Saloon and Restaurant Inc.(Young, William) (Main Document 23 replaced on 10/9/2013 with corrected document provided by filer) (hcic, ). (Entered: 10/08/2013) |
| 10/08/2013 | 24 | Local Rule 26.01 Answers to Interrogatories by Crazy Horse Saloon and Restaurant Inc.(Young, William) (Main Document 24 replaced on 10/9/2013 with corrected document provided by filer) (hcic, ). (Entered: 10/08/2013) |
| 10/09/2013 | 25 | **CONFERENCE AND SCHEDULING ORDER. Rule 26(f) Conference Deadline 10/29/2013, 26(a) Initial Disclosures due by 11/12/2013, Rule 26 Report due by 11/12/2013, Motions to Amend Pleadings due by 1/7/2014, Plaintiffs ID of Expert Witness due by 2/6/2014, Defendants ID of Expert Witnesses Due by 3/10/2014, Records Custodian Affidavit due by 3/10/2014, Discovery due by 5/7/2014, Motions due by 5/22/2014, Rule 26 (a)(3) Disclosures due by 8/5/2014, Jury Selection Deadline 10/6/2014, ADR Statement due by 6/21/2014, Mediation Due by 7/21/2014. Motions in limine must be filed at least three weeks prior to the date set for jury selection. Responses to motions in limine shall be filed within seven (7) days after the motion is filed. Parties shall furnish the Court pretrial briefs seven (7) days prior to the date set for jury selection. Signed by the Honorable R Bryan Harwell on 10/9/2013. (hcic) (Entered: 10/09/2013)** |
| 10/09/2013 | 26 | THIRD PARTY COMPLAINT against Joseph B Hargadon, filed by Crazy Horse Saloon and Restaurant Inc. (Young, William) Modified on 10/10/2013 to remove duplicative text (hcic, ). (Entered: 10/09/2013) |
| 10/30/2013 | 27 | MOTION to Substitute Attorney by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 11/18/2013. Proposed order is being emailed to chambers with copy to opposing counsel.(Paylor, Alice) (Entered: 10/30/2013) |
| 10/31/2013 | 28 | **ORDER GRANTING SUBSTITUTION OF COUNSEL. Signed by the Honorable R Bryan Harwell on 10/31/2013. (hcic) (Entered: 10/31/2013)** |
| 11/05/2013 | 30 | Summons Issued as to Joseph B Hargadon. (hcic) (Entered: 11/05/2013) |

vi

| 11/12/2013 | 31 | Joint Rule 26(f) Report by Alexis Degidio, Crazy Horse Saloon and Restaurant Inc. (Attachments: # 1 Supporting Documents Joint Rule 26(f) Report, # 3 Supporting Documents Proposed Discovery Plan, # 4 Supporting Documents Local Rule 26 03 Information)(Ward, James) Modified on 11/13/2013 to add filer listed on document and to remove proposed order (hcic). (Entered: 11/12/2013) |
|---|---|---|
| 11/13/2013 | 32 | **CONSENT AMENDED SCHEDULING ORDER. 26(a) Initial Disclosures due by 11/15/2013, Motions to Amend Pleadings due by 1/7/2014, Plaintiffs ID of Expert Witness due by 2/6/2014, Defendants ID of Expert Witnesses Due by 3/10/2014, Records Custodian Affidavit due by 3/10/2014, Discovery due by 5/7/2014, Motions due by 6/6/2014, Rule 26(a)(3) Disclosures due by 8/5/2014, Jury Selection Deadline 10/6/2014, ADR Statement due by 6/21/2014, Mediation Due by 7/21/2014. Motions in limine must be filed at least three weeks prior to the date set for jury selection. Responses to motions in limine shall be filed within seven (7) days after the motion is filed. Parties shall furnish the Court pretrial briefs seven (7) days prior to the date set for jury selection. Signed by the Honorable R Bryan Harwell on 11/13/2013. (hcic) (Entered: 11/14/2013)** |
| 11/25/2013 | 33 | NOTICE OF JOINDER re 1 Complaint by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # 1 Exhibit Consent to Become a Party Plaintiff - Gardner)(Ward, James) (Entered: 11/25/2013) |
| 12/11/2013 | 35 | ANSWER to 26 Third Party Complaint, by Joseph B Hargadon.(Luse, William) (Entered: 12/11/2013) |
| 12/11/2013 | 36 | SUMMONS Returned Executed by Crazy Horse Saloon and Restaurant Inc. Joseph B Hargadon served on 11/13/2013, answer due 12/4/2013; Modified on 12/12/2013 to correct event type and to replace with corrected document provided by filing user. (prou, ) (Entered: 12/12/2013) |
| 02/05/2014 | 37 | MOTION to Amend/Correct *Complaint* by Alexis Degidio. Response to Motion due by 2/24/2014. (Attachments: # 1 Exhibit First Amended Class/Collective Action Complaint)No proposed order.(Ward, James) (Main Document 37 and attachment 1 replaced on 2/5/2014 with corrected documents provided by filer) (hcic, ). (Entered: 02/05/2014) |
| 02/07/2014 | 38 | NOTICE of Informal Telephone Conference: Informal Telephone Conference set for 2/11/2014 at 9:15 AM before the Honorable R Bryan Harwell. Defense counsel should initiate the call and have all parties on the line before calling Chambers at 843-676-3800. (hcic, ) (Entered: 02/07/2014) |
| 02/10/2014 | 39 | RESPONSE in Opposition re 37 MOTION to Amend/Correct *Complaint of Plaintiff* Response filed by Crazy Horse Saloon and Restaurant Inc.Reply to Response to Motion due by 2/21/2014 (Attachments: # 1 Exhibit A Plaintiff's Responses to Defendants First Set of Interrogatories and Request for Production)(Young, William) (Entered: 02/10/2014) |
| 02/21/2014 | 40 | REPLY to Response to Motion re 37 MOTION to Amend/Correct *Complaint Reply In Support of Motion to Amend Complaint* Response filed by Alexis Degidio. (Attachments: # 1 Exhibit 1-Responses to Plaintiffs First Set of |

vii

| | | |
|---|---|---|
| | | Interrogatories)(Ward, James) Modified on 2/24/2014 to add descriptive name to exhibit (hcic, ). (Entered: 02/21/2014) |
| 05/29/2014 | 41 | **ORDER granting 37 Motion to Amend/Correct Complaint. Signed by The Honorable R Bryan Harwell on 5/29/2014. (hcic, ) (Entered: 05/29/2014)** |
| 05/29/2014 | 42 | AMENDED COMPLAINT against Crazy Horse Saloon and Restaurant Inc, filed by Alexis Degidio. (hcic, ) (Entered: 05/29/2014) |
| 06/06/2014 | 43 | Consent MOTION for Confidentiality Order by Alexis Degidio. Response to Motion due by 6/23/2014. Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) Modified on 6/9/2014 to replace with corrected document provided by filing user (prou, ). (Entered: 06/06/2014) |
| 06/10/2014 | 44 | **CONSENT CONFIDENTIALITY ORDER granting 43 Motion for Confidentiality Order Signed by Honorable R Bryan Harwell on 6/10/2014.(prou, ) (Entered: 06/10/2014)** |
| 06/13/2014 | 45 | AMENDED ANSWER to *Amended Complaint of Plaintiff* by Crazy Horse Saloon and Restaurant Inc. (Young, William) (Entered: 06/13/2014) |
| 06/19/2014 | 46 | Joint MOTION to Amend/Correct 32 Scheduling Order, by Alexis Degidio, Crazy Horse Salon and Restaurant Inc, and Jospeh B Hargadon. Response to Motion due by 7/7/2014. Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) Modified on 6/20/2014 to add filers listed on document (hcic, ). (Entered: 06/19/2014) |
| 06/25/2014 | 47 | **TEXT ORDER granting 46 Motion to Amend/Correct Scheduling Order. Signed by the R Bryan Harwell on 6/25/2014. (hcic, ) (Entered: 06/25/2014)** |
| 06/25/2014 | 48 | **AMENDED SCHEDULING ORDER. Discovery due by 9/18/2014, Motions due by 10/17/2014, Rule 26(a)(3) Disclosures due by 12/17/2014, Jury Selection Deadline 2/17/2015, ADR Statement due by 10/17/2014, Mediation Due by 11/17/2014. Motions in limine must be filed at least three weeks prior to 1/20/2015. Responses to motions in limine shall be filed within seven (7) days after the motion is filed. Parties shall furnish the Court pretrial briefs seven (7) days prior to the date set for jury selection. Signed by the Honorable R Bryan Harwell on 6/25/2014. (hcic, ) (Entered: 06/25/2014)** |
| 06/30/2014 | 49 | Case Reassigned to Judge Honorable Bruce Howe Hendricks. Judge Honorable R Bryan Harwell no longer assigned to the case. (suro, ) (Entered: 06/30/2014) |
| 09/12/2014 | 51 | Joint MOTION to Amend/Correct *Scheduling Order* by Alexis Degidio. Response to Motion due by 9/29/2014. (Attachments: # 1 Proposed Order Proposed Amended Scheduling Order)Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 09/12/2014) |
| 09/19/2014 | 52 | **AMENDED SCHEDULING ORDER: Discovery due by 11/17/2014, Motions due by 12/17/2014, Jury Selection Deadline 3/17/2015, Mediation Due by 11/17/2014. Parties shall file and exchange Fed.R.Civ.P. 26(a)(3) pretrial disclosures thirty (30) days prior to the date set for jury selection. Parties shall furnish the Court pretrial briefs seven (7) days prior to the date set for jury selection. Motions in limine must be filed no later than 14** |

| | | |
|---|---|---|
| | | days prior to the date set for trial. Written responses are due seven (7) days thereafter. Signed by Honorable Bruce Howe Hendricks on 9/19/2014. (prou, ) (Entered: 09/19/2014) |
| 09/19/2014 | 53 | **TEXT ORDER granting 51 Motion to Amend/Correct Signed by Honorable Bruce Howe Hendricks on 9/19/2014.(prou, ) (Entered: 09/19/2014)** |
| 10/17/2014 | 55 | ADR STATEMENT/CERTIFICATION by Alexis Degidio(Ward, James) (Entered: 10/17/2014) |
| 10/24/2014 | 56 | ADR STATEMENT/CERTIFICATION by Crazy Horse Saloon and Restaurant Inc (Young, William). Modified on 10/28/2014 to replace with corrected document provided by filing user (prou, ). (Entered: 10/24/2014) |
| 10/27/2014 | 57 | MOTION to Appear Pro Hac Vice by Edwin J. Kilpela, Jr. ( Filing fee $ 250 receipt number 0420-5613948) by Alexis Degidio. Response to Motion due by 11/13/2014. (Attachments: # 1 Affidavit of Edwin J. Kilpela, Jr.)Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) Modified on 10/27/2014 to replace with corrected documents provided by filing user (prou, ). (Entered: 10/27/2014) |
| 10/27/2014 | 58 | **TEXT ORDER granting 57 Motion to Appear Pro Hac Vice for Edwin J. Kilpela, Jr. Signed by Honorable Bruce Howe Hendricks on 10/27/2014. (prou, ) (Entered: 10/27/2014)** |
| 11/10/2014 | 61 | MOTION to Strike 59 Notice of Joinder by Alexis Degidio. Response to Motion due by 12/1/2014. No proposed order.(Ward, James) Modified on 11/12/2014 to remove link to document (prou, ). (Entered: 11/10/2014) |
| 11/12/2014 | 62 | NOTICE OF JOINDER re 1 Complaint by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # 1 Consent to Become a Party Plaintiff - Ungaro)(Ward, James) (Entered: 11/12/2014) |
| 11/12/2014 | 63 | **TEXT ORDER granting 61 Motion to Strike 59 Notice of Joinder Signed by Honorable Bruce Howe Hendricks on 11/12/2014.(prou, ) (Entered: 11/12/2014)** |
| 11/12/2014 | 64 | DELETION OF DOCKET ENTRY NUMBER 59 Reason: Document was deleted per document 63 Text Order granting 61 Motion to Strike 59 Notice of Joinder and direction of Chambers. (prou, ) (Entered: 11/12/2014) |
| 11/20/2014 | 66 | Consent MOTION to Dismiss *JOSEPH HARGADON* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 12/8/2014. Proposed order is being emailed to chambers with copy to opposing counsel.(Young, William) (Entered: 11/20/2014) |
| 12/02/2014 | 67 | **ORDER granting 66 Motion to Dismiss Joseph B Hargadon Signed by Honorable Bruce Howe Hendricks on 12/2/2014.(prou, ) (Entered: 12/02/2014)** |
| 12/16/2014 | 69 | MOTION for Summary Judgment by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 1/5/2015. (Attachments: # 1 Memo in Support, # 2 Exhibit - Defendant's Statement of Undisputed Facts, # 3 Declaration of Brent |

ix

| | | |
|---|---|---|
| | | Clark, # 4 Declaration of Laura Watson, # 5 Declaration of Amy Hensell, # 6 Exhibit - Deposition of Joseph Hargadon, # 7 Exhibit - Deposition of Laurie Callicutt, # 8 Exhibit - Deposition of Jacinda Gardner, # 9 Exhibit - Deposition of John Trowbridge, # 10 Exhibit - Deposition of Michael J. Peter, # 11 Exhibit - Deposition of Alexis Degidio, # 12 Exhibit - Plaintiff's Amended Response to Defendant's First Set of Interrogatories and Request for Production of Documents to Plaintiff, # 13 Case: Balducci vs. Chesterfield County, VA, # 14 Case: Chao vs. Mid-Atlantic Installation Services, # 15 Case: Jane Doe v. CIN-LAN, Inc., # 16 Case: Crystal Hilborn vs. Prime Time Club, Inc., # 17 Case: Lee vs. Vance Executive Protection, # 18 Case: Matson vs. Jiggles)Proposed order is being emailed to chambers with copy to opposing counsel.(Young, William) Modified on 12/18/2014 to add descriptions to exhibits (prou, ). Modified on 12/18/2014; see documents # 72 and # 73 for additional attachments (prou, ). (Entered: 12/16/2014) |
| 12/17/2014 | 70 | MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act by Alexis Degidio. Response to Motion due by 1/5/2015. (Attachments: # 1 Memo in Support, # 2 Exhibit 2 - Proposed Notice, # 3 Exhibit 3 - Watson Dep Excerpts, # 4 Exhibit 4 - Clark Dep Excerpts, # 5 Exhibit 5 - Hargadon Dep Excerpts, # 6 Exhibit 6 - Peter Dep Excerpts, # 7 Exhibit 7 - DeGidio Dep Excerpts, # 8 Exhibit 8 - Davenport Dep Excerpts, # 9 Exhibit 9 - Callicutt Dep Excerpts, # 10 Exhibit 10 - Miller Dep Excerpts, # 11 Exhibit 11 - Trowbridge Dep Excerpts, # 12 Exhibit 12 - VIP Room Price Sheet, # 13 Exhibit 13 - Gardner Dep Excerpts)Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) Modified on 3/19/2015; see document # 95 for Supplement (prou, ). (Entered: 12/17/2014) |
| 12/17/2014 | 71 | MOTION to Certify Class by Alexis Degidio. Response to Motion due by 1/5/2015. (Attachments: # 1 Memo in Support, # 2 Exhibit A - Sign in Sheets, # 3 Exhibit B - Proposed Notice)Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 12/17/2014) |
| 12/17/2014 | 72 | Additional Attachments to Main Document 69 MOTION for Summary Judgment . First attachment description: Declaration of Jack Davenport . (Young, William) (Entered: 12/17/2014) |
| 12/17/2014 | 73 | Additional Attachments to Main Document 69 MOTION for Summary Judgment . First attachment description: Deposition of Brent Clark . (Young, William) (Entered: 12/17/2014) |
| 12/23/2014 | 74 | MOTION for Extension of Time to File Response/Reply 69 Motion for Summary Judgment by Alexis Degidio. Response to Motion due by 1/9/2015. Proposed order is being emailed to chambers with copy to opposing counsel. (Ward, James) Modified on 12/29/2014 to link correct event to associated event (prou, ). (Entered: 12/23/2014) |
| 12/30/2014 | 75 | MOTION for Extension of Time to File Response/Reply as to 70 MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 1/16/2015. Proposed |

X

| | | |
|---|---|---|
| | | order is being emailed to chambers with copy to opposing counsel.(Young, William) (Entered: 12/30/2014) |
| 12/30/2014 | 76 | MOTION for Extension of Time to File Response/Reply as to 71 MOTION to Certify Class by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 1/16/2015. No proposed order.(Young, William) (Entered: 12/30/2014) |
| 01/05/2015 | 78 | **ORDER granting 74 Motion for Extension of Time to File Response/Reply re 69 MOTION for Summary Judgment . Response to Motion due by 1/19/2015. Signed by Honorable Bruce Howe Hendricks on 1/5/2015. (prou, )** (Entered: 01/05/2015) |
| 01/05/2015 | 79 | **ORDER granting 75 Motion for Extension of Time to File Response/Reply re 71 MOTION to Certify Class , 70 MOTION for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act ; granting 76 Motion for Extension of Time to File Response/Reply re 71 MOTION to Certify Class , 70 MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act Responses to Motions due by 1/19/2015. Signed by Honorable Bruce Howe Hendricks on 1/5/2015.(prou, )** (Entered: 01/05/2015) |
| 01/19/2015 | 80 | RESPONSE in Opposition re 70 MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act Response filed by Crazy Horse Saloon and Restaurant Inc.Reply to Response to Motion due by 1/29/2015 (Attachments: # 1 Supporting Documents Affidavit of Laura Watson, # 2 Supporting Documents Hensell Declaration, # 3 Supporting Documents Ross Declaration, # 4 Supporting Documents Grisby Declaration, # 5 Supporting Documents Poisson Declaration, # 6 Supporting Documents DeWeese Declaration, # 7 Supporting Documents Davenport Declaration, # 8 Supporting Documents Clark Declaration, # 9 Supporting Documents Degidio Depo, # 10 Supporting Documents Callicutt Depo, # 11 Supporting Documents Clark Depo, # 12 Supporting Documents Davenport Depo, # 13 Supporting Documents Gardner Depo, # 14 Supporting Documents Haragadon Depo, # 15 Supporting Documents Miller Depo, # 16 Supporting Documents Trowbridge Depo, # 17 Supporting Documents Pls Resp to Ds 1st Set of Interr & RFP, # 18 Supporting Documents Pls Am Resp to Ds 1st Set of Interr & RFP, # 19 Supporting Documents MacGregor v. Farmers Ins Exchange case, # 20 Supporting Documents Anish v. Nat'l Securities Corp case, # 21 Supporting Documents Creten-Miller v. Westlake Hardware Inc case, # 22 Supporting Documents Regan v. City of Charleston SC case, # 23 Supporting Documents Matson v. 7455 Inc case, # 24 Supporting Documents Jones-Turner v. Yellow Enterprise System LLC case, # 25 Supporting Documents Rawls v. Augustine Home Health Care Inc case, # 26 Supporting Documents Simons v. Pryor's Inc case) (Young, William) (Entered: 01/19/2015) |
| 01/19/2015 | 81 | RESPONSE in Opposition re 71 MOTION to Certify Class Response filed by Crazy Horse Saloon and Restaurant Inc.Reply to Response to Motion due by 1/29/2015 (Attachments: # 1 Supporting Documents Aff Laura Watson, # 2 Supporting Documents Hensell Declaration, # 3 Supporting Documents Ross |

xi

| | | |
|---|---|---|
| | | Declaration, # 4 Supporting Documents Grisby Declaration, # 5 Supporting Documents Poisson Declaration, # 6 Supporting Documents DeWeese Declaration, # 7 Supporting Documents Davenport Declaration, # 8 Supporting Documents Clark Declaration, # 9 Supporting Documents Degidio Depo, # 10 Supporting Documents Callicutt Depo, # 11 Supporting Documents Clark Depo, # 12 Supporting Documents Davenport Depo, # 13 Supporting Documents Gardner Depo, # 14 Supporting Documents Hargadon Depo, # 15 Supporting Documents Miller Depo, # 16 Supporting Documents Trowbridge Depo, # 17 Supporting Documents Ps Resp to Ds 1st Set of Interr & RFP, # 18 Supporting Documents Ps Am Resp to Ds 1st Set of Interr & RFP, # 19 Supporting Documents Ealy v. Pinkerton Gov't Services Inc case)(Young, William) (Entered: 01/19/2015) |
| 01/20/2015 | 82 | RESPONSE in Opposition re 69 MOTION for Summary Judgment Response filed by Alexis Degidio.Reply to Response to Motion due by 1/30/2015 (Attachments: # 1 Supporting Documents Response to Defendant's Statement of Undisputed Material Facts, # 2 Exhibit Ex. 1 Degidio Depo. Transcript, # 3 Exhibit Ex. 2 Trowbridge Depo. Transcript, # 4 Exhibit Ex. 3 Callicutt Depo. Transcript, # 5 Exhibit Ex. 4 Miller Depo. Transcript, # 6 Exhibit Ex. 5 Davenport Depo. Transcript, # 7 Exhibit Ex. 6 Clark Depo. Transcript, # 8 Exhibit Ex. 7 Hargadon Depo. Transcript, # 9 Exhibit Ex. 8 Gardner Depo. Transcrip, # 10 Exhibit Ex. 9 Watson 30(b)(6) Depo. Transcript, # 11 Exhibit Ex. 10 Peter Depo. Transcript)(Ward, James). Modified on 1/21/2015 to replace with corrected documents provided by filing user (prou, ). Modified on 3/19/2015; see document # 95 for Supplement (prou, ). (Entered: 01/20/2015) |
| 01/26/2015 | 83 | Joint MOTION for Extension of Time *to File Reply Briefs* by Alexis Degidio. Response to Motion due by 2/12/2015. Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 01/26/2015) |
| 01/27/2015 | 84 | **ORDER granting 83 Motion for Extension of Time. Signed by Honorable Bruce Howe Hendricks on 1/27/2015.(prou, )** (Entered: 01/27/2015) |
| 01/27/2015 | 86 | NOTICE OF JOINDER re 1 Complaint by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # 1 Exhibit Consent to Become a Party Plaintiff-Gareeva)(Ward, James) (Entered: 01/27/2015) |
| 02/09/2015 | 87 | REPLY to Response to Motion re 70 MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act Response filed by Alexis Degidio. (Ward, James) (Entered: 02/09/2015) |
| 02/10/2015 | 88 | REPLY to Response to Motion re 69 MOTION for Summary Judgment *Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment* Response filed by Crazy Horse Saloon and Restaurant Inc. (Attachments: # 1 Supporting Documents Clark Deposition, # 2 Supporting Documents Davenport Declaration, # 3 Supporting Documents DeWeese Declaration, # 4 Supporting Documents Ross Declaration, # 5 Supporting Documents Chao v Mid-Atlantic Installation Services, # 6 Supporting Documents Hilborn v Prime Time Club, # 7 Supporting Documents Lee v Vance Executive Protection, # 8 Supporting Documents Matson v 7455, # 9 Supporting Documents McMurray V LRJ |

**xii**

| | | Restaurants, # 10 Supporting Documents Nimmons v RBC Ins Holdings) (Young, William) (Entered: 02/10/2015) |
|---|---|---|
| 02/17/2015 | 91 | MOTION for Leave to File Sur-Reply to Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 3/6/2015. No proposed order.(Young, William) (Entered: 02/17/2015) |
| 02/18/2015 | 92 | **TEXT ORDER granting 91 Motion for Leave to File Sur-Reply to 87 Plaintiff's Memorandum in Support of re 70 Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) Signed by Honorable Bruce Howe Hendricks on 2/18/2015.(prou, ) (Entered: 02/18/2015)** |
| 02/24/2015 | 93 | SUR REPLY to REPLY to Response to Motion re 70 MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act *Defendant's Sur-reply to Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice* Response filed by Crazy Horse Saloon and Restaurant Inc. (Attachments: # 1 Supporting Documents Austen v Catterton case, # 2 Supporting Documents Billingsley v. Citi Trends case, # 3 Supporting Documents Bobryk v Durand Glass case, # 4 Supporting Documents Espinoza v Galardi South Enter case, # 5 Supporting Documents Kleiner v First Nat Bank of Atl case, # 6 Supporting Documents Morris v Metals case, # 7 Supporting Documents Slavinski v Columbia Ass'n case, # 8 Supporting Documents Stevenson v Great Am Dream case)(Young, William) (Entered: 02/24/2015) |
| 03/18/2015 | 95 | SUPPLEMENT by Alexis Degidio to 70 MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act , 82 Response in Opposition to Motion,,, *Notice of Supplemental Authority.* (Attachments: # 1 Exhibit 1-Lewis v. LB Dynasty Opinion)(Ward, James) (Entered: 03/18/2015) |
| 04/07/2015 | 96 | **TEXT ORDER: In support of their motion for summary judgment (ECF No. 69 ), the defendants rely significantly on the ruling of the South Carolina Court of Appeals in Lewis v. L.B. Dynasty, Inc., 400 S.C. 129, 131, 732 S.E.2d 662, 663 (Ct. App. 2012). On March 18, 2015, the South Carolina Supreme Court reversed the decision in Lewis. See Lewis v. L.B. Dynasty, No. 2012-213376, 2015 WL 1223710 (S.C. Mar. 18, 2015). The defendants' motion for Summary Judgment (ECF No. 69 ) is, accordingly, dismissed without prejudice and with leave to refile within 21 days of this order. The refiled motion should address the holding in Lewis. The plaintiff shall then have 14 days to file a response. Signed by Honorable Bruce Howe Hendricks on 4/7/2015.(prou, ) (Entered: 04/07/2015)** |
| 04/23/2015 | 99 | MOTION for Extension of Time *to Refile Defendant's Motion for Summary Judgment* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 5/12/2015. Proposed order is being emailed to chambers with copy to opposing counsel.(Young, William) (Entered: 04/23/2015) |

**xiii**

| 04/24/2015 | 100 | **ORDER granting 99 Motion for Extension of Time Signed by Honorable Bruce Howe Hendricks on 4/24/2015.(prou, )** (Entered: 04/24/2015) |
|---|---|---|
| 05/04/2015 | 102 | MOTION for Summary Judgment *Refiled* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 5/21/2015. (Attachments: # 1 Supporting Documents refiled Memo in Support, # 2 Supporting Documents refiled Ds Undisputed Facts, # 3 Supporting Documents Decl Jack Davenport, # 4 Supporting Documents Decl Laura Watson, # 5 Supporting Documents Decl Brent Clark, # 6 Supporting Documents Depo Laurie Callicutt, # 7 Supporting Documents Decl Amy Hensell, # 8 Supporting Documents Depo Joe Hargadon, # 9 Supporting Documents Depo Alexis Degidio, # 10 Supporting Documents Depo Brent Clark, # 11 Supporting Documents Depo John Trowbridge, # 12 Supporting Documents Depo Jacinda Gardner, # 13 Supporting Documents Depo Laura Watson, # 14 Supporting Documents Depo MJ Peter, # 15 Supporting Documents Ps Amended Resp to Ds 1st Rogs & RFP, # 16 Supporting Documents Lewis vs. LB Dynasty, # 17 Supporting Documents Balducci vs. Chesterfield, # 18 Supporting Documents Chao vs. Mid-Altantic, # 19 Supporting Documents Jane Doe vs. Cin-Lan, # 20 Supporting Documents Hilborn vs. Prime Time Club, # 21 Violation Rpt Attachments Lee vs. Vnace Exe Protect, # 22 Supporting Documents Matson vs. Jiggles, # 23 Supporting Documents Ruffin vs. Entertainment of The Eastern Pandhandle, # 24 Supporting Documents Nimmons vs. RBS Ins Holdings, # 25 Supporting Documents McMurray vs. LRJ Restaurants Inc, # 26 Supporting Documents Verma vs. 2001 Castor Inc)No proposed order. (Young, William) (Entered: 05/04/2015) |
| 05/13/2015 | 105 | Consent MOTION for Extension of Time to File Response/Reply as to 102 MOTION for Summary Judgment *Refiled* by Alexis Degidio. Response to Motion due by 6/1/2015. Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 05/13/2015) |
| 05/14/2015 | 106 | **TEXT ORDER granting 105 Motion for Extension of Time to File Response/Reply re 102 MOTION for Summary Judgment. Response to Motion due by 5/28/2015. Signed by Honorable Bruce Howe Hendricks on 5/14/2015.(prou, )** (Entered: 05/14/2015) |
| 05/28/2015 | 107 | RESPONSE in Opposition re 102 MOTION for Summary Judgment *Refiled* Response filed by Alexis Degidio.Reply to Response to Motion due by 6/8/2015 (Attachments: # 1 Supporting Documents - Plaintiff's Objections and Responses to Defendant's Statement of Undisputed Material Facts, # 2 Exhibit 1- Degidio Deposition Excerpts, # 3 Exhibit 2- Trowbridge Deposition Excerpts, # 4 Exhibit 3- Callicut Deposition Excerpts, # 5 Exhibit 4- Miller Deposition Excerpts, # 6 Exhibit 5- Davenport Deposition Excerpts, # 7 Exhibit 6- Clark Deposition Excerpts, # 8 Exhibit 7- Hargadon Deposition Excerpts, # 9 Exhibit 8- Gardner Deposition Excerpts, # 10 Exhibit 9- Watson 30b6 Deposition Excerpts, # 11 Exhibit 10- Peter Deposition Excerpts)(Ward, James) (Entered: 05/28/2015) |
| 06/04/2015 | 108 | Consent MOTION for Extension of Time *To FIle Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 6/22/2015. Proposed |

xiv

| | | order is being emailed to chambers with copy to opposing counsel.(Young, William) (Entered: 06/04/2015) |
|---|---|---|
| 06/05/2015 | 109 | **TEXT ORDER granting 108 Motion for Extension of Time to File Reply to Plaintiff's 107 Response in Opposition to Defendant's 102 Motion for Summary Judgment. Signed by Honorable Bruce Howe Hendricks on 6/5/2015.(prou, )** (Entered: 06/05/2015) |
| 06/12/2015 | 111 | REPLY to Response to Motion re 102 MOTION for Summary Judgment *Refiled Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment* Response filed by Crazy Horse Saloon and Restaurant Inc. (Young, William) (Entered: 06/12/2015) |
| 06/24/2015 | 113 | NOTICE of Hearing on Motion ( 102 in 4:13-cv-02136-BHH) MOTION for Summary Judgment *Refiled*, ( 71 in 4:13-cv-02136-BHH) MOTION to Certify Class , ( 70 in 4:13-cv-02136-BHH) MOTION for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act , (42 in 4:13-cv-03399-BHH) MOTION to Certify Class , (43 in 4:13-cv-03399-BHH) MOTION for Conditional Certification of Collective Action , (74 in 4:13-cv-03399-BHH) MOTION for Summary Judgment , (41 in 4:13-cv-03399-BHH) MOTION for Summary Judgment : Motion Hearing set for 7/14/2015 03:00 PM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Honorable Bruce Howe Hendricks. Associated Cases: 4:13-cv-02136-BHH, 4:13-cv-03399-BHH(prou, ) (Entered: 06/24/2015) |
| 06/24/2015 | 114 | NOTICE OF RESCHEDULED HEARING Hearing on Motion ( 102 in 4:13-cv-02136-BHH) MOTION for Summary Judgment Refiled, ( 71 in 4:13-cv-02136-BHH) MOTION to Certify Class, ( 70 in 4:13-cv-02136-BHH) MOTION for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act, (42 in 4:13-cv-03399-BHH) MOTION to Certify Class, (43 in 4:13-cv-03399-BHH) MOTION for Conditional Certification of Collective Action, (74 in 4:13-cv-03399-BHH) MOTION for Summary Judgment, (41 in 4:13-cv-03399-BHH) MOTION for Summary Judgment scheduled for 7/14/2015 at 3:00 PM has been cancelled and rescheduled to: Motion Hearing set for 8/18/2015 03:00 PM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Honorable Bruce Howe Hendricks. Associated Cases: 4:13-cv-02136-BHH, 4:13-cv-03399-BHH(prou, ) (Entered: 06/24/2015) |
| 08/18/2015 | 115 | **Minute Entry. Proceedings held before Honorable Bruce Howe Hendricks: Motion Hearing held on 8/18/2015 re (74 in 4:13-cv-03399-BHH) MOTION for Summary Judgment filed by Country Club Inc, (41 in 4:13-cv-03399-BHH) MOTION for Summary Judgment filed by Jacinda Gardner, (42 in 4:13-cv-03399-BHH) MOTION to Certify Class filed by Jacinda Gardner, (70 in 4:13-cv-02136-BHH) MOTION Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act filed by Alexis Degidio, (71 in 4:13-cv-02136-BHH) MOTION to Certify Class filed by Alexis Degidio, (43 in 4:13-cv-03399-BHH) MOTION Conditional Certification of Collective Action filed by Jacinda Gardner, (102 in 4:13-cv-02136-BHH)** |

**xv**

| | | |
|---|---|---|
| | | **MOTION for Summary Judgment** *Refiled* **filed by Crazy Horse Saloon and Restaurant Inc. Attorneys present: James Holt, Gary Lynch, William Paul Young and Dean Fuchs. Court Reporter Raymond Simmons. Associated Cases: 4:13-cv-02136-BHH, 4:13-cv-03399-BHH(swel, )** (Entered: 08/18/2015) |
| 09/30/2015 | [116](#) | **ORDER granting** [70](#) **Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act; denying** [71](#) **Motion to Certify Class; denying** [102](#) **Motion for Summary Judgment. Signed by Honorable Bruce Howe Hendricks on 9/30/15.**(alew, ) (Entered: 09/30/2015) |
| 10/26/2015 | [117](#) | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and/or for Summary Judgment on Plaintiff's Claim Under State Law for Deductions From Tips* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 11/12/2015. (Attachments: # [1](#) Memo in Support of Motion to Dismiss and/or for Summary Judgment on Plaintiffs Claim Under State Law for Deductions From Tips, # [2](#) Defendant's Statement of Undisputed Material Facts, # [3](#) Declaration of Jack Davenport, # [4](#) Declaration of Laura Watson, # [5](#) Deposition of Plaintiff Alexis Degidio, # [6](#) Deposition of Laura Watson, # [7](#) Deposition of Jack Davenport, # [8](#) Deposition of Laurie Callicutt)No proposed order.(Young, William) (Entered: 10/26/2015) |
| 11/09/2015 | [118](#) | NOTICE OF JOINDER re [1](#) Complaint *Notice of Consent to Join a Collective Action Under the FLSA* by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # [1](#) Supporting Documents Consent Form - Seiber, # [2](#) Supporting Documents Consent Form - Smith)(Ward, James) (Entered: 11/09/2015) |
| 11/10/2015 | [119](#) | NOTICE OF JOINDER re [1](#) Complaint - *Notice of Consent to Join a Collective Action Under the FLSA* by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # [1](#) Supporting Documents - Consent Form - Mezzela, # [2](#) Supporting Documents - Consent Form - Parry)(Ward, James) (Entered: 11/10/2015) |
| 11/12/2015 | [120](#) | RESPONSE in Opposition re [117](#) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and/or for Summary Judgment on Plaintiff's Claim Under State Law for Deductions From Tips - Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss* - Response filed by Alexis Degidio.Reply to Response to Motion due by 11/23/2015 (Ward, James); Modified on 11/13/2015 to replace with corrected document provided by filing user (prou, ). (Entered: 11/12/2015) |
| 11/16/2015 | [121](#) | REPLY to Response to Motion re [117](#) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and/or for Summary Judgment on Plaintiff's Claim Under State Law for Deductions From Tips* Response filed by Crazy Horse Saloon and Restaurant Inc. (Young, William) (Entered: 11/16/2015) |
| 11/30/2015 | [122](#) | NOTICE OF JOINDER re [1](#) Complaint - *Notice of Consent to Join a Collective Action Under the FLSA* - by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # [1](#) Supporting Documents - Consent Form - Baker) (Ward, James) (Entered: 11/30/2015) |

| 12/16/2015 | 123 | NOTICE OF JOINDER re 1 Complaint - *Notice of Consent to Join a Collective Action Under the FLSA* - by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # 1 Supporting Documents - Yee Consent Form, # 2 Supporting Documents - Miller Consent Form)(Ward, James) (Entered: 12/16/2015) |
| --- | --- | --- |
| 01/04/2016 | 124 | NOTICE OF JOINDER re 1 Complaint - *Notice of Consent to Join a Collective Action Under the FLSA* - by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # 1 Supporting Documents - Cavagnaro Consent Form, # 2 Supporting Documents - Martinez Consent Form)(Ward, James) (Entered: 01/04/2016) |
| 01/12/2016 | 125 | NOTICE OF JOINDER re 1 Complaint - *Notice of Consent to Join a Collective Action Under the FLSA* - by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # 1 Supporting Documents - Mills Consent Form, # 2 Supporting Documents - Talamantes Consent Form, # 3 Supporting Documents - Whicker Consent Form)(Ward, James) (Entered: 01/12/2016) |
| 01/14/2016 | 126 | NOTICE OF JOINDER re 1 Complaint - *Notice of Consent to Join a Collective Action Under the FLSA* - by James L Ward, Jr on behalf of Alexis Degidio (Attachments: # 1 Supporting Documents - Moreno Consent Form) (Ward, James) (Entered: 01/14/2016) |
| 02/22/2016 | 127 | MOTION to Dismiss *Opt-In Plaintiff Brissia Martin Talamantes* by Alexis Degidio. Response to Motion due by 3/10/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 02/22/2016) |
| 02/23/2016 | 128 | RESPONSE in Support re 127 MOTION to Dismiss *Opt-In Plaintiff Brissia Martin Talamantes* Response filed by Crazy Horse Saloon and Restaurant Inc. (Young, William) (Entered: 02/23/2016) |
| 02/23/2016 | 129 | **ORDER granting 127 Motion to Dismiss Opt-in PlaintiffBrissia Martin Talamantes Signed by Honorable Bruce Howe Hendricks on 2/23/2016. (prou, ) (Entered: 02/23/2016)** |
| 02/26/2016 | 130 | MOTION to Dismiss *Opt-In Plaintiff Ornella Cavagnaro* by Alexis Degidio. Response to Motion due by 3/14/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 02/26/2016) |
| 02/29/2016 | 131 | **ORDER granting 130 Motion to Dismiss Opt-in Plaintiff Ornella Cavagnaro Signed by Honorable Bruce Howe Hendricks on 2/29/2016. (prou, ) (Entered: 02/29/2016)** |
| 06/03/2016 | 132 | **ORDER AND OPINION: It is hereby ORDERED that Defendant's motion to dismiss (ECF No. 117 ) is DENIED. In light of this Order, Plaintiff may re-file her motion for class certification under Rule 23. Plaintiff should submit a proposed order with her motion to certify class. Signed by Honorable Bruce Howe Hendricks on 6/3/2016.(prou, ) (Entered: 06/03/2016)** |
| 06/10/2016 | 133 | MOTION to Amend/Correct 132 Order on Motion to Dismiss for Failure to State a Claim, *and to Certify South Carolina Payment of Wages Act Questions* |

xvii

| | | |
|---|---|---|
| | | *to the South Carolina Supreme Court* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 6/27/2016. No proposed order.(Young, William) (Entered: 06/10/2016) |
| 06/27/2016 | 134 | RESPONSE in Opposition re 133 MOTION to Amend/Correct 132 Order on Motion to Dismiss for Failure to State a Claim, *and to Certify South Carolina Payment of Wages Act Questions to the South Carolina Supreme Court*. Response filed by Alexis Degidio.Reply to Response to Motion due by 7/8/2016 (Ward, James). Modified on 6/28/2016 to replace with corrected document provided by filing user (prou, ). (Entered: 06/27/2016) |
| 07/05/2016 | 135 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's Response in Opposition to D's Motion to Alter or Amend the Court's Order Dated June 3, 2016* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 7/22/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Young, William) (Entered: 07/05/2016) |
| 07/06/2016 | 136 | **TEXT ORDER granting 135 Motion for Extension of Time to File Response/Reply re 133 MOTION to Amend/Correct 132 Order on Motion to Dismiss for Failure to State a Claim, and to Certify South Carolina Payment of Wages Act Questions to the South Carolina Supreme Court. Reply due by 7/18/2016. Signed by Honorable Bruce Howe Hendricks on 7/6/2016.(prou, ) (Entered: 07/06/2016)** |
| 07/06/2016 | 137 | NOTICE of Hearing: Jury Selection set for 8/24/2016 09:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Honorable Bruce Howe Hendricks. Jury Trial set for 9/6/2016-9/9/2016 09:30 AM in Florence #1, McMillan Federal Bldg, 401 W Evans St, Florence before Honorable Bruce Howe Hendricks. (Attachments: # 1 Standing Order)(prou, ) (Entered: 07/06/2016) |
| 07/15/2016 | 138 | REPLY to Response to Motion re 133 MOTION to Amend/Correct 132 Order on Motion to Dismiss for Failure to State a Claim, *and to Certify South Carolina Payment of Wages Act Questions to the South Carolina Supreme Court* Response filed by Crazy Horse Saloon and Restaurant Inc. (Young, William) (Entered: 07/15/2016) |
| 07/15/2016 | 139 | MOTION to Certify Class *Plaintiff's Renewed Motion for Rule 23 Class Certification* by Alexis Degidio. Response to Motion due by 8/1/2016. (Attachments: # 1 Memo in Support of Plaintiff's Renewed Motion for Rule 23 Class Certification, # 2 Exhibit 1 - Lynch Declaration and Firm Resume, # 3 Exhibit 2 - Proposed Class Notice)Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 07/15/2016) |
| 07/20/2016 | 140 | **ORDER denying 133 Motion to Alter and Amend and Motion to Certify. Signed by the Honorable Bruce Howe Hendricks on 7/20/2016. (hcic, ) (Entered: 07/20/2016)** |
| 07/27/2016 | 141 | Joint MOTION to Amend/Correct 137 Notice of Hearing, *Joint Motion to Modify Scheduling Order* by Alexis Degidio. Response to Motion due by 8/15/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Ward, James) (Entered: 07/27/2016) |

xviii

| 07/28/2016 | 142 | **SCHEDULING ORDER: Defendant shall respond to Plaintiff's motion for class certification [ECF No. 139] on or before August 12, 2016. The jury selection and trial dates set forth in the Court's order of July 6, 2016, are cancelled, to be rescheduled at a later date. Plaintiffs ID of Expert Witness due by 10/6/2016, Defendants ID of Expert Witnesses due by 11/10/2016, Records Custodian Affidavit due by 10/20/2016, Discovery due by 12/9/2016. All decertification motions, Daubert motions, and all other motions, except those to complete discovery, those nonwaivable motions made pursuant to Fed. R. Civ. P. 12, and those relating to the admissibility of evidence at trial (other than Daubert motions), shall be filed on or before December 30, 2016. The Court will schedule a conference to set the remaining pretrial and trial deadlines after the deadlines above have passed. Signed by Honorable Bruce Howe Hendricks on 7/28/2016. (prou, )** (Entered: 07/28/2016) |
|---|---|---|
| 07/28/2016 | 143 | **TEXT ORDER granting 141 Motion to Amend/Correct Signed by Honorable Bruce Howe Hendricks on 7/28/2016.(prou, )** (Entered: 07/28/2016) |
| 07/28/2016 | 144 | NOTICE of Cancellation of Hearing: Jury Selection set for 8/24/2016 at 9:30 AM and Jury Trial set for 9/6/2016-9/9/2016 at 9:30 AM have been cancelled. (prou, ) (Entered: 07/28/2016) |
| 08/11/2016 | 146 | MOTION Certify Uncertain Questions *of State Law Raised in Defendant's Motion for Summary Judgment to the South Carolina Supreme Court and Corresponding Memorandum in Support* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 8/29/2016. No proposed order. (Young, William) (Entered: 08/11/2016) |
| 08/11/2016 | 147 | RESPONSE in Opposition re 139 MOTION to Certify Class *Plaintiff's Renewed Motion for Rule 23 Class Certification Defendant's Brief in Opposition to Plaintiff's Renewed Motion for Rule 23 Class Certification* Response filed by Crazy Horse Saloon and Restaurant Inc.Reply to Response to Motion due by 8/22/2016 (Attachments: # 1 Affidavit Affidavit of Laura Watson, # 2 Exhibit Kenya Miller Agreement/Acknowledgment, # 3 Exhibit Sarah Wicker Agreement/Acknowledgments, # 4 Exhibit Laura Parry Agreement/Acknowledgments, # 5 Exhibit Anastasia Martinez Agreement/Acknowledgment, # 6 Exhibit Shawna Baker Agreement/Acknowledgement, # 7 Exhibit Jordan Smith Agreement/Acknowledgment, # 8 Exhibit Milcah Moreno Agreement/Acknowledgements, # 9 Exhibit Savannah Seiber Agreement/Acknowledgments, # 10 Exhibit Kelli Mills Agreement/Acknowledgment)(Young, William) (Entered: 08/11/2016) |
| 08/22/2016 | 148 | REPLY to Response to Motion re 139 MOTION to Certify Class *Plaintiff's Renewed Motion for Rule 23 Class Certification - Reply In Support of Renewed Motion for Class Certification* - Response filed by Alexis Degidio. (Ward, James) (Entered: 08/22/2016) |
| 08/29/2016 | 149 | RESPONSE in Opposition re 146 MOTION Certify Uncertain Questions *of State Law Raised in Defendant's Motion for Summary Judgment to the South Carolina Supreme Court and Corresponding Memorandum in Support* - |

**xix**

| | | |
|---|---|---|
| | | *Plaintiff's Response in Opposition to Defendant's Second Motion to Certify Questions of State Law to the South Carolina Supreme Court* - Response filed by Alexis Degidio.Reply to Response to Motion due by 9/9/2016 (Ward, James) (Entered: 08/29/2016) |
| 09/06/2016 | 150 | REPLY to Response to Motion re 146 MOTION Certify Uncertain Questions *of State Law Raised in Defendant's Motion for Summary Judgment to the South Carolina Supreme Court and Corresponding Memorandum in Support Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion to Certify Uncertain Questions of State Law Raised in Defendant's Motion for Summary Judgment to the South Carolina Supreme Court* Response filed by Crazy Horse Saloon and Restaurant Inc. (Young, William) (Entered: 09/06/2016) |
| 10/31/2016 | 151 | **TEXT ORDER: In its 132 Order issued June 3, 2016, the Court allowed Plaintiff to re-file her motion for class certification under Rule 23 and expressly directed her to submit a proposed order with her motion to certify class. Although Plaintiff re-filed her 139 motion to certify on July 15, 2016, the Court has not yet received a proposed order. The Court asks that Plaintiff's counsel submit a comprehensive proposed order that sets out the particular facts and particular standards relevant to the motion and applies them to the law. Counsel is directed to submit this proposed order within thirty (30) days, by November 30, 2016. Signed by Honorable Bruce Howe Hendricks on 10/31/2016. (prou, ) (Entered: 10/31/2016)** |
| 10/31/2016 | 153 | Defendant's Motion to Dismiss Claims of Opt-Ins to Conditionally Certified FLSA Action and to Compel Arbitration by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 11/17/2016. (Attachments: # 1 Memo in Support D's Brief in Support of its Motion to Dismiss Claims and to Compel Arbitration, # 2 Exhibit 1 - Jordan Smith, # 3 Exhibit 2 - Laura Parry, # 4 Exhibit 3 - Savannah Seiber, # 5 Exhibit 4 - Shawna Baker, # 6 Exhibit 5 - Anastasia Martinez, # 7 Exhibit 6 - Kenya Miller, # 8 Exhibit 7 - Sarah Wicker, # 9 Exhibit 8 - Kelli Mills, # 10 Exhibit 9 - Milcah Moreno)No proposed order. (Young, William).; Modified on 11/1/2016 to add Motion to Dismiss and to edit text (prou, ). (Entered: 10/31/2016) |
| 11/10/2016 | 154 | MOTION for Extension of Time to Amend *Joint Motion to Modify Scheduling Order* by Crazy Horse Saloon and Restaurant Inc. Response to Motion due by 12/1/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Young, William) (Entered: 11/10/2016) |
| 11/10/2016 | 155 | **TEXT ORDER granting 154 Motion to Modify Scheduling Order. Signed by the Honorable Bruce Howe Hendricks on 11/10/2016. (hcic, )** (Entered: 11/10/2016) |
| 11/10/2016 | 156 | **AMENDED SCHEDULING ORDER. Plaintiffs ID of Expert Witness due by 1/16/2017, Defendants ID of Expert Witnesses Due by 2/16/2017, Records Custodian Affidavit due by 1/23/2017, Discovery due by 2/28/2017, Motions due by 4/7/2017. The Court will schedule a conference to set the remaining pretrial and trial deadlines after the deadlines above have passed. Signed by the Honorable Bruce Howe Hendricks on 11/10/2016. (hcic, )** (Entered: 11/10/2016) |

xx

| 11/17/2016 | 157 | RESPONSE in Opposition re 153 First MOTION to Compel *D's Motion to Dismiss Claims of Opt-ins to Conditionally Certified FLSA Action and to Compel Arbitration* MOTION to Dismiss Response filed by Alexis Degidio.Reply to Response to Motion due by 12/1/2016 (Attachments: # 1 Exhibit - Ex. 1. - Email Chain of July 29, 2016, # 2 Exhibit - Ex. 2. - Discovery Served on Kenya Miller)(Ward, James) (Entered: 11/17/2016) |
|---|---|---|
| 11/30/2016 | 158 | REPLY to Response to Motion re 153 First MOTION to Compel *D's Motion to Dismiss Claims of Opt-ins to Conditionally Certified FLSA Action and to Compel Arbitration* MOTION to Dismiss. Response filed by Crazy Horse Saloon and Restaurant Inc. (Young, William); Modified on 12/1/2016 to correct event type. (prou, ) (Entered: 12/01/2016) |
| 01/11/2017 | 159 | NOTICE of Appearance by Thomas Christopher Tuck on behalf of Alexis Degidio (Tuck, Thomas). Modified on 1/12/2017 to replace with corrected document provided by filing user (prou, ). (Entered: 01/11/2017) |
| 01/12/2017 | 160 | Joint MOTION to Stay by Alexis Degidio. Response to Motion due by 1/26/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Proposed Order for Joint Motion to Stay)Proposed order is being emailed to chambers with copy to opposing counsel.(Tuck, Thomas) (Entered: 01/12/2017) |
| 01/17/2017 | 161 | **ORDER granting 160 Motion to Stay Signed by Honorable Bruce Howe Hendricks on 1/17/2017.(prou, ) (Entered: 01/17/2017)** |
| 01/19/2017 | 162 | CERTIFICATE of Counsel by Thomas Christopher Tuck on behalf of Alexis Degidio (Tuck, Thomas) (Entered: 01/19/2017) |
| 01/24/2017 | 163 | MOTION to Withdraw as Attorney by Alexis Degidio. Response to Motion due by 2/7/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order. (Ward, James) (Entered: 01/24/2017) |
| 01/25/2017 | 164 | **TEXT ORDER granting 163 Motion to Withdraw as Attorney. Signed by Honorable Bruce Howe Hendricks on 1/25/2017.(prou, ) (Entered: 01/26/2017)** |
| 01/26/2017 | 166 | **ORDER: Defendant's Motion to Certify Uncertain Questions of State Law, (ECF No. 146 ), is DENIED and Defendant's Motion to Dismiss Claims of Opt-Ins to Conditionally Certified FLSA Action and to Compel Arbitration, (ECF No. 153 ) is also DENIED. Further, upon consideration of Plaintiff's Renewed Motion for Rule 23 Certification, and Defendant's opposition thereto, the Court finds Plaintiff has submitted sufficient evidence to carry her burden to establish that class certification is proper under Fed. R. Civ. P. 23. Plaintiff's Renewed Motion for Rule 23 Class Certification (ECF No. 139 ) is therefore GRANTED. Signed by Honorable Bruce Howe Hendricks on 1/26/2017.(prou, ) (Entered: 01/26/2017)** |
| 02/01/2017 | 168 | NOTICE OF APPEAL as to 166 Order on Motion to Certify Class, Order on Motion for Miscellaneous Relief, Order on Motion to Compel, Order on |

<div align="right">xxi</div>

| | | Motion to Dismiss,,,,,,, by Crazy Horse Saloon and Restaurant Inc. - Filing fee $ 505, receipt number 0420-6975375. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Young, William) (Entered: 02/01/2017) |
| 02/01/2017 | 169 | Transmittal Sheet for Notice of Appeal to USCA re 168 Notice of Appeal. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (prou, ) (Entered: 02/01/2017) |
| 02/09/2017 | 171 | Appeal Remark re 168 Notice of Appeal. Petition for permission to appeal filed by Crazy Horse Saloon and Restaurant Inc. Class Action Fairness Act. (hcic, ) (Entered: 02/09/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/30/2017 11:09:33 | | |
| **PACER Login:** | js0795:2576634:0 | **Client Code:** | Crazy Horse |
| **Description:** | Docket Report | **Search Criteria:** | 4:13-cv-02136-BHH |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

**xxii**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| ALEXIS DEGIDIO, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | Complaint – Class/Collective Action |
| CRAZY HORSE SALOON AND RESTAURANT, INC., d/b/a THEE NEW DOLLHOUSE, | **JURY TRIAL DEMANDED** |
| Defendant, | |
| v. | |
| JOSEPH HARGADON, | |
| Third-Party Defendant. | |

## FIRST AMENDED CLASS/COLLECTIVE ACTION COMPLAINT

Plaintiff Alexis DeGidio ("Plaintiff"), individually and on behalf of all similarly situated employees, brings this Class/Collective action lawsuit against Defendant Crazy Horse Saloon and Restaurant, Inc., d/b/a Thee New DollHouse ("Defendant"), seeking to recover for Defendant's violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, the South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-10 to 110, and common law. Plaintiff, on behalf of herself and all others similarly-situated, alleges as follows:

### INTRODUCTION

1.    As explained herein, under applicable federal and state employment laws, all employees are entitled to fair compensation, overtime compensation, and the retention of tips/gratuities received from customers, unless statutorily exempt. Because Plaintiff and the class members are plainly "employees" under the applicable laws, they should have been paid

1

000001

fair wages, given overtime compensation, and allowed to retain all tips/gratuities provided by customers. To avoid complying with these laws designed to protect employees from employer abuse, Defendant improperly classified Plaintiff and other exotic entertainers ("Dancers") as "independent contractors." As a result of this improper classification, Defendant (1) avoided paying Plaintiff and class members at least the applicable minimum wage; (2) regularly required Plaintiff and class members to work in excess of forty hours per week, and then failed to pay them premium overtime compensation; and (3) improperly collected a portion of the tips Plaintiff and other Dancers received from customers. As set forth herein, such conduct is in violation of the applicable state and federal wage and hour laws.

    2.    Dancers, including Plaintiff and her current and former co-workers, work in an "unorganized" industry where many workers are "disenfranchised" by the wide disparities in bargaining power between workers and club owners. *See* Holly Wilmet, *Naked Feminism: The Unionization of the Adult Entertainment Industry*, 7 Am. U.J. Gender Soc. Pol'y & L. 465, 466 (1999).

    3.    Accordingly, adult entertainment clubs, such as those owned and operated by Defendant, are well-positioned to take advantage of Dancers and routinely deny them basic workplace rights.

    4.    Over the past two decades, the United States Department of Labor ("DOL") and courts across the country have recognized that Dancers are employees, not independent contractors, and, accordingly, are entitled to protection under various state and federal wage and hour laws.

    5.    Despite these significant strides, adult night clubs in South Carolina and across the country routinely deny Dancers the basic protections they are accorded under state and

2

federal law. Defendant is no exception. As set forth herein, Defendant regularly deprives Dancers of their rights under federal law, as well as the laws of South Carolina. Plaintiff brings this lawsuit to address these improper pay practices.

## SUMMARY OF CLAIMS

6.      Plaintiff brings this action as a collective action to recover unpaid wages, pursuant to the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA" or the "Act").

7.      In particular, Plaintiff brings this suit on behalf of the following similarly situated persons:

> All current and former Dancers who have worked for Defendant within the statutory period covered by this Complaint, and elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b) ("Nationwide Collective Class").

8.      In addition, Plaintiff also brings this action as a state-wide class action to recover unpaid wages, including inappropriately withheld tips, pursuant to the South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-10 to 110 (the "PWA"), and common law (the "SC State Laws").

9.      Specifically, Plaintiff brings this suit on behalf of a class of similarly situated persons composed of:

> All current and former Dancers who have worked for Defendant in the state of South Carolina during the statutory period covered by this Complaint (the "SC Class").

10.     Plaintiff alleges on behalf of the Nationwide Collective Class that they are: (i) entitled to unpaid minimum wages from Defendant for hours worked for which Defendant failed to pay the mandatory minimum wage, as required by law; (ii) entitled to unpaid overtime wages

3

for all hours worked in excess of forty in a workweek; and (iii) entitled to liquidated damages pursuant to the FLSA, 29 U.S.C. § 201 *et seq.*

11.    Plaintiff alleges on behalf of the SC Class that Defendant violated the South Carolina state laws by, *inter alia*: (i) failing to pay them the appropriate minimum wages for all hours worked; (ii) improperly denying them overtime wages for all hours worked in excess of forty hours in a workweek; and (iii) inappropriately withholding and/or deducting unlawful amounts from the gratuities of the SC Class.

## PARTIES

12.    Plaintiff Alexis DeGidio is a resident of New York who was employed by Defendant as a "Dancer" at its 3102 Highway 17 South, North Myrtle Beach, South Carolina location from 2012 to 2013. While employed by Defendant as a Dancer, Plaintiff was improperly classified as an independent contractor and, consequently, Defendant failed to compensate Plaintiff properly for all hours worked.

13.    Plaintiff consents in writing to be Plaintiff in this action and has filed an executed Consent To Sue form.

14.    Defendant Crazy Horse Saloon and Restaurant Inc., d/b/a Thee New DollHouse, is a South Carolina corporation having a principal place of business at 3102 Highway 17 South, North Myrtle Beach, South Carolina 29582. Defendant employed Plaintiff as a Dancer.

15.    Crazy Horse Saloon and Restaurant, Inc. owns and operates Thee New DollHouse, which offers adult entertainment services including adult exotic dancing in the nature of live performances at various locations, including at 3102 Highway 17 South, North Myrtle Beach, South Carolina 29582. During the relevant time period, Thee New DollHouse is or was also known as "Thee Dollhouse Presents Crazy Horse" and "Thee Dollhouse Myrtle Beach."

4

16.    At all relevant times Defendant has transacted business, including the employment of Dancers, within the state of South Carolina, including within this district.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 201 *et seq.*

18.    This Court also has original subject matter jurisdiction over all claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a putative class action whereby: (i) the proposed Rule 23 class consists of over 100 or more members; (ii) at least some of the members of the proposed class have a different citizenship from Defendant (Defendant is a citizen of South Carolina and Plaintiff DeGidio is currently a citizen of New York); and (iii) the claims of the proposed Rule 23 class exceed $5,000,000.00 in the aggregate.

19.    Further, this Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative facts.

20.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(ii) as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendant is subject to personal jurisdiction in this district.

21.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

22.    The crux of the FLSA and South Carolina state law is, *inter alia*: (i) that all employees are entitled to be paid mandated minimum wages for all hours worked; (ii) that all employees are entitled to premium overtime compensation for all hours worked in excess of forty hours a week; (iii) that all gratuities earned by an employee are the property of the

5

employee; and (iv) that wages cannot be diverted from employees to offset the business expenses of the employer, particularly without the express, freely-given consent of the employees.

23.    Contrary to these basic protections, Defendant improperly classified its Dancers, including Plaintiff, as "independent contractors" despite Defendant's near total control over them.    Consequently, Plaintiff and the members of the Classes were: (i) deprived of the mandated minimum wage for all hours they worked; (ii) deprived of premium overtime compensation for all hours worked in excess of forty per workweek; (iii) forced to improperly share a percentage of their gratuities with Defendant; and (iv) forced to reimburse Defendant for its ordinary business expenses.

24.    Plaintiff and the members of the Nationwide Collective Class are, or were, Dancers who worked at any of Defendant's business locations.

25.    Plaintiff and the members of the SC Class are, or were, Dancers who worked at Defendant's business locations in South Carolina.

26.    Thee New DollHouse is operated by Defendant under uniform policies applicable to all members of the Classes.    Through these policies and procedures, Defendant maintains significant supervision and control over Plaintiff and members of both Classes.

27.    Notwithstanding Defendant's classification of Dancers as independent contractors, as set forth below, due to the amount of control Defendant has over its Dancers, Dancers are legally Defendant's employees.

28.    Defendant has the power to hire and fire Dancers and has specific rules governing the conditions under which Dancers work.

29.    Further, Dancers are required to check in with the podium host and "House Mom" as soon as they arrive for their shift.    Indeed, there is a sign-in book that the House Mom keeps.

6

30.    Rather than pay its Dancers the applicable minimum wage, Defendant classified its Dancers as independent contractors and required its Dancers to pay Defendant in order to work at Defendant's establishment.    Consequently, Defendant does not compensate Dancers in an amount at least equal to the mandated minimum wage for each hour worked during their shift.

31.    Further, Defendant required its Dancers, including Plaintiff and members of the Classes, to pay "House Fees" for each shift that Dancers worked.    The website for Thee New Dollhouse acknowledges the existence of house fees by suggesting to prospective Dancers that there are "Opportunities for free house fees."[1]

32.    Typically, the House Fees range from $25 per shift to $100 per shift and are changed by Defendant without any advance notice to the Dancers.

33.    It is black letter law that tips received by an employee are the employee's tips and an employer has no ownership interest in said tips.    Indeed, according to the DOL's Regulations, "[t]ips are the property of the employee whether or not the employer has taken a tip credit under section 3(m) of the FLSA."    29 C.F.R. § 531.52.    Despite this plain fact, Defendant unlawfully retained a portion of tips Dancers received from Defendant's customers.

34.    Defendant mandates the fees a Dancer may charge customers for her services.    By way of example, Defendant maintains a policy establishing the amount a Dancer is required to charge for private performances.

35.    For example, Defendant mandates that the price of a private "lap dance" for one song is $30, of which a Dancer must pay Defendant $10, and that the price for a private dance for 30 minutes is $300, of which a Dancer must pay Defendant $50.

---

[1] See http://www.theedollhousesc.com/need-a-job/ (accessed Jan. 30, 2014).

7

Appeal: 17-1145     Doc: 14     Filed: 04/07/2017     Pg: 34 of 279

36.     As a result, customers who believe that they are tipping Dancers a certain amount are actually tipping them less, due to the aforementioned deductions taken by Defendant.

37.     As set forth below, these deductions are in contravention of applicable law.

38.     In addition, Defendant also subjects Dancers to mandatory tip-outs.  That is, Dancers are required to pay cash to certain of Defendant's employees.  Importantly, the individuals that Defendant requires its Dancers to share their tips with do not provide customer service.

39.     Upon information and belief, Defendant uses these tips paid by Dancers to offset its ordinary business expenses.  Stated another way, Defendant requires Dancers to pay cash to these individuals so that Defendant can then reduce its labor costs by having the Dancers supplement the compensation Defendant pays its other employees.

40.     The number of individuals Dancers are required to pay is numerous and the tip amount is significant.  Defendant has a *mandatory* tip out policy whereby Dancers must each pay a minimum of (i) $10 to the House Mom, (ii) $5 to the club's DJ, (iii) $5 to the valet attendant, and (iv) $5 to the Floor Host.  The aforementioned amounts are the required minimum "tip."  Defendant's website confirms the existence of minimum tips, by suggesting to prospective Dancers that the club offers "Low minimum tip outs."[2]

41.     As a result of the mandatory house fees and required tip-outs, Dancers sometimes receive little to no actual compensation despite hours of work.

42.     Defendant requires Dancers to wear certain types of clothes, including a "dancer's G-string."  If Dancers do not have such apparel, they are required to purchase their uniforms from the House Mom, and Defendant does not reimburse them for the cost of their uniforms.  In

---

[2] See http://www.theedollhousesc.com/need-a-job/ (accessed Jan. 30, 2014).

000008

addition, Defendant does not pay for the cost of laundering or maintaining these unique uniforms.

43.   Exemplifying the degree of control Defendant has over Plaintiff and members of the Classes, Dancers are not permitted to select their own music.

44.   In short, Defendant maintains significant supervision and control over Plaintiff and members of the Classes and sets the rules governing the conditions under which Dancers work.

45.   Defendant prohibits its Dancers from doing a number of activities while on duty. Such prohibitions include: (i) leaving the stage until the end of the Dancer's routine unless excused by the DJ, (ii) changing into street clothes before the end of the Dancer's shift, (iii) wearing certain types of platform shoes and/or certain kinds of underwear, (iv) chewing gum while at work, (v) using profane language with a customer, and (vi) discussing the terms of a Dancer's compensation with a customer (*i.e.,* what portion of a "lap dance" a Dancer keeps).

46.   The extent of Defendant's control over its Dancers is demonstrated by the fact that Dancers were prohibited from performing at any competing clubs during the same period they worked for Defendant.

47.   Defendant has been unjustly enriched to the detriment of the Classes by: (i) requiring Dancers to pay money out of their tips to pay for the ordinary business expenses of Defendant; (ii) requiring Dancers to forfeit a portion of their tips to Defendant; (iii) paying Dancers less than the mandated minimum wage while failing to comply with the requirements for doing so; and (iv) failing to pay Dancers premium overtime compensation for all hours worked in excess of forty in a workweek.

9

48.    Further evidencing Defendant's unjust enrichment, when Plaintiff and members of the Classes appear outside the club on Defendant's behalf, they receive no remuneration for their time.

49.    In addition, Defendant does not compensate Plaintiff or other members of the Classes for Defendant's use of the Dancers' image on Defendant's website and/or Facebook page.

50.    At all times relevant to this Complaint, Plaintiff believed she was an employee of Defendant. Indeed, Plaintiff made appearances at public events representing herself as a Dancer of Defendant and advertising Defendant's business.

51.    Evidence generally reflecting the number of uncompensated hours worked by Dancers is in the possession of Defendant.

52.    While Plaintiff is unable to state at this time the exact amount owed to the Classes, Plaintiff believes that such information will become available during the course of discovery. Irrespective of the foregoing, when an employer fails to keep complete and accurate time records, employees may establish the hours worked solely by their testimony and the burden of overcoming such testimony shifts to the employer. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).

## CLASS & COLLECTIVE ACTION ALLEGATIONS

53.    Plaintiff brings this action on behalf of the Nationwide Collective Class as a collective action pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 207 and 216(b). Plaintiff also brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the SC Class for claims under the South Carolina state laws.

10

54.    The claims under the FLSA may be pursued by those who opt in to this case pursuant to 29 U.S.C. § 216(b).  The claims brought pursuant to the South Carolina state laws may be pursued by all similarly-situated persons who do not opt out of the SC Class pursuant to Fed. R. Civ. P. 23.

55.    Upon information and belief, the members of each of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of the members of these Classes is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are over one hundred individuals in each of the Classes.

56.    Defendant has acted or has refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole appropriate.

57.    The claims of Plaintiff are typical of the claims of the Classes she seeks to represent.  Plaintiff and the members of the Classes work or have worked for Defendant and were subject to the same compensation policies and practices, including not being compensated for all hours worked.

58.    Common questions of law and fact exist as to the Classes that predominate over any questions only affecting them individually and include, but are not limited to, the following:

     (a)    whether Plaintiff and members of the Classes were improperly classified as independent contractors by Defendant;

     (b)    whether Defendant has failed to pay minimum wages to Plaintiff and members of the Classes for each hour worked;

     (c)    whether Plaintiff and members of the Classes were required to pay Defendant, in cash, fees for each shift worked;

     (d)    whether Defendant improperly retained and/or diverted any portion of Plaintiff and Dancers' tips;

     (e)    whether Defendant has failed to pay overtime compensation to Plaintiff and members of the Classes for all hours worked in excess of forty hours per workweek;

11

(f)   whether Defendant provided proper notice to Plaintiff and members of the Classes before setting or changing their compensation;

(g)   whether Plaintiff and members of the Classes are entitled to compensatory damages, and if so, the means of measuring such damages;

(h)   whether Plaintiff and members of the Classes are entitled to restitution; and

(i)   whether Defendant is liable for attorneys' fees and costs.

59.   Plaintiff will fairly and adequately protect the interests of the Classes as her interests are aligned with those of the members of the Classes.  Plaintiff has no interests adverse to the Classes she seeks to represent, and she has retained competent and experienced counsel.

60.   The class action/collective action mechanism is superior to other available methods for a fair and efficient adjudication of this controversy.  The damages suffered by individual members of the Classes may be relatively small when compared to the expense and burden of litigation, making it virtually impossible for members of the Classes to individually seek redress for the wrongs done to them by Defendant.

61.   Plaintiff and the Classes she seeks to represent have suffered and will continue to suffer irreparable damage from Defendant's illegal pay practices.

62.   Defendant has acted willfully and has engaged in a continuing violation of the FLSA and South Carolina state laws.

**FIRST CLAIM FOR RELIEF**
**FAIR LABOR STANDARDS ACT MINIMUM WAGE VIOLATIONS**
**(On Behalf of the Nationwide Collective Class)**

63.   Plaintiff, on behalf of herself and the Nationwide Collective Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

64.   At all relevant times, Defendant has had gross revenues in excess of $500,000.

12

65.    At all relevant times, Defendant has been, and continues to be, an employer engaged in interstate commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

66.    At all relevant times, Defendant has employed, and/or continues to employ, Plaintiff and each of the Nationwide Collective Class Members within the meaning of the FLSA.

67.    Pursuant to Defendant's compensation policies, rather than pay Dancers the federally-mandated minimum wage, Defendant improperly classified Plaintiff and other Dancers as independent contractors.

68.    As a result of Defendant's willful practices, Defendant was not entitled to pay Plaintiff and the members of the Nationwide Collective Class less than the mandated minimum wage for all hours worked.

69.    Defendant has violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.* The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

70.    Due to Defendant's FLSA violations, Plaintiff, on behalf of herself and the members of the Nationwide Collective Class, is entitled to recover from Defendant compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs and disbursements of this action pursuant to 29 U.S.C. § 216(b).

### SECOND CLAIM FOR RELIEF
### FAIR LABOR STANDARDS ACT OVERTIME WAGE VIOLATIONS
#### (On Behalf of the Nationwide Collective Class)

71.    Plaintiff, on behalf of herself and the Nationwide Collective Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

72.    At all relevant times, Defendant has had gross revenues in excess of $500,000.

0000013

73.    At all relevant times, Defendant has been, and continues to be, an employer engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

74.    At all relevant times, Defendant has employed, and/or continues to employ, Plaintiff and each of the Nationwide Collective Class Members within the meaning of the FLSA.

75.    At relevant times in the period encompassed by this Complaint, Defendant had, and maintains, a willful policy and practice of refusing to pay premium overtime compensation for all hours worked in excess of forty hours per workweek due to Defendant's improper classification of Plaintiff and Dancers as independent contractors.

76.    Defendant has violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.* The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

77.    Due to Defendant's FLSA violations, Plaintiff, on behalf of herself and the members of the Nationwide Collective Class, is entitled to recover from Defendant compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs and disbursements of this action pursuant to 29 U.S.C. § 216(b).

### THIRD CLAIM FOR RELIEF
### SOUTH CAROLINA PAYMENT OF WAGES ACT
### (On Behalf of the SC Class)

78.    Plaintiff, on behalf of herself and the members of the SC Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

79.    At all relevant times, Defendant has employed, and/or continues to employ, Plaintiff and each of the SC Class Members within the meaning of the South Carolina Payment

14

000014

of Wages Act, S.C. Code Ann. §§ 41-10-10 to 110 ("PWA"). Plaintiff and the SC Class Members are "employees" and are under the control and direction of Defendant.

80.    Plaintiff and the SC Class Members worked for Defendant with the clear understanding and agreement by Defendant that their compensation would be consistent with all applicable laws, including federal and state wage and hour laws.

81.    Pursuant to the PWA, "[a]n employer shall not withhold or divert any portion of an employee's wages unless the employer is required or permitted to do so by state or federal law . . . ." Accordingly, Plaintiff and the members of the SC Class were entitled to receive all compensation due and owing to them.

82.    As a result of Defendant's unlawful policies and practices, as set forth above, Plaintiff and the members of the SC Class have been deprived of compensation due and owing, which Defendant promised to pay in its commitment to abide by applicable wage and hour law, and in violation of the PWA's mandate that no wages be withheld or diverted unless required or permitted under applicable law.

83.    Due to Defendant's policy of deducting amounts from the tips of Plaintiff and the SC Class to offset business expenses, Plaintiff and the SC Class were subject to improper deductions from their compensation. Specifically, Defendant unlawfully withheld and diverted monies from the compensation earned by Plaintiff and the SC Class for business expenses of Defendant, including, but not limited to, the cost of employing other workers, in direct violation of the PWA. Plaintiff and the SC Class Members have not expressly and freely given written consent to such deductions, and these deductions were not made in response to a valid wage assignment or deduction order. Such deductions were not for Plaintiff and SC Class Members' benefit.

84.    Defendant has set, reduced, withheld and/or diverted the wages of Plaintiff and the SC Class Members without providing advance notice of such amounts, and absent any lawfully sufficient reason for such conduct.

85.    As a direct and proximate result of Defendant's conduct, Plaintiff and the SC Class have suffered substantial losses and have been deprived of compensation to which they are entitled, including monetary damages in the amount of three times the unpaid wages, as well as costs and reasonable attorneys' fees.

### FOURTH CLAIM FOR RELIEF
### SOUTH CAROLINA COMMON LAW – UNJUST ENRICHMENT
#### (On Behalf of the SC Class)

86.    This Fourth Count is brought in the alternative to the Third Count (violation of the PWA), to the extent that Defendant disavows its agreement to pay Plaintiff and the SC Class in a manner consistent with federal and state wage and hour laws or to the extent that any alleged agreement between the parties is in violation of such laws, and therefore void.  Plaintiff, on behalf of herself and the SC Class Members, re-alleges and incorporates by reference paragraphs 1-77 above as if they were set forth again herein.

87.    Plaintiff and the members of the SC Class were employed by Defendant within the meaning of South Carolina common law.

88.    At all relevant times, Defendant had, and maintains, a willful policy and practice of denying Dancers their full share of gratuities.

89.    During the class period covered by this Complaint, Defendant had, and maintains, a willful policy and practice of having Dancers subsidize Defendant's business expenses by requiring Dancers to pay or "tip" certain individuals a required minimum amount.  Further, Defendant has a willful policy and practice of not paying Dancers for appearances at events outside the club.

16

90.     Plaintiff and Dancers were subjected to unlawful deductions from their gratuities.

91.     Defendant retained the benefits of its unlawful deductions from the gratuities from Plaintiff and Dancers under circumstances which rendered it inequitable and unjust for Defendant to retain such benefits.

92.     Defendant was unjustly enriched by subjecting Plaintiff and Dancers to such unlawful deductions.

93.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the members of the SC Class have suffered injury and are entitled to reimbursement, restitution and disgorgement from Defendant of the benefits conferred by Plaintiff and the SC Class.

94.     Plaintiff, on behalf of herself and the members of the SC Class, is entitled to reimbursement, restitution, and disgorgement of monies received by Defendant.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and/or on behalf of herself and all other similarly situated members of the Nationwide Collective Class and members of the SC Class, prays that the Court grant the following relief:

A.      Designation of this action as a collective action on behalf of the Nationwide Collective Class, and prompt issuance of notice pursuant to 29 U.S.C. § 216(b), apprising class members of the pendency of this action, and permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b);

B.      Designation of the action as a class action under Fed. R. Civ. P. 23 on behalf of the SC Class;

C.      A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the PWA;

17

000017

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 44 of 279

D.    An injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

E.    An award of unpaid minimum wages to Plaintiff and the members of the Classes;

F.    An award of unpaid overtime wages to Plaintiff and the members of the Classes;

G.    Restitution of wages and gratuities improperly retained by Defendant;

H.    An award of liquidated damages to Plaintiff and members of the Classes;

I.    An award of treble damages to Plaintiff and members of the Classes to the extent permitted by S.C. Code Ann. § 41-10-80(C);

J.    An award of costs and expenses of this action together with reasonable attorneys' and expert fees to Plaintiff and members of the Classes; and

K.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Date:  February 5, 2014

Respectfully submitted,

/s/ James L. Ward, Jr.
James L. Ward, Jr. [Fed. ID 6956]
**RICHARDSON, PATRICK, WESTBROOK**
**& BRICKMAN, LLC**
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC 29464
Tel: 843-727-6500
Fax: 843-216-6509

18

Gary F. Lynch
R. Bruce Carlson
Jamisen A. Etzel
**CARLSON LYNCH LTD**
115 Federal Street, Suite 210
Pittsburgh, PA 15212
Tel: 412-322-9243
Fax: 412-231-0246

Benjamin J. Sweet
Edwin J. Kilpela, Jr.
**DEL SOLE CAVANAUGH STROYD LLC**
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: 412-261-2393
Fax: 412-261-2110

000019

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ALEXIS DEGIDIO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:13-cv-02136-RBH |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| CRAZY HORSE SALOON AND RESTAURANT, INC., d/b/a THEE NEW DOLLHOUSE, | ) ) ) ) | |
| v. | ) ) | |
| Joseph Hargadon | ) ) | |
| Defendant. | ) | |

---

**CRAZY HORSE SALOON'S ANSWER AND DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

Defendant Crazy Horse Saloon and Restaurant, Inc. d/b/a Thee New Dollhouse ("Crazy Horse" or "Defendant") files its Answer to Ms. Degidio's Complaint. Unless specifically admitted, Crazy Horse denies the allegations in the Complaint.

## I.
## AFFIRMATIVE DEFENSES

1. The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

2. Plaintiff's claims are barred in whole or in part by the applicable statute of limitations.

3. Some or all of the Plaintiff's claims are barred by the equitable doctrines of estoppel, laches, waiver, and/or unclean hands.

4. Plaintiff cannot satisfy the requirements of a collective action under the Fair Labor Standards Act ("FLSA") and some or all of the Plaintiff's claims are barred because Plaintiff is not similarly situated to the group of individuals she purports to represent.

Jackson Lewis P.C.

000020

5.  Plaintiff cannot satisfy the requirements of a class action under the South Carolina Rules of Civil Procedure and some or all of her claims are barred because Plaintiff is an inadequate representative of the alleged group of individuals who she purports to represent.

6.  Plaintiff cannot obtain certification of a class or collective action because substantial numbers, if not the majority of the putative class that Plaintiff "identifies" in her Complaint — the existence of which the Defendant expressly denies — is antagonistic to Plaintiff's claims and the existence of such a class.

7.  Some or all of the Plaintiff's claims are unsuitable for collective treatment because these are matters in which individual questions predominate and are not appropriate for collective or class treatment.

8.  Some or all of the Plaintiff's claims are unsuitable for collective treatment because, as a practical matter, under these circumstances the collective action mechanism is not superior to other available methods for the fair and efficient adjudication of this controversy.

9.  Some or all of the Plaintiff's claims are unsuitable for collective treatment because any potential damages that could be recovered would be unique, individualized, subject to set-offs, and nominal.

10.  Plaintiff is barred from obtaining legitimate certification of any class or collective action under the Complaint due to the fact that the Plaintiff, who is alleged to have engaged in unlawful activity, would be inadequate to be representative of any putative class.

11.  In the alternative (in the event that the Court were to determine that Defendant was the Plaintiff's employer, which the Defendant expressly denies), Defendant affirmatively pleads that its acts and/or omissions that may be found to have violated the FLSA or

Jackson Shields Yeiser & Holt

000021

other applicable laws occurred in good faith and that there were reasonable grounds for Defendant to believe that its conduct was in conformity with permissible interpretations of the FLSA, SCPWA, and other applicable laws and regulations.

12. Even if Defendant was the employer of Plaintiff (and/or the members of the alleged group which she purports to represent, the existence of which Defendant expressly denies), which the Defendant expressly denies, the Complaint fails to state a claim for which liquidated damages may be granted.

13. The damages that Plaintiff (and/or the members of the alleged group which she purports to represent, the existence of which Defendant expressly denies) are barred to the extent they are speculative in nature

14. Plaintiff's Complaint is barred because Plaintiff (and the members of the alleged group which she purports to represent, the existence of which Defendant expressly denies) agreed that the business relationship between herself and the Defendant was not that of "employee–employer."

15. Plaintiff's Complaint is barred because the Plaintiff (and/or the members of the alleged group which she purports to represent, the existence of which Defendant expressly denies) would be unjustly enriched by awarding any of the relief requested.

16. Plaintiff's claims, as well as any putative class member asserting the same facts as and claims Plaintiff, are barred because they are based on intentional misrepresentations.

17. Plaintiff (and/or the members of the alleged group which she purports to represent, the existence of which Defendant expressly denies) is precluded from relief on the basis of judicial and/or equitable estoppel.

18. Plaintiff (and/or the members of the alleged group which she purports to represent, the

000022

existence of which Defendant expressly denies) is precluded from relief on the basis of
Defendant's detrimental reliance on the Plaintiff's choice and demand, in word and in
deed, NOT to be treated or characterized as an "employee."

19. Plaintiff, as well as any putative class member asserting the same facts as the Plaintiff, is
precluded from relief on the basis that the Plaintiff did not use reasonable care to avoid or
mitigate any actual or implied damages.

20. Even if Defendant was the employer of the Plaintiff (and/or the members of the alleged
group which she purports to represent), which Defendant expressly denies, all or part of
the time for which Plaintiff seeks compensation is non-compensable under the Portal-to-
Portal Act, 29 U.S.C. § 254.

21. Plaintiff, as well as any putative class member asserting the same facts as the Plaintiff, is
precluded from relief on the basis that all rights to recovery have been waived through
Plaintiff's acceptance and performance as a lessee and/or licensee, and receipt of benefits
thereunder.

22. Plaintiff's damages, to the extent they exist at all, as well as any putative class member
asserting the same facts as the Plaintiff, is subject to set-offs, credits and deductions.

23. Even if Defendant was the employer of the Plaintiff (and/or the members of the alleged
group which she purports to represent),, which Defendant denies, the Complaint is barred,
in whole or in part, because some or all of the time for which compensation is sought is *de
minimis* and not compensable.

24. Plaintiff, as well as any putative class member asserting the same facts as the Plaintiff, is
barred by the doctrine of avoidable consequences.

25. Plaintiff's claims, as well as any putative class member asserting the same facts as the
Plaintiff, are barred because the monies collected from the sales of dance performances

4

000023

were not "tips" or "gratuities."

26. Plaintiff's claims, as well as any putative class member asserting the same facts as the Plaintiff, are barred because the FLSA does not apply to licensees, lessees, or independent performers who work for their own advantage on the premises of another, were not denied the minimum standard of living, and did not perform under an arrangement which threatened unfair competition.

27. Plaintiff's claims are subject to the doctrine of *in pari delicto*.

28. Neither Plaintiff nor any member of the group of persons Plaintiff purports to represent (the existence of which Defendant expressly denies) are entitled to some or all of the relief requested in the Complaint because, even if Defendant was her employer and an unlawful practice(s) occurred (both of which Defendant denies), such acts and/or omissions were not committed, countenanced, ratified, or approved by higher management in Defendant's corporate structure.

29. Defendant avers that this action is groundless, unreasonable and frivolous and, accordingly, Defendant is entitled to reasonable attorneys fees and other costs associated with the defense of this action.

30. Defendant reserves the right to plead other affirmative defenses as discovery proceeds.

## II.

In response to the specific averments in Plaintiffs' Complaint, Crazy Horse says:

1. Denied.

2. Denied.

3. Denied.

5

000024

4.   Defendant admits that there have been cases where the Department of Labor and *some* courts have found dancers to be employees while others have held to the contrary that dancers are *not* employees.

5.   Defendant is without information sufficient to form a belief regarding the conduct of other adult night club businesses.  Defendant denies the remainder of the claims in paragraphs 5.

6.   Denied.

7.   Denied.

8.   Denied.

9.   Denied.

10.  Denied.

11.  Denied.

12.  Defendant is without knowledge or information sufficient to form a belief regarding Plaintiff's residence.  Defendant admits that at one time Plaintiff worked for Defendant as a waitress from April 2013 to July 2013. Defendant denies the remainder of the averments in paragraph 12.

13.  Defendant is without knowledge or information sufficient to form a belief regarding Plaintiff's consent to bring this lawsuit, but denies that Plaintiff is entitled to any relief regarding any claim against Defendant.

14.  Defendant admits that it is a South Carolina corporation with a principal address of business at 3001 Hwy 17 South, North Myrtle Beach, South Carolina.  Defendant denies the remainder of the averments in paragraph 14.

15.  Defendant admits that it owns and operates the Crazy Horse Saloon and Restaurant d/b/a Thee Dollhouse, which offers adult nightclub entertainment including adult exotic dancers/performers at its one location at at 3102 Highway 17 South, North Myrtle Beach,

000025

South Carolina 29582. Defendant admits beginning March 1, 2013, Defendant was known as "Thee New Dollhouse." Defendant denies the remainder of the averments in paragraph 15.

16. Defendant admits it has transacted business within the State of South Carolina, but denies the remainder of the averments in paragraph 16.

17. Defendant admits this Court has subject matter jurisdiction of the claims made, but denies that Plaintiff is entitled to any relief.

18. Denied.

19. Denied.

20. Defendant admits venue is proper.

21. Defendant admits that the Court has the authority to issue a declaratory judgment, but denies that a declaratory judgment should issue in this case.

22. The FLSA and SCPWA speak for themselves. Defendant denies either has any applicability to this case.

23. Denied.

24. Defendant admits that Plaintiff was permitted to perform/dance as an entertainer at Defendant's location, but denies the remainder of the averments in paragraph 24.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

29. Defendant admits entertainers were signed in when they arrive to perform/dance for the evening. Defendant denies the remainder of the averments in paragraph 29.

7

30.  Defendant admits entertainers were permitted to perform at Defendant's nightclub and charge customers for dances, earn tips, and were not paid wages by Defendant.  Defendant admits entertainers sometimes paid a lease fee to use the Club's facilities and perform in the nightclub when they arrived after 7:00 p.m.  Defendant denies the remainder of the averments in paragraph 30.

31.  Denied.

32.  Denied.

33.  Denied.

34.  Denied.

35.  Denied.

36.  Denied.

37.  Denied.

38.  Denied.

39.  Denied.

40.  Denied.

41.  Denied.

42.  Defendant admits that entertainers are expected to wear clothes that comply with applicable state and local law and ordinances, that are clean, and are consistent with Defendant's upscale adult nightclub environment.  Defendant denies the remaining averments in paragraph 42.

43.  Denied.

44.  Denied.

45.  Denied.

46.  Denied.

8

000027

47. Denied.

48. Denied.

49. Defendant admits Defendant paid no compensation to Plaintiff, other than as a waitress. Defendant denies the remainder of the averments in paragraph 49.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Defendant answers the incorporated paragraph as previously answered.

64. Defendant admits that since March 2012 it has had gross revenues in excess of $500,000.00. Defendant denies the remainder of the averments in paragraph 64.

65. Admitted, but Plaintiff denies that Plaintiff was ever "employed" by Defendant in any capacity, other than as a waitress.

66. Denied.

67. Denied.

9

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 55 of 279

68. Denied.

69. Denied.

70. Denied.

71. Defendant answers the incorporated paragraphs as previously answered.

72. Defendant admits that since March 2012 it has had gross revenues in excess of $500,000.00. Defendant denies the remainder of the averments in paragraph 71.

73. Admitted, but Plaintiff was never "employed" by Defendant as an entertainer, nor as anything other than a waitress.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. Denied.

82. Denied.

83. Denied.

84. Denied.

85. Denied.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

000029

90. Denied.

91. Denied.

92. Denied.

93. Denied.

94. Denied.

95. Defendant denies Plaintiff is entitled to any relief.

96. Defendant denies all averments in the First Amended Complaint not heretofore admitted or denied.

WHEREFORE, having fully responded to the First Amended Complaint, Defendant prays that the Complaint be dismissed with prejudice, that judgment be entered in favor of Defendant, that Defendant recover against Plaintiff all costs, expenses and reasonable attorneys fees incurred by Defendant, that costs be assessed against Plaintiff and for such other, further, general, and specific relief to which Defendant is entitled.

Respectfully submitted,

/s/ William Paul Young
S.C. Federal ID 05732
William Paul Young, P.A.
P.O. Box 4213
North Myrtle Beach, SC 29597
843-249-9999
843-249-5876 (fax)
pyoung4213@frontier.com

and

Stephen L. Shields (TN Bar #06981)
James L. Holt, Jr. (TN Bar #012123)
Timothy A. Perkins (TN Bar #024657)
JACKSON, SHIELDS, YEISER & HOLT
262 German Oak Drive
Memphis, TN 38018
901-754-8001
901-754-8524 (fax)
*Attorneys for Defendant*

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ALEXIS DEGIDIO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:13-cv-02136-BHH |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| CRAZY HORSE SALOON AND RESTAURANT, INC., d/b/a THEE NEW DOLLHOUSE, | ) ) ) ) | |
| Defendant. | ) ) | |

---

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION
AND JUDICIAL NOTICE**

---

COMES NOW DEFENDANT Crazy Horse Saloon and Restaurant, Inc. d/b/a Thee New Dollhouse ("Defendant" or the "Club"), and files it Response in Opposition to Plaintiff's Motion for Conditional Collective Action Certification and Judicial Notice Pursuant to Section 216(b) of the Fair Labor Standards Act. [DE 70]

**I.
PROCEDURAL HISTORY**

Plaintiff filed this civil action on August 8, 2013, asserting claims against Defendant for alleged minimum wage and overtime pay violations pursuant to the Fair Labor Standards Act ("FLSA"). Defendant filed its Motion for Summary Judgment on December 16, 2014. On December 17, 2014, Plaintiff filed her Motion for Conditional Certification under the FLSA. Plaintiff also filed a Motion for Rule 23 Class Certification for her claims under South Carolina law. [DE 71]

Plaintiff's Motion should be denied for the following reasons:

1. Defendant is entitled to summary judgment on Plaintiff's claims under the Fair Labor

Standards Act (FLSA), thus this Motion is moot.

2. Plaintiff failed to satisfy her burden of proving that her FLSA action is appropriate for conditional certification because:

   a. It is untimely;

   b. Plaintiff failed to show she and potential opt-ins were victims of a common policy or plan that violated the law;

   c. Plaintiff failed to show she is similarly situated to potential opt-ins who desire to opt-in; and

   d. Plaintiff is not a suitable representative of a class.

## II.
## FACTUAL BACKGROUND

Entertainers currently performing at the Club, and who have done so since mid-November, 2014 have entered into a Licensing Lease and Dispute Resolution Agreement (the "Agreement") (Watson Aff. ¶ 3). The Agreement is part of a Entertainer's Information Package given to each Entertainer. As of this date 114 Entertainers have entered into this Agreement. (*See* Watson Aff. ¶ 4 and attached Exhibit A). In addition to the Agreement, each Entertainer was provided explanatory information about arbitration, the lawsuit filed by Plaintiff and her claims including seeking class and collective action on behalf of other Entertainers. Each Entertainer was also advised of her right to opt out of the arbitration provision, and the right to consult an attorney. (*Id.*) There have been no Entertainers who have opted out of the arbitration provision. (*See* Watson Aff. ¶ 6).

Entertainers at the Club are not subject to a schedule, but are allowed to perform when they want. The Entertainers determine, not the Club, what days they come to the Club, what time they arrive and what time they leave. (*See* Ross Decl. ¶ 6; DeWeese Decl. ¶ 6; Hensell Decl. ¶ 7; Davenport Decl. ¶ 14; Pl's Dep. 98 line 25-99 line 10). The Club does not dictate the Entertainer's schedule in any way. (*See* Davenport Decl. ¶ 6). Entertainers are free to work regularly or sporadically (*See* Davenport Decl. ¶ 14). The arrival time of Entertainers is recorded on a sign-in

000032

sheet, but not the departure time or the number of hours they worked (*See* Watson Decl. ¶ 4).   The Club does not control the manner in which Entertainers perform their dances nor does the Club require Entertainers to dance, entertain or perform in any particular way (*See* Hensell Decl. ¶ 10, 12; Davenport Decl. ¶ 7; Pl's Dep. 37:6-38:14; Clark Dep. 31).   Defendant does not schedule whether or when Entertainers come to the Club or when or how the Entertainer performs.   (*See* Davenport Decl. ¶ 7, 14; Pl's Dep. 37:6-38:14; 98:25-99:10; Clark Dep. 31).   The Club does not require Entertainers to attend staff meetings (*See* Davenport Decl. ¶ 14).   Entertainers who do not perform at the Club for a week, a month, or even longer do so without any consequence (*See* Davenport Decl. ¶ 14). Entertainers are not prohibited from performing at other adult oriented clubs or holding down other jobs (*See* Davenport Decl. ¶ 14, Hensell Decl. ¶ 8; Poisson Decl. ¶ 8; Ross Decl. ¶ 7; DeWeese Decl. ¶ 7). The Club does not subject Entertainers to fines or disciplinary actions (*See* Davenport Decl. ¶ 20; Callicutt Dep. 167; Hargadon Dep. 37).

There is no training or instruction provided by the Club on how to be a successful Entertainer, and Entertainer's earning capacity depends completely upon the individual's ability to appeal to guests. (*See* Davenport Decl. ¶ 6, 7).   Entertainers audition and if they meet the Club's standards for physical beauty and appeal (including personality) they are allowed to perform (*See* Davenport Decl. ¶ 7).   Entertainers are free to mingle with the Club's guests and are free to pick and choose the guests for whom they wish to perform (*See* Davenport Decl. ¶ 15).   Unlike employees, Entertainers are allowed to eat meals, consume alcohol, smoke cigarettes and take breaks at their discretion (*See* Davenport Decl. ¶ 21).   Unlike employees are who required to wear a specific uniform, Entertainers are free to make their own choices of outfits as long as they look beautiful and classy.   (*See* Clark Decl. ¶ 5; Clark Dep. 22:8-23, 23:23-24:7; Hensell Decl. ¶ 12, Poisson Decl. ¶ 12)   The Club does not require Entertainers to strictly comply with the Club's stage rotations (*See* Davenport Decl. ¶ 18; Trowbridge Dep. 34-36; Clark Dep. 31), does not control how much Entertainers may charge guests (*See* Davenport Decl. ¶ 9, 10), and does not require

3

Entertainers to perform for specific customers in VIP or other semi-private areas (*See* Hensell Decl. ¶ 10, 12; Davenport Decl. ¶ 15).    Entertainers at the Club are free to develop their own "fan base" and to promote themselves using social media (*See* Clark Decl. ¶ 8).    While it is customary in the gentlemen's club industry for Entertainers to tip club employees whose services are beneficial to the Entertainer's earning potential, the Club does not require Entertainers do so (*See* Davenport Decl. ¶ 12).    Indeed, Club employees are prohibited from asking Entertainers for tips, and employees may be terminated for harassing an Entertainer for a tip.  (*See* Davenport Decl. ¶ 13; Ross Decl. ¶ 12; DeWeese Decl. ¶ 12; Poisson Decl. ¶ 11; Hensell Decl. ¶ 11; Callicutt Dep.43, 157-160; Trowbridge Dep. 44-48, 96-99).

Plaintiff, Alexis Degidio ("Plaintiff") was an Entertainer who performed at various clubs in South Carolina, North Carolina and Florida from about 2004 to the spring of 2013.  (*See* Pl's Am. Response to Interrog. No. 3).    Although Plaintiff is uncertain, how often, how long and on what specific days she performed at Defendant's Club, Defendant has records which indicate she performed at the Club a total of 21 evenings between July 2012 and April 2013.  (*See* Watson Decl. ¶ 9-20).    Although Plaintiff does not know how much money she earned on any of the evenings she performed at Defendant's Club, she has estimated that in 2011 prior to performing at Defendant's Club she earned about $100,000.00 as a performing Entertainer (at what is referred to as the Old Dollhouse).  (*See* Pl's Dep. 119:16-120:8) Plaintiff also estimated that at Defendant's Club she would earn on average between $900.00 and $3,000.00 per week.  (*See* Pl's Am. Responses to Interrog. No. 11; Pl's Responses to Interrog. Nos. 17-18).    As explained in Defendant's Memorandum in Support of Motion for Summary Judgment, Plaintiff cannot establish that she earned less than the compensation required under the FLSA.

In addition to Plaintiff not being able to establish that she earned less than the Federal minimum wage, the facts do not support her claim in this lawsuit that she was an "employee" under the FLSA.  Plaintiff, like other Entertainers, was not paid as a Club employee, and was

4

asked to pay a House Fee if she arrived after 7:00 p.m, which Plaintiff paid about fifty percent (50%) of the time. (*See* Callicutt Dep. 264:24- 265:21)    However, Plaintiff was not treated as an employee.    Defendant enforced no set of rules on her or other Entertainers other than those required by state and local laws. (*See* Davenport Dec. ¶ 4, 16; Clark Decl. ¶ 6; Callicutt Dep. 166-170). Plaintiff admitted that during the period she performed she believed she was an independent contractor. (*See* Pl's Dep. 133:16-134:17)    Plaintiff admitted in her deposition that the Club did not dictate how she performed and that she developed her own style of performing. (*See* Pl's Dep. 37-39)    While Plaintiff expressed a great deal of animosity toward some of the Club's employees, she testified that she remained at the Club because she enjoyed the good relationship she had with General Manager, Joe Hargadon.    In response to the question why she did not go to work elsewhere Plaintiff testified, "[b]ecause I worked for Joe Hargadon that's why." (*See* Pl's Dep. 31-32, 40-41)    It was Hargadon who was the General Manager at the Club over the entire period she was there.    He was in charge of all operations at the Club. (*See* Hargadon Dep. 39:6-40:10; Davenport Decl. ¶ 3, 5)    Plaintiff, who was close friends with Hargadon's wife, testified that Hargadon never treated her unfairly, never lied to her or cheated her out of money, or mistreated her.    (*See* Pl's Dep. 41; Callicutt Dep. 264:3-10)    Plaintiff proclaimed, "I speak in stellar, glowing performance about Joe Hargadon, yes." (*See* Pl's Dep. 41:1-4)

When asked specifically about the rules to which she alleges Entertainers were subjected, she testified that they were "unspoken" rules, and that General Manager "Joe Hargadon didn't enforce any rules." (*See* Pl's Dep 50:4-14)    Despite that assertion, Plaintiff claims that Entertainers were not allowed to perform at other clubs and has suggested that some are required to adhere to a schedule.    However, such allegations are not supported by the facts.    Multiple Entertainers and other employees who have performed and worked at Defendant's Club since it opened in the Spring of 2012, clearly rebut these allegations.    While it is acknowledged that Entertainers are charged a fee for use of the Club's facilities and stages and allowed access to Club guests,

5

Entertainers are not subject to a schedule, are not restricted from performing at other Clubs, are not told how or when they are to perform at the Club or which guests they privately entertain, and are not required to tip Club employees.  (*See* Declarations of Entertainers Hensell, DeWeese, Poisson and Ross)  Defendant not only relies upon the testimony of Entertainers, but also the testimony of its managers and employees. (*See* Declarations of Davenport and Clark as well as deposition excerpts from Miller, Trowbridge, Davenport and Hargadon)

According to Entertainers who knew Plaintiff when she performed at the Club, Plaintiff was not typical of other Entertainers.  (*See* Hensell Decl. ¶ 13 and 14; Poisson Decl. ¶ 13; Davenport Decl. ¶ 23)  Plaintiff as well as her friend and opt-in Jacinda Gardner were notorious cocaine users in the Club and trouble makers, who were there to party and did not conduct themselves as professional Entertainers.  Plaintiff would even bully other Entertainers to not report her cocaine use in the Club's restroom. (*See* Hensell Decl. ¶ 13; Gardner Dep. 45:11-25)  Plaintiff was close friends with Hargadon's wife, and it was Hargadon who allowed to her to be there, whereas Davenport, who was promoted as the next General Manager, would not have allowed Plaintiff to perform there.  (*See* Davenport Decl. ¶ 24) However, Hargadon, who Plaintiff trusted and held in such high regard even admitted that by the time Plaintiff came to Defendant's Club her heart was no longer into being an Entertainer and she really wanted to be employed as a bartender at the Club.  In April 2013, Plaintiff began employment as a cocktail waitress, but did not perform well. *Hargadon again thought the reason was because she had her heart set on being a bartender.  (See* Hargadon Dep. 90:3-93:21) While Hargadon made efforts to allow her an opportunity to try to be a bartender, it was vetoed by David Boehm, the Club's Marketing Director due to her frequent displays of rude and unpleasant demeanor.  After hearing of Boehm's opposition to her being employed as a bartender, Plaintiff angrily departed, never to return again to the Club.  (*See* Hargadon Dep. 92:8-19) About a month later, and after Hargadon resigned in July 2013, Plaintiff filed this lawsuit, thereby beginning a tale of outright misrepresentations and half-truths clearly

6

aimed at exacting her vengeance on the Club and the people who remained there.

In the Memorandum in Support of Law of the instant Motion, Plaintiff's counsel makes the following assertion and prediction:

> "Although Defendant will likely dispute some of Plaintiff's factual assertions regarding the specific policies and practices in place at Dollhouse, the evidence overwhelming demonstrates that Defendant's policies, whatever they precisely happened to be, were uniformly applied to all Entertainers." (Memorandum, p. 25)"

On its face this assertion and prediction innocuously appears to reflect the notion that is often the case in litigation – namely, that reasonable minds can differ on what the facts "precisely happened to be".    However, for reasons that will be more fully explained, this assertion was not made for the purpose of conveying that obvious point.    Instead, the statement, complete with the cavalier use of the phrase "whatever they (the policies and practices) precisely happened to be" is nothing short of a cynical attempt to anticipatorily deflect what Plaintiff's counsel knew fully well would be a wholesale challenge to "facts" asserted in Section II. B. of the Memorandum, that section being entitled "Defendant's Policies and Practices Applicable to all Dollhouse Entertainers."    The misrepresentations found there regarding what the evidentiary record establishes are beyond disgraceful.    They are appalling.

Plaintiff asserts on page 8 of her Memorandum that before an Entertainer begins dancing at the Defendant, "she is told of ... the Club's ... required tip-outs." (Emphasis supplied)    To support this statement Plaintiff cites to the Deposition of Laurie Callicutt at "159:23-160:24."    The relevant discussion actually begins on page 157, where Callicutt testifies that Entertainers are not required to tip anyone.    On page 158 Callicutt testifies that not all of the Entertainers tip her, and that there were many occasions where Plaintiff did not tip her, and that there are no repercussions to Entertainers if they don't tip.    Here is Callicutt's testimony beginning on page 159:10-160:24:

> Q  Do you have a suggested tip?
> A  If they would like to tip me $10.00, they can.    Some girls give more, some give less.
> Q  Where does the $10.00 number come from?
> A  It's just a suggestion.
> Q  Who made suggestion? (SIC)

000037

A    I don't know.
Q    Do you?
A    No.
Q    Does the Manager?
A    I don't know where it came from.
Q    Do you know how the girls were informed about the suggested tip to  - - to you?
A    It's just another part of the orientation.
Q    And so if you're giving the orientation, it would be coming from you. Right?
A    Right.
Q    If you're giving that orientation.
A    If I am.
Q    And if the Managers doing it, he would tell him?
A    Yes.
Q    Okay what other suggested tip are provided, then, to the dancers?
A    It's usually suggested they tip the floormen about $2.00.
Q    Okay. Each one?
A    Huh.
Q    And that would be could be how many working on any given shift?
A    Like I said, anywhere from like three to ten.
Q    Okay.
A    And the DJ, generally about $10.00.
Q    And the Valet, if the Valet the car that's $3.00. Right?
A    Correct.

As can be observed, at no point in her testimony did Mrs. Callicutt indicate that "tip-outs" were "required".   Mrs. Callicutt only makes reference to "suggested" tip amounts which some Entertainers use and others do not.   Indeed, she had previously told Plaintiff's counsel that Entertainers are not required to tip anyone, and that Plaintiff did not tip on many occasions. Plaintiff also cited to the depositions of General Manager, Jack Davenport, and Manager, John Trowbridge, but their testimony does not support Plaintiff's assertion.   Davenport says that he has never heard of dancers being expected to give tips based upon a percentage of what they've earned and that employees of the Club were told by the General Manager Joe Hargadon that an employee can lose their job by requesting a tip (See Davenport Dep. 17:9-18:19).   Hargadon corroborates this in his deposition when he testified, "You can't even – as a floorman, you can't even ask for tip." (See Hargadon Dep. 97:22-23).   Hargadon also testified that he terminated an employee because he was harassing Entertainers for tips.  (See Hargadon Dep. 96:21-97:22; Davenport

8

Decl. ¶ 12, 13). Plaintiff cites to the deposition of Trowbridge at 48:16-19 and 66:9-11 which only confirms that the Entertainers tip. Nowhere does he say Entertainers are "required to tip." Again if one reads beyond the lines cited, Trowbridge further testifies he has never disciplined an Entertainer for not tipping, nor has he ever encouraged an Entertainer to tip more. (*See* Trowbridge Dep. 49:1-8).

Plaintiff's attempt to show that Entertainers are subject to some kind of schedule also illustrates how far the effort to mislead the Court will be carried. Plaintiff cites the depositions of Hargadon and Joe Miller. Hargadon described efforts he might hypothetically make to help an Entertainer with issues, like suggest the Entertainer come in at different times. (*See* Hargadon Dep. 35-36). This was in the context of a broader discussion about how he might approach an Entertainer to help her be successful by helping her look better, by giving her advice, but not telling her what she had to do as if she were an employee. (*See* Hargadon Dep. 33-36). After the passage cited by Plaintiff, Hargadon goes on to explain "there is no schedule". (*Id* at 37:19). Plaintiff's cite to Miller's deposition only establishes that there have been isolated occasions when there were a multitude of guests in the Club and there would not be many Entertainers, and they might be called on the telephone to see if they wanted to come in. (*See* Miller Dep. 23-24). This does not in any way establish that Entertainers were "required" to come in or in any way were "instructed" to report to work like as employee might have been.

Plaintiff makes a significant misrepresentation concerning Defendant taking disciplinary action against Entertainers. Plaintiff states as follows on page 14 of its Memorandum: "Indeed, the day manager testified that he would write down the names of Entertainers who do not go on stage so the closing manager or housemom can discipline them later." The citation Plaintiff provides for this assertion is page 45 line 25 through page 46 line 19 of the deposition of Joe Miller, Defendants Daytime Manager. Here is that testimony along with several lines which both

9

proceed and follow the passage Plaintiff cited, and which Plaintiff again conveniently failed to include:

Q  Okay.  Do you know if dancers are fined for conduct in the club, misconduct?
A  fine?  No.  Not that I'm aware of.
Q  Whose job is it to discipline dancers if their conduct is out of line?
A  I would believe that would be the manager, closing.
Q  The closing manager?
A  Yeah.
Q  But you yourself --
A  I pretty much just open the club, yeah.  If I have any issues with anybody, then -- then I'll just write it down and they'll deal with it.
Q  Okay.  So what kind of issues might you have?
A  Like -- like you said, if she does---if a girl doesn't go on stage, if a girl get – I don't -- like do something to make a guest mad, or if that -- those type of issues.
Q  So you'll keep a running list of that and pass it off to the night guy or --
A  Yes.
Q  -- the house mom?
A  Yes.
Q  Okay.  Have you ever known a dancer to be fired for doing something that you reported to those people?
A  I'm trying to think of -- I can't recall one right off, but I mean...
Q  Has it happened in general?
A  Like if a girl was like caught stealing money and then I reported that and she was fired, yes, but I can't like recall it happening ever or what name or whatever.

Thus, far from establishing that the Defendant "disciplines" its Entertainers, the testimony of Miller establishes that he knows of no instance when anyone was ever "fined or fired" as a result of anything he reported to the Housemom or the night Manager.

Another example is the assertion on page 9 that Defendant mandates the minimum prices Entertainers may charge customers, and are not permitted to go below.  Plaintiff cites the depositions of Hargadon and Davenport but again the testimony does not support the assertion.  In fact the testimony of Davenport directly refutes it, because he describes them as "suggested minimums," which is consistent with the wording of the posting in the dressing room.  (*See* Davenport Dep. 50:5)  Davenport explains that while the Club provides the Entertainers with

10

suggested minimum prices as guidelines "it is left to each individual Entertainer to establish their fee." (*See* Davenport Decl. ¶ 9).

Another example is Plaintiff's assertion on page 13 of her Memorandum that Defendant directs its Entertainers as to where and how to disrobe when they are performing on stage. Plaintiff cites to the Deposition of Joe Miller, the cited passage being 62:3-11. However, this is not at all the testimony of Miller, who merely described the way Entertainers usually do it. Nowhere does Miller say that Entertainers are directed by the Club to disrobe in a certain way.

Another example is the assertion that Defendant did not permit its Entertainers to perform at other Clubs in the area. Hargadon's deposition is cited at 95:8-25. Yet, all this testimony established is that management would rather Entertainers not dance at other clubs, and that there was once an incident when girls were going to the nearby Gold Club and Brent Clark was told about it. Plaintiff avoids informing the Court that Hargadon goes on to say that Entertainers were never told during orientation about being prohibited from dancing at other places. In that regard, Hargadon stated the following "No, no, no, we never mentioned that. It's never part of the orientation". (*See* Hargadon Dep. 96:2-10). Brent Clark, explains in his Declaration that Entertainers are not restricted on where they can perform, and what occurred regarding the nearby Gold Club was a unique circumstance related to dangerous criminal activity that was reportedly occurring there. At most, it was nothing more than a recommendation that Entertainers to go there. Further, Clark stressed to managers the importance of the Club's policy of not restricting Entertainers on where they could perform. (*See* Clark Decl. ¶ 11) Many witnesses, including Entertainers themselves, have made it clear that there was no restriction.

Another example of the liberties Plaintiff has taken finds Plaintiff asserting on page 15 that Entertainers were "required" to participate in promotions. This assertion is again not support by the testimony, and again, but not surprisingly, testimony that contradicts Plaintiff's assertion is

11

omitted. Brent Clark, Defendant's consultant, testified regarding the promotions saying "...Entertainers <u>who want to participate</u> come up..." (*See* Clark Dep. 69:8-22, Emphasis added).

Finally, Plaintiff's assertion, found on page 14 that Entertainers are required to go where they are directed by Club employees is a gross misrepresentation and not supported by the testimony. Trowbridge testified that there are no "punishments" if dancers routinely miss their stage rotation. (*See* Trowbridge Dep. 34:-35:12).   Clark explains how the stage rotations work and that it is the Entertainer's "option" whether to come to the stage.   (*See* Clark Dep. 31:21-33:12 "...we give the Entertainers the opportunity to be elevated above all the other Entertainers on stages.   That gives her an advantage over other Entertainers to be seen by the guest.")   The fact that the club uses a rotation system to give each Entertainer a fair opportunity to be seen and promoted by the DJ, as opposed to a chaotic free for-all, does not establish that the Club is exercising control over the Entertainer as if she were an employee.

Plaintiff's cavalier reference to "Defendant's policies whatever they precisely happened to be" was simply a way of setting the stage for the presentation of assertions that "happen" not be "policies" at all.   There are certainly more examples, though not enough pages to note them all. Enough have been debunked, in the foregoing, however, to warrant Defendant to respectfully urge the Court to exercise extreme caution before accepting any of Plaintiff's assertions regarding Defendant's so-called "policies."

### III.
### ARGUMENT AND CITATION TO AUTHORITY

**1. PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION IS MOOT BECAUSE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FLSA CLAIMS**

As specified in the Defendant's Motion for Summary Judgment, Defendant is entitled to summary judgment on Plaintiff's FLSA claims.  Therefore, Plaintiff's Motion for Conditional Certification is moot.

000042

Defendant contends that Plaintiff was correctly categorized as an independent contractor instead of an employee because Plaintiff agreed to be designated as such; Defendant did not control Plaintiff's work hours or the manner in which Plaintiff performed as an Entertainer (except to prohibit violation of laws inside its Club); Plaintiff bore the risk of her own profit or loss; Plaintiff significantly invested in clothing and accessories for her performances; Plaintiff had to have some degree of skill or talent to perform for Defendant's upscale gentlemen's club; there was no permanent working relationship between Plaintiff and the Club since she could perform whenever she wanted at her leisure and work for other Clubs or employers; and the Entertainer's performances did not constitute the exclusive services rendered by the gentlemen's club. *Schultz v. Capital Int'l Sec. Inc.,* 466 F.3d 298, 305 (4th Cir. 2006). Since Plaintiff was correctly classified as an independent contractor instead of an employee, Defendant had no responsibility to pay Plaintiff minimum wages or overtime under the FLSA.

Even if Plaintiff had been misclassified, the FLSA was not violated because she cannot establish that her earnings were less than minimum wage, or that she worked more than 40 hours in a week. *Monahan v. County of Chesterfield, Va.,* 95 F.3d 1263, 1280 (4th Cir. 1996). Although Plaintiff could not recall the dates or hours she worked and had no documentation of her actual earnings, Plaintiff admitted that she earned between $450.00 and $1,500.00 each week, which equates to earnings of $11.25 per hour, for forty (40) hours, which is or well over the $7.25 per hour minimum wage and far, far above the $2.13 minimum wage for tipped employees[1]. Further, the lowest estimated hourly rate Plaintiff earned was $14.68 per hour according to Defendant's records of Plaintiff's VIP and table dance service charges in combination with Plaintiff's own admissions as to the average number of hours she worked per night. (*See* D's Memo Sum. Judg. at 24-25; P's Resp. to Interr. No. 11; Pl.'s Dep.17:14-15; 18:9-16.)

---

[1] Even if Plaintiff were an "Employee" under the FLSA, she would have been a "tipped" Employee subject to the "tipped" Employee rate. However, since Plaintiff's compensation exceeds even the $7.25 rate, for purpose of this memorandum and to avoid confusion, that rate will be referenced for the most part.

13

000043

Additionally, Plaintiff produced no evidence or documentation demonstrating that she worked over forty hours per week, nor could she specifically recall any overtime worked.  (*See* Pl's Dep. 118-122; Pl's Resp. Request 13; Pl's Am. Resp. Interrog. No. 11, 13.)  Furthermore, Defendant's records indicated that the most hours Plaintiff worked in one week was 31.32 for four days worked during the week of July 23, 2012.  (*See* Watson Decl. ¶ 10.)  Since the evidence indicates that Plaintiff earned well above the $7.25 per hour minimum wage for all hours worked and did not work overtime, Plaintiff cannot establish an FLSA violation.  *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1280 (4th Cir. 1996); *see also Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor*, 337 S.C. 476, 486 (S.C. Ct. App. Oct. 25, 1999) (employee paid over minimum wage could not bring a minimum wage violation under South Carolina law because there was no requisite injury).  Again, Plaintiff's Motion for Conditional Certification is moot because she failed to demonstrate that she is entitled to any relief under the FLSA.

## 2. PLAINTIFF FAILED TO SATISFY HER BURDEN OF PROVING THAT HER FLSA ACTION IS APPROPRIATE FOR CONDITIONAL CERTIFICATION

Pursuant to "29 U.S.C. § 216(b) . . . an FLSA action . . . 'may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.'" *Simmons v. United Mortgage and Loan Investment, LLC*, 634 F.3d 754, 758 (4th Cir. 2011).  However, Defendant submits that the evidence developed to date establishes that Plaintiff cannot meet her burden of establishing that she and her alleged class of putative Entertainers meet the definition of "Employee" under the FLSA.  For reasons set forth below, Defendant submits that the evidence which establishes this conclusion is appropriate for the Court to now consider for purposes of Plaintiff's instant Motion given the late point in the proceedings as which Plaintiff chose to wait to file it.

000044

### A. The Lenient Standard Used in Early Discovery Stages is Inapplicable Because Plaintiff Delayed in Filing the Certification Motion Until After Discovery Closed

In order to provide expeditious management of FLSA collective actions, district courts have been given discretion to conditionally certify collective actions in appropriate cases. *MacGregor v. Farmers Ins. Exchange,* 2012 WL 2974679, at *1 (D.S.C. July 20, 2012); *see also Pelczynski v. Orange Lake Country Club, Inc.,* 284 F.R.D. 364, 367 (D.S.C. 2012)(the goal of conditional certification is to promote judicial efficiency). Certification of collective actions usually involves a two-step process, the initial "conditional certification" stage and then the potential "decertification" stage. *Simons v. Pryor's, Inc.,* 2011 WL 6012484, at *1-2 (D.S.C. 2011); *see also Anderson v. Cagle's, Inc.,* 488 F.3d 945, 952 (11th Cir. 2007).

During the first stage or "notice" stage, courts typically use a more lenient standard to determine if the plaintiff is similarly situated to potential opt-in plaintiffs because those motions are usually brought at an early stage in the litigation when no discovery or limited discovery is available; therefore, the courts are less stringent since they can only review plaintiff's complaint and affidavits at that time. *Pelczynski,* 284 F.R.D. at 367-68. This lenient standard necessarily presumes that a plaintiff has timely requested conditional certification during the early stages of litigation when the parties are still able to take discovery since it would frustrate the goal of conditional collective action certification to expeditiously resolve cases if the Court permitted plaintiffs to request conditional certification after discovery deadlines had passed. *See, e.g., Anderson,* 488 F.3d at 952 ("the lenient standard . . . may be most useful when making a certification decision early in the litigation before discovery has been completed")(*citing Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1217-19 (11th Cir.2001); *Pelczynski,* 284 F.R.D. at 367 (conditional certification is designed to promote judicial efficiency).

This lenient pre-discovery standard is inapplicable in this instance because Plaintiff untimely filed her conditional certification motion after the litigation had already advanced to the post-discovery stage. Although Plaintiff filed this suit sixteen months ago in August of 2013,

15

Plaintiff brought this untimely conditional certification motion after discovery closed at the end of 2014 pursuant to this Court's Scheduling Order. [DE 48]   Since Plaintiff unnecessarily delayed in seeking conditional certification until discovery closed, Plaintiff inherently waived any consideration for conditional certification under this more lenient standard, which has only traditionally been applied by courts in the early stages of discovery as described above.

**B. Plaintiff's Motion for Conditional Certification Should Be Denied Because It Would Necessarily Require the Court To Extend Discovery for a Period of Time Outside of That Authorized by the Scheduling Order**

Since Plaintiff's motion for conditional certification is untimely in that all discovery deadlines have passed, the Court should deny Plaintiff's motion outright.   A grant of conditional certification would necessitate Defendant issuing discovery to all new opt-in plaintiffs. However, Plaintiff did not supply the Court with good cause for a modification of the Court's Scheduling Order regarding the discovery deadline that has already passed pursuant to Rule 16(b)(4). *See, e.g., Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008).   In fact, it is hard to conceive of any good excuse Plaintiff could have had for failing to request conditional certification much earlier if she believed this to be a proper case for a collective action.   Now that discovery has closed, it would prejudice Defendant for notices to be sent to potential opt-in plaintiffs without Defendant having an opportunity to conduct discovery to determine whether Plaintiff and any opt-in plaintiffs are indeed similarly situated.   Even if the Court granted additional time for discovery regarding the opt-ins, such discovery would probably be protracted since each individual Entertainer's performances, like those of Plaintiff herself, were seemingly sporadic and undocumented as far as hours worked or earnings received.   Thus, in order to adequately conduct discovery on each individual potential opt-in, Defendant may unwillingly and significantly delay the litigation, which, antithetically to the very purpose conditional certification is supposed to serve, would contravene judicial economy in an action that has already been pending for sixteen months.   If the Court does somehow find good cause for Plaintiff's delay in seeking conditional

16

000046

certification after discovery has closed, then the Court should at least in its discretion refuse to apply the more lenient "notice" standard, which is reserved for plaintiffs who seek to expedite the judicious resolution of controversies by requesting such conditional certification early in the litigation.

### C. Even Though the More Lenient Conditional Certification Standard is Not Applicable Because Discovery Closed, Plaintiff Still Cannot Meet that Standard

Even if the Court were to apply the more lenient standard that is reserved for cases where discovery is just beginning, Plaintiff still must meet her burden to "'make a modest factual showing sufficient to demonstrate that [she] and potential plaintiffs together were victims of a common policy or plan that violated the law'" in order to qualify for conditional certification. *Comer v. Wal–Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir.2006) (*quoting Roebuck v. Hudson Valley Farms, Inc.*, 239 F.Supp.2d 234, 238 (N.D.N.Y. 2002). Even at this more lenient stage, it is also important that Plaintiff's "allegations [be] supported to some extent by the employers' 'admissions, and other documentary evidence.'" *Anderson*, 488 F.3d at 952. Additionally, conditional certification is "more likely to be appropriate when '[t]he facts and the circumstances of the case illustrate' that a class of 'similarly situated' aggrieved employees exists," and the "multiple claims ... do not require substantial individualized determinations for each class member." *MacGregor*, 2012 WL 2974679 at *2 (quoting *Purdham v. Fairfax Cnty. Pub. Schs.*, 629 F.Supp.2d 544, 547 (E.D.Va.2009) (internal citations omitted). Further, Plaintiff must show not only "'some identifiable factual nexus which binds the named plaintiffs and the potential class members together" but also "evidence that other similarly situated individuals desire to opt in to the litigation.'" *Pelczynski*, 284 F.R.D. at 368 (*quoting Heagney v. Eur. Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y.1988)).

#### 1. Plaintiff Failed to Show Even Modest Facts Proving that She and Potential Opt-ins "Were Victims of a Common Policy or Plan that Violated the Law"

Even if the Court evaluates Plaintiff's request for conditional certification using the more

17

000047

lenient standard that is usually reserved for the early discovery stage of litigation, Plaintiff cannot meet her burden of showing even modest facts demonstrating that she and the potential opt-in plaintiffs "were victims of a common policy or plan *that violated the law*." *Comer*, 454 F.3d at 547 (emphasis added). As explained above, Plaintiff has failed to provide factual evidence indicating that she was compensated below minimum wage or worked overtime; therefore, Plaintiff has provided *no proof that Defendant violated a minimum wage or overtime law*. To the contrary, the evidence before the Court, including Defendant's records and even Plaintiff's own admissions, supports the conclusion that Plaintiff earned well above FLSA minimum wage and, therefore, directly contradicts her contention that she and the potential opt-in plaintiffs "were victims of a common policy or plan *that violated the law*." *Id*. According to Plaintiff's discovery responses and deposition testimony, Plaintiff appears to have earned well over minimum wage, although she was uncertain about how often, how long, or on what specific days she performed at Defendant's Club. While Plaintiff does not recall the amount of money she earned on any of the evenings she performed at Defendant's Club, Plaintiff estimated that at Defendant's Club she would earn on average between $900.00 and $3,000.00 per week with about half of that spent on her costs. (*See* Pl's Am. Resp. to Interrog. No. 11; Pl's Resp. to Interrog. Nos. 17-18). Therefore, Plaintiff cannot establish that she earned less than required under the FLSA.

### 2. *Plaintiff Failed to Support Her Allegations of FLSA Violations With Defendant's Admissions and Other Documentary Evidence*

Furthermore, even at this more lenient stage, courts have emphasized the importance of Plaintiff's "allegations [being] supported to some extent by the employers' 'admissions, and other documentary evidence.'" *Anderson*, 488 F.3d at 952. Plaintiff has produced no admissions from the Defendant nor other documentary evidence supporting her allegations that she earned less than minimum wage or was not compensated for overtime. *Anderson*, 488 F.3d at 952. Even taking into account Plaintiff's estimates of the hours she averaged when she worked, her minimum fee

18

charges for dances and the Club's records of her VIP/couch performances show that she consistently earned more than the minimum wage under the FLSA. (*See* Memo. of Sum. Judg. at 24-25.) The estimated calculations of Plaintiff's hourly earnings using her own testimony and Defendant's records of her performances was $14.68 per hour, as described in detail in Defendant's Motion for Summary Judgment. (*See* Def's Memo. of Sum. Judg. at 24-25; Pl's Resp. to Interrog. No. 11; Pl.'s Dep.17:14-15; 18:9-16.) Therefore, there can be no dispute that Plaintiff was compensated in excess of the $7.25 per hour minimum wage.

Additionally, Plaintiff produced no evidence or documentation demonstrating that she worked over forty hours per week, nor could she specifically recall any overtime worked. (*See* Pl's Dep. 118-122; Pl's Resp. Request 13; Pl's Am. Resp. Interrog. No. 11, 13.) Furthermore, Defendant's records indicated that the most hours she could have possibly worked in one week was 31.32 for four days during the week of July 23, 2012. (*See* Watson Decl. ¶ 10.)

Since the evidence indicates that Plaintiff earned well above the $7.25 per hour minimum wage for all hours worked and did not work overtime, Plaintiff cannot establish an FLSA violation. *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1280 (4th Cir. 1996); *see also Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor*, 337 S.C. 476, 486 (S.C. Ct. App. Oct. 25, 1999) (employee paid over minimum wage could not bring a minimum wage violation under South Carolina law because she suffered no requisite injury).

Since Plaintiff failed to prove her own allegations of an FLSA violation much less to produce any admissions by Defendant or other documentary evidence confirming that some type of FLSA violation was committed against her, it would be futile for the Court to certify this suit as a collective action. *Anderson*, 488 F.3d at 952.

### 3. *Plaintiff Failed to Meet Her Burden to Prove that She is Similarly Situated to the Potential Opt-ins*

Conditional certification is "more likely to be appropriate when '[t]he facts and the circumstances of the case illustrate' that a class of 'similarly situated' aggrieved employees

19

000049

exists." *MacGregor,* 2012 WL 2974679 at \*2 (quoting *Purdham v. Fairfax Cnty. Pub. Schs.,* 629 F.Supp.2d 544, 547 (E.D.Va.2009) (internal citations omitted). Most importantly, the position that Plaintiff has taken in this suit, which is that Entertainers working in Defendant's club should be classified as employees instead of independent contractors, is directly contrary to the expressed desires of many of the potential opt-in plaintiffs, who wish to retain their freedom as independent contractors. Not only have several Entertainers informed Ms. Watson that they already knew about the lawsuit filed by Plaintiff Alexis Degidio, but also the Entertainers have expressed opposition to the suit instead of a desire to join it because they wish to retain their independent contractor status instead of being paid by the Club as employees. (*See* Watson Aff. ¶ 7 and attached Ex. A.) Some Entertainers have even offered their sworn Declarations to Defendant, and a total of 114 Entertainers have entered into agreements with Defendant that not only establish their non-employee status but reject their participation as class members in Plaintiff's suit. (*See* Watson Decl. ¶ 3-7 and attached Ex. A; *See* Decl. Poisson, Grigsby, DeWeese, Ross and Hensell) The Arbitration provision includes a section entitled "Class Action Waiver" where each of the these 114 Entertainers agreed to bring claims only on an individual basis and not as a class or collective action. The Entertainers' opposition alone should alert the Court that if this suit was conditionally certified as a collective action Plaintiff would not be representing the interests of all Entertainers. Indeed, in that case, Plaintiff and the potential opt-ins would not be "'[s]imilarly situated' . . . with respect to the legal . . . issues to be determined," specifically whether such entertainers were misclassified as independent contractors. *Pelczynski v. Orange Lake Country Club, Inc.,* 284 F.R.D. 364, 367 (D.S.C. 2012) *(quoting Kearns, The Fair Labor Standards Act, §* 18.IV.D.3 (citations omitted).

One South Carolina court declined to grant conditional certification in a case where there was no clear record of the plaintiffs' hours or overtime worked, such as in the instant case. *Pelczynski.,* 284 F.R.D. 367-69 (D.S.C. 2012). That Court decided that joinder of those potential

20

opt-in plaintiffs would not promote judicial efficiency but would present the same manageability issues as separate actions. *Id.* Indeed, the management of such a collective action would be difficult because it would require separate individual testimony, credibility findings, and assessment of each plaintiff's claim. *Id.* In this case, the Defendant does not have records showing the hours worked and earnings for each of its Entertainers. Such evidence would have to come from each putative member in terms of what records and/or memory each of them would present. The admissibility of any such records would have to be done on an individual basis as well as a determination of the credibility and reliability of the evidence deemed admissible. (The consequence of this is discussed in sub-section 5 below.)

### 4. *Plaintiff failed to Meet Her Burden to Show That a Sufficient Number of Similarly Situated Individuals Desire to Opt-in*

Plaintiff has failed to satisfy her burden of demonstrating that there are other similarly-situated individuals who desire to participate in this civil action. Plaintiff must show not only "'some identifiable factual nexus which binds the named plaintiffs and the potential class members together" but also "evidence that other similarly situated individuals desire to opt in to the litigation.'" *Pelczynski,* 284 F.R.D. at 368 (*quoting Heagney v. Eur. Am. Bank,* 122 F.R.D. 125, 127 (E.D.N.Y.1988). Only two former Entertainers have elected to participate in this civil action, which has been pending since August 8, 2013. Nor has Plaintiff proffered the affidavit or declaration of any Entertainer indicating that she would participate in this civil action if she were provided notice from the Court. Beyond the two who have filed opt-ins, Plaintiff herself is unaware of any current or former Entertainers who are interested in joining this lawsuit. (*See* Pl's Dep. 113:7-1) Simply put, Plaintiff has failed to meet her burden of demonstrating that other similarly-situated individuals exist who would want to participate in this civil action if they were provided court-facilitated notice. Courts have required the named plaintiff to "proffer some evidence that other similarly situated individuals desire to opt in to the litigation," because, "[i]n the absence of such evidence, there would be no basis upon which the Court could conclude that

21

the action was an 'appropriate case' for collective-action treatment." *Purdam v. Fairfax Cnty. Pub. Sch.,* 629 F.Supp.2d 544, 548 (E.D.Va.2009); *Parker v. Rowland Express, Inc.,* 492 F.Supp.2d 1159, 116465 (D.Minn. 2007) *(relying on Dybach v. Fla. Dep't of Corrections,* 942 F.2d 1562 (11th Cir. 1991) (holding that a district court "should satisfy itself that there are other employees . . . who desire to 'opt-in' before granting conditional certification")). Plaintiff's basis for speculating about the number of "similarly-situated" entertainers who exist and would opt-in if provided notice is legally insufficient to demonstrate a reasonable basis to believe that there are others who desire to opt-in. The bottom line is that no evidence has been presented that there are any others that desire to opt-in.

The *Pelcynski* Court declined to grant conditional certification because, among other manageability issues, there was no benefit to providing a vehicle for a collective action in a case where there was a very limited class of potential members. *Pelczynski.,* 284 F.R.D. 367-69 (D.S.C. 2012). In the instant case, there would also be no benefit to certifying a collective action because there is a limited class of potential members. As stated above, only two retired Entertainers have opted-in to Plaintiff's suit since it was filed in August of 2013, and 114 Entertainers voluntarily signed arbitration agreements retroactively precluding them from pursuing litigation. (*See* Watson Aff. ¶ 3-4, 6.) Further, there appear to be many potential opt-in plaintiffs who are satisfied with their compensation and remain adamantly opposed to being classified as employees.

### 5. Plaintiff Failed to Meet Her Burden to Prove that the Collective Action Would Be Efficient For the Court to Administer Since the Claims Would Require Individual Determinations For Each Member

To prove that her case is appropriate for conditional certification, Plaintiff must prove that "multiple claims ... do not require substantial individualized determinations for each class member." *MacGregor,* 2012 WL 2974679 at *2 (quoting *Purdham v. Fairfax Cnty. Pub. Schs.,* 629 F.Supp.2d 544, 547 (E.D.Va.2009)) (internal citations omitted). Even though the plaintiff

22

demonstrated some evidence of FLSA violations with seven affidavits in the *Pelczynski* case, the South Carolina district court declined to grant certification due to serious manageability concerns which arose when there was no clear record of the plaintiffs' hours or overtime worked. *Pelczynski.,* 284 F.R.D. 367-69 (D.S.C. 2012). A collective action in that case would still have required separate individual testimony, credibility findings, and assessment of each plaintiff's claim. Here, like the situation in *Pelczynski*, Defendant does not have records of any of the Entertainers showing the hours worked each week, nor any records of their earnings for any day or week they worked. All such evidence would have to come from each putative member's records or memory. Each individual's records would have to be analyzed as to admissibility, reliability, and credibility. The *Pelczynski* Court declined to certify the collective action because it would be extremely inefficient to have to conduct a highly individualized assessment of each putative member's claims. That would be exactly the situation here.

Based on the discovery evidence, Plaintiff is in fact only similarly situated to individuals who have performed as Entertainers at Defendant over a period of time but who have no records or memory as to which particular days or weeks they performed during that period, much less a record or memory of how many hours they worked during those weeks, and, further, who cannot – or will not – produce compensation records – including personal income tax records – which might establish, or at least be probative in establishing, compensation earned while entertaining at Defendant.[2]

### D. If the Court Entertains Plaintiff's Untimely Motion Instead of Denying It Outright Due to Plaintiff's Inexcusable Delay, it Should Apply the Stringent Decertification Standard, Which Plaintiff Also Cannot Meet

In light of the fact that Plaintiff delayed in bringing its conditional certification motion until after the discovery period prescribed by this Court's Scheduling Order had already closed, the

---

[2] As will be discussed below, while Plaintiff testified in very general terms that her net income fluctuated between certain amounts, those amounts are not specific enough to meet her burden of establishing that her earnings fell below FLSA requirements.

23

Court should apply the same standard as it would if Defendant had been extended the opportunity to file a decertification motion. After discovery is finished, which is typically referred to as the "decertification" stage, courts typically apply a more stringent standard for conditional certification. *See, e.g., Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953 (11th Cir. 2007)(*quoting Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1214 (5th Cir.1995)); *White v. Baptist Memorial Health Care Corp.,* 699 F.3d 869 (6th Cir. 2013)(courts apply a "stricter standard" in the second step); *see also Comer v. Wal-Mart Stores, Inc.,* 454 F.3d 544 (6th Cir. 2006); *Pelczynski v. Orange Lake Country Club, Inc.,* 284 F.R.D. 364, 367-68 (D.S.C. 2012)(after discovery has been conducted, a more stringent decertification standard is employed). This second stage is "'typically precipitated by a motion for 'decertification' [that] the defendant usually file[s] after discovery is largely complete and the matter is ready for trial; [thus,] 'the court has much more information on which to base its decision.'" *Anderson, 488 F.3d at 953.* Even "[a]t this "decertification" stage[,] . . . the plaintiff maintains the burden of showing the plaintiffs are similarly situated." *Pelczynski,* 284 F.R.D. at 368. Plaintiffs "must rely on more than just 'allegations and affidavits'" when demonstrating similarity in order to achieve final certification. *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1261 (11th Cir.2008) (*quoting Anderson, 488 F.3d at 953*). Due to Plaintiff's delay in moving for conditional certification at the close of discovery and the fact that the action has not yet been certified, Defendant cannot move for decertification at this time, nor can it automatically take discovery of any new opt-ins without leave of Court. However, despite this patently unfair position Plaintiff has placed Defendant in, it should be abundantly clear to the Court by now that for many reasons besides the untimeliness of Plaintiff's motion her case is not appropriate for conditional certification. Since "the evidence presented at the notice stage clearly shows that [conditional certification and] notice is inappropriate, '[the] court can collapse the two stages of the analysis and deny certification outright.'" *Id.* Therefore, the Court should do so in this instance and deny Plaintiff's request for certification outright since Plaintiff delayed in

24

seeking conditional certification until the end of the discovery period and conditional certification is not appropriate for the numerous reasons cited.

Not only must Plaintiff meet the qualifications and hurdles described in the more lenient standard section above, but Plaintiff must also meet further qualifications in order to become conditionally certified after discovery has closed, as is the case here. Since Defendant has not had an opportunity to bring a motion for decertification due to Plaintiff's inordinate delay in filing its conditional certification motion, in all fairness the following factors that are normally used to decide decertification issues should be considered by the Court in assessing whether to deny certification outright at this stage of the proceeding: "'(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.'" *Id. (Rawls v. Augustine Home Health Care, Inc.,* 244 F.R.D. 298, 300 (D.Md.2007))(*citations omitted*). As noted above, this case involves potential plaintiffs who are unlikely to have records or recollection of what dates and hours they worked over the years because there are no work schedules and their work times, individually and collectively, are inherently amorphous due to the nature of their jobs as freelance Entertainers who come and go as they please. Therefore, if the Court certifies this case it would face the evidentiary nightmare of conducting an individualized assessment of each and every single individual plaintiff in attempting to determine the weekly hours and earnings for each one. Additionally, Defendant has a defense to Plaintiff's FLSA claims that it is entitled to an offset for service fees collected by Entertainers; therefore, if the Court certified a collective action it would also have to make an individual determination on this defense for each and every plaintiff.

As far as considerations of fairness, a grant of conditional certification at this late juncture would either prejudice Defendant due to lack of an opportunity to conduct discovery regarding any potential opt-in plaintiffs or it would delay the litigation even further when Plaintiff could have easily prevented such delay by requesting conditional certification over a year ago. In proving all

000055

of those elements, Plaintiff maintains the burden of showing the plaintiffs are similarly situated." *Pelczynski,* 284 F.R.D. at 368. Moreover, Plaintiff "must rely on more than just 'allegations and affidavits'" when demonstrating similarity in order to achieve final certification. *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1261 (11th Cir.2008) *(quoting Anderson, 488 F.3d at 953).*

This case is clearly not appropriate for conditional certification for numerous reasons, including the following: (1) Plaintiff's inexcusable delay in seeking this relief such that discovery has now closed without Defendant having an opportunity to obtain discovery from new opt-ins such that discovery would have to be reopened to avoid prejudice; (2) Plaintiff failed to prove that she and the opt-ins were victims of a common plan that violated the law because Plaintiff could not even establish that an FLSA violation was committed against her or others; (3) Plaintiff is not similarly situated and would not be able to represent the interests of numerous Entertainers who were opposed to her action and to being classified as an employee; (4) the Court would have to make numerous individual assessments; and (5) such few plaintiffs have expressed interest in joining the action despite the fact that Plaintiff has had sixteen months to garner support for her suit.

### 3. PLAINTIFF FAILED TO SATISFY HER BURDEN OF PROVING THAT SHE WOULD QUALIFY AS A SUITABLE REPRESENTATIVE FOR THE MEMBERS OF THE POTENTIAL COLLECTIVE ACTION

#### A. *Plaintiff Failed to Prove that She Has a Viable FLSA Claim in Order to Represent the Other Members*

As explained above, Plaintiff herself cannot establish that she should have been classified as an employee or was under compensated pursuant to the FLSA. Although similarly situated employees may recover compensation from an employer through an FLSA collective action, a plaintiff who has no viable FLSA claim cannot represent others with whom she alleges she is similarly situated. *See, e.g., Jones-Turner v. Yellow Enterprise Sys., LLC,* 2015 WL 64592 (6th Cir. 2015) Since the extensive discovery evidence accumulated by the parties to date has

26

established that Plaintiff clearly cannot meet this burden on her own behalf, she is not a suitable representative of those she purports to represent.    Although Plaintiff has made general allegations in a conclusory fashion that she was underpaid for hours and overtime, the factual showings she has made, together with the factual evidence submitted through Defendant's submissions, demonstrate to the contrary that Plaintiff was actually paid well above minimum wage and did not work any overtime.    A Plaintiff cannot establish an FLSA claim unless she first demonstrates that she earned less than the compensation the FLSA requires as well as the amount by which she was undercompensated. *Matson v. 7455, Inc.* 2000 WL 1132110, at *6 (D.Or. 2000). This initial burden rests squarely on the FLSA Plaintiff to prove that she has "in fact performed work for which (s)he was improperly compensated and ... (to produce) sufficient evidence to show the amount and the extent of that work as a matter of just and reasonable inference.    *Anderson v. Mt. Clemens Pottery Co.,* 328 US 680, 687-88 (1946); see also *Donovan v. Simons Petroleum Corp.,* 725 Fed 2d8 83, 85 (10th Cir 1983); 29 USCA §§ 201-219.

> B. *Plaintiff is Not a Suitable Representative Because She Filed a Suit Lacking in a Reasonable Factual Basis for Admittedly Vindictive Reasons Which She Has Continued to Pursue and Which Have Clouded Her Judgment*

In the *Matson* case, where discovery evidence was very similar to that in the instant case, the court held that its plaintiff, who was also an exotic dancer, could not "specify an amount by which she was alleged undercompensated" due to her failure to provide estimates of compensation, or to maintain sufficient records of the extent of her work, and to distinguish mandatory service fees collected from tips so that an offset due her employer could be properly calculated.    Therefore, due to her failure to specify an amount by which she was under-compensated, the *Matson* Plaintiff had no factual basis upon which to assert an FLSA claim.    *Matson,* 2000 WL 1132110, at *6.

Plaintiff brought this FLSA claim without a reasonable factual basis.    Plaintiff not only failed to produce reasonable records or evidence of her alleged under-compensation, but her own estimates about her average earnings combined with Defendant's records indicate that she earned

27

000057

in excess of the minimum wage and worked no more than 40 hours in a given work week. Moreover, Plaintiff admitted in her deposition that she brought this suit against Defendant for vindictive reasons and not just to promote justice. (*See* Pl. Dep. 31:12-33; 53:2-11; 69:12-21) Not only is that the wrong reason to bring a lawsuit, but Plaintiff's patent unreasonableness and anger make it likely that she will not be able to suitably represent the interests of the other members of a collective action. For example, since she is substantially motivated by anger and the desire for retribution instead of just to be properly compensated for any alleged injury, Plaintiff is likely to fail or refuse to exercise good judgment which could subject the other members, not only to more potential costs and delay, but also to potential liability for prosecuting this action in bad faith.

The extent of Plaintiff's misguided motivation in this matter has been manifested in conduct she engaged in fully some seven months after the suit was filed. At approximately 12:22 a.m. on March 1, 2014, Defendant's employee, Laurie Callicutt, received, without reason or provocation, a series of text messages from Plaintiff which were threatening in nature and in which Plaintiff referred to Callicutt in extremely vulgar language. (*See* Pl's Dep. 128:3-129:19; Callicutt Dep. 266:25-269:5 and attached Def's Ex.1) When asked in her deposition what her state of mind was when she sent the offensive messages, Plaintiff responded as follows: ". . . I think I was extremely angry about this situation and about how she has treated me over the years and did something, and acted on an immature impulse. That's what, that's what this is. I would never <u>probably</u> ever send it again." (*See* Pl's Dep. 129:10-19)(Emphasis supplied) That Plaintiff's "extreme anger" could "impulsively" erupt in unprovoked vulgarity and threats communicated in the middle of the night some seven months after she left Defendant and that she could refer to her rantings as something she "probably" would not send again, speaks volumes regarding Plaintiff's judgment and her unsuitability to be the representative of the class she seeks to represent.

28

Finally, and sadly, Plaintiff's lack of judgment and suitability as a representative is manifested in her illegal drug abuse. Her abuse of cocaine was confirmed in the testimony of some three of Defendant's managers familiar with her habits, including the manager she respected most, namely General Manager, Joe Hargadon, and even by her friend and opt-in Plaintiff, Jacinda Gardner (*See* Davenport Decl. ¶ 23; Hensell Decl. ¶ 13, 14; Hargadon Dep. 85:8-86:9; Gardner Dep. 45:11-25) As to her position on the matter, Plaintiff, when asked in her deposition about her cocaine abuse, invoked her right under the Fifth Amendment. (*See* Pl's Dep. 109:12-17)

> ### C. Plaintiff Is Not A Suitable Representative Because She Is Unaware That She And Members Of Putative Class She Would Represent May Have A Financial Obligation To Defendant If She Does Not Prevail In Litigation

Plaintiff was asked in her deposition if she understood that if Defendant prevailed in this litigation, Defendant could request the Court to require her to reimburse its costs. Plaintiff appeared completely confused regarding the matter and over the course of repeated and rephrased questioning never indicated that she understood the risk. (*See* Pl's Dep. 56:11-67:7) Yet, Plaintiff asks this Court to designate her as the representative of a putative class whose members, if they were to opt-in to the lawsuit, would face the very risk Plaintiff herself appears not to understand and appreciate.[3] This lack of understanding on the part of an aspiring class representative is made all the more significant, in terms of its impact on Plaintiff's ultimate suitability to be a representative, when it is considered in the context of a Plaintiff substantially motivated by animosity and a desire for retribution and whose judgment is questionable, to say the least. (*See* Section B, immediately above.) Defendant submits that in litigation, as in any form of human endeavor, those worthy of leadership do not expose those they would lead to risks which they themselves have not taken care to understand and are not prepared to confront. Moreover, those worthy of leadership are not prone to letting their judgment being clouded and their actions being

---

[3] Even the judicial notice which Plaintiff has proposed to be sent to members of the putative class fails to convey the risks class members could face. That notice and the many other issues Defendant has with it will be addressed below.

guided by "extreme anger", "immature impulses", and self-interest at odds with the best interests of those being represented.

> D. *Plaintiff has not proven to the Court that she is responsible enough to manage the financial and legal affairs of a collective action*

Plaintiff is not an appropriate representative in a collective action because she has not taken her financial responsibility for her own individual action seriously; therefore, she is not likely to be able to handle the financial and legal responsibilities required of a lead Plaintiff.  For example, Plaintiff has not even paid her own court costs and litigation and travel expenses, despite the fact that she filed her Complaint in August of 2013. (*See* Pl's Dep. 56:1-67:7) Further, Plaintiff did not – or could not - produce her own tax returns for 2012-2013 pursuant to Defendant's discovery request, nor could she provide a copy of the notes she thought she had "jotted down" concerning her work and earnings at Defendant. (*See* Pl's Dep. 119:16-120:8; 121:235-122:12) (emphasis supplied)

**IV.**
**PLAINTIFF'S REQUEST FOR COURT-FACILITATED NOTICE TO PUTATIVE CLASS MEMBERS AND FOR PRODUCTION OF A LIST OF ENTERTAINERS TO FACILITATE NOTICE.**

The issue of whether judicial notice to the putative class members is necessary need only be addressed if the Court grants Plaintiff's Motion for Conditional Certification. (See, *Syrja*, 156 Fed. Supp. 2d at 686) Defendant has presented multiple, compelling reasons why conditional certification should not be granted and, accordingly, why Plaintiff's proposed notice is not required.  However, even if the Court were to grant conditional certification, Defendant submits that: 1) publication of any notice in this matter in the manner Plaintiff has requested is not appropriate, nor even possible; 2) the notice proposed by Plaintiff is misleading and would fail to provide putative class members important information which should rightfully be brought to their attention.

30

000060

### 1. THE LIST SOUGHT BY PLAINTIFF CANNOT BE PRODUCED

To facilitate the issuance of the notice, presumably by mail, to members of the putative class, Plaintiff has requested the Court order Defendant to "produce to Plaintiff the following information within ten '10' days of its Order:

> A list, in electronic and importable format, of all persons who have worked at Defendant's North Myrtle Beach club as Entertainers since March 1, 2012, including their name, job title, address, telephone number, dates of appearances, date of birth, and last four digits of their social security numbers." (See, Pl's Memorandum, p. 31)

Certainly the Court is well aware that one of the key issues in this action involves Defendant's classification of Entertainers as independent contractors and, therefore, the Court can very likely surmise the consequence of that classification as it relates to the list Plaintiff has described. Defendant, because it operated under the reasonable belief that Entertainers were Independent Contractors and because it dealt with them accordingly, did not – and does not – maintain records regarding them in the same fashion as it does its employees.   Simply put, Defendant does not have (nor is it required to have) a "list, in electronic and importable format, "- nor in any format, for that matter –" of all persons who have worked at Defendant ... as Entertainers since March 1, 2012", much less the personal information regarding such Entertainers which Plaintiff has identified. This fact has been confirmed in the attached Affidavit of Defendant's Chief Financial Officer, Laura Watson.   In her Affidavit, Ms. Watson has described the information Defendant has regarding Entertainers (*See* Watson Aff. ¶ 8-14) To begin with, Defendant only has paper records. As a general rule, Defendant, for purposes of confirming that an Entertainer is of legal age to perform, obtains and maintains from an Entertainer prior to her first performance a photocopy of a valid picture identification which includes her date of birth. (*See* Watson Aff. ¶ 8) Some Entertainers provide additional contact information of varying detail.   However, Defendant makes no effort to confirm the contact information or to keep it current. (*See* Watson Aff. ¶ 8) Ms. Watson has reviewed the information Defendant has on Entertainers who have performed at

000061

Defendant since March 2012, and, except for those who have continued to perform in 2014 and who will be discussed below, she has found the address information in the documents to be incomplete, faded and in some instances impossible to read.   Additionally, many of the addresses in documents that can be read are now more than five years old and some of the addresses given by Entertainers made reference to hotels.  (*See* Watson Aff. ¶ 12)  Ms. Watson has also confirmed that Defendant has never used any of the address information provided by the Entertainers and which it has on hand for mailings or any other purpose, and Watson considers the information incomplete and not a reliable source for providing Entertainers with notice. (*See* Watson Aff. ¶ 9, 13)

In sum, Defendant cannot produce the list Plaintiff has described because it has never maintained such a list, and, except for certain Entertainers who began performing and continued to perform into 2014, Defendant has no reliable information with which it could even create such a list. (*See*, e.g., *Regan v. City of Charleston, Va.,* 2014 WL 3530135 at *6 (D.S.C. 2014) (defendant that did not maintain a records of its employees' personal email addresses was not required to "produce what it [did] not have").

As to Entertainers who have worked at Defendant in 2014, as has been indicated above, 114 of them have entered into a Licensing Lease and Dispute Resolution Agreement with Defendant. (*See* Watson Aff. ¶ 4) All Entertainers performing there now have agreed to arbitrate "any disputes" they have with Defendant "whether the dispute arose prior to or after" the Agreement of was executed in lieu of bringing suit in a court, individually or collectively.  (*See* Watson Aff. ¶ 3, 7 and attached Ex. A)   What is more, those Entertainers who entered into the Agreement have done so with full knowledge of their right to seek counsel prior to entering into the Agreement, their right to opt-out of arbitration and to do so without repercussion, and also with full knowledge of the existence of this lawsuit.  (*See* Watson Aff. Ex. A) Thus, while Defendant has more complete

000062

and reliable contact information for those Entertainers who have entered into the Agreement, those Entertainers could not be members of the putative class in any event.

The fact that fully 114 Entertainers who have performed at Defendant in 2014 – indeed since mid-November 2014, have entered into such an Agreement (*See* Watson Aff. ¶ 3) – establishes the reason why Plaintiff's additional request that its proposed notice be posted "in conspicuous places at (Defendant's) North Myrtle Beach location" is also inappropriate. Apart from being unnecessarily disruptive of Defendant's business, posting a notice that would be reviewed by Entertainers to whom it would have no application is a pointless exercise. In addition, it is misleading and incomplete.

### 2.  PLAINTIFF'S  PROPOSED  JUDICIAL  NOTICE  IS  MISLEADING  AND INCOMPLETE

Although a court has discretion regarding the details of the notice to potential plaintiffs, *Lee v. ABC Carpet & Home,* 236 F.R.D. 193, 202 (S.D.N.Y.2006), it must ensure that the notice is "'accurate and timely,'" so that potential plaintiffs 'can make informed decisions about whether to participate,'" *Byard v. Verizon West Virginia, Inc.,* 287 F.R.D. 365 (N.D. W. Va. 2012) (quoting *Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 169 (1989); *see also Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142, 147 (4th Cir.1992).

The proposed notice makes no reference to the pending Rule 23 class action which Plaintiff also seeks to certify. Plaintiff's request for two notices, with one being to putative collection action members who must "opt in", and the other to putative Rule 23 class members who must "opt out", and with neither notice referring to the other or explaining the differences in the claims, is a recipe for utter confusion. To ensure that potential plaintiffs have the opportunity to make a well-reasoned decision about joining a plaintiff's suit, several courts have mandated that the notice require an accurate notification to plaintiffs that they may be individually liable for costs and expenses of the suit. The *Byard* Court required that a notice be mailed to putative plaintiffs with the explanation that: "(1) opt-in plaintiffs might be required to engage in the parties' discovery

efforts and testify at trial, and (2) those who opt in could pay a proportionate share of defendants' costs to defend the case" (i.e., "If you do not prevail on your claim, court costs and expenses may possibly be assessed against you"). *Byard*, 287 F.R.D. at 374-75. Although there is a split of authority on this issue, *c.f., Sexton v. Franklin First Fin., Ltd.,* No. 08–CV–04950, 2009 WL 1706535, at *12 (E.D.N.Y. June 16, 2009) (declining to warn plaintiffs of potential costs of suit), the *Byard* court recognized that "[a]n award of costs to a prevailing defendant in an FLSA case is clearly possible and is not merely theoretical;" therefore, plaintiffs should have that information in order to make an informed decision about the suit. *Byard*, 287 F.R.D. at 375 (*citing Creten– Miller v. Westlake Hardware, Inc.,* No. 08–2351, 2009 WL 2058734, at *4 (D.Kan. July 15, 2009) (citing cases that allowed costs to prevailing defendants in FLSA cases). Other courts have also required the collective action notice to inform plaintiffs of potential costs for which they may be held liable. *See, e.g., Behnken v. Luminant Mining Co., LLC,* 997 F.Supp.2d 511, 524 (N.D. Texas, 2014) (proposed notice that failed to inform individual opt-in plaintiffs of the possibility of paying their proportional share of court costs if they receive an unfavorable judgment was inaccurate since it may mislead plaintiffs to believe that they bore no risk; therefore, the notice had to be corrected so that plaintiffs could make an informed decision); *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F.Supp.2d 91 (S.D.N.Y., 2003) (court approved the following language regarding plaintiffs' economic risks in joining collective action: "If you choose to join in this case, you will be bound by the Judgment, whether it is favorable or unfavorable. You may also be held liable for costs associated with this lawsuit, and for potential counterclaims which could be asserted against you by . . . Defendants").

Further, the proposed notice is incomplete and misleading in that it fails to inform a member of the putative class that she may have to respond to discovery requests, produce documents, sit for depositions, incur various expenses related to the prosecution of the lawsuit, and, most

34

importantly, that she may have to pay Defendant's court costs if Defendant prevails and/or pay attorneys' fees if the Court were to ultimately conclude that Plaintiff had litigated in bad faith.

Plaintiff's proposed notice is further incomplete and misleading in that it fails to identify the exact dollar amount of the minimum wage that prevailed at all times during the period at issue in this litigation, namely "$7.25" per hour, or $2.13 for "tipped employees."   Without the hourly rate being precisely identified as a reference point, a member of the putative class unfamiliar with the regulated amount would have no guidance as to the import of the litigation in terms of their own particular earnings history, a history which would confirm virtually at a glance, as it does in Plaintiff's case, that the Entertainer earned well in excess of the minimum wage.   Similarly, the proposed notice fails to inform members of the putative class that service charges in the form of couch and VIP room fees which Entertainers were allowed to keep are an allowable off-set against any minimum wage obligation Defendant may have.   And, finally, in this regard, the proposed notice is incomplete and misleading because it fails to clearly indicate that the Court has made no determination to date that Plaintiff Alexis Degidio, much less any other person who ever performed as an Entertainer at Defendant, is entitled to any monetary recovery whatsoever.

Finally, Plaintiff has requested that the proposed notice be mailed.   Plaintiff should have indicated what information would be included on the envelope which would be used to send the notice and consent forms to a putative class member. Without such information, the full content of the notice which Plaintiff would have this Court allow to be presented to a putative class member remains unknown.   *See Anish v. Nat'l Sees. Corp.,* No. 10-80330, 2012 WL 3818283, *4 (S.D. Fla. Sept. 4, 2012).

## CONCLUSION

WHEREFORE, for all of the above reasons, Defendant prays that Plaintiff's Motion for Conditional Certification be **DENIED.**

Dated: This 19th day of January, 2015.

35

Respectfully submitted,
/s/ William Paul Young
S.C. Federal ID 05732
William Paul Young, P.A.
P.O. Box 4213
North Myrtle Beach, SC   29597
843-249-9999/843-249-5876 (fax)
pyoung4213@frontier.com

and

Stephen L. Shields (TN Bar #06981)
James L. Holt, Jr.   (TN Bar #012123)
JACKSON, SHIELDS, YEISER & HOLT
262 German Oak Drive
Memphis, TN 38018
901-754-8001/901-754-8524 (fax)
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was filed with the Court's CM/ECF System on January 19, 2015 which will generate service upon the attorneys of record.

/s/ William Paul Young
William Paul Young

000066

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

ALEXIS DEGIDIO, individually and on behalf    )
of all others similarly situated,    )
    )
    Plaintiff,    )    Case No. 4:13-cv-02136-BHH
    )
    v.    )
    )    JURY TRIAL DEMANDED
CRAZY HORSE SALOON AND    )
RESTAURANT, INC., d/b/a THEE NEW    )
DOLLHOUSE,    )
    )
    Defendant.    )

---

### AFFIDAVIT OF LAURA WATSON

I, Laura Watson, make the following Declaration under oath and on the basis of my own personal knowledge. I am over 21 years of age. I suffer from no legal disabilities and am competent to make this Affidavit.

1.    Since December, 2005, I have been Chief Financial Officer (CFO) for Crazy Horse Saloon & Restaurant, Inc. located at 3102 Highway 17 South, North Myrtle Beach, South Carolina. This is the only location Crazy Horse Saloon and Restaurant, Inc. has ever operated a night club. Our office is located next door at 3102 Hwy 17 South, North Myrtle Beach, South Carolina.

2.    On about March 1, 2012, Crazy Horse Saloon & Restaurant, Inc. began doing business as Thee New Dollhouse, a nightclub featuring exotic dancers at the address identified in paragraph 1 above. The d/b/a was later changed to just "Thee Dollhouse" (hereafter referred to as the "Club").

3.      Entertainers performing at the Club since about mid-November 2014, have entered into a Licensing Lease and Dispute Resolution Agreement (the "Agreement"). The Agreement is part of a Entertainers Information Package given to each Entertainer. It is attached hereto as Exhibit A.

4.      As of the date of this Affidavit 114 Entertainers have entered into this Agreement. All Entertainers performing at the Club have signed this Agreement.

5.      In the Entertainer Information Package, in addition to the Agreement each Entertainer was provided information about arbitration, the lawsuit filed by Alexis Degidio, the right to opt out of the arbitration provision, and the right to consult an attorney.

6.      There have been no Entertainers who have opted out of the Arbitration provision.

7.      Several Entertainers have told me they already had knowledge about the lawsuit filed by Alexis Degidio. The Entertainers I have heard on the subject of the lawsuit have expressed opposition to it, do not want to join it, and do not seek to be paid as employees of the Club.

8.      Before being permitted to perform at the Club we require the Entertainers produce a valid picture identification with date of birth. This is for the purpose of verifying that the performer is of legal age. We typically make a copy of the picture identification (ID) and keep it with a form that the Entertainer fills out with whatever information she wishes to provide, i.e. stage name, phone number and address. There is no verification undertaken to confirm that the contact information is valid or current.

9.      The Club has not used the addresses found in the information provided by Entertainers for any mailings or any other purpose.

2

000068

10.    The information for Entertainers like Alexis Degidio, who came to our location after we opened as the New Dollhouse in March 2012, were forwarded to us from the old Dollhouse location. So we did not collect new information from them. Attached as Exhibit B is the information we received for Alexis Degidio. I looked for any information we had on Jacinda Gardner, but none could be located. Exhibit C is the information I located on Dawn Ungaro. Both Degidio's and Ungaro's information appear to have come from the old Dollhouse. The Club did not undertake verify or update the addresses or any other information the Old Dollhouse sent over. The information is kept in the upstairs area of the Club used by the House Moms. Although Managers have access to the information management does not oversee completeness of the information or insure they are maintained. The personnel files containing information on our employees are kept in my office in a separate building next door to the Club.

11.    Degidio, Gardner and Ungaro did not perform here in 2014, and are believed to have retired from performing as Entertainers.

12.    I have reviewed the information we have on Entertainers who have performed here since March 2012, and except for those who continued to perform in 2014, the address information is incomplete, sometimes faded or torn and impossible to read. A lot of the addresses and contact information for Entertainers are more than five years old and we have no idea what their current address might be. Many Entertainers did not fill in or complete the contact information on the form. Some of the forms list a hotel for an address.

13.    Based upon my review and knowledge of the contact information we have of Entertainers who no longer perform here, they are incomplete and not a reliable source for providing them notice of something.

3.

000069

14.    The Club does not maintain any kind of list, electronically, or otherwise of Entertainers with their names, addresses, telephone numbers, date of birth, dates of appearances and social security numbers.  The only contact information we have on Entertainers is what I described above.

_____          1 – 15 – 15
Laura Watson                                            Date

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

On this 15 day of Jan._____, 2015, before me personal appeared Laura Watson, known to be the person described in and who executed the foregoing instrument under oath, and acknowledged that such person executed the same as such person's free act and deed.

_____
Notary Public

My Commission Expires:
_____          My Commission Expires 3/23/2020

4

000070

Appeal: 17-1145   Doc: 14   Filed: 04/07/2017   Pg: 97 of 279

4:13-cv-02136-BHH   Date Filed 01/19/15   Entry Number 80-1   Page 5 of 18
11/28/2014  00:17   8432725289        THEE DOLLHOUSE        PAGE   02/13

Exhibit A

# THEE DOLLHOUSE

# ENTERTAINER'S INFORMATION PACKAGE

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 98 of 279

4:13-cv-02136-BHH    Date Filed 01/19/15    Entry Number 80-1    Page 6 of 18
11/28/2014  00:17    8432725289    THEE DOLLHOUSE    PAGE  03/13

# ENTERTAINER'S INFORMATION PACKAGE

Please find enclosed your Entertainment Package that you will need to read, review and sign where appropriate.  This information includes the following:

1.    Licensing Lease and Dispute Resolution Agreement

2.    Acknowledgement of Receipt of Licensing Lease and Dispute Resolution Agreement; Opt-Out Form; and About Arbitration and Opt-Out Memo

3.    Entertainer Information Form

4.    Model Release Form

5.    Commitment to Legal and Ethical Standards

RECEIVED BY: _____ on _____
                        Signature                                            Date

            _____
                  Print Name

000072

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 99 of 279

4:13-cv-02136-BHH    Date Filed 01/19/15    Entry Number 80-1    Page 7 of 18
11/28/2014  00:17   8432725209           THEE DOLLHOUSE                    PAGE  04/13

## About Arbitration and Opt-out

The Club has adopted a policy that requires most disputes between Entertainers and the Club to be resolved through arbitration, as provided in the enclosed "Agreement". The Club believes that such disputes can be resolved in arbitration more quickly and less expensively than if they were brought in court. But if you do not want to waive your right to bring such disputes before a court, you must notify the Chief Financial Officer, Laura Watson, within 21 days in the manner described below.

**What is arbitration?** The Club hopes that any dispute that might arise between you and the Club will be resolved informally. But if that does not happen, the Dispute Resolution Agreement requires both sides to submit the dispute to "arbitration" instead of filing a lawsuit in court. This means that you and the Club would pick a neutral, independent person, called an "arbitrator," who would make a determination after listening to each side's evidence. The arbitrator will have the power to award the same type of individual relief as a court. In addition, parties in arbitration have more limited rights to appeal than in a lawsuit. The Club believes the reason disputes can be resolved more quickly and less expensively in arbitration than in court is because arbitration proceedings are less formal and limited to individual claims.

**What cannot be arbitrated?** While the Dispute Resolution Agreement provides that you can arbitrate the same claims on behalf of yourself as you can in court, you will not be permitted to bring claims on behalf of *other* Entertainers (as one would, e.g., in a class action). The United States Supreme Court recently observed that if class claims were brought in arbitration, the advantages of arbitration would be lost, making arbitration as slow and as costly as class action court proceedings, which can often take years to resolve.

**What if I do not want to arbitrate?** You have 21 days from the date of this memorandum to opt out of the Dispute Resolution Agreement. You may do so by signing and returning the attached Opt-Out Form to Laura Watson at 3102 Hwy. 17 South, North Myrtle Beach, South Carolina 29582 by registered certified U.S. Mail (or Federal Express or United Parcel Service) post-marked within the 21 day opt-out period. The Club will not tolerate retaliation against any Entertainer who decides to opt out of the Agreement. If you opt out within the 21 day period, you will not be required to arbitrate disputes between you and the Club. But if you fail to opt out within this period and do nothing, the Dispute Resolution Agreement will become binding on you and the Club 21 days after you received the Agreement. Thereafter, you must arbitrate any dispute with the Club that cannot be resolved informally.

**How will the Agreement affect my rights?** The Dispute Resolution Agreement provides that you and the Club each waive the right to file a lawsuit in court against one another, and that any claim that is arbitrated must be done on behalf of you alone

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 100 of 279

4:13-cv-02136-BHH    Date Filed 01/19/15    Entry Number 80-1    Page 8 of 18
11/28/2014    00:17    8432725209    THEE DOLLHOUSE    PAGE    05/13

and not on behalf of a class.  For instance, recently Alexis Degidio a former dancer filed a lawsuit alleging violations of the Fair Labor Standards Act and South Carolina law against Crazy Horse.  The Plaintiff in the lawsuit alleges that, as a Entertainer, she and other Entertainers (including, potentially, you) who have worked at the Club during the statutory periods were improperly classified as independent contractors rather than employees and, as a result, were not paid the federal minimum wage or overtime at the rate of one and one-half times the regular rate of pay for all hours worked in excess of 40 per week.  The lawsuit also alleges that the Club improperly collected fees and a portion of tips in violation of the FLSA and State law.  Essentially, the plaintiff claims that she and the potential class members have not been properly paid for all their working time as a result of being misclassified as an independent contractor and that the Club unlawfully took a portion of her and others' tips, all of which is denied.  If you were bound by the Dispute Resolution Agreement and wanted to make the same type of claim against the Club, you would be required to arbitrate that claim by yourself and would not be able to participate in Degidio's lawsuit as a plaintiff or a class member.

**May I consult an attorney?**    The Club believes the Dispute Resolution Agreement will benefit everyone.  Nevertheless, the decision to waive your right to have a court hear your dispute or your right to participate in a class action is an important one, and you certainly have the right to consult an attorney of your own choosing before deciding whether to sign the Dispute Resolution Agreement and/or opt out.

---

**To Performer:**

        Please initial here _____

        *(This will only acknowledge your <u>receipt</u> of this memo, <u>not</u> your consent to its terms, etc.)*

---

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 101 of 279

4:13-cv-02136-BHH    Date Filed 01/19/15    Entry Number 80-1    Page 9 of 18
11/28/2014  00:17   8432725289          THEE DOLLHOUSE                    PAGE  06/13

CRAZY HORSE SALOON AND RESTAURANT, INC. d/b/a
THEE NEW DOLLHOUSE


ACKNOWLEDGEMENT OF RECEIPT OF LICENSING LEASE AND
DISPUTE RESOLUTION AGREEMENT WITH OPT-OUT FORM AND
ABOUT ARBITRATION MEMO


I acknowledge that I have received, read, and reviewed the Licensing Lease and Dispute Resolution Agreement with an Opt-Out Form, and understand that all claims are subject to arbitration.  I have been given the About Arbitration Memo and advised that a lawsuit has been filed in the U.S. District Court of South Carolina, seeking a class and collective action against Crazy Horse Saloon and Restaurant, Inc., d/b/a Thee New Dollhouse by Alexis Degidio, Case No.: 4:13-cv-02136-RBH claiming that performers should have been paid as employees and not treated as independent contractors.

I have been given a Dispute Resolution Opt-Out Form which I understand that if I wish to Opt-Out of the Dispute Resolution provision this Opt-Out Form must be signed, dated and returned to _____ within 21 days of my receipt of the Licensing Lease Agreement.


Name:      _____


Signature: _____


Date:      _____


000075

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 102 of 279

4:13-cv-02136-BHH    Date Filed 01/19/15    Entry Number 80-1    Page 10 of 18
11/28/2014  00:17   8432725209                THEE DOLLHOUSE                        PAGE  07/13

## DISPUTE RESOLUTION OPT-OUT FORM

I, _____ wish to opt out and not be subject to the Dispute Resolution/Arbitration Provision (paragraph 15).

I understand and acknowledge that in order for this Opt-Out to be effective, I must sign, date and return to Chief Financial Officer, Laura Watson within twenty-one (21) days of my receipt of the Licensing Lease and Dispute Resolution Agreement.


Signature: _____          Date: _____

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 103 of 279

4:13-cv-02136-BHH    Date Filed 01/19/15    Entry Number 80-1    Page 11 of 18
11/28/2014  00:17    8432725289    THEE DOLLHOUSE    PAGE  08/13

## COMMITMENT TO LEGAL AND ETHICAL STANDARDS

I understand that as an entertainer in an adult nightclub there are certain legal and ethical restrictions that I must comply with.

Management has explained to me the legal restrictions as an adult entertainer and by my signature below I agree to comply with such restrictions. If I have any questions, I will contact the manager or management.

I also understand that each Club has ethical guidelines that will be explained to me by management.

I also understand this facility is a Drug-Free Workplace. Illegal drugs are prohibited.

I also understand that my legal rights will be respected, including the right not to be required to do anything illegal or be harassed in any manner.

As an entertainer, if I have any questions or concerns regarding any ethical or legal issues, I will report them to a manager. If it would not be appropriate to report it to a manager, I understand I may contact Laura Watson at the following number: _____.

_____
Signature

_____
Print Name

_____
Date

000077

## LICENSING LEASE AND DISPUTE RESOLUTION AGREEMENT

This Agreement between Crazy Horse Saloon and Restaurant, Inc. located at 3102 Hwy. 17 South, North Myrtle Beach, South Carolina 29582, including its owners, managers, and authorized agents ("the Club") and _____ ("Performer") sets forth the terms and conditions of the business relationship between the parties as follows:

WHEREAS, the Club is in the business of providing an upscale gentlemen's nightclub which includes, a restaurant and a bar serving alcoholic beverages for consumption on the premises and which features adult exotic dancer/performers;

WHEREAS, Performer is an adult professional entertainer who wishes to perform at the Club; and

WHEREAS, the Club is willing to provide Performer by way of Lease, access to its premises so that Performer may perform as an independent contractor, and not as an employee.

### INTRODUCTION

The purpose of this introductory paragraph is to clarify what the nature of this document is and explain what the nature of relationship is between you, as a Performer, and us, "the Club." YOU ARE NOT AN EMPLOYEE.  THE CLUB IS NOT YOUR EMPLOYER.  The Club and Performer each acknowledge and agree that the relationship of the parties is that of the Club as "Licensor" and "Lessor" and that of the Performer as "Licensee" and "Lessee" and not an employee/employer relationship.  What this means is that the Club, as Licensor and Lessor, provides you with the non-exclusive use of the stages, dance facilities, dressing rooms, lockers and storage facilities.  All of the space, premises, and rights granted herein on a limited and non-exclusive basis are hereinafter referred to as the "Premises." In exchange, you, as a Licensee and Temporary Space Lessee, pay a fee for your use of the Premises in connection with your performances which you will conduct as an independent entity, i.e., you work for yourself.  The nature of your relationship with the Club is similar to the way a tenant, such as a kiosk, operates in a mall.  The mall has many independent tenants and makes space available to its tenants to operate their businesses.  The tenants do not "work" for the mall; they simply handle their own guests as part of the mall's larger operation.  Pursuant to these tenants' leases with the mall, there are terms and conditions to which these independent businesses agree.  These terms include the tenant conducting business during operating hours of the mall, paying rent and other fees, and generally abiding by the law.  Your relationship with the Club is the same.  You are agreeing to perform as an independent entity pursuant to the terms and conditions of this Agreement.  These terms include you performing during the operating hours of the Club should you wish to perform, paying a fee, and abiding by the law, just like the businesses in the mall.  The Agreement also includes a dispute resolution procedure allowing for the resolution of any dispute that may arise.

1. **GRANT OF LICENSE**

The Club hereby grants to Performer a temporary, revocable license (the "License") and non-exclusive right to use and occupy the Premises (the "Temporary Space Lease") commencing on License and Temporary Space Use Lease Commencement Date and continuing until the Termination Date, defined below, subject to the terms and conditions contained herein.

2. **PERMITTED USES**

The Club will give access to its premises during normal operating hours for Performer's performances.  The scheduling of performances shall be determined by Performer in consultation with the Club and/or the DJ on duty.

This License shall be limited to Performer's use and occupancy of the Club as a Performer and Performer shall be entitled to perform entertainment services at the Club.  Performer shall not use or occupy the Club or act or fail to act in any way which would constitute an event of default by Performer under this Agreement.

3. **DURATION   OF   LICENSE   AND TEMPORARY   SPACE   LEASE; TERMINATION   OF   LICENSE   AND TEMPORARY SPACE LEASE**

This Agreement shall be for the period commencing on the License and Temporary Space Use Lease Commencement Date and shall terminate on the day preceding the first anniversary of the License and Temporary Space Use Lease Commencement Date. The License and Temporary Space Use Lease shall be *automatically extended* for successive periods equal to the current term. Notwithstanding the foregoing, either the Club or Performer may terminate this Agreement by giving the other party thirty (30) days' written notice of intent to terminate.  In addition, the Club may terminate this Agreement without advanced notice in the event of

any material breach by Performer, violation of any federal, state or local law or for any unprofessional conduct by Performer while on premises of the Club.

4. **BASE LICENSE FEE.**

In consideration of The Club's granting to Performer the right to use and occupy the Premises up through and including the License and Temporary Space Lease Termination Date, Performer hereby agrees to pay to The Club a license fee known as a "House Fee" which is established by the Club. The House Fee shall be due and payable each night that Performer performs at the Club.

5. **COMPENSATION.**

Performer shall be entitled to retain all fees and gratuities received by guests of the Club for performances of Performer's services, subject to administrative fees charged by the Club in exchange for processing of credit cards, redemption of Club Scrip (Golden Dance Dollars, etc.). Performers may establish their own Performance Fees. However, the Club may establish suggested minimum fees (the "Performance Fees") to guests for entertainers' performances to be paid by guests based on industry custom and in consultation with Performers. However, nothing shall prevent Performer from receiving Performance Fees in excess of the suggested minimum fees, tips or other gratuities. The Performer specifically acknowledges that the Performance Fees established by Performer attributable to personal dances or performances in private or semi-private rooms are a non-discretionary mandatory service charge paid by the guests directly to Performer, and are not tips or gratuities to the Performer.

6. **SERVICES**

In addition to use of the Club premises, The Club shall provide the following services at the Club, at The Club's expense and/or with Club permission:

1

000078

a.  Music (including ASCAP/BMI/SESAC fees);
b.  Dressing Room Facilities;
c.  Lockers;
d.  Wait and Host Staff;
e.  Beverage Service; and
f.  Performers are free to advertise on behalf of themselves, however any advertisement specific to the Performer shall be at Performer's sole cost and expense and The Club shall have no obligation to advertise for the Performer);
g.  "Disc Jockey" - The Disc Jockey is compensated independently by the Club, however, the Performer may provide voluntary gratuities to the Disc Jockey, if desired. While the Club may inform you of suggested minimum tips customary at the Club, the Club in no way requires tipping;
h.  "House Mom" – The House Mom' is compensated independently by the Club, however, the Performer may provide voluntary gratuities to the House Mom, if desired. While the Club may inform you of suggested minimum tips customary at the Club, the Club in no way requires tipping;
i.  "Floor Host" – The Floor Host is compensated independently by the Club, however, the Performer may provide voluntary gratuities to the Floor Host, if desired. While the Club may inform you of suggested minimum tips customary at the Club, the Club in no way requires tipping.

Performer agrees that the License Fee does not include fees for the following services: hair and make-up, artists and/or any other ancillary services which shall be contracted for and paid directly by Performer, at Performer's sole cost and expense.

7.  RELATIONSHIP

A.  The Club and Performer each acknowledge and agree that the relationship of the parties hereto is that of The Club as "Licensor" and "Lessor" and Performer is an Independent Performer Licensee and Temporary Space Lessee and is not an employee of the Club. Nothing in this Agreement shall be construed so as to create an employee/employer or joint venture relationship between the parties hereto. Performer shall be solely responsible for obtaining and maintaining, at Performer's sole cost and expense, all necessary business licenses and permits and insurance including but not limited to, health, disability and workers compensation and for paying all federal, state and local taxes and contributions imposed upon any income earned by Performer at the Club.

B.  The Club and Performer acknowledge and represent that if the relationship between them was that of employer and employee, the Club would be required to collect, and would retain, all Performance Fees paid by guests to Performer. Performer acknowledges and agrees that if the relationship were one of employer/employee, all Performance Fees would be the property of the Club. THE PARTIES ACKNOWLEDGE AND REPRESENT THAT PERFORMER'S RIGHT TO OBTAIN AND KEEP PERFORMANCE FEES PURSUANT

TO THIS LICENSE IS SPECIFICALLY CONTINGENT UPON THE BUSINESS RELATIONSHIP OF THE PARTIES BEING THAT OF THE CLUB BEING A LICENSOR AND TEMPORARY SPACE LESSOR AND PERFORMER BEING AN INDEPENDENT PERFORMER LICENSEE AND TEMPORARY SPACE LESSEE.

C.  Performer is a skilled entertainer and the Club is not responsible for providing training or instruction on performances. Since Performer understands that for all purposes under this Agreement, Performer will operate as an independent contractor Performer, Performer retains full independence in exercising judgment as to the time and manner in performing at the Club. For example, Performer shall have the sole and exclusive right to choose the days or evenings to appear and perform at the Club, and individual choice over his/her costumes, props, or any other equipment used during a performance. Performer is solely responsible for the development of any performances, number of hours spent performing, and the final control over any aspect of the presentation of any performance.

D.  All expenses associated with any performance (e.g., costumes, props, advertising, etc.) are the responsibility of Performer.

E.  Performer shall be paid exclusively by patrons of the Club. Furthermore, Performer acknowledges that any and all fees received from patrons must be reported in full to the Internal Revenue Service, and that the payment of taxes and other required contributions are the sole responsibility of Performer, and that the Club has no control over the amount of income Performer earns nor any means to monitor or determine same.

F.  Performer has the right to provide similar services to other nightclubs or companies while subject to the terms of this Agreement.

8.  RELEASE FROM LIABILITY

Performer agrees that The Club shall not be responsible or liable for any damage or injury to any property or to any person or persons at any time on or about the Premises arising from any cause whatsoever except The Club's willful misconduct. Performer shall not hold The Club in any way responsible or liable therefore and will indemnify and hold The Club harmless from and against any and all claims, liabilities, penalties, damages, judgments and expenses (including, without limitation, reasonable attorneys fees and disbursements) arising from injury to person or property of any nature arising out of Performer's use or occupancy of the Premises and also for any other matter arising out of Performer's use or occupancy of the Premises including damage or injury caused by Performer.

9.  LAWFUL ENTERTAINMENT

Performer agrees to abide by all of the local ordinances of the City or County and the laws of the State of South Carolina regulating topless dancing and/or adult performances. Performer agrees that he/she will not

2

4:13-cv-02136-BHH     Date Filed 01/19/15     Entry Number 80-1     Page 13 of 18

000079

violate any law, or statute regarding prostitution, obscenity, harassment or unlawful pornographic performances and will hold the Club harmless for attorney fees, fines, and costs arising out of Performer's performances or services rendered at the Club's premises or business location which result from Performer's non-compliance.

## 10. NO ASSIGNMENT

No assignment of this License and Temporary Space Lease shall be made by Performer.

## 11. DEFAULT

In the event Performer shall be in default of any obligation to pay money under this License and Temporary Space Lease or in the event Performer shall be in default of any non-monetary provision of this License and Temporary Space Lease (including but not limited to violation of any Federal, state or local laws or regulations), this License and Temporary Space Lease shall immediately terminate, and The Club shall have the right to the extent permitted by law, to (i) immediately withdraw the permission hereby granted to Performer to use the Premises; and (ii) remove all persons and property therefrom, without being deemed to have committed any manner of trespass. Such remedies shall be in addition to any other rights or remedies The Club may have hereunder or at law or equity.

## 12. CONFIDENTIALITY

The Club and Performer acknowledge that each may come into contact with information in all forms regarding the other's business, clients and clients' businesses. All such information shall be deemed confidential information and shall not be used or communicated by the other at any time for any reason whatsoever.

## 13. NOTICES

Any notices required or permitted to be given to either party under this License shall be given to the respective parties at the address written on the first page of this Agreement by hand, by Certified U.S. Mail, return receipt requested, or overnight courier (for next business day delivery) return receipt requested. Such notices shall be deemed given upon: a) delivery, in the case of hand delivery; b) one business day after mailing, in the case of overnight courier, and c) three business days after mailing, in the case of mailing.

## 14. LEGAL ACTION

This Agreement shall be governed by and construed in accordance with the law of the State of South Carolina without giving effect to the conflicts of laws principles thereof.

## 15. ARBITRATION

　i.　Dispute Resolution/Arbitration Provision:

　a.　If a dispute arises between the Club and Performer (over any aspect of their relationship), the Parties agree that the best way to resolve such dispute is informally. For that reason, if either Party has such a dispute with the other, the Party will bring it to the other Party's attention and attempt to work things out informally. But if not resolved informally, the Parties agree and neither will object to submit the dispute to final and binding arbitration as explained in this Section 15 rather than filing a lawsuit in court.

　b.　Both Parties are equally bound to arbitrate disputes, held to the same standard, and are given comparable rights under this Agreement. The Parties share the right to select the arbitrator and are allowed access to an attorney throughout the arbitration process.

　c.　THIS PROVISION ELIMINATES THE RIGHT TO A TRIAL BY JUDGE OR JURY AND TO BRING OR JOIN IN CLASS ACTION PROCEEDINGS.

　d.　The Parties agree to submit any dispute (whether the dispute arose prior to or after execution of this Agreement) they are unable to resolve informally to final and binding arbitration as follows:

　　i.　How this Arbitration Provision Applies
This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1, et seq. Its purpose is to ensure that an arbitrator, not a court, will decide ALL federal, state, statutory, and common law claims between the Parties, including, but not limited to all claims—legal or equitable, whether based in statute, tort, contract, equity, or breach of trust—that arise out of, in connection with, or relating to this Agreement (including formation, execution, enforcement, interpretation, or modification), Performer's classification as an independent contractor, and the arbitrability of any such claim, regardless of when it may have arisen, and regardless of whether a lawsuit has been filed seeking a collective or class action, all of which must be submitted for the arbitrator to decide in the first instance.

　　ii.　Limitations On How This Agreement Applies
This Agreement will not apply if an arbitrator determines (1) that the applicable law prohibits the arbitrator from deciding a particular matter or (2) that the Agreement restricts either Party from exercising a right that cannot be expressly waived by an agreement such as the right to pursue a claim of a unfair labor practice with the NLRB.

　　iii.　Selecting the Arbitrator
The Parties will select an Arbitrator by mutual agreement as follows:

- The Arbitrator must be an attorney or a former judicial officer;
- The Arbitrator must be licensed to practice or to preside where the arbitration will be conducted;
- The Parties may also mutually agree to use JAMS or the American Arbitration Association (or another organization) to resolve any claim. Claims will be resolved by the selected organization's rules in effect when the claim is filed, except where those rules conflict with this Agreement;
- If the Parties are unable to select an arbitrator by mutual agreement, either may apply to a court of competent jurisdiction where the arbitration will take place for the appointment of a neutral arbitrator. The court will appoint an arbitrator

3

4:13-cv-02136-BHH　　Date Filed 01/19/15　　Entry Number 80-1　　Page 14 of 18

who will act under this Agreement with the same effect as if the Parties had mutually agreed upon the arbitrator's selection. The arbitration will take place no more than 25 miles from where the Performer last performed at the Club, unless the Parties agree otherwise.

iv. **Starting The Arbitration**
The same statutes of limitation that would apply in court apply to claims in arbitration. The Party initiating the claim must deliver a written demand for arbitration to the other Party by hand or U.S. Mail within the applicable statute of limitations period. The demand must include the claimant's name, address, telephone number, an email address (if available), an identification of the Parties, and a brief statement describing the nature of the claim(s) and the remedy the Party is seeking. Any arbitration demand made to the Club must be mailed to: CFO, 3001 Hwy 17 South, North Myrtle Beach, South Carolina 29582. The arbitrator will resolve all disputes regarding timeliness or the propriety of the arbitration demand.

v. **How Arbitration Proceedings Are Conducted**
In arbitration, the Parties will have the right to be represented by an attorney, to conduct civil discovery, to file dispositive motions, to have the arbitrator issue subpoenas, and to present witnesses and evidence as needed in support of any claim(s) or defense(s), and the Arbitrator will resolve any disputes in this regard.

vi. **Class Action Waiver**
The arbitration is between the Club and Performer alone. For this reason, the Parties agree to bring claims *only* on an individual basis—*not* as a class action, collective action, or in any other representative capacity, such as a "private attorney general", etc. What this means as a practical matter is that each Party agrees that it will not:

   1. File a claim seeking to proceed as a class action, collective action, or in any representative capacity or proceeding (e.g., private attorney general, etc.);

   2. Attempt to consolidate claims involving separate claimants, unless the Club agrees in a writing signed by its Chief Executive Officer;

   3. Join, be part of, participate, or be represented in any class or representative action brought by someone else; or

   4. Pursue any award or remedy for someone who is not a named Party to the arbitration.

Furthermore, each party agrees that they will take all necessary steps to Opt-out or otherwise remove themselves as a participant in any class action filed under either state or federal law.

vii. **Paying For The Arbitration**
Each Party will pay its own attorney fees

unless the Arbitrator awards attorney fees to the prevailing party under the applicable law. The Club will pay the Arbitrator's and arbitration fees where the law requires. If applicable law does not require the Club to pay the Arbitrator's and/or arbitration fees, the fees will be apportioned between the Parties in accordance with applicable law, and the Arbitrator will resolve any disputes in that regard.

viii. **The Arbitration Hearing And Award**
The Parties will arbitrate their dispute before the Arbitrator who will confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard. Within 30 days of the close of the arbitration hearing, any Party has the right to prepare a brief, serve it on the other Party, and file it with the Arbitrator. For any claim submitted to the Arbitrator, the Arbitrator may award any remedy the Party would otherwise be entitled to as an individual under applicable law. This Agreement will *not* cause any remedy that would otherwise be available to an individual in a court of law to be forfeited. The Arbitrator will issue a decision in writing stating the essential findings of fact and conclusions of law. Except where an Arbitrator determines that the law requires it, neither a Party nor an Arbitrator may disclose the existence, content, or results of the arbitration without the written consent of all Parties. Any court of competent jurisdiction will have the authority to enter a judgment based on the Arbitrators award.

ix. **Enforcement of This Agreement**
If any part of this Agreement is found to be invalid, illegal or otherwise unenforceable, the Parties will first be given an opportunity to refashion the offending provision to best effectuate (1) the intent of the original provision to the extent permissible under the law and (2) the private, out-of-court resolution of disputes. If the Parties are unable to agree upon an amended provision that the arbitrator or court finds enforceable, the arbitrator may apply the offending provision to the extent permissible under the law or select (from among the Parties' proposed modifications) the clause that best effectuates (1) the intent of the original provision and (2) the private, out-of-court resolution of disputes. If none of the Parties' proposed modifications would render the offending provision enforceable under the law, the clause will be severed and the remainder of the Agreement will be enforced.

x. **Scope of Arbitration and Arbitrability Reserved to the Arbitrator**
This provision's purpose is to ensure that an arbitrator—*not* a court—will decide ALL federal, state, statutory, and common law claims between the Parties and to ensure that the class action waiver provision will apply to all such claims regardless of whether there are any pending collective or class actions pending at the time the agreement is entered. The Parties expressly agree that the arbitrator will decide all issues in the

4

first instance, including, but not limited to all gateway questions of arbitrability concerning: substantive arbitrability; the scope of this arbitration provision; the provision's applicability to a particular dispute; procedural arbitrability; whether the Parties have complied with this arbitration provision; the validity and enforceability of the Agreement as a whole; the validity and enforceability of this arbitration provision; and whether the arbitration clause is substantively or procedurally unconscionable. Neither of the Parties will institute a civil action concerning a dispute between the Parties, and will instead submit all disputes to arbitration. If a Party institutes a civil action despite this provision, the Parties agree the court will immediately refer the matter to the arbitrator in the first instance for determination. Should Performer attempt to disavow the nature of the Parties' relationship or its classification as an Independent Performer, Licensee and Temporary Space Lessee, and not an "employee", such challenges will be heard exclusively by the arbitrator, not a court — moreover, the class action waiver provision will continue to apply to all such claims, regardless of the arbitrator's determination. If arbitrator reclassifies Performer as an employee, this Agreement will remain in full effect (including the class action waiver), and the arbitrator will proceed to adjudicate the claimant's remaining employment-related allegations, such as those arising, e.g., under Title VII, the FLSA, ADEA, or any state statutes covering similar subjects.

16.  VOLUNTARY AGREEMENT.

Performer confirms she is entering into this Agreement freely without threat, duress, or coercion of any kind.

17.  MISCELLANEOUS.

This Agreement constitutes the entire understanding of the parties. No representations or warranties have been made by either party to the other, or by anyone else, except as expressly set forth in this Agreement. No prior oral or written statements, representations, promises and inducements have been made by either of the parties relating to the subject matter hereof which are not embodied in this Agreement. If any provision of this Agreement or the application thereof to any person or circumstance shall, for any reason and to the extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to the other person or circumstance shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law. The Club's failure to insist on compliance or enforcement of any provision of this Agreement shall not affect the validity or enforceability of this Agreement or operate or be construed as a waiver of any future enforcement of that provision or any other provision of this Agreement. This Agreement represents the entire agreement of the parties with respect to the subject matter thereof, and may not be modified or amended except in accordance by a writing signed by each of the parties hereto. Sections 8 through 15 shall survive the termination of this Agreement.

This Agreement replaces any prior agreement between the Parties, and since this Agreement is the most accurate description of the nature of the relationship of the Parties,

and represents what the Parties intended for their relationship to be when it was established, the terms and conditions herein are retroactive to and deemed effective from the date of any prior agreement or relationship between the Parties, should one exist.

The undersigned has executed this Agreement (which is comprised of five (5) pages) as of the day and year written below, and agrees to be bound by all provisions of the Agreement including the Dispute Resolution/Arbitration provision which provides that an arbitrator, not a court or jury, will decide any past or future dispute between the parties.

AGREED TO AND ACKNOWLEDGED BY:

_____
Signature-Legal Name of "Performer"

_____
Print Name

_____
Date

_____
Witness to Performer's Signature

_____
Print Name

_____
Date

_____
Authorized Representative of the Club

_____
Date

5

4:13-cv-02136-BHH   Date Filed 01/19/15   Entry Number 80-1   Page 16 of 18

Exhibit B

Start Date ___ 3/28/04 ___

Club: Bill Hues

Name: _Alaye Digido_

Stage Name: Bully

Position: Dancer

Home Phone: _____

Cell Phone: 424-9478

E-Mail: _____

Address: 107 NREIA Hazewill

City/State: NC

D.O.B. _7/20/18_

Exhibit C

# THEE DOLLHOUSE – M.B.

Name _Dawn Ungaro_

Stage Name _Syrah Fine_

Position _Entertainer_

Home Phone _P_

Cell Phone _843-222-1553_

E-Mail _Dawn_Ungaro@yahoo.com_

Address _160 Weeping Willow Dr_

City/State _MB  SC  29579_

D.O.B. _10-11-1978_

Start Date _9-22-_



SOUTH CAROLINA
UNGARO, LEA DAWN
160 WEEPING WILLOW DR
MYRTLE BEACH SC 29579-9205
Class: D    Hgt: 5-04    Wgt: 125
Sex: F    DOB: 10-11-1978
Issued: 10-11-2005    2004 0 4
D.L.#: 100281573
Expires: 10-11-2015

| | | |
|---|---|---|
| State of South Carolina | } | |
| | } | Declaration of Amy Hensell in Lieu of Affidavit |
| County of Horry | } | Pursuant 28 U.S.C. § 1746 |

Amy Hensell declares, under penalty of perjury, as follows:

1.     I am an adult who is competent to testify in a court of law.  The information contained in this Declaration is true, to the best of my personal knowledge and belief.

2.     I am an adult Entertainer that has performed at Crazy Horse d/b/a Thee New Dollhouse in North Myrtle Beach, South Carolina ("The Club") since it opened as Thee New Dollhouse in 2012.  I have been an Entertainer for about twelve years, and danced at many other adult nightclub locations not affiliated with the Club during that time both before and since it opened in 2012.

3.     I am providing this declaration after being interviewed by Laura Watson and legal counsel for Crazy Horse.  Ms. Watson explained to me that this declaration could be used to help the Club defend against a lawsuit brought by a dancer named Alexis Degidio under the Fair Labor Standards Act, and the South Carolina wage and hour laws which claims Entertainers at the Club should be paid as employees and not treated as independent contractors.

4.     I have been provided with nothing of value in exchange for this declaration or for agreeing to be interviewed.  Manager Laura Watson also explained to me that I was free to decline to be interviewed, and that if I did not agree to be interviewed or provide a declaration, there would be absolutely no negative consequences.

5.     My participation is voluntary, and I agreed to be interviewed, and to provide this declaration, of my own free will.

6.     Appearing and performing as an Entertainer at the Club is a part-time, seasonal thing for me, as I am a single mother with three children, two of whom are teenagers.

7.     I very much prefer to be an independent contractor rather than an employee. I like the freedom that I have to work when I want and when I can, and to earn as much money as my entertaining skills and abilities allow. Having the flexibility to work on my own schedule and keep what I earn has allowed me the opportunity to obtain three college degrees, save some money, and provide for my three children as well as spend valuable time with them. I believe most of the Entertainers at the Club share the same preference to keep the independent contractor relationship.

8.     The Club has never prohibited me from dancing at other nightclubs in Myrtle Beach or anywhere else. I am not aware of the Club restricting any Entertainer as to where they perform.

9.     As an independent contractor, I like the opportunity to make good money based upon my skills as an Entertainer. When I choose, I usually work three nights a week. I average taking home earnings of about $1,500.00 to $2,000.00 per week working only three nights per week. I pay a House Fee depending upon when I arrive at the Club. If I arrive before 7:00 p.m. then there is no House Fee.

10.    The Club charges a set rate to the customers for use of the private VIP room or couch area separate from what I charge for my time with a customer in the VIP room or couch area. I am able to set my own fee for that time. There is a suggested minimum, but I can set my charge to the customer at whatever fee I want.

11.    It is customary to tip the DJ, House Mom and Floor Hosts and I usually do. If I have a bad night, then I may not. Entertainers are not forced to tip. The customary amount tipped to the House Mom is $10.00 or $15.00 if two House Moms, $10.00 to the DJ, and $2.00 to Floor Hosts, but it is ultimately in the discretion of the Entertainer whether to tip and how much.

12.    I am also able to choose the outfits that I wear when I perform. These choices allow me to express myself as an Entertainer. I do not do as many individual dances for customers as a lot of other Entertainers. A good portion of my earnings comes from tips from customers who I spend time with at their table just talking. Entertainers are not required to do individual dances for customers if they choose not to

do so. The Club allows Entertainers to use the Club to entertain customers however they choose as long as it is within the law.

13.    I have worked as an Entertainer at the Club when Alexis Degidio occasionally appeared there as an Entertainer. The first time I met her she was in the bathroom doing cocaine. She looked at me and threatened me in an attempt to bully me about not telling on her. She was usually high on drugs when I saw her at the Club, and a frequent source of trouble in one way or another.

14.    I also knew Jacinda Gardner who was also usually high on drugs when she appeared at the Club. Both Degidio and Gardner were not similar to most of the Entertainers who appeared at the Club, which is the best and nicest club I have had the opportunity to work at as an Entertainer. Degidio appeared to be there to party. No doubt, there are many adult clubs where the majority of Entertainers are "party girls" like Degidio, but for the most part the Club did not. Although some "party girl" types would occasionally show up, they were the exception and not typical of the Entertainers who regularly appear there.

15.    The last I saw Jacinda Gardner, she was escorted out of the Club by police after she attempted to get drugs from an off-duty police officer.

FURTHER DECLARANT SAITH NAUGHT

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, in witness whereof I have signed below on the date indicated, at North Myrtle Beach, South Carolina.

_Amy Hensell_                          _11-13-14_
Amy Hensell                            Date

                                    ø ø ø

State of South Carolina   }
                              }   Declaration of _AMBER ROSS_ in Lieu of Affidavit
County of ___HORRY___   }   Pursuant 28 U.S.C. § 1746

_Amber Ross_ declares, under penalty of perjury, as follows:

    1.    I am an adult who is competent to testify in a court of law. The information contained in this Declaration is true, to the best of my personal knowledge and belief.

    2.    I am ~~presently~~ *was* an adult entertainer at Crazy Horse d/b/a Thee New Dollhouse in North Myrtle Beach, South Carolina ("the Club"). I have performed there since about ___2000___.

    3.    I am providing this declaration after being interviewed by Laura Watson. They explained to me that this declaration will be used to help the club defend against a lawsuit brought by a dancer named Alexis Degidio under the Fair Labor Standards Act, and the South Carolina wage and hour laws, which claims entertainers should be treated as employees and not independent contractors.

    4.    I have been provided with nothing of value in exchange for this declaration or for agreeing to be interviewed. Manager Laura Watson also explained to me that I was free to decline to be interviewed, and that if I did not agree to be interviewed or provide a declaration, there would be absolutely no negative consequences.

    5.    Ms. Watson explained that my participation is voluntary, and I agreed to be interviewed, and to provide this declaration, of my own free will.

    6.    I prefer to be an independent contractor rather than an employee. I like the freedom that I have to work when I want and when I can. There has never been a schedule requiring me to work. I come in and perform based upon my own schedule.

    7.    The Club does not prohibit me from performing at other nightclubs in Myrtle Beach or anywhere else.

8.    The Club does not tell me how to perform or stage or in the semi-private areas.  The Club does not choose for which customers I spend my time or perform private dances.  Those are my choices.

9.    As an independent contractor, I like the freedom to come and go as I please and that I do not have to wait for a paycheck.  I do not want my independence interfered with, and I believe other entertainers feel the same way.

10.    I am able to choose the outfits that I wear when I perform.

11.    The Club charges a set rate to the customers for use of the private VIP room or couch area separate from what I charge for my time with a customer in the VIP room or couch area.  I am able to set my own fee for that time.  There is a suggested minimum, but I can set my charge to the customer at whatever fee I want.

12.    It is customary to tip the DJ, House Mom and Floor Hosts and I usually do.  If I have a bad night, then I may not.  Entertainers are not forced to tip.  The customary amount tipped to the House Mom is $10.00 or $15.00 if two House Moms, $10.00 to the DJ, and $2.00 to Floor Hosts, but it is ultimately in the discretion of the Entertainer whether to tip and how much.

FURTHER DECLARANT SAITH NAUGHT

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, in witness whereof I have signed below on the date indicated, at North Myrtle Beach, South Carolina.

_____            ___12/20/14___
                                                                    Date

State of South Carolina    )
                           )    Declaration of Eliza Grigsby in Lieu of Affidavit
County of Horry            )    Pursuant 28 U.S.C. § 1746

Eliza Grigsby declares, under penalty of perjury, as follows:

1.    I am an adult who is competent to testify in a court of law.  The information contained in this Declaration is true, to the best of my personal knowledge and belief.

2.    I have appeared as an adult entertainer at Crazy Horse d/b/a Thee New Dollhouse in North Myrtle Beach, South Carolina ("the Club"). I have performed there off and on over the last two years.

3.    I am providing this declaration after being interviewed by Laura Watson. They explained to me that this declaration will be used to help the club defend against a lawsuit brought by a dancer named Alexis Degidio under the Fair Labor Standards Act, and the South Carolina wage and hour laws, which claims entertainers should be treated as employees and not independent contractors.

4.    I have been provided with nothing of value in exchange for this declaration or for agreeing to be interviewed. Manager Laura Watson also explained to me that I was free to decline to be interviewed, and that if I did not agree to be interviewed or provide a declaration, there would be absolutely no negative consequences.

5.    Ms. Watson explained that my participation is voluntary, and I agreed to be interviewed, and to provide this declaration, of my own free will.

6.    I prefer to be an independent contractor rather than an employee. I like the freedom that I have to work when I want and when I can. There has never been a schedule requiring me to work. I come in and perform based upon my own schedule.

7.    The Club does not prohibit me from performing at other nightclubs in Myrtle Beach or anywhere else.

000090

8.    The Club does not tell me how to perform or stage or in the semi-private areas.  The Club does not choose for which customers I spend my time or perform private dances.  Those are my choices.

9.    As an independent contractor, I like the freedom to come and go as I please and that I do not have to wait for a paycheck.  I earn far in excess of the minimum wage.  I do not want my independence interfered with, and I believe other entertainers feel the same way.

FURTHER DECLARANT SAITH NAUGHT

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, in witness whereof I have signed below on the date indicated, at North Myrtle Beach, South Carolina.

_____          Jan 3, 2015
Eliza Grigsby                             Date

| | | |
|---|---|---|
| State of South Carolina | } | |
| | } | Declaration of Gabrielle Poisson in Lieu of Affidavit |
| County of Horry | } | Pursuant 28 U.S.C. § 1746 |

Gabrielle Poisson declares, under penalty of perjury, as follows:

1.     I am an adult who is competent to testify in a court of law.  The information contained in this Declaration is true, to the best of my personal knowledge and belief.

2.     I am presently an adult Entertainer that appears on a regular basis at Crazy Horse d/b/a Thee New Dollhouse in North Myrtle Beach, South Carolina ("The Club").  I have been an Entertainer for about four years. I also have danced at other adult nightclub locations not affiliated with Crazy Horse during that time.

3.     I am providing this declaration after being interviewed by Laura Watson and legal counsel for Crazy Horse.  Ms. Watson explained to me that this declaration could be used to help the Club defend against a lawsuit brought by a dancer named Alexis Degidio under the Fair Labor Standards Act, and the South Carolina wage and hour laws which claims Entertainers at the Club should be paid as employees and not treated as independent contractors.

4.     I have been provided with nothing of value in exchange for this declaration or for agreeing to be interviewed.  Manager Laura Watson also explained to me that I was free to decline to be interviewed, and that if I did not agree to be interviewed or provide a declaration, there would be absolutely no negative consequences.

5.     My participation is voluntary, and I agreed to be interviewed, and to provide this declaration, of my own free will.

6.     Dancing and performing as an Entertainer at the Club is a part-time thing for me, as I am a full-time college student.

7.     I very much prefer to be an independent contractor rather than an employee.  I like the freedom that I have to work when I want and when I can.  I live

about 1½ hours away from the Club. Being a full-time student, I need the flexibility to work when I can. I can do that at the Club because I am not required to have a schedule. I believe most of the Entertainers at the Club share the same preference.

8.      The Club does not prohibit me from dancing at other adult nightclubs in Myrtle Beach or anywhere else. I am not aware of the Club ever restricting any Entertainer as to where they perform.

9.      As an independent contractor, I like the opportunity to make good money and that I do not have to wait for a paycheck. My best night I earned about $6,500.00. On Thursday, Friday and Saturday nights when I work, I average taking home earnings of about $1,000.00 per night. The amount an Entertainer is able to earn depends upon her skills and abilities to entertain the Club guests.

10.     Entertainers pay a House Fee if they arrive after 7:00 p.m. Other than the House Fee, the Club does not charge or take from me any of the cash money I earn. The Club charges a rate for use of the VIP room separate from what I charge for my time with a customer in the VIP room. I am able to get my own rate for that time. There is a suggested minimum, but I can set my charge to the customer at whatever rate I want.

11.     It is customary to tip the DJ, House Mom and Floor Hosts and I usually do. If I have a bad night, then I may not. Entertainers are not forced to tip. There is no policing by the Club of tips. There is a customary rate of $10.00 to the House Mom or $15.00 if two House Moms, and $10.00 to the DJ, and $2.00 to Floor Hosts, but it is ultimately in the discretion of the Entertainer.

12.     Although the Club asks Entertainers to wear classy, nice looking dresses and outfits, the styles and colors vary widely and are unique and individual to each Entertainer. I choose the outfits that I wear when I perform. These choices allow me to express myself as an Entertainer.

13.     I knew Alexis Degidio when she appeared as an Entertainer at the Club. I do not think she is representative of the majority of Entertainers who regularly appear there.

000093

FURTHER DECLARANT SAITH NAUGHT

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, in witness whereof I have signed below on the date indicated, at North Myrtle Beach, South Carolina.

_____          _____
Gabrielle Poisson                                          Date   11-14-14

State of South Carolina          }          Declaration of LUCINDA DEWEESE in Lieu of Affidavit
                                 }
County of ___HORRY___            }          Pursuant 28 U.S.C. § 1746

*Lucinda T DeWeese* declares, under penalty of perjury, as follows:

1.    I am an adult who is competent to testify in a court of law. The information contained in this Declaration is true, to the best of my personal knowledge and belief.

2.    I am presently an adult entertainer at Crazy Horse d/b/a Thee New Dollhouse in North Myrtle Beach, South Carolina ("the Club"). I have performed there since about ___I have been a Entertainer for over 30 years and have work here about 10 years___

3.    I am providing this declaration after being interviewed by Laura Watson. They explained to me that this declaration will be used to help the club defend against a lawsuit brought by a dancer named Alexis Degidio under the Fair Labor Standards Act, and the South Carolina wage and hour laws, which claims entertainers should be treated as employees and not independent contractors.

4.    I have been provided with nothing of value in exchange for this declaration or for agreeing to be interviewed. Manager Laura Watson also explained to me that I was free to decline to be interviewed, and that if I did not agree to be interviewed or provide a declaration, there would be absolutely no negative consequences.

5.    Ms. Watson explained that my participation is voluntary, and I agreed to be interviewed, and to provide this declaration, of my own free will.

6.    I prefer to be an independent contractor rather than an employee. I like the freedom that I have to work when I want and when I can. There has never been a schedule requiring me to work. I come in and perform based upon my own schedule.

7.    The Club does not prohibit me from performing at other nightclubs in Myrtle Beach or anywhere else.

8.    The Club does not tell me how to perform or stage or in the semi-private areas. The Club does not choose for which customers I spend my time or perform private dances. Those are my choices.

9.    As an independent contractor, I like the freedom to come and go as I please and that I do not have to wait for a paycheck. I do not want my independence interfered with, and I believe other entertainers feel the same way.

10.    I am able to choose the outfits that I wear when I perform.

11.    The Club charges a set rate to the customers for use of the private VIP room or couch area separate from what I charge for my time with a customer in the VIP room or couch area. I am able to set my own fee for that time. There is a suggested minimum, but I can set my charge to the customer at whatever fee I want.

12.    It is customary to tip the DJ, House Mom and Floor Hosts and I usually do. If I have a bad night, then I may not. Entertainers are not forced to tip. The customary amount tipped to the House Mom is $10.00 or $15.00 if two House Moms, $10.00 to the DJ, and $2.00 to Floor Hosts, but it is ultimately in the discretion of the Entertainer whether to tip and how much.

FURTHER DECLARANT SAITH NAUGHT

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, in witness whereof I have signed below on the date indicated, at North Myrtle Beach, South Carolina.

_Lucinda T. DeWeese_                     _Dec. 20. 2014_
                                          Date

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

| | | |
|---|---|---|
| ALEXIS DEGIDIO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:13-cv-02136-BHH |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| CRAZY HORSE SALOON AND RESTAURANT, INC., d/b/a THEE NEW DOLLHOUSE, | ) ) ) ) | |
| Defendant. | ) ) | |

---

## DEFENDANT'S REFILED MOTION FOR SUMMARY JUDGMENT

---

Defendant Crazy Horse Saloon and Restaurant, Inc. ("Defendant") refiles its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and this Court's Order of April 7, 2015, on all of Plaintiff's claims under the Fair Labor Standard Act, 29 U.S.C. § 201 et seq.; the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-10 et seq; and common law, on the grounds that there are no genuine issues of material fact on any of the claims asserted in the Amended Complaint, and thus summary judgment should be granted.

In support of the Motion Defendant relies upon the following:

a) Memorandum in Support (with copies of unpublished decisions);

b) Defendant's Statement of Undisputed Facts;

c) Deposition excerpts of Plaintiff, Laura Watson, John Trowbridge, Brent Clark, Laurie Callicutt, Joe Haragdon, Michael J. Peter, Jacinda Gardner; Declarations of Laura Watson, Jack Davenport, Brent Clark, Amy Hensell; and Plaintiff's Amended Responses to Interrogatories No. 11 and 13 and Requests for Production 1, 5 and 7.

Respectfully submitted,

/s/ William Paul Young
S.C. Federal ID 05732
William Paul Young, P.A.
P.O. Box 4213
North Myrtle Beach, SC  29597
843-249-9999
843-249-5876 (fax)
pyoung4213@frontier.com

and

Stephen L. Shields (TN Bar #06981)
James L. Holt, Jr.  (TN Bar #012123)
Timothy A. Perkins (TN Bar #024657)
JACKSON, SHIELDS, YEISER & HOLT
262 German Oak Drive
Memphis, TN 38018
901-754-8001
901-754-8524 (fax)

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was filed with the Court's CM/ECF System on May 4, 2015 which will generate service upon the attorneys of record.

/s/William Paul Young
William Paul Young

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | | |
|---|---|---|
| ALEXIS DEGIDIO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:13-cv-02136-BHH |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| CRAZY HORSE SALOON AND RESTAURANT, INC., d/b/a THEE NEW DOLLHOUSE, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S REFILED MOTION FOR SUMMARY JUDGMENT

COME NOW Crazy Horse Saloon and Restaurant, Inc. d/b/a Thee New Dollhouse ("Defendant" or "the Club"), and refiles its summary judgment per the Court's Order (Doc. No. 96), which provided Defendant the opportunity to refile this motion in order to address the recent reversal of *Lewis v. L.B. Dynasty*, --- S.E.2d --- (2015), No. 2012–213376, 2015 WL 1223710 (S.C. Mar. 18, 2015).

Since the *Lewis* decision only addressed whether an exotic dancer qualified as an employee for workers' compensation purposes since no Fair Labor Standards Act ("FLSA") claim was involved, that opinion is not binding on the Court in the instant action and does not alter Defendant's argument, nor the conclusion that it advocates, that Plaintiff should not be considered its employee for the following reasons: (1) the *Lewis* decision was based on a South Carolina workers' compensation claim, while in this case the FLSA pre-empts Plaintiff's South Carolina minimum wage claims and, thus, federal law, as opposed to South Carolina law, definitively determines whether Plaintiff must be considered an employee under the FLSA; (2) the legal test

000099

used by *Lewis* to analyze employee status for workers' compensation purposes is liberally construed because the statute serves a beneficent purpose and addresses somewhat different factors than the FLSA employee test;[1] and (3) even if the same legal standards had been employed for both the *Lewis* case and the instant case, the Court would still have been obligated to examine the totality of the circumstances based on the specific facts, which are different from the *Lewis* case, especially with regard to the "right to control," which the South Carolina Supreme Court identified as "[t]he crux of this determination" in the workers' compensation employee test.[2] Furthermore, even if the Court were to find despite the different fact pattern in the instant case as well as the different legal standard to be applied that Plaintiff was Defendant's employee,

---

[1] *See Lewis*, 2015 WL 1223710, at *2 ("We construe workers' compensation law liberally in favor of coverage to further the beneficent purpose of the Workers' Compensation Act; accordingly, only exceptions and restrictions to coverage are strictly construed") (*citing James v. Anne's Inc.,* 390 S.C. 188, 198, 701 S.E.2d 730, 735 (2010)). In analyzing the nature of a work relationship for purposes of workers' compensation, South Carolina courts examine four factors: (1) direct evidence of the right or exercise of control; (2) furnishing of equipment; (3) method of payment; (4) right to fire. *See Lewis*, 2015 WL 1223710, at *2 (citing *Shatto v. McLeod Reg'l Med. Ctr.,* 406 S.C. 470, 475–76 (2013)). However, the following six factors are analyzed in the FLSA "economic realities test:" (1) "the degree of control that the putative employer has over the manner in which the work is performed;" (2) "the worker's opportunities for profit or loss;" (3) "the worker's investment in equipment or material;" (4) "the degree of skill required;" (5) "the permanence of the working relationship;" and (6) "the degree to which the services rendered are an integral part of the putative employer's business." *Schultz v. Capital Int'l Sec. Inc.,* 466 F.3d 298, 305 (4th Cir. 2006).

[2] *See Lewis*, 2015 WL 1223710, at *2 ("The crux of this determination is the purported employer's right to control the claimant in the performance of his work"). In *Lewis*, the club had much more control over the Entertainer because that club, unlike Defendant, could discipline Lewis for leaving her shift early, not participating in the stage rotation when called, and not performing VIP dances for specific customers as requested by the club. *See Lewis*, 2015 WL 1223710, at *3, 5. Multiple facts upon which the South Carolina relied to determine that Lewis was an employee due to that club's "right to control" her differ from the facts in the instant case, including that in this case Defendant did not fine or discipline Entertainers for failure to perform any VIP dance requested, failure to participate in the stage rotation when requested, or for leaving the club early. (Davenport Decl. ¶ 14-15, 18; Pl.'s Dep. 98-99; Trowbridge Dep. 34-36; Clark Dep. 31.) Therefore, Defendant did not exercise the same degree of control over the Entertainer as the defendant did in *Lewis*.

000100

Defendant would still be entitled to summary judgment because Plaintiff cannot establish that she was undercompensated as an "employee."

## I.    CONCISE SUMMARY OF NATURE OF CASE

Plaintiff brings the instant action against Defendant alleging: (1) that she was the Club's employee, and was misclassified by the Club as an independent contractor; (2) that, as a result, Defendant failed to pay her statutory minimum wages and overtime wages as required by the Fair Labor Standards Act of 1938, ("FLSA"), 29 U.S.C. § 201, et seq. and for relief under the South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-10 to 110 ("PWA"), or, (3) in the alternative, that, under state common law, Defendant has been unjustly enriched by making unlawful deductions from Plaintiff's compensation.

Defendant is entitled to Summary Judgment on the following grounds:

1.    Plaintiff was not an "employee" and thus not covered by either the FLSA or the South Carolina Payment of Wages Act;

2.    Plaintiff cannot establish a claim that she was undercompensated as an "employee" under either the FLSA or South Carolina Payment of Wages Act, nor can she establish a claim of unjust enrichment; and

3.    All of Plaintiff's state law claims, specifically those brought under the South Carolina Payment of Wages Act and for unjust enrichment, are pre-empted by the FLSA.

## II.    CONCISE SUMMARY OF THE FACTS

Defendant refers the Court to its separate Statement of Undisputed Material Facts which is incorporated herein by reference.

## III.    ARGUMENT AND CITATION OF AUTHORITY

"The purpose of the FLSA is to protect the standard of living and general well-being of the American worker." *Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997). Plaintiff in this

3

case, through her own bargaining power and her own decision-making, had the opportunity to secure a high standard of living not enjoyed by many citizens of our state or even our country who possess similar levels of education, training and experience.    Despite that fact, Plaintiff, who by her own admission is motivated to bring this suit as a personal vendetta against the Club and the people who work there (Plaintiff's Dep. 31-34, 53, 69), is attempting to force Defendant to pay additional wages that neither party bargained for or expected.    "[T]he FLSA is designed and intended as a shield to protect the unwary and not as a sword on which to impale an unsuspecting employer who is engaged in a business and honestly exercises a reasonable effort in good faith to comply with all the required provisions of such act." *Wirtz v. Harrigill*, 214 F. Supp. 813, 815 (S.D. Miss. 1963), *aff'd*, 328 F.2d 963 (5th Cir. 1964).    Plaintiff was not unwary; she was an Entertainer for many years at various nightclubs and understood that she was an independent contractor and not an "employee" at any of them.    Plaintiff estimates that in 2011, prior to performing at Defendant's Club in 2012, she earned around $100,000.00 as an Entertainer.    (Pl.'s Dep. 117-19)    Despite her better than average income, Plaintiff now attempts to use the FLSA as a "sword" for which it was not intended.

A.    **Plaintiff Was Not An Employee of Defendant.**

Plaintiff asserts that she was an employee of Defendant. The FLSA's minimum wage provisions apply only to "employees," not independent contractors. 29 U.S.C. § 206(a); *Chao v. Mid-Atlantic Installation Services, Inc.*, 16 Fed.Appx. 104, 105 (4th Cir. 2001). Determining whether a person is an "employee" under the FLSA is an essential element of Plaintiff's claim, and she must first establish that she is an "employee." *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999).    Under the FLSA, an "employee" is defined as "any individual employed by an employer." 29 U.S.C. §§ 203(e)(1).    To "employ" is defined as to "suffer or permit to work." 29 U.S.C. § 203(g).    The FLSA does not define the critically essential element

4

000102

of "suffer or permit to work."    Under the PWA, the term "employee" is not expressly defined, and an "employer" is defined as "every person, firm, partnership, association, corporation, receiver, or other officer of a court of this State, the State or any political subdivision thereof, and any agent or officer of the above classes employing any person in this State."  PWA, § 41-10-10(1).

In order to determine whether an individual is an employee or an independent contractor, in the absence of statutory definitions, courts typically look to the "economic reality" of the relationship by analyzing the following six factors:  (1) "the degree of control that the putative employer has over the manner in which the work is performed;" (2) "the worker's opportunities for profit or loss;" (3) "the worker's investment in equipment or material;" (4) "the degree of skill required;" (5) "the permanence of the working relationship;" and (6) "the degree to which the services rendered are an integral part of the putative employer's business." *Schultz v. Capital Int'l Sec. Inc.*, 466 F.3d 298, 305 (4th Cir. 2006).  "No single factor is dispositive."  *Id.*  There is no automatic classification of exotic dancers but rather that the Court must individually analyze each case's facts to determine whether a dancer meets the definition of an employee for FLSA purposes based on the six "economic realities" factors.[3]

Courts have reached different conclusions as to whether Entertainers such as Plaintiff are employees or independent contractors.    For example, the Court in *Verma v. Castor, Inc.*, 2014 WL 2957453 (E.D. PA., 2014), found that dancers were employees where the club exercised significant control over the dancers' schedules for being present and for performing at the club; assessed fines to dancers who chewed gum or talked on stage, used cell phones or electronic

---

[3] *Matson v. 7544, Inc.*, 2000 WL 1132110, at *1-2 (D. Or. Jan. 2000); *Hilborn v. Prime Time Club, Inc.*, No. 4:11CV00197 BSM, 2012 WL 9187581 (E.D.Ark. July 12, 2012); *McFeeley v. Jackson St. Entm't, LLC*, 47 F.Supp.3d 260, 267 (D. Md. 2014); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901, 912-13 (S.D.N.Y. 2013).

000103

devices on stage or on the floor or arrived late to their scheduled shifts; and required dancers to tip employees. *Id.*, at 5-6. In *Clincy v. Galardi S. Enters., Inc.*, 808 F.Supp.2d 1326 (N.D. GA. 2011), the club's written and unwritten guidelines for dancers' scheduling, conduct on stage, dress and appearance and cost of dances weighed in favor of the dancers being employees. *Id.*, at 1344-45. However, in *Matson v. 7544, Inc.*, 2000 WL 1132110, (D. Or. Jan. 2000), the Court found that an Entertainer such as Plaintiff was an independent contractor despite rules enforced and fines charged by the club where she entertained. *Id.*, at 2. Like Plaintiff, the Entertainer in *Matson* paid fees to access the club's clientele and was compensated solely by the service fees and tips she collected. *Id.*, at 1. Additionally, in *Hilborn, et al. v. Prime Time Club, Inc.*, 2012 WL 8132324 (E.D. Ar. 2012), the Court found that all factors weighed toward dancers being independent contractors. In the instant case, an examination of the economic realities similarly weighs in favor of Plaintiff as an independent contractor, or lessee, and not an employee.

Defendant has found no decision from the Fourth Circuit that has specifically considered whether exotic dancers are more properly classified as employees or independent contractors under the FLSA. However, other cases from the Fourth Circuit provide guidance for the instant case. In *Schultz,* a case involving security personnel, the Fourth Circuit found that the "degree of control" factor weighed heavily in favor of an employer/employee relationship because defendants "exercised nearly complete control over how the [security] agents did their jobs." *Schultz,* 466 F.3d at 307. Specifically, the Court in *Schultz* found that defendants issued its workers an eight-page SOP which strictly dictated the manner in which the agents were to carry out their duties of providing security for the defendants. *See id.* In contrast, at the other end of the spectrum, in *Chao v. Mid-Atlantic Installation Services, Inc.*, 16 Fed.Appx. 104 (4th Cir. 2001), the district court declined to find that cable installers were "employees" because the defendant "[did] not exercise the type of control over 'the manner in which the work is to be performed...'".

6

000104

*Chao,* 16 Fed. Appx. at 106, 108.

### 1. Degree of Control.

To determine independent contractor/employee status, courts look at whether the putative

employer exerts a certain degree of control over the manner in which the work is performed (as

opposed to the outcome or final result of the work).[4] The fact that an independent contractor is

subject to some control or "rules" mostly requiring that person to conform to the law does not

transform her into an employee.[5]   In the instant case, Defendant contends that it did not exert a

significant degree of control over Plaintiff to the point that she could have been rendered an

"employee" as a matter of law.   For instance, Plaintiff set her own schedule for performances,

chose any dress in conformity with the upscale Club, and completely controlled *the final result of*

*her work (i.e. how she physically performed her dances).*[6]   Additionally, Plaintiff testified that the

rules were unspoken; therefore, such "unspoken" and unwritten "rules" actually did not constitute

"rules" at all but rather common methods used by the entertainers.[7]   Plaintiff admitted that she

thought of herself as working for Joe Hargadon, the General Manager, and he "didn't enforce any

rules."[8] Laurie Calicutt's testimony also confirmed that Hargadon permitted Plaintiff to do

---

[4] *Chao v. Mid-Atlantic Installation Servs., Inc.,* 16 Fed.Appx. 104, 106-108 (4th Cir. 2001)(cable installers were not "employees" because defendant "[did] not exercise the type of control over 'the *manner* in which the work is to be performed"); *Schultz,* 466 F.3d at 304 (courts consider "the degree of control that an alleged employer has in comparison to the control exerted by the *worker*").

[5] *See, e.g., Wilkinson v. Palmetto State Transp. Co.,* 382 S.C. 295, 302 (S.C. 2009) ("requiring a worker to comply with the law is not evidence of control by the putative employer" when the court analyzes employee versus independent contractor status for workers' compensation purposes).

[6] SOF ¶ 13, 15, 20; Clark Dep. 31:12-15.

[7] Pl.'s Dep. at 50:9-14. Plaintiff cannot now claim that such "rules" or "common practices" of the entertainers (that were never communicated to her by Defendant) are material to the issue of whether Defendant controlled her, except to prove that Defendant in fact did not.

[8] Pl.'s Dep. at 40:25; 50:9-14.

7

000105

whatever she wanted.[9]

Defendant exercises much less control over Entertainers than do most other adult night clubs. For instance, Defendant distributes no set of rules which it enforces on Entertainers other than those required by state and local laws. (Davenport Dec. ¶ 4, 16; Clark Decl. ¶ 6; Callicutt Dep. 166-170). The Club has no specific dress code as Entertainers select their own gowns or dresses, based upon their choice of style, color and material so they each have own unique look (Davenport Decl. ¶ 16). The Club does not dictate how Entertainers perform or the way they dance to satisfy the Club's guests (Davenport Decl. ¶ 7), nor does the Club subject Entertainers to any material limitation or control, other than that which is prohibited by state and local law (Davenport Decl. ¶ 4). The Club does not subject Entertainers to fines or disciplinary actions (Davenport Decl. ¶ 20; Callicutt Dep. 167; Hargadon Dep. 37). Unlike *Lewis*,[10] Defendant does not punish Entertainers for failure to perform a VIP dance, for failure to participate in the stage rotation when requested, or for leaving the club early. (SOF ¶ 17; Davenport Decl. ¶ 14-15, 18; Pl.'s Dep. 98-99; Trowbridge Dep. 34-36; Clark Dep. at 31:21-33:12).

Entertainers at the Club are allowed to perform when they want, i.e., what days they come to the Club, what time they arrive and what time they leave. (Davenport Decl. ¶ 14; Plaintiff's Dep. 98 line 25- 99 line 10). The Club but does not dictate the Entertainer's schedule in any way. (Davenport Decl. ¶ 6). Entertainers are free to work regularly or sporadically. (Davenport Decl. ¶ 14). The arrival time of Entertainers is recorded on a sign-in sheet, but not the departure time or the number of hours they worked (Watson Decl. ¶ 4). The Club does not control the manner in which Entertainers perform their dances nor does the Club required Entertainers to dance,

---

[9] Callicutt Dep. at 264:24-25; 265:1-21.

[10] *Lewis*, 2015 WL 1223710, at *2.

000106

entertain or perform in any particular way (Davenport Decl. ¶ 7; Pl.'s Dep. 37:6 – 38:14; Clark Dep. 31). The Club does not require Entertainers to attend staff meetings (Davenport Decl. ¶ 14). Entertainers who do not come to the Club for a week, a month, or even more do so without any consequence (Davenport Decl. ¶ 14). Entertainers are not prohibited from performing at other adult oriented clubs or holding down other jobs (Davenport Decl. ¶ 14, Hensell Decl. ¶ 8).

Entertainers are free to mingle with the Club's guests and are free to pick and choose the guests for whom they wish to perform (Davenport Decl. ¶ 15). Unlike employees, Entertainers are allowed to eat meals, consume alcohol, smoke cigarettes and take breaks at their discretion (Davenport Decl. ¶ 21). The Club does not require Entertainers to strictly comply with the Club's stage rotations (Davenport Decl. ¶ 18; Trowbridge Dep. 34-36; Clark Dep. 31), does not limit how much Entertainers may charge guests (Davenport Decl. ¶ 9, 10), and does not require Entertainers to perform for specific customers in VIP or other semi-private areas (Davenport Decl. ¶ 15). Entertainers at the Club are free to develop their own "fan base" and to promote themselves using social media (Clark Decl. ¶ 8). While it is customary in the gentlemen's club industry for Entertainers to tip club employees, the Club does not require Entertainers to do so (Davenport Decl. ¶ 12). Indeed, Club employees are prohibited from asking for tips, and any may be terminated for harassing an Entertainer for a tip. (Davenport Decl. ¶ 13; Hensell Dec. ¶ 11; Callicutt Dep.43, 157-160; Trowbridge Dep. 44-48, 96-99).

Unlike the rules imposed upon the workers in *Schultz,* no such specific rules govern the conduct of Entertainers at Defendant. Other than rules requiring that their lower private areas be covered in compliance with the law and an expectation that the Entertainer's appearance will meet the Club's upscale reputation, there are no rules enforced against the Entertainers (Davenport Dec. ¶ 4, 16; Clark Decl. ¶ 6; Callicutt Dep. 166-170).

Defendant does not schedule whether or when Entertainers come to the club or when or

9

how the Entertainer performs. (Davenport Decl. ¶ 7, 14; Pl.'s Dep. 37:6 – 38:14, 98:25 – 99:10; Clark Dep. 31). Business records of the Club show that Plaintiff performed at the Club sporadically between July through November, 2012, and then not again until her last time on March, 19, 2013 (Watson Decl. ¶ 10-20). Such freedom to perform when, where, as often and how she chooses is not indicative of an employment relationship. In light of the totality of the circumstances, this factor weighs in favor of economic independence.

### 2. Opportunity for Profit or Loss.

Entertainers have opportunity for profit or loss while performing at the Club. Entertainers are free to use the Club's VIP-areas to sell and perform private dances for the Club's guests. Entertainers may use the Club's VIP-areas to perform privately for whatever fee they establish with the customer. (Davenport Decl. ¶9-11, Watson Decl. ¶ 5). The Club charges a fee for use of certain semi-private spaces to the guests, not the Entertainer (Watson Decl. ¶ 5). The Club does not require Entertainers to use the semi-private spaces nor does the Club limit or mandate either how often an entertainer can perform or the number of couch or VIP-area dances she performs for its guests (Davenport Decl. ¶ 9-10).

Plaintiff could control her own profitability based on when and how often she chose to perform as well as how much she decided to charge for various types of performances at the Club (Davenport Decl. ¶14; Callicutt Dep. 112-114; Plaintiff's Dep. 98 line 25 - 99 line 10). Plaintiff controlled how she interacted with the Club's customers, including whether or not she wished to perform privately, or entertain guests in the Club's VIP, couch or Jacuzzi areas. (Davenport Decl. ¶ 20) She had exclusive control over her appearance and the costumes she wore to make herself visually appealing to the Club's customers, and how much she spent on achieving her look (Watson Decl. ¶ 2; Clark Decl. ¶ 5; Davenport Decl. ¶ 16, 24). Plaintiff alone decided which guests she wanted to spend time with, talk to or perform for (Davenport Decl. ¶ 15). Like the

10

000108

Entertainer in *Matson,* Plaintiff paid fees to access the club's clientele and was compensated solely by the service fees and tips she collected. *Matson v 7544, Inc.,* 2000 WL 1132110, at 1.

Plaintiff's putative opt-in Jacinda Gardner, an Entertainer allegedly similarly situated to Plaintiff, testified that on some occasions she earned nothing, effectively suffering a net loss for the evening. (Gardner Dep. 74–77). This admission disproves the existence of an employer-employee relationship. Employees go to work to earn money, not to lose money. No rational employee who "loses" money at work returns to that job, week after week, month after month, only to continue to lose money. Yet, Gardner claims that on many nights, business was so slow that she suffered a "net financial loss," having paid the Club more in house fees than she earned from tips and service charges from dancing. This should be considered as strong evidence weighing in favor of an independent contractor relationship.

The fact that the Entertainers agree to pay the Club to perform there, makes them more akin to independent contractors or lessees than employees. Employees do not typically pay their employers to work, and certainly do not voluntarily risk losing money when they do work, which is the *very antithesis of an employer-employee relationship.* This factor weighs against finding an employment relationship, and weighs in favor of economic independence.

### 3. Investment in Equipment or Material.

For purposes of this prong, the Fourth Circuit analyzes "the *worker's* investment in equipment or material,"[11] and evidence that plaintiffs incurred significant expense "of a type not normally borne by employees" weighs strongly in favor of independent contractor status.[12] Plaintiff purchased her equipment and materials necessary for her performances (including her

---

[11] *Schultz,* 466 F.3d at 308.

[12] *Chao,* 16 Fed.Appx. at 107.

000109

own dresses, gowns, costumes, shoes, and cosmetics); however, she received no reimbursement from Defendant for any of those expenses except tattoo makeup.[13] Since employees usually do not buy their own costumes as Plaintiff had to, this factor weighs in favor of independent contractors status.[14] Additionally, Plaintiff had to pay a house fee to perform at the Club, and entertainers arriving after 7:00 pm were required to pay Defendant a "House Fee" ranging from a low of $20 to a high of $100, depending on what time the entertainer arrives.  (Davenport Decl. ¶ 8).  Thus, Plaintiff made a significant investment in purchasing items necessary for her appearance and in paying house fees in furtherance of her entertainment career.

In *Chao,* the district court concluded that the fact that installers made investment in their own equipment, and because they incurred significant expense "of a type not normally borne by employees," that this factor weighed strongly in favor of concluding they were independent contractors.  *Chao,* 16 Fed.Appx. at 107.  In contrast, in *Schultz,* the Court found that this factor weighed in favor of an employer-employee relationship because defendants "supplied almost every piece of equipment the [plaintiffs] used."  466 F.3d at 308.  This case is more akin to *Chao* than it is to *Schultz.*

Here the Club provides none of the tools or training upon which an Entertainer uses while performing.  (Watson Decl. ¶ 2, Pl.'s Dep. 86-90; Davenport Decl. ¶ 7).  While Plaintiff may indeed benefit from the Club's investments in its building, bar, food and DJs, etc., these investments are not "for" the Entertainers, but are primarily for the purpose of attracting guests to be entertained in a variety of ways (not just Entertainers) and spend money on food and drink.

---

[13] Although customers pay a rental fee for use of the Club's private rooms, Plaintiff provides the majority of equipment and material used in furtherance of her dances, and the Club does not provide the tools she uses while performing. Watson Decl. ¶ 2, Pl.'s Dep. 86-90; Davenport Decl. ¶¶ 8-9. The fact that Defendant did not "suppl[y] almost every piece of equipment the [plaintiff] used" weighs against employee status. *Schultz,* 466 F.3d at 308.

[14] *Schultz,* 466 F.3d at 308.

12

000110

(Davenport Decl. ¶ 3; Peter Dep. 117:22-123:3).   For these reasons, this factor weighs in favor of finding an independent contractor relationship.

### 4. Degree of Skill Required.

In analyzing the type of skill required for an Entertainer to perform at Defendant's Club, the Court should not focus solely on the Entertainer's physical ability to dance, although both Plaintiff and putative opt-in Entertainer Jacinda Gardner both had significant expertise in that area.[15]   Rather, since the Entertainer's success in that type of entertainment industry hinges not upon purely physical learned skills, such as those used in a trade like carpentry, but instead upon the Entertainer's presentation and connection with the audience through skills more like those of actors, musicians or comedians, the Court should acknowledge the unique combination of talent and skill necessary for an Entertainer to appeal to an audience, which in the final analysis governs the success or failure of any entertainer.

Entertainers interested in performing at Defendant's Club must audition before the General Manager and are subjectively evaluated based on whether they exhibit an appealing personality, beautiful appearance, and ability to dance.   It is a highly selective process, and Entertainers who do not meet the Club's standard of appeal are not selected.   (Davenport Decl. ¶ 7; Davenport Dep. 36-37).   The Club provides no training or instruction on how to be a successful Entertainer; thus, the Entertainer must have a significant ability to appeal to its guests in order to profit because her earning capacity depends completely upon her ability to appeal to those guests.   (Davenport Decl. ¶¶ 6-7.)   Plaintiff's level of talent and skill in dance and audience appeal, which she had previously developed for eight years at other clubs, necessarily surpassed the level of skill that the

---

[15] (Pl.'s Dep. 37 ¶¶ 1-21; Gardner Dep. 19.)

000111

average street person would have in appearing as an Entertainer at this upscale Club.[16]

### 5. *Permanence of the Working Relationship.*

"The fifth factor is the degree of permanency of the working relationship. The more permanent the relationship, the more likely the worker is to be an employee." *Schultz*, 466 F.3d at 308-309. Over the entire ten month period in which Plaintiff claims to have worked, Defendant's documentation only supports the inference that Plaintiff actually only performed there on twenty-one occasions, or about 2 times per month, with sometimes weeks or months between performances.[17] During that time period, she was free to perform at other clubs and did not perform at Defendant consistently or regularly. She would sometimes go weeks between appearances, sometimes appear once in a week, other times two or three times. (Watson Decl. ¶ 9-20). Even if Plaintiff alleges that she worked about forty to fifty shifts (with thirty-six of them from July to November of 2012, or an average of 6 times per month during that period), that still does not establish the kind of permanent working relationship between an employer and employee.[18] Based on those undisputed facts, the Court should find that Plaintiff did not consistently or regularly perform at the Club and that her working relationship with it was therefore not of a permanent nature. Thus, this factor weighs in favor of independent contractor status.

### 6. *Integral Nature of Services Rendered.*

Defendant does not dispute that Entertainers are important to its operations as a

---

[16] For example, Plaintiff, who regarded herself as an "accomplished dancer," testified that she developed her own dance style and ability through about eight years of practice and experience at other clubs. (Pl.'s Dep. 37 ¶¶ 1-21.) Gardner, who also performed at the Club as an Entertainer, had previous dance training as a child as well as experience in high-school in cheerleading and gymnastics. (Gardner Dep. 19.)

[17] Watson Decl. ¶¶ 9-20.

[18] P.'s Dep. at 18:1-4.

14

gentlemen's club, but would contend that there are several services offered by the Club that are also important and integral to its operations, such as the commitment to hospitality services, full bar, VIP bottle service, DJ, other entertainment and TV sports.   (Davenport Decl. ¶ 3; Peter Dep. 117 – 123).   The club's gross revenue made from the Entertainers, including VIP and couch rentals as well as the charges for Golden Dollar fees, did not represent the majority of Defendant's income but instead constituted less than 45% of the club's gross revenue at most;[19] therefore, the money generated incidental to the Entertainers is not integral or critical to the Club's operation.[20] Even if the performances of Entertainers were considered the primary source of revenue, this factor, standing alone, would not create an employment relationship between the Entertainers and the Club.

### 7. Consideration of All Factors.

Given the above analysis, only the sixth factor might come close to weighing in favor of an "employer-employee" relationship.   Plaintiff was not economically dependent on the Club but rather chose to perform sporadically at the Club.   As a matter of economic reality, she was in business for herself in the same manner as a vendor who rents space from a landlord in order to sell her services or products, with the result that the Court should find that Plaintiff was, as a matter of law, an independent contractor.   The relationship between a Gentlemen's club, like Defendant, and its Entertainers, like Plaintiff, is not a typical employment relationship.   In the typical

---

[19] About 20-30% of the Club's gross income came from VIP rentals for couch dances, while another 12-15% came from Golden Dollars. (Watson Dep. at 43:4-13.)

[20] In fact, Michael Peter testified that even if the Club had no Entertainers, it would still survive because they are "in the nightclub business" and he has all kinds of other attractions, including liquor, food, forty-five televisions that attract numerous sports fans, and other shows that can be performed (including the "greatest blue comedian that ever lived," Pussycat Dolls show, live bands with female dancers, and a vocalist who has recorded over twelve albums and placed "third on the X Factor").   (Peter Dep. 118:22-25, 119-120.)

15

000113

employer/employee relationship, the employer pays its employees a salary, hourly wage, or some in-kind benefit in exchange for the employee's services, which are ordinarily rendered to the employer or for his direct benefit. Here, the Entertainer agrees to pay the Club a fee for access to the Club's facilities and the opportunity to make money by offering her services to the Club's guests with virtually no control or direction from the Club as to how to do so. Because the FLSA was never intended to apply to the type of business relationship which exists between the Club and its Entertainers, the Court should not interfere with that voluntary arrangement between competent contracting parties.

Though some Courts have held that Entertainers in businesses such as Plaintiff's were employed by the clubs where they performed due to the Club's exercise of control over them, that result is based on facts distinguishable from the facts here. The ultimate question for the Court's consideration is whether the Plaintiff was, "economically dependent on the business to which [she] renders service or is, as a matter of economic [reality], in business for [herself.]" *Schultz,* 466 F.3d at 304. The facts in this case show that Plaintiff was not economically dependent on Defendant, a Club where she performed only twenty-one days over approximately a ten-month period (Watson Decl. ¶ 9). Plaintiff was not employed by Defendant and is not owed wages or overtime compensation pursuant to the FLSA or the PWA.

Plaintiff was not economically dependent on the Club but rather chose when and when not to perform at the Club while in business for herself.[21] While Plaintiff failed to disclose income tax records of her other earnings during that period, the facts before the Court indicate that Plaintiff in reality was not economically dependent on Defendant, a Club where she performed only twenty-one days (or according to Plaintiff about forty times) over about a ten-month period, during

---

[21] *Schultz,* 466 F.3d at 304.

000114

which time she made well over minimum wage.[22] Moreover, the FLSA was not designed for an entertainer, who was earning well over minimum wage ($100,000 per year or $900 per week minimum) while believing she was an independent contractor, to turn once angered and then wield her non-classification as an employee as a sword against Defendant to extract her vengeance.[23] The undisputed facts demonstrate as a matter of law that this Court may find that Plaintiff was not employed by Defendant.

> **B.    Plaintiff Cannot Establish a Claim That She was Undercompensated as an "Employee" Under Either the FLSA or South Carolina Law.**

A plaintiff cannot establish an FLSA claim unless she first demonstrates that she earned less than minimum wage and the amount by which she was undercompensated. *Matson v. 7455 Inc.*, 2000 WL 1132110, at *6 (D.Or. 2000). This initial burden rests squarely on the FLSA plaintiff to prove that she has "in fact performed work for which [s]he was improperly compensated and ... [to produce] sufficient evidence to show the amount and the extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *see also Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 85 (10th Cir.1983); 29 U.S.C.A. §§ 201-219. Only if a plaintiff meets her initial burden to prove the amount by which she was undercompensated is an employer then obligated to provide evidence of the amount of work the employee performed or other evidence negating the reasonable inferences drawn from the employee's evidence. *See Anderson, 328 U.S. at 687-88.* In the instant case, Plaintiff cannot meet her burden of proving that she earned less than the $7.25 minimum wage required by the FLSA because Plaintiff could not produce reasonably certain records of hours worked or compensation received or her annual income tax returns; therefore, there is no

---

[22] Watson Decl. ¶¶ 9-20.

[23] Pl.'s Dep. 129:14-17; *s3ee Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997).

17

"sufficient evidence to show the amount and the extent of [her] work" or that she was underpaid for her work. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946); *see also* 29 U.S.C.A. §§ 201-219; S.C. Code Ann. §§ 41-10-10 to 110.

Furthermore, if it is undisputed that a plaintiff was "compensated well in excess of the statutory minimum wage for all hours worked [which in this case was $7.25 per hour]. . . there can be no violation of [29 U.S.C. § 206]," the federal minimum wage requirement. *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1280 (4th Cir. 1996); *see also Balducci v. Chesterfield, Va.*, 187 F.3d 628 (4th Cir. 1999). Even by her own estimates, Plaintiff was compensated far in excess of minimum wage and has therefore demonstrated no FLSA or corresponding South Carolina wage law violation. For instance, Plaintiff admits that she earned approximately $450 to $1500 per week for less than forty hours of work, which equates to earnings of at least $11.25 per hour and far exceeds minimum wage. (Plaintiff's Am. Response to Interrog. No. 11; Pl.'s Dep.17:14-15; 18:9-16). Additionally, Defendant's undisputed evidence that Plaintiff's earnings from certain VIP and table dance service charges, which may be used to calculate her wages as an employee, confirms that Plaintiff's earnings at Defendant's club exceeded minimum wage. *Matson*, 2000 WL 1132110, at *6. Since Plaintiff cannot specify an amount by which she was allegedly undercompensated, Plaintiff has failed to establish a factual basis for an essential element of an FLSA and South Carolina wage violation claim, which is that the employee was compensated below minimum wage; therefore, Defendant is entitled to summary judgment as a matter of law.

### 1. Plaintiff Failed to Produce Proof that She Earned Below Minimum Wage or the Amount By Which She Was Allegedly Undercompensated.

Even if Plaintiff could be considered an employee instead of an independent contractor, Plaintiff cannot meet her initial burden to demonstrate that she "in fact performed work for which

000116

[s]he was improperly compensated and ... [to produce] sufficient evidence to show the amount and the extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88 (1946); *see also Donovan v. Simmons Petroleum Corp.,* 725 F.2d 83, 85 (10th Cir.1983) (employee met burden of proving he was under-compensated under the FLSA by providing testimony of twelve former employees plus the compliance officer and documentary evidence); 29 U.S.C.A. §§ 201-219. For example, the *Matson* Court held that its plaintiff, who was also an exotic dancer, could not "specify an amount by which she was allegedly undercompensated" due to her failure to provide estimates of any annual compensation below minimum wage, maintain sufficient records signifying the extent of her work, and distinguish mandatory service fees collected from tips so that any offset due employer could be properly calculated; therefore, due to her failure to specify an amount by which she was undercompensated, the Matson plaintiff had no factual basis upon which to assert an F.L.S.A. claim." *Matson v. 7455 Inc.,* 2000 WL 1132110, at *6 (D.Or. 2000). Since the *Matson* plaintiff failed to produce evidence of wrongful compensation, there was no genuine dispute regarding any material fact, which entitled defendant to summary judgment as a matter of law on her FLSA claim. *See id.*

Similar to the *Matson* plaintiff, the instant Plaintiff failed to meet her burden of producing factual evidence indicating that she earned less than the federal minimum hourly wage during the relevant time periods. *Matson,* 2000 WL 1132110, at *6. In order to demonstrate that she was compensated at less than the minimum wage, Plaintiff's evidence must prove that her hourly compensation fell below $7.25 per hour for specific hours. As discussed below, Plaintiff did not supply certain evidence that was critical in order to determine her actual compensation rate for her hours worked; therefore, no inference of under-compensation could be drawn based on Plaintiff's evidence alone. Plaintiff's provision of such evidence is critical to the success of her claim since she must meet her burden of production before Defendant has any obligation to provide evidence

19

negating her FLSA claim.  *See Anderson, 328 U.S. at 687-88.*

Plaintiff provided no proof as to the amount she was compensated during each individual hour in which she claimed there was a wage violation from July 2012 through April 2013.  (Pl.'s Am. Response Interrog. No. 11.)   Nor did Plaintiff provide evidence of specific weekly earnings along with hours worked during each of those weeks so that her hourly compensation rate could be accurately calculated.  (Pl.'s Am. Response Interrog. No. 11.)   Without such specific evidence of her earnings, Plaintiff cannot accurately prove whether the amount she earned in any given hour or calendar week was under minimum wage, nor can she differentiate the payments she collected as either tips or service charges that could be imputed to her wages.  *Cf. Lundy v. Catholic Health Sys. Of Long Island Inc.,* 711 F.3d 106 (2d Cir. 2013)(in order to state a plausible FLSA overtime claim, a plaintiff must demonstrate having worked forty hours in a given workweek as well as some uncompensated time in excess of the forty hours); *Lee v. Vance Executive Protection, Inc.,* 7 Fed.Appx. 160, 166 (4th Cir. 2001) (summary judgment granted because there was insufficient evidence to estimate the amount and extent of hours worked in excess of forty per week). Plaintiff testified that although she "jotted down" some records of the amount of money she earned at Defendant's club from July 2012 to April 2013, she does not have those records now.  (Pl.'s Dep. 121-122.)  Plaintiff failed to provide even general estimates of her 2012 or 2013 annual compensation or to produce tax returns for those years in response to Defendant's discovery requests, although those would not have been enough to prove a wage violation for each specific hour, especially without information about the number of hours she worked on any given date or week.  (Pl.'s Dep. 19:1-11; Pl.'s Am. Response Interrog. No. 11.)  Although Plaintiff testified in very general terms that her net weekly income fluctuated from about $450 to $1500 depending on the season and attendance at the club, those terms are also not specific enough to meet Plaintiff's burden of establishing that her wage fell below minimum wage for certain individual hours during

000118

specific work weeks. (Pl.'s Am. Response Interrog. No. 11.) Additionally, as explained below, those figures actually prove that Plaintiff made in excess of minimum wage instead of below minimum wage.

In addition to failing to establish her compensation rate, Plaintiff also cannot even establish what hours she worked. Plaintiff produced no records or testimony reflecting the number of hours she worked at the club or the dates on which she worked those hours. (Pl.'s Dep. 121-122; Pl.'s Am. Response Interrog. No. 13; Pl's Am. Response to Prod. Requests 1, 5, 7.) Plaintiff could not recall or specify the number of hours she worked at the Club. (Pl.'s Am. Response Interrog. No. 11, 13; Pl.'s Dep. 119-120). Additionally, Plaintiff was unable to recall any dates she worked between July 2012 and April 2013 and could not even confirm that she worked on the dates where her name appeared on sign-in sheets. (Pl.'s Dep. 118). Plaintiff testified, I could have worked more. I could have worked less. (Pl.'s Dep. 120). Therefore, Plaintiff has not met her burden to demonstrate that she was undercompensated for certain hours or the amount by which she was undercompensated.

Since Plaintiff did not present evidence proving the amount of her compensation for the number of hours she worked in that specific time period, Plaintiff failed to demonstrate that her hourly earnings were deficient under minimum wage laws. Thus, Plaintiff has failed to meet her burden to prove that she was undercompensated, and Defendant is therefore entitled to summary judgment without producing further evidence that no FLSA violation occurred.

### 2. Plaintiff's Testimony Establishes that Even According to Her Own Estimates She Earned in Excess of Minimum Wage.

In addition to Plaintiff's failure to produce reasonable records or evidence proving her alleged under-compensation, Plaintiff's own estimates about her average earnings indicate that she earned in excess of minimum wage and therefore has no factual basis for an FLSA claim. For

000119

instance, Plaintiff admits that while performing at Defendant's club she earned approximately $900.00 to $3,000.00 per week from customers less approximately half of that income due to paying the "house fee," providing tips to the club's employees, and purchasing entertainment-related supplies and clothing. (Plaintiff's Am. Response Interrog. No. 11; Pl.'s Dep. 17: 14-15; 18: 9-16). Plaintiff later recanted her claim that the club took half or more of her earnings by stating in her deposition that the club probably did not take half of her earnings every night but might have taken $200 out of $500. (Pl's Dep. 98:5-24). Aside from those assertions being nothing more than Plaintiff's random speculation, Defendant did not take anything from Plaintiff other than a house fee. Her other expenses were discretionary and did not go to Defendant. Plaintiff is not able to prove with any certainty any amount spent on house fees, tips, or clothing expenses because she kept no records. (Pl.'s Am. Resp. to Interrog. No. 11; Pl's Dep. 84-97). However, even if Plaintiff's earnings were reduced by 50% as she alleges such that she only earned between $450.00 and $1,500.00 each week, those figures still indicate that Plaintiff was compensated far in excess of minimum wage. Even if Plaintiff earned her alleged minimum of $450 per week for forty hours worked, which is more than the club's records reflect as indicated in Section 3 below, that equates to earnings of $11.25 per hour, which is well over the minimum wage of $7.25. (Pl.'s Am. Response to Interrog. No. 11; Pl.'s Dep.17:14-15; 18:9-16.). Since Plaintiff's own estimated weekly net earnings (after all expenses) of $450 to $1500 exceed minimum wage, Plaintiff has not proven facts demonstrating that she was compensated below minimum wage in violation of the FLSA.

Further evidence that points to Plaintiff's compensation above minimum wage includes that Plaintiff estimated that she probably earned about $100,000.00 in 2011, although she was unsure whether she earned $100,000 in 2012. (Pl.'s Dep. 19:1-11.) Additionally, Plaintiff admitted that she made an estimated $500.00 to $1,500.00 each night she worked, and, even

22

though she claimed that the club would take about $200 out of $500 from her, the minimum $300 Plaintiff would be left with per night was also clearly above minimum wage taking into account that the longest average hours Plaintiff was estimated to have worked was 37.97 total for four nights during the week of November 11 or approximately 10 hours per night, which would equate to a minimum wage of $30 per hour. (Pl.'s Dep. 94:16-20; 98:5-24.)

When it is undisputed that an employee was "compensated well in excess of the statutory minimum wage for all hours worked [which in this case was $7.25 per hour]. . . there can be no violation of [29 U.S.C. § 206]," the federal minimum wage requirement. *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1280 (4th Cir. 1996); *see also Balducci v. Chesterfield, Va.*, 187 F.3d 628 (4th Cir. 1999). Since Plaintiff admits to earning amounts that equate to well above the minimum wage, no FLSA violation can be found to have occurred in the instant case.

### 3. Defendant's Records Also Confirm that Plaintiff's Earnings Exceeded Minimum Wage.

Even if the Court were to determine that Plaintiff's FLSA claim was still viable even though she cannot meet her initial burden to specify the dollar amount by which she was undercompensated and she admitted to earning compensation that exceeded minimum wage, Defendant's records of Plaintiff's earnings from mandatory service charges for VIP and table dances further demonstrate that her earnings exceeded minimum wage.

For purposes of calculating whether Plaintiff's service charges were consistent with minimum wage, Defendant calculated the service charge Plaintiff received based on her standard charges and performance records. In her deposition, Plaintiff admitted that she always charged the minimum fee suggested by the club of $20.00 for each couch dance and the following VIP Room rates: (1) for a 15 minute session, $150 with $25 to the club; (2) for a 30 minute session, $300 with $50 to the club; (3) for a 60 minute session, $600 with $100 to the club; and (4) for a 30 minute

23

Jacuzzi session, $600 with $200 to club. (Pl.'s Dep. 79 line 25 to 80 line 20.) Therefore, based on the minimum suggested fee that Plaintiff claimed to have always charged in combination with Defendant's business records that tracked Plaintiff's VIP and couch performances, Defendant was able to determine the minimum payments Plaintiff would have received for VIP and couch performances alone without considering any other additional income she received in tips or other performances.

Additionally, although Defendant's records did not reflect what time Plaintiff stopped performing each night, Defendant estimated Plaintiff's hours using the time she was signed in through 4:00am based upon her estimates that she would average leaving between 3:00am and 5:00am in the morning. (Pl.'s Dep. 126-127.) Although Defendant's records indicate that someone put Plaintiff's stage name, "Bella," on the sign-in sheets forty times between July of 2012 and April of 2013, Defendant can only confirm that Plaintiff was actually working on twenty-one of those dates due to its records of her performing dances. (Watson Decl. ¶ 9.) Plaintiff testified that she was not sure if she worked more or less than what was reflected on the sign-in sheets. (Pl.'s Dep. 119-120). Therefore, the only evidence of Plaintiff actually working in the club shows her working only twenty-one nights as described below.

According to Defendant's records and calculations, for the week of July 22 through July 28, 2012 there is evidence that Plaintiff performed 10 couch dances in addition to two 15-minute and three 30-minute VIP sessions which equates to a total of $1,200.00 for working four evenings (7/2312; 7/26/12; 7/27/12; 7/28/12). (Watson Decl. ¶ 10.) Even if Plaintiff is credited working from the time she signed-in each night until 4:00 a.m., Plaintiff's total estimated hours worked this week were 31.32 hours. Since Plaintiff earned $1,200.00 during 31.32 hours of work, she earned a wage of $38.31 per hour.

For the following week of July 29 – August 4, 2012, there are records showing that

24

Plaintiff worked on August 2, 2012 and did one 15 minute session in the VIP area which would be $125.00 (Watson Decl. ¶ 11). Even if Plaintiff is credited working from the time she signed-in on August 2, 2012, and worked until 4:00 a.m. Plaintiff would have totaled 7.28 hours. Having earned $125.00 for that time, her wage equates to $17.17 per hour.

Records do not show that Plaintiff worked again until the week of September 9 – September 15, 2012 where on September 13, 2012 she did one couch dance and one 15 minute session which would bring her $145.00 for that evening. (Watson Decl. ¶ 12). Even if Plaintiff is credited working from the time she signed-in on September 13, 2012, and worked until 4:00 a.m. Plaintiff would have totaled 7.1 hours. Having earned $145.00 for that one night equates to $20.42 per hour.

The following week of September 16 – September 22, 2012 she did five couch dances for $100.00 on September 22, 2012. (Watson Decl. ¶ 13). Even if Plaintiff is credited working from the time she signed-in on September 22, 2012, and worked until 4:00 a.m. Plaintiff would have totaled 6.77 hours. Having earned $100 for that night equates to $14.77 per hour.

Records reflects she did not work again until the week of October 7 – 13, 2012, when she did three couch dances and two VIP sessions of 15 minutes for $330.00 on October 12, 2012. (Watson Decl. ¶ 14). Even if Plaintiff is credited working from the time she signed-in on October 12, 2012, and worked until 4:00 a.m. Plaintiff would have totaled 6.3 hours. Having earned $330.00 for that one night equates to $52.38 per hour.

The following week October 14 – October 20, 2012 records indicate Plaintiff did two couch dances and one VIP segment of 30 minutes for $270.00 and the following night did three couch dances for $60.00 which would give her a weekly total of $330.00 for working two evenings. (Watson Decl. ¶ 15). Even if Plaintiff is credited working from the time she signed-in on each of the two evenings (10/17/12 and 10/18/12) and worked until 4:00 a.m. Plaintiff would

000123

have totaled 12.95 hours.   Having earned $330.00 for those two nights equates to $25.48 per hour.

The next week of October 21 – October 27, 2012, records indicate she worked three nights and did nine couch dances and one VIP session of 15 minutes for a total for that week of $310.00 for working three evenings.   (Watson Decl. ¶ 16).   Even if Plaintiff is credited working from the time she signed-in on each of the three evenings (10/25/12; 10/26/12; and 10/27/12) and worked until 4:00 a.m. Plaintiff would have totaled 21.12 hours.   Having earned $310.00 for those three nights equate to $14.68 per hour.

Records show her next working the week of November 4 – November 10, 2012, where she did six couch dances and four VIP segments for a total of $620.00 for working only two evenings. (Watson Decl. ¶ 17).   Even if Plaintiff is credited working from the time she signed-in on each of the two evenings (11/8/12 and 11/10/12) and worked until 4:00 a.m. Plaintiff would have totaled 15.62 hours.   Having earned $620.00 for those two nights equate to $39.69 per hour.

The following week November 11 – November 17, she did ten couch dances and one 15 minute and one hour VIP sessions for a total of $825.00 for working three evenings.   (Watson Decl. ¶ 18).   Even if Plaintiff is credited working from the time she signed-in on each of those three evenings (11/11/12; 11/16/12; and 11/17/12) and worked until 4:00 a.m. Plaintiff would have totaled 22.9 hours.   Having earned $825.00 for those 22.9 hours equates to $36.02 per hour.

The records indicate that she did not work again until March 19, 2013 where she did eight couch dances for a total of $160.00 for just working one night that week. (Watson Decl. ¶ 19). Even if Plaintiff is credited working from the time she signed-in on that one evening (3/19/12) and worked until 4:00 a.m. Plaintiff would have totaled 10.68 hours.   Having earned $160.00 for that one night equates to $14.98 per hour.

The records show that she worked the following week of March 24 – 30, 2014 and performed eighteen couch dances for a total of $360.00 for working two nights.   Those are the last

26

two nights there are any records of Plaintiff working as an Entertainer at the Club.   (Watson Decl. ¶ 20).  Even if Plaintiff is credited working from the time she signed-in on each of the two evenings (3/25/12 and 3/26/12) and worked until 4:00 a.m. Plaintiff would have totaled 17.66 hours.   Having earned $360.00 for those two nights equates to $20.39 per hour.

Therefore, the foregoing calculations based on Defendant's records establish that there is no factual dispute that Plaintiff was compensated in excess of the $7.25 per hour minimum wage. The lowest hourly rate Plaintiff was paid was $14.68 according to these calculations.   Note that these calculations are based only on two types of dances and would not have constituted Plaintiff's entire earnings.   As referenced above, Plaintiff herself testified in her deposition that she made a net of at least $450 per week, which equates to $11.25 per hour using a 40-hour work week.

Defendant's minimum wage obligation, if any, may be reduced by the amount of "service charges" distributed by the customers to the Club and then from the Club to the Entertainer as compensation for her performances.[24]  There is no factual dispute that the majority of Plaintiff's compensation came from customers, whose payments in the form of Golden Dollars were taken into Defendant's gross receipts and then distributed to the dancers by Defendant's staff (minus the Club's minimum room or couch rental charge and Golden Dollar processing fee).[25]   The minimum price Defendant suggested dancers charge for VIP and couch dances was equivalent to a mandatory fixed minimum charge because Defendant required a certain minimum fee for customers using its space for private dances in addition to providing a minimum compensation to

---

[24] *Matson*, 2000 WL 1132110, at *6 (mandatory fixed fees for table dances were not tips but service charges that could be used to calculate an employee's minimum wage since no limitation in the FLSA statute precludes such usage); *see also* 29 C.F.R. § 531.52 (a tip is discretionary in amount as opposed to a service charge); 29 C.F.R. § 531.55 (a mandatory service charge is not considered a tip, even if the employer distributes if to the employee).

[25] (Pl.'s Dep. 80, 81:21-25, 82:1-24, 83:1-20; Watson Decl. ¶ 5, 8; Hargadon Dep. 65, 66:1-3, 67.)

000125

protect the dancer, whereas if the customer paid a dancer above that minimum amount the extra would amount to a tip for which Defendant is not claiming credit.[26]  Based on those undisputed facts, this Court may conclude as a matter of law that Plaintiff's receipt of funds from the customers, which flowed through Defendant's gross receipts and were distributed by Defendant to the Entertainers, constituted a "service charge;" thus, Defendant is entitled to an offset in any wages due by the amount of service charges Plaintiff received.[27]  Since Defendant established that it is entitled to an offset for the funds Plaintiff received from customers for performances and that Plaintiff has not disputed with any issue of material fact that she was compensated over minimum wage for all hours worked, there was no FLSA violation.[28]

---

[26] *See supra*, note 25; Clark Dep. 63:5-21.

[27] In the instant case, the mandatory minimum service charges that Plaintiff received for performances may be applied to her wages, even if Defendant did not take those service charges into its gross receipts. *Matson*, 2000 WL 1132110, at *6 (mandatory fixed fees for table dances were not tips but service charges that could be used to calculate an employee's minimum wage since no limitation in the FLSA statute precludes such usage); *see also* 29 C.F.R. § 531.52 (a tip is discretionary in amount as opposed to a service charge); 29 C.F.R. § 531.55 (a mandatory service charge is not considered a tip, even if the employer distributes if to the employee). Although some courts have decided that earnings may only be classified as a service charge if the employer took the payment into its gross receipts and then submitted it to the employee, at least one of those courts has admitted that the regulations do not "expressly [tie] service-charge treatment to inclusion in gross receipts. *Hart v. Rick's Cabaret International, Inc.*, 967 F.Supp.2d 901, 929 (S.D.N.Y 2013).  Another Court held that a fee's inclusion in the employer's gross receipts is not imperative in order to constitute a service charge but instead focused on the language differentiating a service charge as a mandatory fee whereas a tip is discretionary. *Ruffin v. Entertainment of the Eastern Panhandle*, 845 F.Supp.2d 762 (N.D. W. Virginia 2011). The *Ruffin* case is analogous to the instant case because the dancers charged a standard minimum fee with a set portion of the fee paid to defendants; however, the dancer could receive tips above and beyond the minimum fee.  *Id.; see also, Ruffin v. Entertainment of the Eastern Panhandle*, 2012 WL 1435674, at *2 (N.D.W.Va.) (defendant was entitled to an offset for the mandatory minimum fee even if that fee did not enter its gross receipts where defendant set minimum mandatory dance fees and required that a certain set minimum fee go to defendant); *Doe v. Cin–Lan, Inc.*, 2010 WL 726710 (E.D.Mich. 2010) (mandatory minimum service fees do not have to be included in Defendant's gross receipts to offset minimum wage payments).

[28] *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1280 (4th Cir. 1996). Although Plaintiff waives her sword and attempts to take both the service charges rightfully due Defendant as well as

000126

Alternatively, as raised in Defendant's affirmative defenses that Plaintiff is subject to set offs and waived her rights to recover through acceptance of receipt of certain benefits,[29] Defendant would be entitled to recoup a set off due to Plaintiff receiving such mandatory service charges on a theory that it would be unjust for Plaintiff to retain those service charges she received in the posture of an independent contractor while at the same time bringing an action to recover as though she should have been paid as an employee. *Ruffin*, 845 F.Supp.2d at 769 (defendants sufficiently pled an alternative claim for unjust enrichment such that it may be entitled to offset against any wage liability).

### 4. *Plaintiff Cannot Establish a Wage Violation Pursuant to the South Carolina Payment of Wages Act.*

In regard to the South Carolina Payment of Wages Act, although that statute requires the employer to provide notice to the employee of the amount of his wage at the time of his hiring and to pay all wages due on the pay date, including federal minimum wage if so required, it does not require a state-imposed minimum wage in addition to the federal minimum wage. S.C. Code Ann. §§ 41-10-10 to 110. Additionally, the South Carolina Court of Appeals has held that an employee who was paid more than minimum wage, as is the case with the instant Plaintiff, did not have standing to sue under South Carolina law even if the employer failed to give the employee notice of the minimum wage as required by the statute because the employee suffered no requisite injury

---

minimum wage as an employee, this Court should take Plaintiff's thrusting sword from her hand since her standard of living has already been protected by her own contractual arrangement with Defendant, whereby she was compensated above minimum wage. *See Villarreal*, 113 F.3d at 207.

[29] Defendant asserted as an affirmative defense that "Plaintiff's damages to the extent that they exist at all as well as any putative class member asserting the same facts as Plaintiff is subject to set offs, credits, and deductions." (Def.'s Answer, Affirmative Defense No. 22.)  Further, Defendant claimed another affirmative defense that "Plaintiff as well as any putative class member asserting the same facts as Plaintiff is precluded from relief on the basis that all rights to recovery have been waived through Plaintiff's acceptance and performance as a lessee and/or licensee and receipt of benefits thereunder." (Def.'s Answer, Affirmative Defense No. 21.)

000127

or prejudice since she made above minimum wage. *Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor*, 337 S.C. 476, 486 (S.C. Ct. App. Oct. 25, 1999). Since the evidence presented indicates that Plaintiff earned more than minimum wage, she has no standing to sue under South Carolina law for a wage violation.

Like the *Matson* plaintiff, the instant Plaintiff failed to offer evidence sufficient to prove that she was wrongfully compensated pursuant to minimum wage laws. 2000 WL 1132110, at *6. Since Plaintiff failed to meet her burden of demonstrating that she was undercompensated by offering evidence of such deficiency and there is no factual dispute that Plaintiff received compensation in excess of minimum wage due to her own estimates and Defendant's records of her service charges earned at its club, Defendant is entitled to summary judgment on Plaintiff's FLSA claim as a matter of law. *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 85 (10th Cir.1983); *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1280 (4th Cir. 1996); 29 U.S.C.A. §§ 201-219.

**D.    Defendant is Entitled to Summary Judgment on Plaintiff's Claim for Overtime Wages.**

In order to assert a claim for unpaid overtime wages under the FLSA, Plaintiff bears the ultimate burden of proving that she worked at Defendant's club for over forty hours in any given workweek without proper compensation, or that she "performed work for which [she was ] not compensated." *Lee v. Vance Executive Protection, Inc.,* 7 Fed.Appx. 160, 166 (4th Cir. 2001). "[A]n employee carries his burden under the law by (1) "prov[ing] that he has in fact performed work for which he was improperly compensated," and (2) "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id. (citing Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88 (1946)). If the employee carries his burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise

000128

amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (citing *Anderson.,* 328 U.S. at 687-88). A plaintiff's record of hours worked in excess of forty hours per week has been held to be specific evidence that is acceptable to meet the plaintiff's burden under the FLSA; however, general testimony about tasks performed is insufficient to reasonably indicate "the amount or extent of this extra work" and therefore permit the court to estimate unrecorded hours for an FLSA violation. *Lee v. Vance Executive Protection, Inc.,* 7 Fed.Appx. 160, 166 n.2 (4th Cir. 2001) (citing *Anderson,* 328 U.S. at 687).

In this case, Plaintiff presented no evidence that she worked over forty hours per week. Plaintiff cannot remember the dates or number of hours she worked, and she kept no records of any kind reflecting the dates or the number of hours worked. (Pl.'s Dep. 118-122; Pl.'s Am. Response Interrog. No. 11, 13). Without any documentary evidence or her own recollection of how many work weeks she may have worked in excess of forty hours, Plaintiff's bare supposition is insufficient to prove she is entitled to any overtime wages. *Lundy v. Catholic Health Sys. Of Long Island Inc.,* 711 F.3d 106 (2d Cir. 2013)(in order to state a plausible FLSA overtime claim, a plaintiff must demonstrate having worked forty hours of work in a given workweek as well as some uncompensated time in excess of the forty hours); *Lee v. Vance Executive Protection, Inc.,* 7 Fed.Appx. 160, 166 (4th Cir. 2001) (summary was judgment granted on overtime claim because there was insufficient evidence to estimate the amount and extent of hours worked in excess of forty per week). Thus, Plaintiff has not met her burden to demonstrate that she was undercompensated for certain hours, and her FLSA claim for overtime wages should be dismissed.

Furthermore, although Defendant has no obligation to produce such evidence because Plaintiff has not met her initial burden, Defendant's records indicate, as detailed above, that the most hours Plaintiff worked in one week was 31.32 for four days worked during the week of July

000129

23, 2012. (Watson Decl. ¶ 10.) Since there is no evidence in the record that Plaintiff worked over forty hours per week, there can be no overtime violation. *Monahan*, 95 F.3d at 1280 ("[l]ogically, in pay periods without overtime, there can be no violation of section 207 which regulates overtime payment").

### E. Plaintiff's State Law Claims Are Pre-Empted by the Fair Labor Standards Act.

Since Plaintiff seeks compensation under state and federal law for alleged wage and overtime violations, her overlapping state claims (failure to pay minimum wages, unlawful deductions, and unjust enrichment) are preempted by the FLSA and must be dismissed.[30] The FLSA provides the exclusive remedial scheme to address employees' rights to be paid a minimum wage for hours worked and to be paid overtime for all hours worked in excess of forty in a given workweek. *See* 29 U.S.C. §§ 206(a), 207(a); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir.2007); *Nimmons v. RBC Ins. Holdings (USA) Inc.*, 6:07-cv-2637, 2007 WL 4571179 (D.S.C. Dec. 27, 2007)(holding plaintiff's various state law claims related to alleged overtime must be dismissed because they assert rights that are duplicative of those protected by the FLSA); *Dockins v. Ingles Markets, Inc.*, 306 S.C. 496 (S.C.1992) (South Carolina Supreme Court held that plaintiff's state law claims were not cognizable because plaintiff was limited to those statutory

---

[30] Am. Complaint ¶¶ 11, 82-83, 90; *Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2007) (state law claims that wages were unlawfully withheld and unjustly enriched Defendant were pre-empted by FLSA); *McMurray v. LRJ Restaurants, Inc.*, 2011 WL 247906 (D.S.C. 2011) (all plaintiff's state wage and overtime claims were pre-empted by the FLSA, except for claims for compensation due over and above minimum wage since defendant specifically entered into a contract for such compensation; however, that argument is inapplicable here because this Plaintiff had no employment agreement with Defendant, much less one to be paid above minimum wage, and in fact, believed she was an independent contractor instead of an employee when she started working for Defendant, see P.'s Dep. at 134:8-15); *Nimmons v. RBC Ins. Holdings (USA) Inc.*, 2007 WL 4571179, at *1-3, n.1 (D.S.C. 2007) (state law claims related to overtime were pre-empted as they were duplicative of rights protected by FLSA, except for failure to pay accrued vacation pay); 29 C.F.R. § 531.35.10.

remedies available under the FLSA).   Plaintiff asserts the following claims in her Complaint: (a) a

claim under the South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-10 to 110

("PWA") for failing to pay wages and overtime under South Carolina law (Am. Complaint, ¶ 11);

(b) a claim under PWA for inappropriately withholding and/or deducting unlawful amounts from

the gratuities of the South Carolina Class (Am. Complaint, ¶¶ 82-83); or, in the alternative, (c) a

claim for common law unjust enrichment for subjecting plaintiff dancers "to unlawful deductions

from their gratuities"   (Am. Complaint, ¶ 90).   Since all of Plaintiff's South Carolina claims were

premised on the assertion that she was owed compensation for some type of wage or overtime

violation covered by the FLSA, her duplicitous state law claims are pre-empted and should be

dismissed.

### 1.   Plaintiff's South Carolina Claim for Failure to Pay Minimum Wage or Overtime.

To the extent that Plaintiff seeks compensation under state law for overtime pay, or alleges

that she received less than the federal minimum wage for all hours worked,   *Anderson* clearly

provides that such claims are preempted by the FLSA and must be dismissed.   *See also*

*McMurray v. LRJ Restaurants, Inc.*, 2011 WL 247906 (D.S.C. Jan. 26, 2011).

### 2.   Plaintiff's South Carolina Claims for Inappropriate Withholding or Unlawful Deductions from Gratuities and Claim For Common Law Enrichment Due To Subjecting Plaintiffs to "Unlawful Deductions From their Gratuities."

To the extent Plaintiff's state law claims are predicated upon "tip-sharing" or unjust

enrichment due to improper deductions being taken in violation of the FLSA, those issues are also

pre-empted by the FLSA, which seeks to ensure that the employee is adequately paid.   Under the

FLSA, there is no legal difference between a deduction from an employee's paycheck and

requiring the employee to bear the expense of the item directly out of her own wages, as wages are

required to be paid "free and clear."   29 C.F.R. § 531.35.10.   Additionally, district courts have

routinely held that claims seeking the reimbursement of alleged "kickbacks" fall within the

33

regulatory scheme of the FLSA. 29 C.F.R. § 531.35; *Yu G. Ke v. Saigon Grill, Inc.,* 595 F.Supp.2d 240, 257 (S.D.N.Y.2008)(plaintiff's state common-law claim for unjust enrichment was preempted by the FLSA as well as claims pertaining to Defendants' alleged failure to pay Plaintiffs in accordance with the FLSA); *see also Anderson v. Sara Lee Corp.,* 508 F.3d 181, 194 (4th Cir.2007); *Nettles v. Techplan Corp.,* 704 F.Supp. 95, 100 (D.S.C. 1988) (awarding summary judgment to employer on negligence claim as duplicative of FLSA claim, thereby implicitly ruling that negligence claim was FLSA-preempted). Therefore, Plaintiff's state law claims are pre-empted by FLSA since she claims that her wages were inappropriately or unlawfully withheld and that such actions unjustly enriched Defendant, which is an area exclusively covered by the FLSA; therefore, Defendant should be granted summary judgment. *Anderson v. Sara Lee Corp.,* 508 F.3d 181 (4th Cir. 2007).

<div align="center">

### CONCLUSION

</div>

For the above and foregoing reasons, Defendant's Motion for Summary Judgment should be **GRANTED**.

Dated: **This 4th day of May, 2015.**

<div align="right" style="margin-left:40%">

Respectfully submitted,

/s/ William Paul Young
S.C. Federal ID 05732
William Paul Young, P.A.
P.O. Box 4213
North Myrtle Beach, SC   29597
843-249-9999
843-249-5876 (fax)
pyoung4213@frontier.com

and

</div>

34

000132

Stephen L. Shields (TN Bar #06981)
James L. Holt, Jr.   (TN Bar #012123)
JACKSON, SHIELDS, YEISER & HOLT
262 German Oak Drive
Memphis, TN 38018
901-754-8001
901-754-8524 (fax)
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was filed with the Court's CM/ECF System on **May 4, 2015,** which will generate service upon the attorneys of record.

/s/ William Paul Young
William Paul Young

35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ALEXIS DEGIDIO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:13-cv-02136-BHH |
| v. | ) ) | JURY TRIAL DEMANDED |
| CRAZY HORSE SALOON AND RESTAURANT, INC., d/b/a THEE NEW DOLLHOUSE, | ) ) ) ) | |
| Defendant. | ) ) | |

---

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

---

1. Crazy Horse Saloon and Restaurant, Inc. d/b/a Thee Dollhouse is an upscale gentlemen's club in North Myrtle Beach, South Carolina, (the "Club"), which features adult exotic performers which shall be referred to as "Entertainers".  (Davenport Decl. ¶ 1).

2. Plaintiff Alexis Degidio, stage name "Bella" ("Plaintiff") appeared sporadically as an Entertainer on 21 occasions over the course of about a ten month period between about July 2012 and April 2013. (Watson Decl. ¶ 3, 4, 9).

3. The Club is subject to local laws that the Club understands prohibits Entertainers from performing nude.  While Entertainers may appear topless while performing for guests, they are expected to keep their lower private areas covered in compliance with state and local laws.  (Davenport Decl. ¶ 4; Clark Decl. ¶ 6).

4. Defendant is an upscale gentlemen's club.  The Club makes every effort to present a first class experience from the moment customers, who are referred to as "guests", arrive. There is a valet service that will offer to park their car.  Upon entering the Club, the

building and décor are meant to impress and make the guests feel like they are walking into a first class establishment.   It is the job of every employee in the Club to offer maximum hospitality to the guests.   (Davenport Decl. ¶ 3).

5.   The Club offers the top champagnes, wines and liquors and features special semi-private areas for full bottle service. (Davenport Decl. ¶ 3).

6.   There are 4 elevated lighted stages where Entertainers perform exotic adult dancing.   The Club also features semi-private areas for Entertainers to perform for guests and a jacuzzi area.   (Davenport Decl. ¶ 3).

7.   A Disc Jockey ("D.J.") entertains guests with comedy and music.   (Davenport Decl. ¶ 3)

8.   There are four luxurious bars where guests may sit if they choose.   For sports fans there are 25 HDTV screens which feature all varieties of sports. (Davenport Decl. ¶ 3).

9.   Since March 1, 2012 the Club began operating as Thee New Dollhouse, and later changed to just Thee Dollhouse. (Watson Decl. ¶ 2).

10. Since March 1, 2012, the Club has not classified or treated its Entertainers as employees, but as lessees or independent contractors, who are permitted the non-exclusive use of the Club's stages, dressing room, lockers, and semi-private areas for performing.   (Watson Decl. ¶ 2).

11. It is standard and customary in the adult night club industry for Entertainers to not be classified or treated as employees, but as independent contractors.   Under such an arrangement, Entertainers have for many years enjoyed very lucrative careers performing at gentlemen's clubs like Defendant. (Davenport Decl. ¶ 6).

12. The Club has no set of rules which it enforces on Entertainers. The only "rules" which the Club imposes on its Entertainers are those which are required by state and local laws – that

2

Entertainers conform to all legal requirements regarding their dress and performance. (Davenport Decl. ¶ 4, 16; Clark Decl. ¶ 6; Callicutt Dep. 166 – 171:14).

13. The Club does not impose any specific dress code on Entertainers, and allows and encourages Entertainers to have their own individual style and look. (Davenport Decl. ¶ 16; Hensell Decl. ¶ 12; Clark Decl. ¶ 5).

14. The Club does not impose fines on its Entertainers. (Davenport Decl. ¶ 20; Callicutt Dep. 167:20-22; Hargadon Dep. 36:17-37:14).

15. The Club does not require Entertainers to adhere to any particular work schedule or work any set number of nights. (Davenport Decl. ¶ 14; Plaintiff's Dep. 98 line 25 – 99 line 10).

16. Entertainers who perform at Defendant's Club are allowed to work when they want, and are permitted to come and go as they please. Entertainers are not required to attend staff meetings. (Davenport Decl. ¶ 14).

17. Entertainers let the DJ know when they are ready and they are then put in the rotation to appear on stage. There is a rotation to allow each Entertainer an opportunity to showcase herself on stage. The Club does not require Entertainers to strictly comply with a set rotation of stage appearances, and there is no punishment if they do not appear when called by the DJ. (Davenport Decl. ¶ 18; Trowbridge Dep. 34:8-36:9; Clark Dep. 31:16-33:12).

18. The majority of Plaintiff's compensation came from customers, whose payments in the form of Golden Dollars were taken into Defendant's gross receipts, recorded in the Club's daily transactions, and then distributed to the dancers by Defendant's staff (minus the Club's minimum room or couch rental charge and Golden Dollar processing fee). (Pl.'s Dep. 80, 81:21-25, 82:1-24, 83:1-20; Watson Decl. ¶ 5, 8; Hargadon Dep. 65, 66:1-3, 67.)

19. Defendant required a certain minimum rental fee for customers using its semi-private areas

3

such as couch VIP rooms and Jacuzzi for private dances in addition to establishing a minimum compensation guideline for the Entertainer, although the Entertainer was free to charge more than the minimum fee. (Pl.'s Dep. 80, 81:21-25, 82:1-24, 83:1-20; Watson Decl. ¶ 5, 8; Hargadon Dep. 65, 66:1-3, 67; Davenport Decl. ¶ 9, 10; Clark Dep. 63:5-21).

20. The Club does not control the manner in which plaintiff performs her dance to satisfy the Club's guests nor does the Club require Entertainers to dance, entertain or perform in any particular way. (Davenport Decl. ¶ 7; Plaintiff's 37:6 – 38:14; Clark Dep. 31).

21. Plaintiff controlled how she interacted with the Club's guests, including whether or not she wished to perform table-side dances, or entertain guests in the Club's VIP areas, or speak or not speak with any guests. (Davenport Decl. ¶ 9, 10, 15).

22. The Club does not subject Entertainers to limitations or control, other than that which is legally prohibited. (Clark Decl. ¶ 5-6).

23. The Club does not limit the amount of private or VIP dances Entertainers perform. (Davenport Decl. ¶ 9, 10).

24. Entertainers are allowed to eat meals, consume alcohol and smoke cigarettes and talk on the telephone while in the Club. Employees are subject to rules limiting those activities. (Davenport Decl. ¶ 21).

25. Entertainers are free to pick and choose the customers for whom they wish to perform. (Davenport Decl. ¶ 15).

26. Entertainers are free to mingle with the Club's guests, and can take breaks as often they need. (Davenport Decl. ¶ 15, 21).

27. Entertainers are allowed to take off a week, or even a month or more at a time from the Club without any consequence. (Davenport Decl. ¶ 14).

4

28. Entertainers are not restricted from performing at other adult night clubs or holding down other jobs or attend school.   (Davenport Decl. ¶ 17; Hensell Decl. ¶ 8; Clark Decl. ¶ 7).

29. Entertainers are free to promote themselves using social media.   (Clark Decl. ¶ 8).

30. Entertainers are free to charge customers more or less than the minimum service suggested by the Club for private dances.   (Davenport Decl. ¶ 9; Plaintiff's Dep.   79:4-81:5, 83:12-20; Hargadon Dep. 64:19-66:16).

31. Entertainers can control their own profitability by determining when, how often, and how much to work. (Davenport Decl. ¶ 14; Callicutt Dep. 112:3-115:2; Plaintiff's Dep. 98:25-99:10).

32. Plaintiff had control over her appearance and the dresses and costumes she wore to make herself visually appealing to the Club's customers.   (Watson Decl. ¶ 2; Clark Decl. ¶ 5; Davenport Decl. ¶ 16, 24).

33. Entertainers invest significantly in their appearance, and are responsible for purchasing their own costumes, shoes, cosmetics, and all other materials and supplies they need to perform.   (Watson Decl. ¶ 2).

34. Entertainers are charged a "House Fee" by the Club for every evening they perform, depending on what time the entertainer arrives.   If they arrive before 7:00 pm there is no House Fee.   After 8:00 pm it is $20.00. After 9:00 pm it is $40.00.   After 10:00 pm it is $60.00.   After 11:00 pm it is $80.00.   After midnight it is $100.00. (Davenport Decl. ¶ 8).

35. Throughout the adult night club industry it is customary that Entertainers tip the House Mom, DJ, and Floor Hosts since they provide them a service which helps them perform and earn income.   However, tipping is not mandatory.   It is discretionary and completely up to each Entertainer whether to tip, and how much to tip.   (Davenport Decl. ¶ 12; Hensell

5

000138

Decl. ¶ 11; Callicutt Dep. 43:9-21, 157:14-161:2; Trowbridge Dep 45:8-49:8, 96:19-99:3).

36. The Club informed Entertainers of suggested minimum amounts to tip house moms, DJ's and Floor Hosts as follows:  $10.00 to House Mom; $10.00 to DJ and $2.00 to each Floor Host.   These are the customary amounts that have been given for the last several years at Thee Dollhouse.   (Davenport Decl. ¶ 12; Callicutt Dep. 157:14-161:2; Clark Dep. 45:14-46:10, 51:20-52:13).

37. The Club does not reimburse Entertainers for their clothes, costumes, props or any other expenses. (Watson Decl. ¶ 2).

38. The Club requires dancers to audition before a Manager before allowing them to perform there. The audition process for Entertainers is "highly selective." Entertainers are evaluated based upon their physical appearance, their personality, and their overall ability to entertain. (Davenport Decl. ¶ 7).

39.  The Club does not provide Entertainers with any kind of training or instruction on how to perform. (Davenport Decl. ¶ 7).

40. Prior to performing at the Club, Plaintiff, who regarded herself as an "accomplished dancer," had significant adult dance experience having previously performed and developed her own dance style and ability at other local gentlemen's clubs for about eight years.  (Pl.'s Dep. 37:1-8.) Jacinda Gardner, who also performed at the Club as an Entertainer, had previous dance training as a child as well as experience in high-school cheerleading and gymnastics.  (Gardner Dep. 19.)

41. The Entertainers themselves, and not the Club, determine what nights the Entertainers perform at the Club.  The Club does not require Entertainers to schedule their hours, work a minimum number of hours or shifts, or require them to work certain days and times.

6

000139

(Davenport Decl. ¶ 6, 14).

42. The arrival time of Entertainers the Club is recorded on a sign-in sheet, but not the departure time or the number of hours they worked. (Watson Decl. ¶ 4).

43. Plaintiff performed at the Club sporadically for approximately ten months. Plaintiff had no other income from any other source during that time. (Watson Decl. ¶ 4; Plaintiff's Dep. 21:14-20).

44. During that time Plaintiff, she was free to perform at other clubs or work at other locations. (Davenport Decl. ¶ 17, 24; Clark Decl. ¶ 7).

45. By the time Plaintiff came to perform at Defendant's Club her heart and soul was no longer into being an Entertainer, and she wanted to be a Bartender. (Hargadon Dep. 88:12-92:19).

46. Plaintiff did not perform at the Club consistently or regularly. Records indicate that she actually worked as an Entertainer a total of 21 evenings between July 2012 and April 2013. There are no other records indicating that Plaintiff actually performed or earned any income on any other dates during that period. (Watson Decl. ¶ 9).

47. Plaintiff has no records of any kind that reflect the money she earned, the dates she worked or the number of hours she worked at the Club. (Plaintiff's Dep. 121:25-122:14; Plaintiff's Am. Response to Defendant's Interrog. Nos. 11 and 13 and Request for Production 1, 5, and 7).

48. Plaintiff cannot specify the number of hours she worked at the Club on any specific day or week. (Pl.'s Am. Response Interrog. No. 13).

49. Plaintiff claims she probably earned about $100,000.00 as an Entertainer in 2011, but Plaintiff does not know how much money she earned in 2012 or 2013. Plaintiff is not sure

7

whether she earned more than $100,000.00 in 2012.   Defendant has requested Plaintiff's

tax returns for 2012 and 2013, but none have been provided.   (Plaintiff's Dep.

119:16-120:8).

50. On one particular evening at the Club Plaintiff earned $2,000.00.   In her Interrogatory

Response Plaintiff estimated she earned between $900.00 and $3,000.00 per week at

Defendant's Club.   In her deposition Plaintiff claimed her nightly earnings ranged

between $500.00 and $1,500.00 depending on the season (Plaintiff's Interrog. Response

11; Plaintiff's Dep. 94:13-20).

51. The Club does not pay its Entertainers hourly wages like it pays its wait staff, hosts,

bartenders, bar backs, or house moms.   Instead, Entertainers receive not only tips directly

from the Club's customers, but also are compensated with service charges which they set

with their customers for couch dances and private dances in the Club's VIP areas.

(Davenport Decl. ¶ 6, 9, 10, 11; Plaintiff's Dep. 79-80).

52. In the Club's "couch" areas, the Club charges $10.00 per song for use of the couch space

and the Entertainer charges a fee for the dance.   The suggested minimum is $30.00 which

includes the $10.00 for use of the space.   Most Entertainers charge their guest $20.00 or

higher for their performance fee.   The use fee for the couch dances are tracked by a Club's

Floor Hosts, and a record is kept of them including the stage name of the Entertainer.

Records kept in the regular course of business show Plaintiff doing couch dances. (Watson

Decl. ¶ 5, 6, 10-20 and attached Ex. C).

53. Entertainers earn money by charging a fee for dances the VIP areas of the Club.   There are

VIP rooms which charge in increments of time starting with 15 minutes.   The Club

charges a fee for use of the VIP room as follows: $25.00 for 15 minutes; $50.00 for 30

8

minutes; $100.00 for 60 minutes. Use of the Club's Jacuzzi for 30 minutes is $200.00. Entertainers may charge whatever price they negotiate with the guests. The Club does provide Entertainer minimum price guidelines, but it is left to each individual Entertainer to establish their fee. The use fee for the Club stays the same. Entertainers typically charge the suggested rate or higher. It is up to them. It is also completely up to each Entertainer whether to use the VIP Rooms, and there is no limit to their use. (Watson Decl. ¶ 5, 7, 10-18 and attached Ex. D; Hargadon Dep. 64 – 66).

54. Floor Hosts keep track of Entertainers in the VIP areas. Records kept in the regular course of business show that Plaintiff used the VIP areas with the Club's guests. (Watson Decl. ¶ 7, 10-18 and attached Ex. D).

55. The Club does not provide Entertainers with their costumes, clothing, shoes, or other supplies, nor does it reimburse Entertainers' expenses for these items. In exchange for the House Fee, the Club only provides Entertainers a safe venue and non-exclusive use of the Club and semi-private areas for performing, stages, music, a dressing area, and lockers for their use. (Watson Decl. ¶ 2).

56. About 20-30% of the Club's gross income came from VIP rentals for couch dances, while another 12-15% came from Golden Dollars. (Watson Dep. at 43:4-13.)

57. During the times Plaintiff appeared as an Entertainer at the Club the Manager was Joe Hargadon. As the Manager he was in charge of how the Club operated, and was who Plaintiff considered to be the individual that she "worked for" at the Club. (Hargadon's Dep. 38:12-39:10; Plaintiff's Dep. 39:20-25; Davenport Decl. ¶ 2).

58. During the times Plaintiff performed at the Club the House Moms were Laurie Callicutt and Jennifer Balchum. House Moms are hourly paid employees who are there to help the

000142

Entertainers get ready, and help keep the peace between the Entertainers. They collect House Fees for the Manager. House Moms do not hire and fire and have no managerial responsibilities. (Davenport Decl. ¶ 22; Clark Dep. 52:17-24; Callicutt Dep. 206:9-19, 222:1-7).

59. Plaintiff always charged the minimum fees. (Plaintiff's Dep. 80:7 – 81:13).

60. During, the week of July 22 – July 28, 2012, Defendant's records show that Plaintiff performed 10 couch dances and two 15 minute and three 30 minute VIP dances which, if she only charged the minimum fee she would have earned a total of $1,200.00 for that week working four evenings, which would be $20.00 for each song in the couch area and $125.00 for 15 minutes. (Watson Decl. ¶ 10).

61. The following week of July 29 – August 4, 2012, there are records Plaintiff worked on August 2, 2012 and did one 15 minute segment in the VIP area which would total $125.00 for that one evening's work. (Watson Decl. ¶ 11).

62. Defendant's records show that Plaintiff did not work again until the week of September 9 – September 15, 2012 where on September 13, 2012 she did one couch dance and one 15 minute private segment which would total $145.00 for that evening. (Watson Decl. ¶ 12).

63. The following week of September 16 – September 22, 2012 she did five couch dances for $100.00 on September 22, 2012. (Watson Decl. ¶ 13).

64. Records reflects she did not work again until the week of October 7 – 13, 2012, when she did three couch dances and two 15 minute and one 30 minute VIP segments for a total of $560.00 on October 12, 2012 (Watson Decl. ¶ 14).

65. The following week October 14 – October 20, 2012, records indicate Plaintiff did two couch dances and one VIP segment of 30 minutes for $270.00 and the following night did

10

000143

three couch dances for $60.00 which would give her a weekly total of $330.00 for working two evenings.   (Watson Decl. ¶ 15).

66. The next week of October 21 – October 27, 2012, records indicate she worked three nights and did nine couch dances and one VIP segments of 15 minutes for a total for that week of $310.00 for working three evenings. (Watson Decl. ¶ 16).

67. Records show her next working the week of November 4 – November 10, 2012, where she did six couch dances and four VIP segments for a total of $620.00 for working only two evenings. (Watson Decl. ¶ 17).

68. The following week of November 11 – November 17, 2012 she did ten couch dances and one 15 minute and one hour VIP segments for a total of $825.00 for working three evenings. (Watson Decl. ¶ 18).

69. The records indicate that she did not work again until March 19, 2013 where she did eight couch dances for a total of $160.00 for just working one night that week. (Watson Decl. ¶ 19).

70. The records show that she worked two nights the following week and did eighteen couch dances for a total of $360.00 for working two nights.   Those are the last two nights there are any records of Plaintiff working as an Entertainer at the Club.   (Watson Decl. ¶ 20).

71. Plaintiff was close friends with Manager Joe Hargadon's wife at the time Plaintiff performed at Defendant.   (Hargadon Dep. 82:2-6; Davenport Decl. ¶ 23).

72. During the years Plaintiff performed at the Old Dollhouse and the time she performed at Defendant's club she believed she was an independent contractor.   (Plaintiff's Dep. 133:16-134:17).

11

73. Michael Peter testified that even if the Club had no Entertainers, it would still survive because they are "in the nightclub business" and he has all kinds of other attractions, including liquor, food, 45 televisions that attract numerous sports fans, and other shows that can be performed (including the "greatest blue comedian that ever lived," Pussycat Dolls show, live bands with female dancers, and a vocalist who has recorded over twelve albums and placed "third on the X Factor").   (Peter Dep. 118:22-25, 119-120.)

74. In 2013, Plaintiff expressed her desire to be a Bartender at Defendant, but was not given that position.   In mid-April 2013 she became employed as a member of the wait staff (Watson Decl. ¶ 3, 20; Hargadon Dep. 90:16-22).

75. Plaintiff was not a good waitress.   Only Manager Hargadon wanted to give her an opportunity as a Bartender.   Clark and Boehm opposed it because of her often angry demeanor and rude personality (Hargadon Dep. 90:16-92:19; Clark Decl. ¶ 9).

76. After being told by Hargadon that David Boehm vetoed her being a Bartender at the Club, Plaintiff angrily stormed off, and never returned to Club.   (Hargadon Dep. 92:8-19).

77. Plaintiff was a volatile person and frequently had problems and confrontations with Defendant's employees and other Entertainers, sometimes bullying and threatening them. She had a rude demeanor, knocked over trays of waitresses, yelled at girls and made them cry, and did whatever she pleased.   (Hargadon Dep. 82:12-84:12; Davenport Decl. ¶ 23; Hensell Decl. ¶ 13; Callicutt Dep. 264 – 266).

78. Plaintiff is motivated at least 50% by personal reasons for bringing this lawsuit.   Other than her Manager Joe Hargadon, Plaintiff holds a lot of anger toward those who remained at the Club after Hargadon left, calling them "liars" and "scumbags", who she would "like to see in Court", and " have to pay the piper, if you will". (Plaintiff's Dep. 31:12-33:23,

000145

53:2-11, 69:12-21).

79. Current Manager Jack Davenport would not have permitted Plaintiff to be an Entertainer in the Club if he had been the General Manager. (Davenport Decl. ¶ 23).

80. Following the filing of this lawsuit Plaintiff has continued to harass and bully Defendant's employee Laurie Callicutt with threats and profane insults without reason or provocation by sending her a series of text messages after midnight on March 1, 2014. (Plaintiff's Dep. 128:3-129:19; Callicutt Dep. 266:25-269:5 and attached Defendant's Ex. 1).

81. Plaintiff does not hold the Manager in charge, Joe Hargadon responsible for the way she was allegedly mistreated and/or "cheated out of money", but instead the corporate offices of Michael J. Peter.  No corporate office of Michael J. Peter is a party in this litigation. (Plaintiff's Dep. 41:1-16).

82. Plaintiff used illegal drugs when she appeared as an Entertainer at the Club, and would bully and threaten other Entertainers not to tell on her.  (Davenport Decl. ¶ 23; Hensell Decl. ¶ 13, 14; Gardner Dep. 45:11-25; Hargadon Dep. 85:8-86:9).

83. Plaintiff did not pay the filing fee instituting this lawsuit or any of the litigation expenses including her travel to appear at her deposition, and has no understanding about her ultimate responsibility for costs in this litigation should she not prevail. (Plaintiff's Dep. 56:11-62:7).

Respectfully submitted,

/s/ William Paul Young
S.C. Federal ID 05732
William Paul Young, P.A.
P.O. Box 4213
North Myrtle Beach, SC   29597
843-249-9999

13

843-249-5876 (fax)
pyoung4213@frontier.com

and


Stephen L. Shields (TN Bar #06981)
James L. Holt, Jr.   (TN Bar #012123)
JACKSON, SHIELDS, YEISER & HOLT
262 German Oak Drive
Memphis, TN 38018
901-754-8001
901-754-8524 (fax)
*Attorneys for Defendant*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was filed with the Court's CM/ECF System on December 16, 2014 which will generate service upon the attorneys of record.

/s/ William Paul Young_____
William Paul Young

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ALEXIS DEGIDIO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:13-cv-02136-BHH |
| v. | ) ) | JURY TRIAL DEMANDED |
| CRAZY HORSE SALOON AND RESTAURANT, INC., d/b/a THEE NEW DOLLHOUSE, | ) ) ) ) | |
| Defendant. | ) ) | |

---

## DECLARATION OF JACK DAVENPORT

---

I, Jack Davenport, make the following Declaration under oath and on the basis of my own personal knowledge. I am sixty-three (63) years of age. I suffer from no legal disabilities and am competent to make this Declaration.

1.      I am employed by the Crazy Horse Saloon and Restaurant, Inc. d/b/a Thee Dollhouse located at 3102 Highway 17 South, North Myrtle Beach, South Carolina ("the Club"). I am currently the General Manager and in charge of overseeing the daily operations of the Club. I am at the Club Tuesday through Saturday. Manager John Trowbridge serves as the Manager in charge on Sundays and Mondays and when I am not able to be there. I have been the General Manager since about August 2014. I report to Brent Clark.

2.      I began my employment at the Club on or about July 3, 2012, as a Floor Host, and Opening Manager. I reported to the General Manager, Joe Hargadon until he was no

longer there.   The General Manager reports to Brent Clark and/or the owners.

3.      This is an upscale gentlemen's club. By that, the Club makes every effort to present a first class experience from the moment a customer, who we refer to as "guests", arrives.   We have a valet service that will offer to park their car.   Upon entering the Club, the building and décor are meant to impress and make the guest feel like they are walking into a first class establishment.   Guests are welcomed to the Club by a beautiful female hostess who is elegantly dressed.   Guests are escorted to their seats by Floor Hosts who are finely dressed in suit and tie.   The cocktail waitresses are appealing and wear identical white outfits.   It is the job of every employee in the Club to offer maximum hospitality to the guests.   The furniture is designed to be upscale and comfortable.   The Club offers the top champagnes, wines and liquors and features special semi-private areas for full bottle service.   There are 4 elevated lighted stages where Entertainers perform exotic adult dancing which includes topless dancing.   The Club also features semi-private areas for Entertainers to perform for guests and a jacuzzi area.   There is a D.J. who entertains with comedy and music.   There are four luxurious bars where guests may sit if they choose. Many sports fan come and watch our 25 HDTV screens which feature all varieties of sports.

4.      The Club is subject to local laws.   It is my understanding that Entertainers are prohibited by law from performing nude. While Entertainers may appear topless while on stage or performing for guests, they are expected to keep their lower private areas covered.

5.      The General Manager is responsible for hiring, firing, scheduling and overseeing employees which include, waitresses or servers, kitchen personnel, bartenders,

2

bar-backs, Floor Hosts, Hostesses.   The DJ's are usually hired by Brent Clark.   This is the way it has been for me as General Manager, as well as for Joe Hargadon when he was General Manager.

6.   Unlike the employees described above, the Entertainers are not treated as employees.   They are not subject to a schedule and perform at the Club whenever they choose.   I have been a manager in the gentleman's club industry for more than 20 years, and I've been in the industry for longer than that.   It is customary in this industry for Entertainers to work as independent contractors rather than employees.   Under this arrangement Entertainers can have lucrative careers earning between $1,500.00 to $5,000.00 per week only working 2 to 3 nights per week. Their earning capacity wholly depends upon their individual appearance, skills and talents to entertain our guests.

7.   In order to be an Entertainer at the Club, the Entertainer must pass an audition before the General Manager or the manager in charge.   This is a highly selective process.   Entertainers that are determined to possess the qualities of physical beauty and appeal, and to some degree, an appealing personality are permitted to perform at the Club. The Club does not provide any training for being an Entertainer.   Entertainers are not told how to perform or the way to dance.   How they dance or perform is completely left up to them.

8.   Entertainers are required to pay a House Fee each night they appear at the Club.  If the entertainer arrives before 7:00 p.m., there is no House Fee.   If they arrive between 7:00 p.m. and 8:00 p.m., the House Fee is $20.00.   At 9:00 p.m., the House Fee is $40.00; at 10:00 p.m., the House Fee is $60.00; after 11:00 p.m., it is $80; and, after midnight it

3

is $100.00.   After midnight it is Manager's discretion whether to let more Entertainers in and if so how much to charge for House Fee.

9.    Entertainers earn money by charging a fee for dances in semi-private areas of the Club.   There are VIP rooms which are available in increments of time starting with 15 minutes.   The Club charges a fee for use of the VIP room as follows: $25.00 for 15 minutes; $50.00 for 30 minutes; $100.00 for 60 minutes.   Use of the Club's Jacuzzi for 30 minutes is $200.00.   Entertainers may charge whatever price they negotiate with the guests.   The Club does provide the Entertainers minimum price guidelines for the spaces, but it is left to each individual Entertainer to establish their fee.   The use fee for the space paid to the Club by the guests stays the same.   Entertainers typically charge the suggested rate or higher. It is up to the Entertainer what she charges for her performance.   It is also completely up to each Entertainer whether to use the VIP rooms, and there is no limit on their use.   A copy of the suggested minimum prices is attached as Exhibit A.

10.    In addition to the VIP rooms and Jacuzzi, Entertainers may also use is the couch area on a per song basis.   The Club charges a flat rate of $10 per song for use of the couch space.   Typically Entertainers charge $30.00 for each song with $10.00 going to the Club and the Entertainers keeps $20.00.   Occasionally Entertainers charge more.   It is Entertainer's own choice whether to do a couch dance.   Entertainers are never directed by the Club to perform for guests.   An Entertainer may choose to do as many couch dancers as she wishes.   There is no limit set by the Club.

11.    In addition to the fees Entertainers charge for performing in the VIP rooms, Jacuzzi and couch areas.   Entertainers also receive tips from guests.   Entertainers are not

4

required to report to me or anyone else at the Club the performer's fees they charged or the tips they received.

12.    It is customary in the gentlemen's club industry for Entertainers to tip the employees at the Club that helped them in some way during the course of the evening. The Club suggest, but does not require Entertainers tip anyone.   As the word, "tip" is defined it is a voluntary gratuity. As a guide to Entertainers the Club suggests $10.00 to the House Mom, $10.00 to the D.J., and $2.00 to the Floor Hosts.

13.    Employees are prohibited from harassing an Entertainer for a tip.   Floor Hosts are instructed not to even ask Entertainers for a tip.   If management learns that any one is harassing an Entertainer for a tip it is grounds for termination.   Last year a Floor Host was terminated for that reason.

14.    Entertainers determine for themselves when and if they choose to work. There is no schedule for Entertainers.   They can come in and leave whenever they choose. Entertainers are not required to schedule their work times, nor are they required to work a minimum number of nights.   Entertainers are free to work regularly or sporadically. They can take off from work as many days, weeks or months and still work when they choose.   Entertainers are not required to attend staff meetings.

15.    Once in the Club Entertainers are free to mingle with guests at the Club. Entertainers can choose for themselves which guests, if any, they want to spend time, talk or perform dances.   It is completely each Entertainers own choice.

16.    Entertainers are "show girls" and asked to wear clothes generally consistent with that appearance.   There is no specific dress code.   Entertainers are to wear evening

5

gowns when they are in the Club and not on stage.   The purpose is to elevate the Entertainers above everyone else.   Each Entertainer can select their own dresses in terms of style, color and material as well as their own look.   They are expected to look beautiful and classy.   How they attain that look is up to them.

17.    Entertainers are free to perform at other venues and there are no restrictions put on them working at other night clubs.

18.    Entertainers are given the opportunity to earn tips by performing on its stages in rotation with other Entertainers.   There is a rotation to give all the Entertainers a fair opportunity to be seen and promoted by the D.J.

19.    It is my understanding that prior to Thee Dollhouse coming to the Crazy Horse there was a practice of D.J.'s expecting a tip of 10% of an Entertainers earnings.   This was stopped after the Thee Dollhouse took over.   It was reiterated that our policy was that tips are discretionary and that the suggested tip to D.J.'s was $10.00, not 10% of earnings. It was also discovered that the DJ's were sometimes getting money from Entertainers to skip them during the rotation.   This was also stopped.

20.    At the Dollhouse I have never known Entertainers to have been subjected to fines or disciplinary actions.   I have never done so.

21.    There are no rules at the Club limiting an Entertainer from drinking alcohol, or having dinner, using their telephone or taking breaks. Entertainers are free to do any and all of those things in the Club.   Employees on the other hand are subject to rules limiting those activities.

22.    House Moms help the Entertainers get ready, and collect the House Fees and

000153

turn the money into the Manager who is closing that evening.    House Moms do not hire or fire and have no managerial responsibility.

23.    I am familiar with Alexis Degidio and knew her to be an Entertainer at the Club.   She had been for several years an Entertainer at the Thee Dollhouse located about 4 miles from its current location at the Crazy Horse location.   She went by the stage name, Bella.   By the time she came to the Crazy Horse she no longer had the appearance or personality consistent with the high standards expected for Entertainers.    I knew she was a cocaine user as was her friend, an Entertainer by the name of Jacinda Gardner. However, Degidio was close friends with the wife of General Manager, Joe Hargadon and it was for that reason that she was permitted to be an Entertainer there.   If I had been the General Manager I would have not permitted her to be an Entertainer at our Club.

24.    The relationship between the Club and the Entertainers and the business practices I have described in this Declaration were applicable generally to all Entertainers, including Alexis Degidio, excepts as previously noted that I would not have permitted Degidio to perform in the Club if I had been General Manager.

**FURTHER DECLARANT SAITH NAUGHT**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, in witness whereof I have signed below on the date indicated, at North Myrtle Beach, South Carolina.

_____Jack Davenport_____        ___12/10/14___
Jack Davenport                                      Date

7

000154

Exhibit A



# VIP Rooms

15 min $150 w/ $25 To club

30 min $300 w/ $50 To club

60 min $600 w/ $100 To club

jacuzzi - $600 w/ $200 for 30 min.    To club

k minimum price guidelines, you may negotiate your own VIP prices

000155

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

ALEXIS DEGIDIO, individually and on behalf )
of all others similarly situated,                            )
                                                             )
                    Plaintiff,                               )        Case No. 4:13-cv-02136-BHH
                                                             )
        v.                                                   )
                                                             )        JURY TRIAL DEMANDED
CRAZY HORSE SALOON AND                                       )
RESTAURANT, INC., d/b/a THEE NEW                             )
DOLLHOUSE,                                                   )
                                                             )
                    Defendant.                               )

---

## DECLARATION OF LAURA WATSON

---

     I, Laura Watson, make the following Declaration under oath and on the basis of my own personal knowledge. I am over 21 years of age. I suffer from no legal disabilities and am competent to make this Declaration.

     1.    Since December, 2005, I have been Chief Financial Officer (CFO) for Crazy Horse Saloon & Restaurant, Inc. located at 3102 Highway 17 South, North Myrtle Beach, South Carolina. This is the only location Crazy Horse Saloon and Restaurant, Inc. has ever operated a night club. Our office is located next door at 3102 Hwy 17 South, North Myrtle Beach, South Carolina.

     2.    On about March 1, 2012, Crazy Horse Saloon & Restaurant, Inc. began doing business as Thee New Dollhouse, a nightclub featuring exotic dancers at the address identified in paragraph 1 above. The d/b/a was later changed to just "Thee Dollhouse" (hereafter referred to as the "Club"). Entertainers have not been classified as employees, but are instead considered lessees or independent contractors who are permitted the non-exclusive use of the Club's stages,

dressing room, lockers and semi-private areas for performing. Entertainers agree to pay a House Fee to the Club for each evening they perform. Entertainers are not paid a wage by the Club. Entertainers earn compensation by what they receive in fees collected for their dances and time in semi-private areas of the Club, and whatever else they receive from customers (referred to as "guests") of the Club in tips. Entertainers are responsible for their own expenses, costumes and dresses. The Club does not pay for these things nor does it reimburse them.

3.     I am familiar with Alexis Degidio. Mrs. Degidio was an Entertainer at the Club beginning in July 2012. Degidio went by the stage name "Bella". In mid-April 2013, she was hired as a waitress. Previous to being hired to be a waitress Degidio was not employed by the Club. She was permitted to perform there as an Entertainer. Joe Hargadon was the Manager during the entire period of time that Degidio performed as an Entertainer at the Club. Hargadon began his employment at the Club in July 2012. After Hargadon quit his employment Degidio never returned.

4.     I have reviewed all available sign-in sheets of Entertainers between July 1, 2012 and end of April 2013. The name Bella appears on sign-in sheets for 40 days, but the one from January 4, 2013 is crossed out. These sign-in sheets record when each Entertainer arrives at the Club. It does not indicate whether the Entertainer actually worked that evening, nor how long the Entertainer worked. These records are kept in the regular course of business and are attached as Exhibit A.

5.     Whether an Entertainer actually worked on a particular evening could be confirmed from Club records of Entertainers who performed for guests in any of the designated semi-private areas where the Club charges a fee to the guests for use of the space, and the Entertainer is permitted to set her own separate performance fee. These spaces include the couch

2

area, the VIP rooms and the Jacuzzi area. Attached as Exhibit B is the suggested minimum prices for the VIP areas. Guests are charged $10.00 on a per song basis for use of the couch space, and the Entertainer typically charges $20.00 which goes directly to the Entertainer from the guests. VIP rooms and Jacuzzi are available in increments of time as follows:

|  | VIP: | 15 minutes - $25.00 |
|--|------|---------------------|
|  |      | 30 minutes - $50.00 |
|  |      | 60 minutes - $100.00 |
|  | Jacuzzi: | 30 minutes - $200.00 |

6.      Club employees record each use of the couch area by noting the stage name of the Entertainer. I have searched all the records where Degidio, aka Bella, performed in the couch area on all the days where Bella's name appeared on the sign-in sheet. Those records are attached as Exhibit C.

7.      Club employees also record each use of a VIP room and Jacuzzi, where the name of the Entertainer is noted along with the time in and time out of the room. I searched the VIP records on all the days Bella's name appeared on a sign-in sheet and pulled all those records where Bella's name appears. Those records are kept in the regular course of business and are attached as Exhibit D.

8.      Club employees record all Golden Dollar transactions on each day of operation. I searched the Golden Dollar records for all the days Bella's name appeared on the sign-in sheet. Those records are kept in the regular course of business and are attached as Exhibit E.

9.      All of these records indicate that Degidio was actually in the Club working as an Entertainer for a total of 21 nights during the period between July 2012 and the end of April 2013.

10.     During, the week of July 22 – July 28, 2012, the records show that Degidio performed 10 couch dances and two 15 minute and three 30 minute VIP sessions which, if she

3

only charged the suggested minimum fee she would have earned a total of $1,200.00 for that week working four evenings. The Club's suggested minimum performance fee was $20.00 for each song in the couch area and $125.00 for 15 minutes.

11.    The following week of July 29 – August 4, 2012, records show Degidio worked on August 2, 2012 and did one 15 minute sessions in the VIP area which would total $125.00 for that one evening's work if she charged the minimum suggested fee.

12.    The records show that Degidio did not work again until the week of September 9 – September 15, 2012 where on September 13, 2012 she did one couch dance and one 15 minute session which would total $145.00 for that evening if she only charged the minimum suggested fee.

13.    The following week of September 16 – September 22, 2012 Degidio did five couch dances on September 22nd which would total $100.00 if she only charged the suggested minimum fee.

14.    The records reflects Degidio did not work again until the week of October 7 – 13, 2012, when on October 12, 2012 she did three couch dances and two VIP 15 minute and one 30 minute sessions for a total of $560.00 if she only charged the suggested minimum fee.

15.    Records of the following week October 14 – October 20, 2012 indicate Degidio did two couch dances and one VIP session of 30 minutes for $270.00 and the following night did three couch dances for $60.00 which would give her a weekly total of $330.00 for working two evenings if she only charged the suggested minimum fee.

16.    The next week of October 21 – October 27, 2012, records indicate Degidio worked three nights and did nine couch dances and one VIP session of 15 minutes for a total for that week of $310.00 for working three evenings if she only charged the suggested minimum fee.

4

000159

17.    Records show Degidio next working the week of November 4 – November 10, 2012, she worked two evenings where she did six couch dances and four VIP sessions for a total of $620.00 if she only charged the suggested minimum fee.

18.    The following week of November 11 – November 17, Degidio did ten couch dances and one 15 minute and one hour VIP sessions over three nights for a total of $825.00 if she only charged the suggested minimum fee.

19.    The records indicate that Degidio did not work again until March 19, 2013 where in one night she did eight couch dances for a total of $160.00 if she only charged the suggested minimum fee.

20.    The records show that Degidio worked two nights the following week of March 24 – 30, 2013 and did eighteen couch dances for a total of $360.00 if she only charged the suggested minimum fee.  Those are the last two nights there are any records of Degidio working as an Entertainer at the Club.  In April 2013, Degidio became employed as a waitress at the Club.

FURTHER DECLARANT SAITH NAUGHT

**Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, in witness whereof I have signed below on the date indicated, at North Myrtle Beach, South Carolina.**

_____                    12 – 10 – 14
Laura Watson                                                              Date

5

Exhibit A

| | ENTERTAINER SIGN-IN SHEET | | DAY: Tuesday | | DATE: 7/7/12 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
| 1 | Kitty | 5:26 | | | 31 | | | | |
| 2 | Michelle | 5:40 | | | 32 | | | | |
| 3 | Albina | 6:33 | | | 33 | | | | |
| 4 | Sonya | 6:33 | | | 34 | | | | |
| 5 | Angel | 6:37 | | | 35 | | | | |
| 6 | Katrina | 6:46 | | | 36 | | | | |
| 7 | Veronica | 6:47 | | | 37 | | | | |
| 8 | Roxane | 6:51 | | | 38 | | | | |
| 9 | Sarah | 6:55 | | | 39 | | | | |
| 10 | Carly | 6:57 | | | 40 | | | | |
| 11 | Candy | 6:59 | | | 41 | | | | |
| 12 | Brittany | 7:28 | | | 42 | | | | |
| 13 | Saphia | 7:34 | | | 43 | | | | |
| 14 | Yasmine | 7:42 | | | 44 | | | | |
| 15 | Larma | 7:43 | | | 45 | | | | |
| 16 | Kim | 7:53 | | | 46 | | | | |
| 17 | Blair | 7:57 | | | 47 | | | | |
| 18 | Bella | 8:45 | | | 48 | | | | |
| 19 | Sophia | 9:15 | | | 49 | | | | |
| 20 | Sasha | 10:00 | | | 50 | | | | |
| 21 | | | | | 51 | | | | |
| 22 | | | | | 52 | | | | |
| 23 | | | | | 53 | | | | |
| 24 | | | | | 54 | | | | |
| 25 | | | | | 55 | | | | |
| 26 | | | | | 56 | | | | |
| 27 | | | | | 57 | | | | |
| 28 | | | | | 58 | | | | |
| 29 | | | | | 59 | | | | |
| 30 | | | | | 60 | | | | |



ENTERTAINER SIGN-IN SHEET    DAY: Thurs.    DATE: 7/9

| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Dawn | 3:45 | | | 31 | | | | |
| 2 | Carly | 6:25 | | | 32 | | | | |
| 3 | Veronica | 6:42 | | | 33 | | | | |
| 4 | Ambrose | 6:44 | | | 34 | | | | |
| 5 | Bella | 7:27 | | | 35 | | | | |
| 6 | Jaycinda | 7:27 | | | 36 | | | | |
| 7 | Saphaire | 7:35 | | | 37 | | | | |
| 8 | Electra | 7:45 | | | 38 | | | | |
| 9 | Kira | 7:53 | | | 39 | | | | |
| 10 | Amelia | 7:57 | | | 40 | | | | |
| 11 | Lacrexi | 7:59 | | | 41 | | | | |
| 12 | Candy | 7:59 | | | 42 | | | | |
| 13 | Sophia | 8:34 | | | 43 | | | | |
| 14 | Yasmine | 8:50 | | | 44 | | | | |
| 15 | Kendra | 8:55 | | | 45 | | | | |
| 16 | Chloe | 8:57 | | | 46 | | | | |
| 17 | Barbie | 9:00 | | | 47 | | | | |
| 18 | Jersey | 9:00 | | | 48 | | | | |
| 19 | Baily | 9:22 | | | 49 | | | | |
| 20 | Bree | 9:37 | | | 50 | | | | |
| 21 | Alexis | 9:44 | | | 51 | | | | |
| 22 | Smokey | 10:18 | | | 52 | | | | |
| 23 | Tiffany | NEW | | | 53 | | | | |
| 24 | Sasha | 10:26 | | | 54 | | | | |
| 25 | Colby | 10:41 | | | 55 | | | | |
| 26 | | | | | 56 | | | | |
| 27 | | | | | 57 | | | | |
| 28 | | | | | 58 | | | | |
| 29 | | | | | 59 | | | | |
| 30 | | | | | 60 | | | | |

000163

| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| ENTERTAINER SIGN-IN SHEET | | DAY: Friday | | | DATE: 7/20/12 | | | | |
| 1 | Dawn | 4:00 | | | 31 | | | | |
| 2 | Katia | 6:08 | | | 32 | | | | |
| 3 | Tina | 6:20 | | | 33 | | | | |
| 4 | Carly | 6:26 | | | 34 | | | | |
| 5 | Sonja | 6:40 | | | 35 | | | | |
| 6 | Albina | 6:40 | | | 36 | | | | |
| 7 | lina | 6:40 | | | 37 | | | | |
| 8 | Electra | 6:51 | | | 38 | | | | |
| 9 | Sassy | 6:55 | | | 39 | | | | |
| 10 | Karina | 6:55 | | | 40 | | | | |
| 11 | Kim | 7:00 | | | 41 | | | | |
| 12 | Sarah | 7:05 | | | 42 | | | | |
| 13 | Sapphire | 7:41 | | | 43 | | | | |
| 14 | Tiffany | 7:49 | | | 44 | | | | |
| 15 | Denata | 7:58 | | | 45 | | | | |
| 16 | London | 8:05 | | | 46 | | | | |
| 17 | Amalie | 8:05 | | | 47 | | | | |
| 18 | Bella | 8:18 | | | 48 | | | | |
| 19 | Yasmine | 8:35 | | | 49 | | | | |
| 20 | Candy | 8:37 | | | 50 | | | | |
| 21 | Kendra | 8:57 | | | 51 | | | | |
| 22 | Jacinda | 9:58 | | | 52 | | | | |
| 23 | Alexis | 9:0 | | | 53 | | | | |
| 24 | Simone | 9:34 | | | 54 | | | | |
| 25 | Colby | 9:39 | | | 55 | | | | |
| 26 | Smokey | 1000 | | | 56 | | | | |
| 27 | Aliah | NEW | | | 57 | | | | |
| 28 | Jean | Nth | | | 58 | | | | |
| 29 | SASHA | 10:53 | | | 59 | | | | |
| 30 | Mia | 1:07 | | | 60 | | | | |

000164

ENTERTAINER SIGN-IN SHEET    DAY: Saturday    DATE: 7-21-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Dawn | 4:12 | | | 31 | Chanel | | | |
| 2 | Kaytia | 4:30 | | | 32 | Tanya | | | |
| 3 | Cream | 5:32 | | | 33 | Colby | | | |
| 4 | Jicinda | 5:42 | | | 34 | | | | |
| 5 | Sonya | 6:28 | | | 35 | | | | |
| 6 | Electra | 6:30 | | | 36 | | | | |
| 7 | Sarah | 6:39 | | | 37 | | | | |
| 8 | Karina | 6:39 | | | 38 | | | | |
| 9 | Sassy | 6:56 | | | 39 | | | | |
| 10 | Kira | 6:57 | | | 40 | | | | |
| 11 | Carley | 7:10 | | | 41 | | | | |
| 12 | Saphire | 7:29 | | | 42 | | | | |
| 13 | Ambrose | 7:49 | | | 43 | | | | |
| 14 | Tina | 7:50 | | | 44 | | | | |
| 15 | Naughtia | 7:55 | | | 45 | | | | |
| 16 | Clohé | 8:00 | | | 46 | | | | |
| 17 | Skyler | 8:02 | | | 47 | | | | |
| 18 | Jasmine | 8:19 | | | 48 | | | | |
| 19 | Candy | 8:23 | | | 49 | | | | |
| 20 | Heather | 8:35 | | | 50 | | | | |
| 21 | Amellia | 8:47 | | | 51 | | | | |
| 22 | Jade | 8:48 | | | 52 | | | | |
| 23 | Hope | 8:49 | | | 53 | | | | |
| 24 | Aubry | 8:49 | | | 54 | | | | |
| 25 | Barbie | 9:00 | | | 55 | | | | |
| 26 | Bella | 9:22 | | | 56 | | | | |
| 27 | Sugar | | | | 57 | | | | |
| 28 | Amelie | | | | 58 | | | | |
| | Bailey | | | | | | | | |
| | Alexis | | | | | | | | |

000165



000166





000168

ENTERTAINER SIGN-IN SHEET    DAY: Saturday    DATE: 7-28-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|----|------|---------|-----|------|
| 1 | Emerald | 345 | | | 31 | Ava | 856 | | |
| 2 | Hannah | 520 | | | 32 | Tosha | 850 | | |
| 3 | Lilly | 530 | | | 33 | Skyler | 917 | | |
| 4 | Electra | 600 | | | 34 | Summer | 918 | | |
| 5 | Margarita | 620 | | | 35 | Michela | 937 | | |
| 6 | Tina | 650 | | | 36 | Bailey | 942 | | |
| 7 | Katia | 650 | | | 37 | Alexis | 946 | | |
| 8 | Carly | 655 | | | 38 | Kim | 954 | | |
| 9 | Devin | 656 | | | 39 | Tanya | 957 | | |
| 10 | Sassy | 659 | | | 40 | Tyra | 1005 | | |
| 11 | Veronica | 700 | | | 41 | Niomi | 1005 | | |
| 12 | Alianna | 710 | | | 42 | Colby | 1007 | | |
| 13 | Chloe | 715 | | | 43 | Honey | 1017 | | |
| 14 | Bree | 715 | | | 44 | Brooke | 1022 | | |
| 15 | Angel | 718 | | | 45 | Grace | 1055 | | |
| 16 | Hope | 725 | | | 46 | | | | |
| 17 | Saphire | 727 | | | 47 | | | | |
| 18 | Karla | 730 | | | 48 | | | | |
| 19 | Cali | 748 | | | 49 | | | | |
| 20 | Amelia | 758 | | | 50 | | | | |
| 21 | Lanna | 800 | | | 51 | | | | |
| 22 | Candy | 805 | | | 52 | | | | |
| 23 | Yasmine | 810 | | | 53 | | | | |
| 24 | Jazz | 830 | | | 54 | | | | |
| 25 | Lacey new | | | | 55 | | | | |
| 26 | Bella | 853 | | | 56 | | | | |
| 27 | Courtney | 855 | | | 57 | | | | |
| 28 | Dallas | 855 | | | 58 | | | | |
| 29 | Barbie | 856 | | | 59 | | | | |
| 30 | Jersey | 856 | | | 60 | | | | |

000169

## DAILY ENTERTAINER REPORT

DATE: 4/29/15

| # | ENTERTAINER | TIME IN | TIME OUT | $ AMT |
|---|---|---|---|---|
| 1 | Chloe | 6:30 | | |
| 2 | Kitty | 6:30 | | |
| 3 | Veronica | 6:30 | | |
| 4 | Alexon | 6:47 | | |
| 5 | | 6:53 | | |
| 6 | Jessica | 7:49 | Pd 20 | |
| 7 | | 7:59 | Rollover | |
| 8 | Candy | 8/17 | Rollover | |
| 9 | Candy | 8:16 | Pd 20 callin | |
| 10 | Jazz | 8:41 | Pd 20 callin | |
| 11 | Bailey | 8:51 | Pd 30 | |
| 12 | Nyla | 9:03 | Pd LYK | |
| 13 | Nicomi | 9:23 | Pd LYK | |
| 14 | Summer C | 9:27 | Pd 40 | |
| 15 | Main | 9:51 | | |
| 16 | Smokey | 9:59 | Pd 40 | |
| 17 | Angel | 10:50 | Pd 40 | |
| 18 | Jazz 2 | 10:56 | Pd 50 Roll 6mos 50 | |
| 19 | | | | |
| 20 | | | | |

MANAGER (signature)

NOTES:

NO SHOWS: 10

CASH DROP: 1,326

000170

ENTERTAINER SIGN-IN SHEET    DAY: Thursday    DATE: 8/2/12

| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Chloe | 4:39 | | | 31 | Yazmine | 9:00 | | |
| 2 | Monique | 4:41 | | | 32 | Alexis | 9:27 | | |
| 3 | Alianna | 5:49 | | | 33 | Bailey | 9:28 | | |
| 4 | Kaytia | 6:04 | | | 34 | Ava | 9:35 | | |
| 5 | Casey | 6:37 | | | 35 | Harley | 9:50 | | |
| 6 | Ambrose | 6:40 | | | 36 | Smokey | 10:00 | | |
| 7 | Sarah | 6:41 | | | 37 | Katy | NEW | | |
| 8 | Dennotta | 6:42 | | | 38 | Grace | 10:35 | | |
| 9 | Veronica | 6:43 | | | 39 | Kim | ? | | |
| 10 | Carly | 6:45 | | | 40 | Colby | 10:56 | | |
| 11 | Corey | 6:52 | | | 41 | | | | |
| 12 | Roxy | 6:53 | | | 42 | | | | |
| 13 | Electra | 6:53 | | | 43 | | | | |
| 14 | Sassy | 6:55 | | | 44 | | | | |
| 15 | Lanna | 6:57 | | | 45 | | | | |
| 16 | Samone | 7:06 | | | 46 | | | | |
| 17 | Courtney | 7:17 | | | 47 | | | | |
| 18 | Violet | NEW? | | | 48 | | | | |
| 19 | Vera | 7:30 | | | 49 | | | | |
| 20 | Aliyah | 7:30 | | | 50 | | | | |
| 21 | Lacy | 7:38 | | | 51 | | | | |
| 22 | Sophia | 7:40 | | | 52 | | | | |
| 23 | Jazz | 8:03 | | | 53 | | | | |
| 24 | Angel | 8:05 | | | 54 | | | | |
| 25 | Amelia | 8:15 | | | 55 | | | | |
| 26 | Bella | 8:43 | | | 56 | | | | |
| 27 | Skyler | 8:50 | | | 57 | | | | |
| 28 | Niomi | 8:52 | | | 58 | | | | |
| 29 | Saphire | 8:55 | | | 59 | | | | |
| 30 | GoDIVA | NEW | | | 60 | | | | |

000171

ENTERTAINER SIGN-IN SHEET    DAY: Friday    DATE: 8/24/12

| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Abbey | 4:23 | | | 31 | Candy | 9:00 | | |
| 2 | HannahLee | 4:41 | | | 32 | Bella | 9:00 | | |
| 3 | Taylor | 4:48 | | | 33 | Hunter | 9:11 | | |
| 4 | Brie | 4:50 | | | 34 | Clees | 9:20 | | |
| 5 | Kaytia | 5:07 | | | 35 | Yazmine | 9:24 | | |
| 6 | Raven | 5:26 | | | 36 | Alexis | 9:35 | | |
| 7 | Tasha | 5:40 | | | 37 | Kayla | 8:55? | | |
| 8 | Sassy | 5:58 | | | 38 | Vixin | 9:38 | | |
| 9 | Star | 6:02 | | | 39 | KENDRA | 9:58 | | |
| 10 | Crystal | 6:15 | | | 40 | Camilla | 9:59 | | |
| 11 | Brenna | 6:26 | | | 41 | Erica | NEW | | |
| 12 | Carmen | 6:43 | | | 42 | Cataline | NEW | | |
| 13 | Jenna | 6:45 | | | 43 | Neveeh | NEW | | |
| 14 | Godiva | 6:47 | | | 44 | Vera | NEW | | |
| 15 | Sarah | 6:48 | | | 45 | Colby | 10:07 | | |
| 16 | Victoria | 6:48 | | | 46 | Missy | 10:07 | | |
| 17 | Mya | 6:50 | | | 47 | Simone | 10:22 | | |
| 18 | Riley | 6:53 | | | 48 | Heather | 10:50 | | |
| 19 | Edie | 6:57 | | | 49 | Smokie | 10:58 | | |
| 20 | Amberose | 6:59 | | | 50 | Becky | 12:26 | | |
| 21 | Devin | 7:00 | | | 51 | | | | |
| 22 | Jean | 7:15 | | | 52 | | | | |
| 23 | Jazz | 7:17 | | | 53 | | | | |
| 24 | Amilia | 7:49 | | | 54 | | | | |
| 25 | Erion | 7:58 | | | 55 | | | | |
| 26 | Jenny | 7:58 | | | 56 | | | | |
| 27 | Lanna | 8:00 | | | 57 | | | | |
| 28 | Hope | 8:15 | | | 58 | | | | |
| 29 | Veronica | 8:48 | | | 59 | | | | |
| 30 | Nadia | 8:54 | | | 60 | | | | |

000172

ENTERTAINER SIGN-IN SHEET    DAY: Thursday    DATE: 9-30

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Emerald | 3:30 | | | 31 | Alexis | 8:58 | | |
| 2 | Abby | 3:50 | | | 32 | Chris Anne | 9:03 | | |
| 3 | Layla | 3:59 | | | 33 | Missy | 9:12 | | |
| 4 | Chloe | 4:05 | | | 34 | Mikayla | 9:21 | | |
| 5 | Kitty | 4:26 | | | 35 | Vixen | 9:30 | | |
| 6 | Isis | 5:19 | | | 36 | Skylar | 9:30 | | |
| 7 | Candy | 5:27 | | | 37 | Baily | 9:38 | | |
| 8 | Kaytia | 5:44 | | | 38 | Sofia | 9:49 | | |
| 9 | Jazz | 5:58 | | | 39 | Smokey | 10:57 | | |
| 10 | Kasey | 6:04 | | | 40 | Nevaeh | 11:15 | | |
| 11 | Crystal | 6:21 | | | 41 | | | | |
| 12 | Denise | NEW | | | 42 | | | | |
| 13 | Devin | 6:25 | | | 43 | | | | |
| 14 | Victoria | 6:41 | | | 44 | | | | |
| 15 | Jenna | 6:46 | | | 45 | | | | |
| 16 | Electra | 6:46 | | | 46 | | | | |
| 17 | Carley | 6:50 | | | 47 | | | | |
| 18 | Righley | 6:53 | | | 48 | | | | |
| 19 | Roxxane | 6:53 | | | 49 | | | | |
| 20 | Kim | 7:00 | | | 50 | | | | |
| 21 | Ambrose | 7:36 | | | 51 | | | | |
| 22 | Lana | 7:46 | | | 52 | | | | |
| 23 | Amillia | 7:50 | | | 53 | | | | |
| 24 | Raven | 7:59 | | | 54 | | | | |
| 25 | Becky | 8:03 | | | 55 | | | | |
| 26 | Bella | 8:04 | | | 56 | | | | |
| 27 | Amy | 8:10 | | | 57 | | | | |
| 28 | Veronica | 8:15 | | | 58 | | | | |
| 29 | Saphire | 8:33 | | | 59 | | | | |
| 30 | Jeste | 8:57 | | | 60 | | | | |

000173

ENTERTAINER SIGN-IN SHEET    DAY:____    DATE:____

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Katia | 403 | | | 31 | Locna | 651 | | |
| 2 | Abby | 404 | | | 32 | Chloe | 651 | | |
| 3 | Candy | 420 | | | 33 | Acora | 652 | | |
| 4 | Sammy | 431 | | | 34 | Veronica | 657 | | |
| 5 | Kim | 533 | | | 35 | Edie | 651 | | |
| 6 | Hailey | NEW | | | 36 | CJ | 657 | | |
| 7 | Jessi | NEW | | | 37 | Hope | 658 | | |
| 8 | Tina | 551 | | | 38 | Crystal | 713 | | |
| 9 | Isis | 609 | | | 39 | Mya | 717 | | |
| 10 | Silver | 620 | | | 40 | Sophie | 728 | | |
| 11 | Ambrose | 622 | | | 41 | Yasmine | 739 | | |
| 12 | Kristen | 629 | | | 42 | MacyJane | 747 | | |
| 13 | Devin | 633 | | | 43 | Sabrina | 827 | | |
| 14 | Haze | 634 | | | 44 | Holly | 827 | | |
| 15 | Riley | 637 | | | 45 | Amy | 831 | | |
| 16 | Victoria | 642 | | | 46 | Alexis | 833 | | |
| 17 | Electra | 642 | | | 47 | Summer | 855 | | |
| 18 | Carly | 642 | | | 48 | Bella | 855 | | |
| 19 | Monica | 642 | | | 49 | Savannah | 904 | | |
| 20 | Leslie | 642 | | | 50 | Skylar | 921 | | |
| 21 | Genisis | 642 | | | 51 | Angel | 943 | | |
| 22 | Luna | 642 | | | 52 | Logan | 958 | | |
| 23 | Kitana | 644 | | | 53 | Modique | | | |
| 24 | Jenna | 643 | | | 54 | Smokey | 959 | | |
| 25 | Sonya | 647 | | | 55 | Grace | 959 | | |
| 26 | Sara | 648 | | | 56 | Jade | 1034 | | |
| 27 | Elliana | 648 | | | 57 | Neveah | 1034 | | |
| 28 | Roxanne | 650 | | | 58 | Cameron | 1048 | | |
| 29 | Katie | 650 | | | 59 | Jersey | 1053 | | |
| 30 | Nam | 651 | | | 60 | Sasha | 1102 | | |

000174

ENTERTAINER SIGN-IN SHEET    DAY: Tuesday    DATE: 9/4/12

| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Abbey | 3:30 | | | 31 | Grace | 6:55 | | |
| 2 | Sassy | 4:00 | | | 32 | Simone | 6:55 | | |
| 3 | Layla | 4:13 | | | 33 | CJ | 6:57 | | |
| 4 | Smokey | 4:13 | | | 34 | Yazmine | 7:00 | | |
| 5 | Kitty | 4:29 | | | 35 | Skylar | 7:15 | | |
| 6 | Chloe | 5:11 | | | 36 | Jersey | 7:19 | | |
| 7 | Hannah Lee | 5:19 | | | 37 | Bella | 7:26 | | |
| 8 | clees | 5:26 | | | 38 | Carly | 7:30 | | |
| 9 | Bree | 5:26 | | | 39 | Godiva | 7:36 | | |
| 10 | Missy | 5:45 | | | 40 | Lexi | 7:40 | | |
| 11 | Jenna | 5:49 | | | 41 | Holly | 8:47 | | |
| 12 | Jazz | 5:21 | | | 42 | Nevaeh | 8:47 | | |
| 13 | Tiffany | 6:25 | | | 43 | Lenzy | NEW | | |
| 14 | Riley | 6:28 | | | 44 | Cassie | NEW | | |
| 15 | Veronica | 6:32 | | | 45 | Harley | 9:38 | | |
| 16 | Brenna | 6:36 | | | 46 | Hunter | 9:43 | | |
| 17 | Bailey | 6:37 | | | 47 | MaryJane | 9:53 | | |
| 18 | Victoria | 6:39 | | | 48 | Pheobe | 10:09 | | |
| 19 | Katrina | 6:48 | | | 49 | | | | |
| 20 | Electra | 6:48 | | | 50 | | | | |
| 21 | Dixie | 6:48 | | | 51 | | | | |
| 22 | Sarah | 6:48 | | | 52 | | | | |
| 23 | Mickey | 6:48 | | | 53 | | | | |
| 24 | Kia | 6:50 | | | 54 | | | | |
| 25 | Anetta | 6:50 | | | 55 | | | | |
| 26 | Edie | 6:51 | | | 56 | | | | |
| 27 | Corey | 6:51 | | | 57 | | | | |
| 28 | Heather | 6:51 | | | 58 | | | | |
| 29 | Roxanne | 6:52 | | | 59 | | | | |
| 30 | Raven | 6:52 | | | 60 | | | | |

000175

ENTERTAINER SIGN-IN SHEET    DAY: Saturday    DATE: 4/1

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Layla | 3:30 | | | 31 | Amelia | 8:56 | | |
| 2 | Abby | 3:55 | | | 32 | Alexis | 8:59 | | |
| 3 | Jade | 4:02 | | | 33 | Katie | 9:08 | | |
| 4 | Katia | 4:05 | | | 34 | Skylar | 9:30 | | |
| 5 | Sassy | 4:26 | | | 35 | Vixen | 9:37 | | |
| 6 | Missy | 5:15 | | | 36 | Grace | 9:43 | | |
| 7 | Denise | 5:30 | | | 37 | Fox | NEW | | |
| 8 | Star | 6:12 | | | 38 | Alba | NEW | | |
| 9 | Edie | 6:19 | | | 39 | Norah | 1033 | | |
| 10 | Ellionniah | 6:28 | | | 40 | Holly | 1032 | | |
| 11 | Devin | 6:30 | | | 41 | Simone | 10:53 | | |
| 12 | Crystal | 6:30 | | | 42 | Smokie | 1057 | | |
| 13 | Brenna | 6:49 | | | 43 | Becky | 1057 | | |
| 14 | Mia | 6:50 | | | 44 | Bella | 94 | | |
| 15 | Electra | 6:50 | | | 45 | | | | |
| 16 | Carmen | 6:52 | | | 46 | | | | |
| 17 | Sarah | 6:52 | | | 47 | | | | |
| 18 | Veronica | 6:53 | | | 48 | | | | |
| 19 | Roxxane | 6:55 | | | 49 | | | | |
| 20 | Dixie | 6:55 | | | 50 | | | | |
| 21 | Amy | 7:15 | | | 51 | | | | |
| 22 | Chloe | 7:16 | | | 52 | | | | |
| 23 | Isis | 7:17 | | | 53 | | | | |
| 24 | Cali | 7:18 | | | 54 | | | | |
| 25 | Lana | 7:49 | | | 55 | | | | |
| 26 | Corey | 7:53 | | | 56 | | | | |
| 27 | Kim | 8:01 | | | 57 | | | | |
| 28 | Tiffany | 8:17 | | | 58 | | | | |
| 29 | Yasmine | 8:49 | | | 59 | | | | |
| 30 | Bailey | 8:53 | | | 60 | | | | |

ENTERTAINER SIGN-IN SHEET    DAY: Wednesday    DATE: 9-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Logan | 3 45 | | | 31 | Bella | 8 47 | | |
| 2 | Abby | 404 | | | 32 | Skylar | 857 | | |
| 3 | Camen | 4 10 | | | 33 | Cameron | 931 | | |
| 4 | Sassy | 417 | | | 34 | Grace | 9:44 | | |
| 5 | Isis | 5 26 | | | 35 | Ava | 9:59 | | |
| 6 | Natasha | 5:55 | | | 36 | Sasha | 10:02 | | |
| 7 | Genisis | 555 | | | 37 | Sophie | 10:05 | | |
| 8 | Monica | 555 | | | 38 | Harly | 10:37 | | |
| 9 | Leslie | 555 | | | 39 | | | | |
| 10 | Nana | 601 | | | 40 | | | | |
| 11 | Riley | 619 | | | 41 | | | | |
| 12 | Chloe | 630 | | | 42 | | | | |
| 13 | Veronica | 640 | | | 43 | | | | |
| 14 | CJ | 647 | | | 44 | | | | |
| 15 | Aurora | 648 | | | 45 | | | | |
| 16 | Silver | NEW | | | 46 | | | | |
| 17 | Corey | 650 | | | 47 | | | | |
| 18 | Edy | 650 | | | 48 | | | | |
| 19 | Mika | 714 | | | 49 | | | | |
| 20 | Scarlett | 714 | | | 50 | | | | |
| 21 | Crystal | 729 | | | 51 | | | | |
| 22 | Monique | 729 | | | 52 | | | | |
| 23 | Kim | 733 | | | 53 | | | | |
| 24 | Aubrey | 742 | | | 54 | | | | |
| 25 | Simone | 758 | | | 55 | | | | |
| 26 | DENISE | 759 | | | 56 | | | | |
| 27 | MaryJane | 803 | | | 57 | | | | |
| 28 | Angel | 819 | | | 58 | | | | |
| 29 | Hunter | 825 | | | 59 | | | | |
| 30 | Vixen | 839 | | | 60 | | | | |

ENTERTAINER SIGN-IN SHEET    DAY: Thursday    DATE: 9-13-12

| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Logan | 3:23 | | | 31 | Kim | 7:44 | | |
| 2 | Crystal | 3:25 | | | 32 | Anellia | 7:49 | | |
| 3 | Missy | 4:03 | | | 33 | Aubry | 7:51 | | |
| 4 | Abby | 4:05 | | | 34 | Monique | 7:52 | | |
| 5 | Sassy | 4:12 | | | 35 | Hope | 7:55 | | |
| 6 | Candy | 4:22 | | | 36 | Amy | 8:04 | | |
| 7 | Katia | 9:29 | | | 37 | Yasmine | 8:21 | | |
| 8 | Smoky | 4:30 | | | 38 | Veronica | 8:40 | | |
| 9 | Star | 5:45 | | | 39 | Bella | 8:54 | | |
| 10 | Silver | 6:04 | | | 40 | Alexis | 9:03 | | |
| 11 | Chloe | 6:05 | | | 41 | Skylar | 9:07 | | |
| 12 | Devin | 6:26 | | | 42 | Sasha | 9:54 | | |
| 13 | Angel | 6:30 | | | 43 | Brina | New | | |
| 14 | Riley | 6:33 | | | 44 | Grace | 10:16 | | |
| 15 | Victoria | 6:39 | | | 45 | Holly | 9:00 | | |
| 16 | Karina | 6:40 | | | 46 | Kristen | 10:27 | | |
| 17 | Electra | 6:44 | | | 47 | Simone | 10:44 | | |
| 18 | Tina | 6:44 | | | 48 | Harley | 10:44 | | |
| 19 | Blah | 6:44 | | | 49 | | | | |
| 20 | Mila | 6:45 | | | 50 | | | | |
| 21 | Nana | 6:45 | | | 51 | | | | |
| 22 | Roxxane | 6:46 | | | 52 | | | | |
| 23 | Sara | 6:46 | | | 53 | | | | |
| 24 | Sophie | 7:06 | | | 54 | | | | |
| 25 | Jenna | 7:08 | | | 55 | | | | |
| 26 | Paris | 7:17 | New | | 56 | | | | |
| 27 | Luna | 7:29 | | | 57 | | | | |
| 28 | Genisis | 7:29 | | | 58 | | | | |
| 29 | Lesli | 7:29 | | | 59 | | | | |
| 30 | Monica | 7:29 | | | 60 | | | | |

000178

DAY: Wednesday DATE: 9-19-12

ERTAINER SIGN-IN SHEET

| NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|------|---------|-----|------|-----|------|---------|-----|------|
| Kitty | 3:57 | | | 31 | Mila | 8:05 | | |
| Angel | 4:21 | | | 32 | Jersey | 8:17 | | |
| ~~Dintasha~~ | ~~4:52~~ | FIRED | | 33 | Veronica | 8:29 | | |
| Kim | 5:27 | | | 34 | Cali | 8:47 | | |
| Carley | 5:51 | | | 35 | Harley | 9:14 | | |
| Kenzy | 5:53 | | | 36 | Bella | 9:35 | | |
| Genissis | 5:55 | | | 37 | Chantel | 10:09 | | |
| Natasha | 5:55 | | | 38 | Charisma | 10:09 | | |
| Sophie | 6:12 | | | 39 | Neveah | 10:10 | | |
| Logan | 6:30 | | | 40 | Jade | 10:10 | | |
| Sonya | 6:37 | | | 41 | Simone | 10:23 | | |
| Riley | 6:39 | | | 42 | CJ | 10:57 | | |
| Nana | 6:41 | | | 43 | Smokey | 11:02 | | |
| Lesli | 6:42 | | | 44 | Mary Jane | 04 | | |
| Monica | 6:42 | | | 45 | Lisa | 97 | | |
| Rory | 6:43 | | | 46 | | | | |
| Edie | 6:43 | | | 47 | | | | |
| Chloe | 6:46 | | | 48 | | | | |
| Victoria | 6:46 | | | 49 | | | | |
| AMELIA | 6:50 | | | 50 | | | | |
| Carmen | 6:50 | | | 51 | | | | |
| ~~Star~~ | ~~7:04~~ | FIRED | | 52 | | | | |
| Isis | 7:12 | | | 53 | | | | |
| Ellianna | 7:30 | | | 54 | | | | |
| Hazel | 7:31 | | | 55 | | | | |
| Ava | 7:35 | | | 56 | | | | |
| Vixen | 7:46 | | | 57 | | | | |
| Silver | 7:57 | | | 58 | | | | |
| Yasmine | 8:02 | | | 59 | | | | |
| Scarlet | 8:05 | | | 60 | | | | |

000179

ENTERTAINER SIGN-IN SHEET    DAY: Thursday    DATE: 9-20-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Grace | 3:49 | | | 31 | Aroura | 6:52 | | |
| 2 | Sunny | 4:11 | | | 32 | Sophie | 6:53 | | |
| 3 | Candy | 4:12 | | | 33 | Edie | 6:55 | | |
| 4 | Sassy | 4:14 | | | 34 | Amellia | 6:56 | | |
| 5 | Hanna Li | 4:21 | | | 35 | Brooke | 6:58 | | |
| 6 | Smokey | 4:28 | | | 36 | Amy | 7:30 | | |
| 7 | Angel | 5:00 | | | 37 | Summer | 7:31 | | |
| 8 | Veronica | 6:12 | | | 38 | Roxxane | 7:48 | | |
| 9 | Silver | 6:25 | | | 39 | | | | |
| 10 | Brenna | 6:32 | | | 40 | Monree | 8:00 | | |
| 11 | Kim | 6:35 | | | 41 | Bella | 8:20 | | |
| 12 | Chloe | 6:35 | | | 42 | Paris NEW | 8:30 | | |
| 13 | Devin | 6:36 | | | 43 | Ruby NEW | 8:30 | | |
| 14 | Lorna | 6:37 | | | 44 | Alexis | 8:31 | | |
| 15 | Nana | 6:37 | | | 45 | Cali | 8:55 | | |
| 16 | Monica | 6:37 | | | 46 | Savanna | 9:09 | | |
| 17 | Lesli | 6:37 | | | 47 | Alba | 9:34 | | |
| 18 | Hope | 6:37 | | | 48 | Fox | 9:34 | | |
| 19 | Victoria | 6:39 | | | 49 | Karisma | 9:35 | | |
| 20 | Sonya | 6:39 | | | 50 | Chantelle | 9:35 | | |
| 21 | Isis | 6:41 | | | 51 | Brookly | NEW | | |
| 22 | Larina | 6:41 | | | 52 | Ashylin | NEW | | |
| 23 | Carmen | 6:42 | | | 53 | Donnafine | NEW | | |
| 24 | Riley | 6:42 | | | 54 | Sasha | 10:26 | | |
| 25 | Vixen | 6:44 | | | 55 | Skylar | 10:49 | | |
| 26 | Haze | 6:47 | | | 56 | CJ | 10:58 | | |
| 27 | Litana | 6:49 | | | 57 | Harley | 10:59 | | |
| 28 | Tyra | 6:49 | | | 58 | | | | |
| 29 | Electra | 6:49 | | | 59 | | | | |
| 30 | Carley | 6:50 | | | 60 | | | | |

ITERTAINER SIGN-IN SHEET    DAY: Saturday    DATE: 9-22-12

| NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|
| Abby | 3:48 | | | 31 | Edie | 6:58 | | |
| Jessie | 3:51 | | | 32 | Kim | 6:59 | | |
| Sunny | 3:54 | | | 33 | Riley | 7:15 | | |
| Grace | 4:45 | | | 34 | Genissis | 7:32 | | |
| Hanna L. | 5:06 | | | 35 | Natasha | 7:32 | | |
| Mya | 5:17 | | | 36 | Summer | 7:37 | | |
| Brenna | 5:27 | | | 37 | Amy | 7:43 | | |
| Chloe | 5:30 | | | 38 | Angel | 7:44 | | |
| Carley | 5:45 | | | 39 | Leslie | 7:50 | | |
| Hope | 5:50 | | | 40 | Monica | 7:50 | | |
| Tyler | 6:06 | | | 41 | Sabrina | 8:01 | | |
| Marinda | 6:19 | | | 42 | Holly | 8:01 | | |
| Silver | 6:25 | | | 43 | Jordan | 8:09 | | |
| Lana | 6:31 | | | 44 | Cali | 8:39 | | |
| Ashley | 6:31 | | | 45 | Yasmine | 8:44 | | |
| Electra | 6:35 | | | 46 | Alexis | 8:45 | | |
| Nana | 6:36 | | | 47 | Jersey | 8:45 | | |
| Lorna | 6:42 | | | 48 | Trina | 8:48 | | |
| Logan | 6:43 | | | 49 | Blake | 8:48 | | |
| Katana | 6:45 | | | 50 | Destiny | 8:57 | | |
| Candy | 6:46 | | | 51 | Tasha | 9:06 | | |
| Karina | 6:46 | | | 52 | Bella | 9:14 | | |
| Sophie | 6:46 | | | 53 | Katie | 9:29 | | |
| Veronica | 6:47 | | | 54 | Simone | 9:57 | | |
| Devin | 6:48 | | | 55 | Neveah | 10:48 | | |
| Vixen | 6:49 | | | 56 | Jade | 10:48 | | |
| Carmen | 6:51 | | | 57 | Camille | 10:13 | | |
| Roxanne | 6:53 | | | 58 | Fox | 10:19 | | |
| Hunter | 6:54 | | | 59 | Alba | 10:14 | | |
| Corey | 6:58 | | | 60 | Nikki | 10:26 | | |

000181

ENTERTAINER SIGN-IN SHEET   DAY: Saturday   DATE: 9/29/12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Natasha | 3:50 | | | 31 | Aubrey | 7:59 | | |
| 2 | Chies | 4:17 | | | 32 | Sofie | 8:10 | | |
| 3 | Katia | 4:23 | | | 33 | Amelia | ? | | |
| 4 | Candy | 4:29 | | | 34 | Haley | 8:23 | | |
| 5 | HannahLee | 4:46 | | | 35 | Ellie | 8:36 | | |
| 6 | Nana | 5:58 | | | 36 | Lexus | 8:37 | | |
| 7 | Mariah | 6:02 | | | 37 | Hunter | 8:40 | | |
| 8 | Mijah | 6:06 | | | 38 | Lexi | 8:46 | | |
| 9 | Riley | 6:20 | | | 39 | Raven | 8:48 | | |
| 10 | Lorna | 6:28 | | | 40 | Cameron | 8:48 | | |
| 11 | Sonya | 6:30 | | | 41 | Jade | 9:14 | | |
| 12 | Silver | 6:34 | | | 42 | Neveah | 9:44 | | |
| 13 | Vixen | 6:37 | | | 43 | Cali | 9:17 | | |
| 14 | Carisma | 6:38 | | | 44 | Niomi | 9:19 | | |
| 15 | Alex | 6:40 | | | 45 | MaryJane | 9:24 | | |
| 16 | Victoria | 6:40 | | | 46 | Pamela | 9:27 | | |
| 17 | Barbie | 6:40 | | | 47 | Onya | 9:28 | | |
| 18 | Mandi | 6:40 | | | 48 | Bella Melia | 9:28 | | |
| 19 | Jenna | 6:41 | | | 49 | Leah | 9:28 | | |
| 20 | Haze | 6:47 | | | 50 | Skyler | 9:29 | | |
| 21 | Aurora | 6:50 | | | 51 | Katie | 9:33 | | |
| 22 | Roxanne | 6:52 | | | 52 | Sammi | 9:36 | | |
| 23 | Catana | 6:52 | | | 53 | Harley | 935 | | |
| 24 | Veronica | 6:53 | | | 54 | Zoey | 9 56 | | |
| 25 | Carmen | 6:54 | | | 55 | Juliana | 956 | | |
| 26 | Kim | 6:54 | | | 56 | Nikki | 10 30 | | |
| 27 | Sabrina | 7:42 | | | 57 | Lisa | 1034 | | |
| 28 | Yazmine | 7:57 | | | 58 | CJ | 10 35 | | |
| 29 | Hope | 7:58 | | | 59 | Chanel | NEW | | |
| 30 | Carly | 7:58 | | | 60 | Christine | 1037 | | |

000182

ENTERTAINER SIGN-IN SHEET    DAY:                    DATE:

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Cadence | 3:20 | | | 31 | Victoria | 6:45 | | |
| 2 | Katia | 3:30 | | | 32 | Breana | 6:48 | | |
| 3 | Tera | 3:30 | | | 33 | Carly | 6:48 | | |
| 4 | Sunny | 3:55 | | | 34 | Devin | 6:40 | | |
| 5 | Natasha | 3:59 | | | 35 | Sarah | 6:48 | | |
| 6 | Genesis | 3:59 | | | 36 | Aubrey | 6:48 | | |
| 7 | ~~Missy~~ | ~~4:15~~ | | | 37 | Hope | 6:49 | | |
| 8 | Sassy | 4:16 | | | 38 | Jenna | 6:49 | | |
| 9 | Haze | 4:18 | | | 39 | Roxanne | 6:51 | | |
| 10 | Candy | 4:23 | | | 40 | Isis | 6:52 | | |
| 11 | Smokey | 4:26 | | | 41 | Kaytona | 6:53 | | |
| 12 | Hannah | 4:30 | | | 42 | Ambrose | 6:56 | | |
| 13 | Carmen | 4:41 | | | 43 | Veronica | 7:10 | | |
| 14 | Demi | 4:44 | | | 44 | Logan | 7:22 | | |
| 15 | Enya | 4:44 | | | 45 | Carisma | 7:28 | | |
| 16 | Gianna | 4:44 | | | 46 | CJ | 7:37 | | |
| 17 | Ashley | 5:00 | | | 47 | Silver | 7:39 | | |
| 18 | Alex | 5:10 | | | 48 | Sabrina | 8:00 | | |
| 19 | Chloe | 5:28 | | | 49 | Hunter | 8:11 | | |
| 20 | Lorna | 5:50 | | | 50 | Mariah | 8:17 | | |
| 21 | Sophie | 6:25 | | | 51 | Kim | 8:19 | | |
| 22 | nana | 6:29 | | | 52 | Bella | 8:24 | | |
| 23 | Melinda | 6:29 | | | 53 | ~~Jade~~ | 8:39 | | |
| 24 | Electra | 6:31 | | | 54 | Naven | 8:29 | | |
| 25 | Edie | 6:37 | | | 55 | TRINA | 8:53 | | |
| 26 | Sonya | 6:40 | | | 56 | Tyra | 8:50 | | |
| 27 | Riley | 6:41 | | | 57 | Yazmin | 9:14 | | |
| 28 | Vixen (new) | 6:43 | | | 58 | Kelli | 9:18 | | |
| | Barbie | 6:45 | | | 59 | lisa | 9:25 | | |
| 24 | | 6:45 | | | 60 | Skyla | 9:26 | | |

000183

ENTERTAINER SIGN-IN SHEET    DAY:    DATE:

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Joselin | 3:30 | | | 31 | Veronica | 8:56 | | |
| 2 | Sierra | 3:30 | | | 32 | Allexis | 8:57 | | |
| 3 | Hailey | 3:40 | | | 33 | Holly | 8:58 | | |
| 4 | Jessi | 3:40 | | | 34 | Sabrina | 8:58 | | |
| 5 | Khatia | 3:45 | | | 35 | Kelly | 9:00 | | |
| 6 | ABBY | 3:58 | | | 36 | Lili | 9:00 | | |
| 7 | Candy | 4:27 | | | 37 | Skylar | 9:11 | | |
| 8 | Chloe | 5:00 | | | 38 | Grace | 9:46 | | |
| 9 | Devin | 6:26 | | | 39 | Alora | 9:48 | | |
| 10 | Haze | 6:28 | | | 40 | Edie | 9:56 | | |
| 11 | Electra | 6:32 | | | 41 | CJ | 9:56 | | |
| 12 | Katona | 6:40 | | | 42 | Sasha | 9:57 | | |
| 13 | Leslie | 6:42 | | | 43 | Brooke | NEW | | |
| 14 | Monica | 6:42 | | | 44 | Ava | 10:27 | | |
| 15 | Silver | 6:51 | | | 45 | Jade | 10:34 | | |
| 16 | Natasha | 6:52 | | | 46 | Smokey | 10:51 | | |
| 17 | Genisis | 6:52 | | | 47 | Marytan | 11:04 | | |
| 18 | Kristal | 6:54 | | | 48 | Kenzey | 11:44 | | |
| 19 | Nana | 6:55 | | | 49 | Ariana | 9+ | | |
| 20 | Carley | 6:58 | | | 50 | Reagan | 9+ | | |
| 21 | Isis | 7:20 | | | 51 | | | | |
| 22 | Hope | 7:33 | | | 52 | | | | |
| 23 | Star | 7:45 | | | 53 | | | | |
| 24 | monique | 8:12 | | | 54 | | | | |
| 25 | Hunter | 8:13 | | | 55 | | | | |
| 26 | yazmin | 8:32 | | | 56 | | | | |
| 27 | Kristen | 8:39 | | | 57 | | | | |
| 28 | Sofie | 8:44 | | | 58 | | | | |
| 29 | Bella | 8:54 | | | 59 | | | | |
| 30 | Tyra | 8:55 | | | 60 | | | | |

000184

ENTERTAINER SIGN-IN SHEET    DAY: Friday    DATE: 10-12-12

| NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|------|---------|-----|------|---|------|---------|-----|------|
| 1 ABBY | 3:30 | | | 31 Christina | 7:29 | | |
| 2 Kaytia | 3:30 | | | 32 Corey | 7:39 | | |
| 3 nina | 3:57 | | | 33 Riley | 6:30 | | |
| 4 mattie | 3:57 | | | 34 Roxanne | 7:50 | | |
| 5 sassy | 4:15 | | | 35 Aubrey | 7:52 | | |
| 6 Smokey | 4:43 | | | 36 Simone | 8:31 | | |
| 7 Hanna Li | 5:00 | | | 37 Jean | 8:35 | | |
| 8 Star | (new) | | | 38 nevaeH | 8:39 | | |
| 9 Devin | 5:19 | | | 39 Silva | 8:44 | | |
| 10 Candy | 5:19 | | | 40 sranna | 8:44 | | |
| 11 Jenna | 5:30 | | | 41 logan | 8:46 | | |
| 12 layla | 5:33 | | | 42 Sophie | 8:48 | | |
| 13 Cherie | 5:35 | | | 43 Jade | 8:48 | | |
| 14 coco | 5:59 | | | 44 CJ | 8:48 | | |
| 15 Breena | 6:15 | | | 45 sabrina | 8:49 | | |
| 16 Haze | 6:25 | | | 46 Juliana | 8:55 | | |
| 17 Sonya | 6:30 | | | 47 Zoe | 8:55 | | |
| 18 Electra | 6:35 | | | 48 Angie | 8:55 | | |
| 19 Yazmin | 6:36 | | | 49 Chelsey | 9:00 | | |
| 20 Kristin | 6:40 | | | 50 ISis | 9:09 | | |
| 21 victoria | 6:43 | | | 51 raven | 9:11 | | |
| 22 Chase | 6:43 | | | 52 Jersey | 9:11 | | |
| 23 Gabriella | 6:45 | | | 53 Sammy | 9:11 | | |
| 24 Katana | 6:45 | | | 54 Skylar | 9:35 | | |
| 25 Aurrura | 6:46 | | | 55 Katie | 9:38 | | |
| 26 Mila | 6:53 | | | 56 Mkayla | 9:40 | | |
| 27 Alex | 6:53 | | | 57 Bella | 9:42 | | |
| 28 veronica | 6:54 | | | 58 Sasha | 9:50 | | |
| 29 nana | 7:21 | | | 59 Niomi | 9:54 | | |
| 30 maryjane | 7:29 | | | 60 Selena | 9:59 | | |

000185

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 212 of 279

ENTERTAINER SIGN-IN SHEET    DAY: Wednesday    DATE: 10-17-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Abby | 3:55 | | | 31 | Angie | 8:52 | | |
| 2 | bassy | 4:13 | | | 32 | Zoe | 8:52 | | |
| 3 | Edie | 4:16 | | | 33 | Sylvia | 8:52 | | |
| 4 | Candy | 4:22 | | | 34 | Raven | 9:02 | | |
| 5 | Alexia | 4:57 | | | 35 | Bella | 9:25 | | |
| 6 | Christina | 5:00 | | | 36 | Cali | 9:30 | | |
| 7 | Isis | 5:53 | | | 37 | Angel | 10:08 | | |
| 8 | Lina | 5:59 | | | 38 | Natalie | 10:14 | | |
| 9 | Sophie | 6:05 | | | 39 | HARLEy | 10:50 | | |
| 10 | Carley | 6:06 | | | 40 | Sasha | 9+ | | |
| 11 | Soniya | 6:29 | | | 41 | | | | |
| 12 | Riley | 6:34 | | | 42 | | | | |
| 13 | Selena | 6:40 | | | 43 | | | | |
| 14 | Mila | 6:41 | | | 44 | | | | |
| 15 | Nana | 6:41 | | | 45 | | | | |
| 16 | Haze | 6:45 | | | 46 | | | | |
| 17 | Karina | 6:53 | | | 47 | | | | |
| 18 | Aubry | 6:54 | | | 48 | | | | |
| 19 | Victoria | 7:00 | | | 49 | | | | |
| 20 | Jersey | 7:00 | | | 50 | | | | |
| 21 | Veronica | 7:30 | | | 51 | | | | |
| 22 | Annmarie | New | | | 52 | | | | |
| 23 | Yasmine | 7:40 | | | 53 | | | | |
| 24 | Summer | 8:09 | | | 54 | | | | |
| 25 | Mary Jane | 8:13 | | | 55 | | | | |
| 26 | Skylar | 8:26 | | | 56 | | | | |
| 27 | Jade | 8:34 | | | 57 | | | | |
| 28 | NiOMi | 8:37 | | | 58 | | | | |
| 29 | Logan | 8:43 | | | 59 | | | | |
| 30 | Jullianna | 8:52 | | | 60 | | | | |

000186

ENTERTAINER SIGN-IN SHEET    DAY: Thursday    DATE: 10-18-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Kitty | 3:37 | | | 31 | trina | 8:45 | | |
| 2 | Grace | 3:43 | | | 32 | Blake | 8:45 | | |
| 3 | Sunny | 3:51 | | | 33 | Sophie | 8:45 | | |
| 4 | Edie | 4:30 | | | 34 | Jade | 8:45 | | |
| 5 | Sassy | 4:30 | | | 35 | Zoe | 8:51 | | |
| 6 | Hanna Li | 4:47 | | | 36 | Julianna | 8:51 | | |
| 7 | Candy | 4:54 | | | 37 | Sylvia | 8:51 | | |
| 8 | Katia | 5:30 | | | 38 | Angie | 8:51 | | |
| 9 | Angel | 5:30 | | | 39 | Mikayla | 9:00 | | |
| 10 | Allianna | 5:39 | | | 40 | Collette | NEW | | |
| 11 | Lacy | 5:39 | | | 41 | Sydney | NEW | | |
| 12 | Myah | 5:52 | | | 42 | Selena | 9:19 | | |
| 13 | Brenna | 6:14 | | | 43 | Sammy | 9:32 | | |
| 14 | Devin | 6:23 | | | 44 | Cameron | 9:32 | | |
| 15 | Layla | 6:27 | | | 45 | Bella | 9:38 | | |
| 16 | Hazel | 6:34 | | | 46 | Skylar | 9:44 | | |
| 17 | Riley | 6:42 | | | 47 | Smokie | 9:51 | | |
| 18 | Nana | 6:42 | | | 48 | Simone | 9:52 | | |
| 19 | Ann Marie | 6:46 | | | 49 | Veronica | 10:05 | | |
| 20 | Carley | 7:00 | | | 50 | Anna | NEW | | |
| 21 | Alex | 7:10 | | | 51 | Latina | NEW | | |
| 22 | Isis | 7:52 | | | 52 | Courtney | NEW | | |
| 23 | Celeste | 7:59 | | | 53 | Sasha | 10:47 | | |
| 24 | Lexi | 8:00 | | | 54 | Niomi | 10:49 | | |
| 25 | Summer | 8:07 | | | 55 | | | | |
| 26 | Savanna | 8:07 | | | 66 | | | | |
| 27 | Christina | 8:23 | | | 57 | | | | |
| 28 | Cali | 8:33 | | | 58 | | | | |
| 29 | Dixie | 8:44 | | | 59 | | | | |
| 30 | | | | | 60 | | | | |

ENTERTAINER SIGN-IN SHEET    DAY: Thursday    DATE: 10-25-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Ari | 3:45 | | | 31 | Paris | 8:26 | | |
| 2 | Grace | 3:55 | | | 32 | Sabrina | 8:34 | | |
| 3 | Sassy | 4:09 | | | 33 | Cali | 8:34 | | |
| 4 | Layla | 4:36 | | | 34 | Sylvia | 8:35 | | |
| 5 | Hanna L. | 4:37 | | | 35 | Caitlyn | NEW | | |
| 6 | Vixen | 4:38 | | | 36 | Alexis | 8:37 | | |
| 7 | Katia | 4:45 | | | 37 | Anna | 8:40 | | |
| 8 | Sophie | 4:45 | | | 38 | Latina | 9:21 | | |
| 9 | Demi | 4:45 | | | 39 | Courtney | 9:21 | | |
| 10 | Candy | 5:39 | | | 40 | Smokey | 9:29 | | |
| 11 | Devin | 5:54 | | | 41 | CJ | 9:59 | | |
| 12 | Riley | 10:21 | | | 42 | Heartey | 10:10 | | |
| 13 | Haze | 6:35 | | | 43 | Sasha | 10:30 | | |
| 14 | Electra | 6:35 | | | 44 | Bella | 9+ | | |
| 15 | Nana | 6:36 | | | 45 | Amy | 10:09 | | |
| 16 | Edie | 6:38 | | | 46 | | | | |
| 17 | Victoria | 6:40 | | | 47 | | | | |
| 18 | Chelsea | 6:48 | | | 48 | | | | |
| 19 | Karina | 6:51 | | | 49 | | | | |
| 20 | Mila | 6:52 | | | 50 | | | | |
| 21 | Kim | 6:52 | | | 51 | | | | |
| 22 | Ann Marie | 6:53 | | | 52 | | | | |
| 23 | Brenna | 7:13 | | | 53 | | | | |
| 24 | Yasmine | 7:18 | | | 54 | | | | |
| 25 | Veronica | 7:39 | | | 55 | | | | |
| 26 | Celeste | 7:39 | | | 56 | | | | |
| 27 | Jade | 7:43 | | | 57 | | | | |
| 28 | Roxanne | 7:51 | | | 58 | | | | |
| 29 | Dixie | 7:56 | | | 59 | | | | |
| 30 | Lexi | 8:00 | | | | | | | |

000188

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 215 of 279

ENTERTAINER SIGN-IN SHEET    DAY: Friday    DATE: 10-26-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Sunny | 3:30 | | | 31 | Carisma | 8:15 | | |
| 2 | Khaytia | 4:00 | | | 32 | Allexis | 8:22 | | |
| 3 | Ashley | 4:15 | | | 33 | Jean | 8:23 | | |
| 4 | Smokey | 4:16 | | | 34 | Veronica | 8:29 | | |
| 5 | Vixen | 4:40 | | | 35 | Trina | 8:33 | | |
| 6 | Ari | 4:43 | | | 36 | logan | 8:34 | | |
| 7 | Hana Li | 4:51 | | | 37 | Raven | 8:39 | | |
| 8 | Sophie | 5:13 | | | 38 | Chanel | 8:41 | | |
| 9 | Demi | 5:13 | | | 39 | Christina | 8:41 | | |
| 10 | layla | 5:59 | | | 40 | Nevaeh | 8:43 | | |
| 11 | Edie | 6:30 | | | 41 | Silvia | 8:44 | | |
| 12 | Mya | 6:34 | | | 42 | Cali | 8:53 | | |
| 13 | Breena | 6:36 | | | 43 | Sabrina | 8:53 | | |
| 14 | Haze | 6:37 | | | 44 | Skylar | 8:55 | | |
| 15 | Electra | 6:40 | | | 45 | Katie | 8:56 | | |
| 16 | Victoria | 6:47 | | | 46 | CrystalCummins | 8:59 | | (new) |
| 17 | Roxanne | 6:48 | | | 47 | Bella | 9:29 | | |
| 18 | Carmen | 6:49 | | | 48 | paris | 9:31 | | |
| 19 | Dixie | 6:49 | | | 49 | Bonafine | 9:34 | | |
| 20 | Aurora | 6:53 | | | 50 | Jean | 9:34 | | |
| 21 | Hope | 7:00 | | | 51 | Niomi | 9:58 | | |
| 22 | Corley | 7:00 | | | 52 | Courtney | 10:20 | | |
| 23 | Riley | 7:00 | | | 53 | Latina | 10:20 | | |
| 24 | Katena | 7:20 | | | 54 | CJ | 10:26 | | |
| 25 | Devin | 7:40 | | | 55 | Susie | 10:50 | | |
| 26 | Kim | 7:51 | | | 56 | Amy | 11:02 | | |
| 27 | Jade | 7:51 | | | 57 | Harley | 11:10 | | |
| 28 | Ama | 8:00 | | | 58 | | | | |
| 29 | Celeste | 8:00 | | | 59 | | | | |
| 30 | lexr | 8:00 | | | | | | | |

000189

Appeal: 17-1145   Doc: 14   Filed: 04/07/2017   Pg: 216 of 279

**ENTERTAINER SIGN-IN SHEET**   DAY: Saturday   DATE: 10-27

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Monica | 3:57 | | | 31 | Ellie | 941 | | |
| 2 | Candy | 4:16 | | | 32 | DinaFine | 950 | | |
| 3 | Carmen | 4:16 | | | 33 | Katie | 954 | | |
| 4 | Sunny | 4:25 | | | 34 | Cameron | 954 | | |
| 5 | Smokey | 4:35 | | | 35 | Niomi | 958 | | |
| 6 | Vixen | 4:46 | | | 36 | Skylar | 1013 | | |
| 7 | Abby | 5:40 | | | 37 | Harley | 1112 | | |
| 8 | Riley | 6:27 | | | 38 | CJ | 8+ | | |
| 9 | Devin | 6:29 | | | 39 | Sasha | 10+ | | |
| 10 | Sonya | 6:29 | | | 40 | | | | |
| 11 | Electra | 6:40 | | | 41 | | | | |
| 12 | Nana | 6:41 | | | 42 | | | | |
| 13 | Caitlin | 6:47 | | | 43 | | | | |
| 14 | Dixie | 6:50 | | | 44 | | | | |
| 15 | Aurora | 6:52 | | | 45 | | | | |
| 16 | Carley | 6:53 | | | 46 | | | | |
| 17 | Kim | 6:56 | | | 47 | | | | |
| 18 | Veronica | 7:20 | | | 48 | | | | |
| 19 | Katana | 7:26 | | | 49 | | | | |
| 20 | Haze | 7:27 | | | 50 | | | | |
| 21 | Isis | 7:29 | | | 51 | | | | |
| 22 | Sabrina | 7:36 | | | 52 | | | | |
| 23 | Yasmine | 7:55 | | | 53 | | | | |
| 24 | Hunter | 8:00 | | | 54 | | | | |
| 25 | Celeste | 8:09 | | | 55 | | | | |
| 26 | Bella | 8:24 | | | 56 | | | | |
| 27 | Logan | 8:39 | | | 57 | | | | |
| 28 | Alexis | 8:57 | | | 58 | | | | |
| 29 | Simone | 9:00 | | | 59 | | | | |
| 30 | Paris | 9:16 | | | | | | | |

000190

ENTERTAINER SIGN-IN SHEET    DAY: Thursday    DATE: 11-8-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Jessica | 3:46 | | | | | | | |
| 2 | Candy | 4:08 | | | 31 | Bella | 7:59 | | |
| 3 | Ari | 4:18 | | | 32 | Isis | 7:59 | | |
| 4 | Sophie | 4:29 | | | 33 | Paris | 8:00 | | |
| 5 | Demi | 4:29 | | | 34 | Carsmia | 8:11 | | |
| 6 | Vixen | 4:39 | | | 35 | Lexi | 8:21 | | |
| 7 | Grace | 5:19 | | | 36 | Monroe | NEW | | |
| 8 | Kim | 5:25 | | | 37 | Meadow | 8:24 | | |
| 9 | Layla | 5:48 | | | 38 | Chanel | 8:28 | | |
| 10 | Carley | 6:06 | | | 39 | Trina | 8:34 | | |
| 11 | Mya | 6:20 | | | 40 | Courtney | 8:48 | | |
| 12 | Riley | 6:24 | | | 41 | Cali | 8:50 | | |
| 13 | Edie | 6:26 | | | 42 | Zoe | 8:54 | | |
| 14 | Devin | 6:28 | | | 43 | Sylvia | 8:54 | | |
| 15 | Haze | 6:34 | | | 44 | Neveaha | 9:09 | | |
| 16 | Mila | 6:34 | | | 45 | Alexis | 9:10 | | |
| 17 | Nana | 6:34 | | | 46 | Yasmine | 8:30 | | |
| 18 | Roxanne | 6:38 | | | 47 | Caitlyn | 9:30 | | |
| 19 | Victoria | 6:41 | | | 48 | Harley | 9:42 | | |
| 20 | Electra | 6:48 | | | 49 | Smokie | 10:24 | | |
| 21 | Sonya | 6:48 | | | 50 | Honey | 10:59 | | |
| 22 | Brenna | 6:50 | | | 51 | Niomi | 11:00 | | |
| 23 | Dixie | 6:52 | | | 52 | Adriana | NEW | | |
| 24 | Aurora | 6:53 | | | 53 | Angel | | | |
| 25 | CJ | 6:58 | | | 54 | | | | |
| 26 | Anna | 7:06 | | | 55 | | | | |
| 27 | Karina | 7:10 | | | 56 | | | | |
| 28 | Christina | 7:39 | | | 57 | | | | |
| 29 | Celeste | 7:54 | | | 58 | | | | |
| 30 | Veronica | 7:58 | | | 59 | | | | |

000191

ENTERTAINER SIGN-IN SHEET    DAY: Saturday    DATE: 11-10-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | Ashley | 3:27 | | | 31 | Cali | 9:25 | | |
| 2 | Abby | 3:40 | | | 32 | Trina | 9:38 | | |
| 3 | Candy | 3:58 | | | 33 | Skylar | 9:47 | | |
| 4 | Ari | 4:20 | | | 34 | Niomi | 9:58 | | |
| 5 | Layla | 4:21 | | | 35 | CJ | 9:58 | | |
| 6 | Grace | 5:14 | | | 36 | Makayla | 10:05 | | |
| 7 | Smokey | 5:14 | | | 37 | Angel | 10:10 | | |
| 8 | Simone | 5:37 | | | 38 | meadow | 10:10 | | |
| 9 | Aurora | 5:56 | | | 39 | Tsis | 9:55 | | |
| 10 | Riley | 6:03 | | | 40 | Nikki | 10:30 | | |
| 11 | Devin | 6:04 | | | 41 | Harley | 10:50 | | |
| 12 | Mila | 6:22 | | | 42 | Allexis | 10:52 | | |
| 13 | Chase | 6:23 | | | 43 | | | | |
| 14 | Carley | 6:36 | | | 44 | | | | |
| 15 | Haze | 6:37 | | | 45 | | | | |
| 16 | Caitlyn | 6:51 | | | 46 | | | | |
| 17 | Dixie | 6:54 | | | 47 | | | | |
| 18 | Nana | 7:20 | | | 48 | | | | |
| 19 | Yasmine | 7:24 | | | 49 | | | | |
| 20 | Sammy | 7:40 | | | 50 | | | | |
| 21 | Ambrose | 7:43 | | | 51 | | | | |
| 22 | Sophie | 8:22 | | | 52 | | | | |
| 23 | Veronica | 8:29 | | | 53 | | | | |
| 24 | Bella | 8:29 | | | 54 | | | | |
| 25 | Sunny | 8:44 | | | 55 | | | | |
| 26 | Brittney | 8:54 | | | 56 | | | | |
| 27 | Zoe | 8:54 | | | 57 | | | | |
| 28 | Sylvia | 8:54 | | | 58 | | | | |
| 29 | Katie | 9:00 | | | 59 | | | | |
| | christina | 9:12 | | | | | | | |

000192

_INER SIGN-IN SHEET    DAY: Sunday    DATE: 11-11-12

| NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|------|---------|-----|------|----|------|---------|-----|------|
| Zeylee | 6:00 | | | 31 | | | | |
| _vin | 6:23 | | | 32 | | | | |
| Faze | 6:35 | | | 33 | | | | |
| Kim | 6:47 | | | 34 | | | | |
| Roxanne | 6:49 | | | 35 | | | | |
| Sarah | 6:50 | | | 36 | | | | |
| Anna | 6:51 | | | 37 | | | | |
| Xaviña | 6:52 | | | 38 | | | | |
| Sophie | 6:56 | | | 39 | | | | |
| Demi | 6:56 | | | 40 | | | | |
| Riley | 6:58 | | | 41 | | | | |
| Grace | 6:58 | | | 42 | | | | |
| Paris | 7:18 | | | 43 | | | | |
| Candy | 7:19 | | | 44 | | | | |
| Isis | 7:20 | | | 45 | | | | |
| Bella | 8:00 | | | 46 | | | | |
| Trina | 8:23 | | | 47 | | | | |
| Angel | 8:25 | | | 48 | | | | |
| Zoey | 8:52 | | | 49 | | | | |
| Sylvia | 8:52 | | | 50 | | | | |
| Meadow | 9:20 | | | 51 | | | | |
| Veronica | 9:00 | | | 52 | | | | |
| Harley | 9:40 | | | 53 | | | | |
| Nimi | 10:10 | | | 54 | | | | |
| 25 | | | | 55 | | | | |
| 26 | | | | 56 | | | | |
| 27 | | | | 57 | | | | |
| 28 | | | | 58 | | | | |
| 29 | | | | 59 | | | | |

000193

**ENTERTAINER SIGN-IN SHEET**    DAY: Wednesday    DATE: 11-14

| NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|------|---------|-----|------|---|------|---------|-----|------|
| Abby | 3:35 | | | 31 | Ellie | 9:39 | | |
| Candy | 4:07 | | | 32 | Alexis | 9:44 | | |
| Sophie | 4:32 | | | 33 | CJ | 9:55 | | |
| Demi | 4:32 | | | 34 | Sasha | 10:58 | | |
| Courtney | 5:50 | | | 35 | Molly | NEW | | |
| Niaomi | 6:08 | | | 36 | | | | |
| Mya | 6:27 | | | 37 | | | | |
| Devin | 6:27 | | | 38 | | | | |
| Haze | 6:37 | | | 39 | | | | |
| Lilly | 6:39 | | | 40 | | | | |
| Sonia | 6:44 | | | 41 | | | | |
| Sarah | 6:45 | | | 42 | | | | |
| Karina | 6:5 | | | 43 | | | | |
| Angel | 7:44 | | | 44 | | | | |
| Yasmine | 7:45 | | | 45 | | | | |
| Grace | 7:49 | | | 46 | | | | |
| Jersey | 7:57 | | | 47 | | | | |
| Dixie | 7:58 | | | 48 | | | | |
| Celeste | 8:28 | | | 49 | | | | |
| Trina | 8:37 | | | 50 | | | | |
| Simone | 8:43 | | | 51 | | | | |
| Cameron | 8:43 | | | 52 | | | | |
| Hunter | 8:48 | | | 53 | | | | |
| Cali | 8:54 | | | 54 | | | | |
| Sylvia | 8:54 | | | 55 | | | | |
| Zoe | 8:54 | | | 56 | | | | |
| Bella | 9:15 | | | 57 | | | | |
| Jasmine | 9:17 | | | 58 | | | | |
| McKayla | 9:27 | | | 59 | | | | |
| Harley | 9:32 | | | | | | | |

000194

**ENTERTAINER SIGN-IN SHEET**    DAY: Friday    DATE: 11-16-12

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|------|---------|-----|------|
| 1 | ABBY | 3:30 | | | 31 | Veronica | 8:23 | | |
| 2 | Sassy | 3:57 | | | 32 | Carmen | 6:58 | | |
| 3 | Candy | 4:28 | | | 33 | Chanel | 8:29 | | |
| 4 | Hanna Li | 4:37 | | | 34 | Roxanne | 8:41 | | |
| 5 | Ihim | 4:49 | | | 35 | Trina | 8:42 | | |
| 6 | Charisma | 5:50 | | | 36 | Holly | 8:42 | | |
| 7 | Addrianna | 5:50 | | | 37 | Cali | 8:44 | | |
| 8 | DEVIN | 6:00 | | | 38 | Christina | 8:49 | | |
| 9 | layla | 6:00 | | | 39 | Silvia | 8:51 | | |
| 10 | Edie | 6:14 | | | 40 | Skylar | 8:51 | | |
| 11 | Sonya | 6:33 | | | 41 | Celeste | 8:56 | | |
| 12 | Mila | 6:48 | | | 42 | Allexis | 9:12 | | |
| 13 | Karina | 6:44 | | | 43 | Niomi | 9:26 | | |
| 14 | Electra | 6:46 | | | 44 | Donnafine | 9:40 | | |
| 15 | Riley | 6:47 | | | 45 | CJ | 9:52 | | |
| 16 | Victoria | 6:49 | | | 46 | Gabby | NEW | | |
| 17 | Jersey | 6:49 | | | 47 | Mckayla | 9:56 | | |
| 18 | Aurora | 6:59 | | | 48 | Harley | 10:00 | | |
| 19 | Hope | 7:00 | | | 49 | Smokie | 10:00 | | |
| 20 | Anna | 7:00 | | | 50 | Leah | 10:00 | | |
| 21 | Aubrey | 7:19 | | | 51 | Angel | 10:43 | | |
| 22 | Lexi | 7:48 | | | 52 | Destiny | NEW | | |
| 23 | Yazmin | 7:49 | | | 53 | Sasha | 11:45 | | |
| 24 | Chelsey | 7:52 | | | 54 | | | | |
| 25 | Grace | 7:56 | | | 55 | | | | |
| 26 | Bella | 8:00 | | | 56 | | | | |
| 27 | page | 8:11 | | | 57 | | | | |
| 28 | Courtney | 8:11 | | | 58 | | | | |
| 29 | Dixie | 8:12 | | | 59 | | | | |
| 30 | Hunter | 8:17 | | | | | | | |

000195

ENTERTAINER SIGN-IN SHEET    DAY: Saturday    DATE: 11-17

| | NAME | TIME IN | OUT | FEES | | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Abby | 3:30 | | | 31 | Sylvia | 8:57 | | |
| 2 | Gabby | 4:36 | | | 32 | Bella | 9:06 | | |
| 3 | Hanna Li | 4:50 | | | 33 | Dixie | 9:15 | | |
| 4 | Ashley | 5:18 | | | 34 | Veronica | 9:24 | | |
| 5 | Lina | 5:56 | | | 35 | Daisey | 9:34 | | |
| 6 | Edie | 6:14 | | | 36 | Yazmine | 9:58 | | |
| 7 | Devin | 6:23 | | | 37 | Cameron | 9:00 | | |
| 8 | Chelsea | 6:28 | | | 38 | Angel | 9:34 | | |
| 9 | Karisma | 6:32 | | | 39 | Tessica | (new) | | |
| 10 | Adrianna | 6:32 | | | 40 | Bailey | 11:18 | | |
| 11 | Electra | 6:39 | | | 41 | Harley | 11:19 | | |
| 12 | Kim | 6:40 | | | 42 | | | | |
| 13 | Niaomi | 6:46 | | | 43 | | | | |
| 14 | Courtney | 6:46 | | | 44 | | | | |
| 15 | Aurora | 6:51 | | | 45 | | | | |
| 16 | Riley | 6:53 | | | 46 | | | | |
| 17 | Mila | 6:55 | | | 47 | | | | |
| 18 | Carmen | 6:56 | | | 48 | | | | |
| 19 | Hope | 6:58 | | | 49 | | | | |
| 20 | Aubry | 7:00 | | | 50 | | | | |
| 21 | Alliannah | 7:25 | | | 51 | | | | |
| 22 | Layla | 6:30 | | | 52 | | | | |
| 23 | Leah | 8:00 | | | 53 | | | | |
| 24 | Grace | 8:29 | | | 54 | | | | |
| 25 | Holly | 8:31 | | | 55 | | | | |
| 26 | Chanelle | 8:34 | | | 56 | | | | |
| 27 | Logan | 8:36 | | | 57 | | | | |
| 28 | Skylar | 8:37 | | | 58 | | | | |
| 29 | Christina | 8:37 | | | 59 | | | | |
| | Latina | 8:40 | | | | | | | |

000196

**ENTERTAINER SIGN-IN SHEET**    DAY: Friday    DATE: 1-4-13

| # | NAME | TIME IN | OUT | FEES | | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|---|----|------|---------|-----|------|
| 1 | Gabby | 6:30 | | | | 31 | | | | |
| 2 | Abby | 6:32 | | | | 32 | | | | |
| 3 | Shannon | 6:38 | | | | 33 | | | | |
| 4 | Riley | 6:39 | | | | 34 | | | | |
| 5 | Caitlyn | 6:40 | | | | 35 | | | | |
| 6 | Nicole | 6:42 | | | | 36 | | | | |
| 7 | Amelia | 6:43 | | | | 37 | | | | |
| 8 | Victoria | 6:46 | | | | 38 | | | | |
| 9 | Sarah | 6:47 | | | | 39 | | | | |
| 10 | Grace | 6:47 | | | | 40 | | | | |
| 11 | Allianna | 6:49 | | | | 41 | | | | |
| 12 | Sassy | 6:49 | | | | 42 | | | | |
| 13 | Carmen | 6:50 | | | | 43 | | | | |
| 14 | Evie | 6:53 | | | | 44 | | | | |
| 15 | Anna | 6:53 | | | | 45 | | | | |
| 16 | Devin | 6:53 | | | | 46 | | | | |
| 17 | Hanna Li | 6:30 | | | | 47 | | | | |
| 18 | Smokey | 6:59 | | | | 48 | | | | |
| 19 | Dixie | 7:00 | | | | 49 | | | | |
| 20 | Storm | NEW | | | | 50 | | | | |
| 21 | Lami | NEW | | | | 51 | | | | |
| 22 | Candy | 7:38 | | | | 52 | | | | |
| 23 | Bella | 7:46 | | | | 53 | | | | |
| 24 | Faith | 8:45 | | | | 54 | | | | |
| 25 | Sophie | 8:48 | | | | 55 | | | | |
| 26 | Demi | 8:48 | | | | 56 | | | | |
| 27 | Katie | 9:21 | | | | 57 | | | | |
| 28 | Harley | 9:55 | | | | 58 | | | | |
| 59 | | | | | | 59 | | | | |

Poop......

000197

ENTERTAINER SIGN-IN SHEET    DAY: Tuesday    DATE 03-19-13

| # | NAME | TIME IN | OUT | FEES | # | NAME | TIME IN | OUT | FEES |
|---|------|---------|-----|------|-----|------|---------|-----|------|
| 1 | Michelle | 3:48 | | | 31 | | | | |
| 2 | Mercedes | 3:52 | | | 32 | | | | |
| 3 | CARMEN | 3:55 | | | 33 | | | | |
| 4 | Chelsea | 4:00 | | | 34 | | | | |
| 5 | Lexi | 4:29 | | | 35 | | | | |
| 6 | Juliana | 4:47 | | | 36 | | | | |
| 7 | Veronica | 5:19 | | | 37 | | | | |
| 8 | NATASHA | 5:20 | | | 38 | | | | |
| 9 | Bella | 5:41 | | | 39 | | | | |
| 10 | Zoey | 6:06 | | | 40 | | | | |
| 11 | NADIA | 6:18 | | | 41 | | | | |
| 12 | Sonja | 6:33 | | | 42 | | | | |
| 13 | Kim | 6:37 | | | 43 | | | | |
| 14 | Karina | 6:39 | | | 44 | | | | |
| 15 | Noelle | 6:42 | | | 45 | | | | |
| 16 | Aurora | 6:47 | | | 46 | | | | |
| 17 | gazelle | 6:33 | | | 47 | | | | |
| 18 | Becky | 7:00 | | | 48 | | | | |
| 19 | Selena | 7:50 | | | 49 | | | | |
| 20 | Summer | 7:50 | | | 50 | | | | |
| 21 | ALEXIS | 8:25 | | | 51 | | | | |
| 22 | CALI | 8:27 | | | 52 | | | | |
| 23 | Brook | (nw) | | | 53 | | | | |
| 24 | Harley | 9:05 | | | 54 | | | | |
| 25 | | | | | 55 | | | | |
| 26 | | | | | 56 | | | | |
| 27 | | | | | 57 | | | | |
| 28 | | | | | 58 | | | | |
| 29 | | | | | 59 | | | | |

000198

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 225 of 279

ENTERTAINER SIGN-IN SHEET     DAY: Monday     DATE: 3-05-13

| | NAME | TIME IN | FLOOR | FEES | | NAME | TIME IN | FLOOR | FEES |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | 3:45 | 3 | 2 | 31 | → WALLETS Got ! ! | | | |
| 2 | 1-LoNA | 3:45 | 4:00 | 0 | 32 | | | | |
| 3 | JAIMIE | 4:37 | 4:57 | 0 | 33 | | | | |
| 4 | Natasha | 6:00 | 6:85 | 0 | 34 | | | | |
| 5 | Veronica | 6:00 | 6:51 | 0 | 35 | | | | |
| 6 | nana | 6:38 | 6:55 | 0 | 36 | | | | |
| 7 | Ava | 6:51 | 7:56 | 20 | 37 | | | | |
| 8 | Smokey | 6:53 | 7:10 | 20 | 38 | ? | | | |
| 9 | Erin | 7:21 | 7:53 | 20 | 39 | | | | |
| 10 | Summer | 7:25 | 7:54 | 20 | 40 | | | | |
| 11 | michelle | 7:34 | 7:51 | 20 | 41 | | | | |
| 12 | Victoria | 7:34 | 7:51 | 20 | 42 | | | | |
| 13 | Bella | 7:34 | 7:48 | 20 | 43 | | | | |
| 14 | Lilly | 7:23 | 7:56 | 20 | 44 | | | | |
| 15 | Shanna | 8:30 | 8:44 | 40 | 45 | | | | |
| 16 | morgan | 8:31 | 8:44 | 40 | 46 | | | | |
| 17 | Riley | 8:80 | 8:48 | 80 | 47 | → Rollover 20 | | | |
| 18 | Farrah | 8:38 | 8:50 | 40 | 48 | | | | |
| 19 | | | | | 49 | | | | |
| 20 | | | | | 50 | | | | |
| 21 | | | | | 51 | | | | |
| 22 | | | | | 52 | | | | |
| 23 | | | | | 53 | | | | |
| 24 | | | | | 54 | | | | |
| 25 | | | | | 55 | | | | |
| 26 | | | | | 56 | | | | |
| 27 | | | | | 57 | | | | |
| 28 | | | | | 58 | | | | |
| 29 | | | | | 59 | | | | |
| 30 | | | | | 60 | | | | |

000199

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 226 of 279

ENTERTAINER SIGN-IN SHEET    DAY: Tues    DATE: 3/26/13

| # | NAME | TIME IN | FLOOR | FEES | # | NAME | TIME IN | FLOOR | FEES |
|---|------|---------|-------|------|---|------|---------|-------|------|
| 1 | Paris | 339 | | | 31 | | | | |
| 2 | Monica | 400 | | | 32 | | | | |
| 3 | Mercedes | 403 | | | 33 | | | | |
| 4 | nana | 620 | | | 34 | | | | |
| 5 | Bambi | NEW | | X | 35 | | | | |
| 6 | Daisy | 635 | | | 36 | | | | |
| 7 | Xander | 6:44 | | | 37 | | | | |
| 8 | Victoria | 6:44 | | | 38 | | | | |
| 9 | Bella | 646 | | | 39 | | | | |
| 10 | Kim | 649 | | | 40 | | | | |
| 11 | Jules | 736 | | 20.00 | 41 | | | | |
| 12 | Tina | 743 | | 2.00 | 42 | | | | |
| 13 | Cody | NEW | | X | 43 | | | | |
| 14 | Breana | 7:21 | | 2.00 | 44 | | | | |
| 15 | Veronica | 810 | | 40.00 | 45 | | | | |
| 16 | natasha | 812 | | 40.00 | 46 | | | | |
| 17 | Phoebe | 834 | | 40.0 | 47 | | | | |
| 18 | Farrah | 845 | | 40.00 | 48 | | | | |
| 19 | Autumn | (new) | | X | 49 | | | | |
| 20 | Harley | 10:20 | | KEY | 50 | | | | |
| 21 | Lilly | 10:22 | | 1.0 | 51 | PAID OWES NEW | | | |
| 22 | Haley | 1030 | | NEW | 52 | | | | |
| 23 | | | | | 53 | | | | |
| 24 | | | | | 54 | | | | |
| 25 | | | | | 55 | | | | |
| 26 | | | | | 56 | | | | |
| 27 | | | | | 57 | | | | |
| 28 | | | | | 58 | | | | |
| 29 | | | | | 59 | | | | |
| 30 | | | | | 60 | | | | |

000200

ENTERTAINER SIGN-IN SHEET    DAY: Monday    DATE: 4/8/13

| # | NAME | TIME IN | OUT | FEES | | # | NAME | TIME IN | OUT | FEES |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Mercedes | 3:30 | 4:00 | 0 | | 31 | | | | |
| 2 | Amber ~~(new)~~ | | | | | 32 | | | | |
| 3 | Leaha | 5:27 | 5:38 | 0 | | 33 | | | | |
| 4 | Gabby | 5:28 | 5:30 | 30 | | 34 | | | | |
| 5 | Jewels | 5:52 | 6:47 | 0 | | 35 | | | | |
| 6 | Candy | 5:58 | 6:05 | 80 | | 36 | → Robbur 20.00 | | | |
| 7 | Taylor | 6:37 | 6:52 | 0 | | 37 | | | | |
| 8 | Amelia | 6:37 | | 0 | | 38 | | | | |
| 9 | Summer | 6:38 | | 0 | | 39 | | | | |
| 10 | Brenna | 6:39 | | 0 | | 40 | | | | |
| 11 | Alissa | 6:50 | | 0 | | 41 | | | | |
| 12 | Sophia | 6:56 | | 0 | | 42 | | | | |
| 13 | Jenna | 6:56 | | 0 | | 43 | | | | |
| 14 | Monica | 7:07 | 7:20 | 20 | | 44 | | | | |
| 15 | Celeste | 7:14 | 7:44 | 20 | | 45 | | | | |
| 16 | Angel | 7:14 | 7:55 | 20 | | 46 | | | | |
| 17 | Mila | 7:32 | 7:43 | 20 | | 47 | | | | |
| 18 | Victoria | 7:33 | 7:47 | 20 | | 48 | | | | |
| 19 | bella | 7:33 | 7:47 | 20 | | 49 | | | | |
| 20 | Onasis | 7:36 | 7:45 | 20 | | 50 | | | | |
| 21 | Erin | 7:38 | 7:55 | 20 | | 51 | | | | |
| 22 | Sabrina | 7:58 | DRAHO | 0 | | 52 | | | | |
| 23 | Natasha | 8:30 | 8:56 | 40 | | 53 | | | | |
| 24 | India | 8:49 | 8:56 | 40 | | 54 | | | | |
| 25 | Kimora | (new) | NEW | 0 | | 55 | | | | |
| 26 | red | (new) | New | 0 | | 56 | | | | |
| 27 | layna | (new) | New | 0 | | 57 | | | | |
| 28 | lisa | 9:20 | 9:53 | 80 | | 58 | | | | |
| 29 | Farrah | 10:32 | DAVID | 20 | | 59 | | | | |
| 30 | | | | | | 60 | | | | |

000201

Exhibit B

# VIP Rooms

15 min $150 w/ $25 To club

30 min $300 w/ $50 To club

60 min $600 w/ $100 To club

jacuzzi - $600 w/ $200 for 30 min.    To club

K minimum price guidelines, you may negotiate your own VIP prices

Exhibit C



U.I.P. 470.

000203

PAGE 51/52          THEE DOLLHOUSE          8432725209          11/25/2014 23:33



2-27-12

| # | Name | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|------|---|---|---|---|---|---|---|---|----|----|----|----|----|----|
| 4 | Gene | X | X | X | X | X | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| 5 | Emerald | X | X | X | X | X | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| 6 | Margerita | X | X | X | X | X | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| 7 | Katia | X | X | X | X | X | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 8 | Saphire | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 9 | Electra | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 10 | Sarah | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 11 | Devin | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 12 | Sassy | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 13 | Bree | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 14 | Kim | X | X | X | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 15 | Carla | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | Lanna | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 17 | Angel | X | X | X | X | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 18 | Ambrose | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 19 | Cali | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 20 | Bella | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 21 | Hope | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 22 | Summer | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 23 | Chloe | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 24 | Keely | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 25 | Heather | X | X | X | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 26 | Joanna | X | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 27 | Trixi | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 28 | Barbie | X | X | X | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 29 | Veronica | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 30 | Candy | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |

000206





Column headers (handwritten, read vertically): Blake, Sophie, Jade, Zoey, Juliana, Sylvia, Maggie, Makayla, bella, Skylar, Cameron, Smektle, Simone, Latina, Courtney, Sasha, Naomi, Sami, Salena

12-18-13

000211



000212

Handwritten tally grid. Column names (left to right, numbered 25 down to 1):

| # | Name |
|---|------|
| 25 | CJ |
| 24 | Harley |
| 23 | Amy |
| 22 | SASHA |
| 21 | Naomi |
| 20 | Leslie |
| 19 | Dyma-fine |
| 18 | Paris |
| 17 | Belle |
| 16 | Krystal |
| 15 | Katie |
| 14 | Skylar |
| 13 | Sabrina |
| 12 | Cali |
| 11 | Silvia |
| 10 | Alurea |
| 9 | Cristina |
| 8 | Chanell |
| 7 | Raven |
| 6 | Legend |
| 5 | Trina |
| 4 | Veronica |
| 3 | Gwen |
| 2 | Alexis |
| 1 | Carisma |

Rows numbered 1 through 18 with "X" marks in upper rows.

000213



000214

Hailey  Sabra  CJ  cashman  Skylar  Niomie  Katie  Daphne  Elie

el-ze-cl

000215

PACK SALES REPORT

X $5.00

12-10-12

25 PACKS PER HOUR

| # | Name | | | | | | | | | | | | | | | | | | | | | | |
|---|------|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 2 | Miles | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | Abby | | | | | | | | | | | | | | | | | | | | | | | |
| | Candy | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | Aili | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | Layla | | | | | | | | | | | | | | | | | | | | | | | |
| 6 | Grace | | | | | | | | | | | | | | | | | | | | | | | |
| 7 | Smokey | | | | | | | | | | | | | | | | | | | | | | | |
| | Simone | | | | | | | | | | | | | | | | | | | | | | | |
| | Aurora | | | | | | | | | | | | | | | | | | | | | | | |
| 10 | Riley | | | | | | | | | | | | | | | | | | | | | | | |
| 11 | Devin | | | | | | | | | | | | | | | | | | | | | | | |
| 12 | Mila | | | | | | | | | | | | | | | | | | | | | | | |
| 13 | Chase | | | | | | | | | | | | | | | | | | | | | | | |
| 14 | Carley | | | | | | | | | | | | | | | | | | | | | | | |
| 15 | Hazel | | | | | | | | | | | | | | | | | | | | | | | |
| 16 | Caitlyn | | | | | | | | | | | | | | | | | | | | | | | |
| 17 | Dixie | | | | | | | | | | | | | | | | | | | | | | | |
| 18 | Naja | | | | | | | | | | | | | | | | | | | | | | | |
| 19 | Yasmine | | | | | | | | | | | | | | | | | | | | | | | |
| 20 | Sammy | | | | | | | | | | | | | | | | | | | | | | | |
| 21 | Ambrose | | | | | | | | | | | | | | | | | | | | | | | |
| 22 | Sophie | | | | | | | | | | | | | | | | | | | | | | | |
| 23 | Veronica | | | | | | | | | | | | | | | | | | | | | | | |
| 24 | Bexlee | | | | | | | | | | | | | | | | | | | | | | | |
| 25 | Suzan | | | | | | | | | | | | | | | | | | | | | | | |
| 26 | Brittney | | | | | | | | | | | | | | | | | | | | | | | |
| 27 | Zoey | | | | | | | | | | | | | | | | | | | | | | | |
| 28 | Sylvia | | | | | | | | | | | | | | | | | | | | | | | |
| 29 | Katie | | | | | | | | | | | | | | | | | | | | | | | |
| 30 | Christina | | | | | | | | | | | | | | | | | | | | | | | |

000217



11-16-D

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 Hanna-L | | | | | | | | | | | | | | | | | | |
| 5 Kim | | | | | | | | | | | | | | | | | | |
| 6 Carisma | | | | | | | | | | | | | | | | | | |
| 7 Adrienne | | | | | | | | | | | | | | | | | | |
| 8 Devin | | | | | | | | | | | | | | | | | | |
| 9 Layla | | | | | | | | | | | | | | | | | | |
| 10 Edie | | | | | | | | | | | | | | | | | | |
| 11 Sadie | | | | | | | | | | | | | | | | | | |
| 12 Mila | | | | | | | | | | | | | | | | | | |
| 13 Karina | | | | | | | | | | | | | | | | | | |
| 14 Electra | | | | | | | | | | | | | | | | | | |
| 15 Riley | | | | | | | | | | | | | | | | | | |
| 16 Victoria | | | | | | | | | | | | | | | | | | |
| 17 Jersey | | | | | | | | | | | | | | | | | | |
| 18 Aurora | | | | | | | | | | | | | | | | | | |
| 19 Hope | | | | | | | | | | | | | | | | | | |
| 20 Anna | | | | | | | | | | | | | | | | | | |
| 21 Aubrey | | | | | | | | | | | | | | | | | | |
| 22 Lexi | | | | | | | | | | | | | | | | | | |
| 23 Yazmine | | | | | | | | | | | | | | | | | | |
| 24 Chelsea | | | | | | | | | | | | | | | | | | |
| 25 Grace | | | | | | | | | | | | | | | | | | |
| 26 Bella | | | | | | | | | | | | | | | | | | |
| 27 Paige | | | | | | | | | | | | | | | | | | |
| 28 Courtney | | | | | | | | | | | | | | | | | | |
| 29 Dixie | | | | | | | | | | | | | | | | | | |
| 30 Hunter | | | | | | | | | | | | | | | | | | |

000220

Names (column headers): Sylvia, Bella, Dixie, Veronica, Desiree, Yasmine, Carmen, Angel, Jessica, Bailey

Columns numbered: 30, 29, 28, 27, 26, 25, 24, 23, 22, 21, 20, 19, 18, 17, 16, 15, 14, 13, 12, 11, 10, 9, 8, 7, 6, 5, 4, 3, 2, 1

Each column contains rows numbered 1 through 18.

11-7-13

000221

Names (column headings): Harley, Brooke, Cali, Kim, Alexis, Summer, Selena, Becky, Gazelle, Noelle, Aurora, Karina, Sonya, Nina, Zoey, Bella, Natasha, Veronica, Juliana, Lexi, Chelsea, Carmen, Michelle

75.00

M-1-2013

Names (rows top to bottom): Monica, Mercedes, NALA, Bambi, Daisy, Xander, Victoria, Bella, Kim, Paris, Jules, Tina, Kody, Brianna, Veronica, (unreadable), Phoebe, Farah, Autumn, Lilly, Harley, Hailey

3-25-13

| | Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X | LEXI | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| X | Fiona | X | X | X | X | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 3 | JAimie | X | X | X | X | X | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 4 | Veronica | X | X | X | X | X | X | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
| 5 | NaTasha | X | X | X | X | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 6 | Nana | X | X | X | X | X | X | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 7 | Ava | X | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 8 | Shailey | X | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 9 | ERIN | X | X | X | X | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 10 | Summer. | X | X | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 11 | MICHELLE | X | X | X | X | X | X | X | X | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 12 | VICTORIA | X | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 13 | BELLA | X | X | X | X | X | X | X | X | X | 10 | 11 | 12 | 13 | 14 | 15 |
| 14 | LILLY | X | X | X | X | X | X | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 15 | Shana | X | X | X | X | X | X | X | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | Morgan | X | X | X | X | X | X | X | X | X | X | 11 | 12 | 13 | 14 | 15 |
| 17 | Riley | X | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 18 | Farrah | X | X | X | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 19 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 20 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 21 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 22 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 23 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 24 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 25 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 26 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 27 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 28 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 29 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 30 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |

Exhibit D



2-23-18

U.T.P. 470.

| ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | ENTERTAINER |
|---|---|---|---|---|---|---|---|
| SASHA | 15 | 1:05 | 11:20 | 25 | 25 | 31 | |
| VERONICA | 15 | 11:05 | 11:20 | 25 | 50 | 32 | |
| BELLA+MCYNDA | 30 | 11:40 | 12:10 | 50 | 100 | 33 | |
| CALI | 15 | 2:15 | 12:30 | CR 25 | 125 | 34 | |
| CHLOE | 15 | 12:50 | 1:05 | 25 | 150 | 35 | |
| JASMIN+SASHA | 15 | 1:05 | 1:20 | 25 | 175 | 36 | |
| CALI | 30 | 2:05 | 2:20 | 25 | 205 | 37 | |
| VERONICA | 15 | 2:05 | 2:35 | CR 50 | 250 | 38 | |
| CHLOE | 15 | 2:45 | 3:00 | 25 | 275 | 39 | |
| BELLA | 15 | 2:45 | 3:00 | 25 | 300 | 40 | |
| SASHA | 15 | 2:55 | 3:10 | 25 | 325 | 41 | |
| | | | | | | 42 | |
| | | | | | | 43 | |
| | | | | | | 44 | |
| | | | | | | 45 | |
| | | | | | | 46 | |
| | | | | | | 47 | |
| | | | | | | 48 | |
| | | | | | | 49 | |
| | | | | | | 50 | |
| | | | | | | 51 | |
| | | | | | | 52 | |
| | | | | | | 53 | |
| | | | | | | 54 | |
| | | | | | | 55 | |
| | | | | | | 56 | |
| | | | | | | 57 | |
| | | | | | | 58 | |
| | | | | | | 59 | |
| | | | | | | 60 | |

8/2/12

| | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # |
|---|---|---|---|---|---|---|---|
| | Elektra | The | 10:00 | 11:00 | 100 | $100 | 31 |
| | Caetley | 30 | 11:00 | 11:30 | 50 | $150 | 32 |
| | Elektra | The | 11:15 | 12:15 | 100 | $250 | 33 |
| 10 | Korey | 15 | 11:40 | 11:55 | 25 | $275 | 34 |
| 9 | Sophia | 30 | 11:55 | 12:25 | 50 | $325 | 35 |
| 2 | Ambrosia | 15 | 12:00 | 12:15 | 25 | $350 | 36 |
| 10 | Katie | 30 | 12:20 | 12:50 | 50 | $400 | 37 |
| | Grace | 30 | 12:35 | 1:05 | 50 | $450 | 38 |
| 9 | Somone | 15 | 1:15 | 1:30 | 25 | $475 | 39 |
| 7 | Harley | 30 | 1:15 | 1:45 | 50 | $525 | 40 |
| 3 | Somone | 30 | 2:15 | 2:45 | 50 | $575 | 41 |
| 4 | Sativa | 15 | 2:15 | 2:30 | 25 | $600 | 42 |
| 8 | Saphier | 30 | 2:30 | 3:00 | 50 | $650 | 43 |
| 10 | Veronica | 15 | 2:30 | 2:45 | 25 | $675 | 44 |
| 11 | Kim | 15 | 2:40 | 2:55 | 25 | $700 | 45 |
| 3 | Cobey | 15 | 2:50 | 3:05 | 25 | $725 | 46 |
| 3 | Somone | The | 3:00 | 4:00 | 100 | $825 | 47 |
| 10 | Bella | 15 | 3:35 | 3:50 | 25 | $850 | 48 |
| | Alex | 30 | 3:35 | 4:05 | 50 | $900 | 49 |
| 4 | Vita | 30 | 4:15 | 4:45 | 50 | $950 | 50 |
| 3 | Cobey | 15 | 4:35 | 4:50 | 25 | $975 | 51 |
| 3 | Somon | The | 4:30 | 5:30 | 100 | $1080 | 52 |

000226



000227

12-12-12

PORT

| AGE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | ENTE |
|---|---|---|---|---|---|---|---|---|
| 9 | Se bra | 13 | 2:10 | 2:25 | 125 | 235 | 31 | |
| 2 | Juliana | 15 | 2:10 | 2:25 | 125 | 235 | 32 | |
| 13 | Brenna | 30 | 2:15 | 2:45 | 250 | 235 | 33 | |
| 6 | Electra | 35 | 2:20 | 2:50 | 250 | 245 | 34 | |
| 4 | Lauren | 60 | 2:20 | 3:20 | 400 | 245 | 35 | |
| 8 | Lacey | 30 | 2:35 | 3:05 | 200 | 245 | 36 | |
| 12 | Chelsea | 30 | 2:30 | 3:05 | 200 | 245 | 37 | |
| 4 | Mary Jane | 30 | 2:30 | 3:00 | 250 | 255 | 38 | |
| 5 | Angel | 15 | 2:30 | 2:45 | 125 | 285 | 39 | |
| 2 | Belle | 15 | 2:40 | 2:55 | 125 | 2415 | 40 | |
| 11 | Katie | 15 | 2:40 | 2:55 | 25 | 290 | 41 | |
| 14 | Nina | 30 | 2:45 | 3:15 | 250 | 290 | 42 | |
| 9 | Selena | 15 | 2:50 | 3:05 | 25 | 2415 | 43 | |
| 13 | Bryna | 13 | 2:50 | 3:03 | 6 | 3010 | 44 | |
| 4 | Logan | 30 | 3:10 | 3:40 | 200 | 3100 | 45 | |
| 6 | Chelsea | 30 | 3:10 | 3:40 | 200 | 3200 | 46 | |
| 7 | Roxanne | 30 | 3:25 | 3:55 | 40 | 3250 | 47 | |
| 7 | Lauren | 15 | 3:25 | 3:40 | 125 | 3215 | 48 | |
| 13 | Katrina | 15 | 3:30 | 3:45 | 125 | 330 | 49 | |
| 9 | Roxanne | 30 | 3:45 | 4:15 | 250 | 330 | 50 | |
| 15 | Annah | 15 | 4:00 | 4:15 | 25 | 3375 | 51 | |
| 13 | Brenna | 15 | 4:00 | 4:15 | 25 | 3400 | 52 | |
| 7 | Sonya | 30 | 4:10 | 4:40 | 250 | 3450 | 53 | |
| 24 | | | | | | | 54 | |
| 25 | | | | | | | 55 | |
| 26 | | | | | | | 56 | |
| 27 | | | | | | | 57 | |
| 28 | | | | | | | 58 | |
| 29 | | | | | | | 59 | |
| 30 | | | | | | | 60 | |

000228



12-17-12

| SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | EI |
|---|---|---|---|---|---|---|---|---|
| 3 | Ann Marie | 30 | 830 | 900 | $50 | 50 | 31 | |
| 7 | NaNa | 30 | 10:30 | 10:50 | $50 | 100 | 32 | |
| 6 | Jade | 30 | 10:35 | 11:05 | $50 | 150 | 33 | |
| 1 | Yazzmen | 15 | 10:35 | 11:05 | $25 | 175 | 34 | |
| 7 | Silvia | 15 | 11:05 | 11:20 | $25 | 200 | 35 | |
| 8 | Ann Marie | 30 | 11:10 | 11:40 | $50 | 250 | 36 | |
| 3 | Angie | 15 | 11:20 | 11:35 | $25 | 275 | 37 | |
| 4 | Logan | 15 | 11:20 | 11:35 | $25 | 300 | 38 | |
| 5 | Harley | 15 | 11:35 | 11:50 | $25 | 325 | 39 | |
| 8 | Angie | 15 | 11:45 | 12:00 | $25 | 350 | 40 | |
| 4 | Christina | 15 | 11:45 | 12:00 | $25 | 375 | 41 | |
| 7 | Bella | 30 | 11:55 | 12:25 | $50 | 425 | 42 | |
| 5 | Jersey | 15 | 12:00 | 12:15 | $25 | 450 | 43 | |
| 9 | Harley | 15 | 12:00 | 12:15 | $25 | 475 | 44 | |
| 1 | Yazzmen | 15 | 12:05 | 12:20 | $25 | 500 | 45 | |
| 10 | NaNa | 30 | 12:20 | 12:50 | $50 | 550 | 46 | |
| 4 | Summer | 30 | 12:20 | 12:50 | $50 | 600 | 47 | |
| 3 | Karina | 15 | 12:20 | 12:35 | $25 | 625 | 48 | |
| 5 | Seleena | 15 | 12:30 | 12:45 | $25 | 650 | 49 | |
| 8 | Eddie | 15 | 12:30 | 12:45 | $25 | 675 | 50 | |
| 6 | Sasha | 30 | 12:35 | 1:05 | $50 | 725 | 51 | |
| 1 | Yazzmen | 15 | 1:00 | 1:15 | $25 | 750 | 52 | |
| 7 | Mary Jane | 15 | 1:05 | 1:20 | $25 | 775 | 53 | |
| 9 | Veronica | 1hr | 1:20 | 2:20 | $100 | 875 | 54 | |
| 8 | Seleena | 15 | 1:25 | 1:40 | $25 | 900 | 55 | |
| 5 | Calli | 15 | 1:30 | 1:45 | $25 | 925 | 56 | |
| 1 | Ann Marie | 15 | 2:35 | 2:50 | $25 | 950 | 57 | |
| 2 | Summer | 15 | 2:35 | 2:50 | $25 | 975 | 58 | |
| 2 | Jersey | 15 | 3:00 | 3:15 | $25 | 1000 | 59 | |
| | | | | | | | 60 | |

000229

11-16-12



| # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | ENT? |
|---|---|---|---|---|---|---|---|---|
| 8 | Jersey | 30 | 8:10 | 8:40 | 50 | 50 | 1 | Yazz |
| 8 | Karisma | 30 | 8:40 | 9:10 | 50 | 100 | 2 | Susi |
| 7 | Karissma | 30 | 9:10 | 9:40 | 50 | 150 | 4 | Skyi |
| 8 | Electeia | 30 | 10:15 | 9:40 | 50 | 200 | 8 | Holl |
| 8 | Karissma | 15 | 10:20 | 10:35 | 25 | 225 | 5 | ABB |
| 8 | Karissma | 15 | 10:35 | 10:50 | 25 | 250 | 8 | Calli |
| 5 | Mela | 15 | 10:35 | 10:50 | 25 | 275 | 3 | Adee |
| 4 | Grace | 15 | 10:40 | 10:55 | 25 | 300 | 8 | Sosa |
| 6 | Roxann | 30 | 10:45 | 11:15 | 50 | 350 | 3 | Elle |
| 8 | Holly | 15 | 10:50 | 11:05 | 25 | 375 | 9 | Diki |
| 9 | Calli | 15 | 11:15 | 11:30 | 25 | 400 | 10 | Sosa |
| 5 | Holly | 30 | 11:20 | 11:50 | 50 | 450 | | 42 |
| 7 | Huntee | 30 | 11:20 | 11:50 | 50 | 500 | | 43 |
| 6 | Roxann | 30 | 11:25 | 11:55 | 50 | 550 | | 44 |
| 3 | Calli | 15 | 11:35 | 11:50 | 25 | 575 | | 45 |
| 5 | Hazley | 15 | 11:40 | 11:55 | 25 | 600 | | 46 |
| 9 | Hope | 30 | 11:50 | 12:20 | 50 | 650 | | 47 |
| 7 | Trina | 1hr | 11:55 | 12:55 | 100 | 750 | | 48 |
| 7 | Bella | | | | | | | 49 |
| 4 | Karina | 15 | 12:00 | 12:15 | 25 | 775 | | 50 |
| 3 | Adeona | 15 | 12:05 | 12:20 | 25 | 800 | | 51 |
| 8 | Holly | 30 | 12:20 | 12:50 | 50 | 850 | | 52 |
| 5 | Mela | 15 | 12:30 | 12:45 | 25 | 875 | | 53 |
| 6 | Karissma | 30 | 12:30 | 1:00 | 50 | 925 | | 54 |
| 8 | Veronica | 30 | 12:50 | 1:20 | 50 | 975 | | 55 |
| 5 | Makayla | 15 | 1:15 | 1:30 | 25 | 1000 | | 56 |
| 7 | Karina | 30 | 1:20 | 1:50 | 50 | 1050 | | 57 |
| 4 | Hazley | 15 | 1:25 | 1:40 | 25 | 1075 | | 58 |
| 6 | CJ | 30 | 1:40 | 2:10 | 50 | 1125 | | 59 |
| 5 | MaKayla | 30 | 1:35 | 2:05 | 50 | 1175 | | 60 |

000230

1-11-12

| SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | CC OR $ | SUITE # | ENTERTAINM |
|---|---|---|---|---|---|---|---|---|
| 1 | ANNA | 15 | 8:55 | 9:10 | 25 | $25 | 31 | |
| 11 | SARAH | 15 | 9:20 | 9:35 | 25 | $50 | 32 | |
| 2 | KEYLEE | 15 | 9:40 | 9:55 | 25 | $75 | 33 | |
| 11 | GRACE | 30 | 9:45 | 10:15 | 50 | $125 | 34 | |
| 10 | SARAH | 15 | 10:25 | 10:50 | 25 | $150 | 35 | |
| 6 | ZOE | 15 | 10:35 | 10:50 | 25 | $175 | 36 | |
| 6 | HARLEY | 60 | 10:35 | 11:35 | 100 | $275 | 37 | |
| 11 | TRINA | 15 | 11:05 | 11:20 | 25 | $300 | 38 | |
| 2 | ZOE | 15 | 11:35 | 11:50 | 25 | $325 | 39 | |
| 8 | SARAH | 30 | 11:35 | 12:05 | 50 | $375 | 40 | |
| 6 | HARLEY | 60 | 11:40 | 12:40 | 100 | $475 | 41 | |
| 9 | PARIS | 30 | 11:55 | 12:25 | 50 | $525 | 42 | |
| 9 | BELLA | 15 | 12:15 | 12:30 | 25 | $600 | 43 | |
| 11 | ZOE | 15 | 1:50 | 2:05 | 25 | $550 | 44 | |
| 11 | SYLVIA | 15 | 1:50 | 2:05 | 25 | $575 | 45 | |
| | | | | | | | 46 | |
| | | | | | | | 47 | |
| | | | | | | | 48 | |
| | | | | | | | 49 | |
| | | | | | | | 50 | |
| | | | | | | | 51 | |
| | | | | | | | 52 | |
| | | | | | | | 53 | |
| | | | | | | | 54 | |
| | | | | | | | 55 | |
| | | | | | | | 56 | |
| | | | | | | | 57 | |
| | | | | | | | 58 | |
| | | | | | | | 59 | |
| | | | | | | | 60 | |

000231

000007
VIP0050   $50.00   $50.00

Handwritten date: 11-10-12

| # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | ENTERTAINER | ROOM TIME |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Arora | 15 | 9:40 | 9:55 | 25 | 25 | 4 | Silvia | 15 |
| 6 | Carley | 1hr | 10:05 | 11:05 | 100 | 125 | 1 | Yazzmen | 30 |
| 11 | Sofie | 30 | 10:20 | 10:50 | 50 | 175 | 3 | Arora | 15 |
| 5 | Mela | 30 | 10:25 | 10:55 | 50 | 225 | 3 | Grace | 15 |
| 6 | Sammy | 15 | 10:30 | 10:45 | 25 | 250 | 8 | Zoe | 15 |
| 8 | Carley | 1hr | 11:10 | 12:10 | 100 | 350 | 8 | Silvia | 15 |
| 7 | Bella | 15 | 11:20 | 11:35 | 25 | 375 | 10 | Skylar | 15 |
| 1 | Calli | 15 | 11:20 | 11:35 | 25 | 400 | 4 | N.Ki; | 15 |
| 9 | Yazzmen | 30 | 11:30 | 12:00 | 50 | 450 | 3 | Veronica | 15 |
| 7 | Chestina | 15 | 11:55 | 11:50 | 25 | 475 | 2 | Carley | 15 |
| 5 | Nikki | 30 | 11:40 | 12:10 | 50 | 525 | 4 | Nikki; | 15 |
| 8 | Bella | 15 | 12:10 | 12:25 | 25 | 550 | | | |
| 4 | Silvia | 15 | 12:15 | 12:30 | 25 | 575 | | | |
| 10 | Medow | 30 | 12:25 | 12:55 | 50 | 650 | | | |
| 8 | Harley | 30 | 12:25 | 12:55 | 50 | 700 | | | |
| 9 | Bella | 15 | 12:35 | 12:50 | 25 | 725 | | | |
| Jac. | Carley (J) | 30 | 12:50 | 1:20 | 200 | 925 | | | |
| 4 | Silvia | 15 | 12:45 | 1:00 | 25 | 950 | | | |
| 6 | Berthany | 1hr | 10:45 | 1:45 | 100 | 1050 | | | |
| 8 | "Bella" | 15 | 12:55 | 1:10 | 25 | 1075 | | | |
| 9 | Ambrose | 30 | 1:00 | 1:30 | 50 | 1125 | | | |
| 3 | Angel | 30 | 1:10 | 1:40 | 50 | 1175 | | | |
| 9 | Ambrose | 30 | 1:40 | 2:10 | 50 | 1225 | | | |
| 7 | Zoe | 30 | 1:35 | 2:05 | 50 | 1275 | | | |
| 7 | Medow | 15 | 1:40 | 1:55 | 25 | 1300 | | | |
| 3 | Grace | 30 | 1:45 | 2:15 | 50 | 1350 | | | |
| 6 | Berthany | | | | | | | | |

C
CK.
AME
MC/A
CHR
CA+CK
#*#*C

000232

| # | Name | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT |
|---|------|-----------|---------|----------|-------|----------|---------|-------------|-----------|---------|----------|-------|
| | Amy | 15 | 9:40 | 9:55 | 25 | 25 | 8 | NaNa | 15 | 1:25 | 1:40 | 25 |
| 8 | Silver | 30 | 9:45 | 10:05 | 50 | 75 | 7 | Hope | 30 | 1:40 | 2:10 | 50 |
| 1 | Kierann | 30 | 9:45 | 10:15 | 50 | 125 | 5 | Monica | 15 | 1:40 | 1:55 | 25 |
| 8 | Yazmen | 15 | 10:05 | 10:20 | 25 | 150 | 6 | Candy | 15 | 1:50 | 2:05 | 25 |
| 5 | Holly | 30 | 10:20 | 10:50 | 50 | 200 | 8 | Kristin | 15 | 1:50 | 2:05 | 25 |
| 6 | Sarah | 15 | 10:20 | 10:35 | 25 | 225 | 5 | Electra | 30 | 2:00 | 2:30 | 50 |
| 7 | Jenna | 15 | 10:40 | 10:55 | 25 | 250 | 9 | Cloe | 30 | 2:20 | 2:50 | 50 |
| 4 | Electra | 15 | 10:45 | 11:00 | 25 | 275 | 8 | Sasha | 15 | 2:20 | 2:35 | 25 |
| 5 | Star | 15 | 10:55 | 11:10 | 25 | 300 | 4 | Somone | 1hr | 2:25 | 3:25 | 100 |
| | Amy | 30 | 11:00 | 11:30 | 50 | 350 | 3 | Missy | 15 | 2:30 | 2:45 | 25 |
| 8 | Monica | 15 | 11:00 | 11:15 | 25 | 375 | 5 | Veronica | 30 | 2:30 | 3:00 | 50 |
| 8 | Holly | 15 | 11:05 | 11:20 | 25 | 400 | 5 | Lanena | 15 | 2:45 | 3:00 | 25 |
| 8 | Silver | 15 | 11:25 | 11:40 | 25 | 425 | 7 | Cloe | 30 | 3:35 | 4:05 | 50 |
| 8 | Holly | 15 | 11:30 | 11:45 | 25 | 450 | | | | | | |
| 6 | Victoria | 30 | 11:35 | 12:05 | 50 | 500 | | | | | | |
| 8 | Holly | 15 | 11:45 | 12:00 | 25 | 525 | | | | | | |
| 7 | Nana | 30 | 12:05 | 12:35 | 50 | 575 | | | | | | |
| 8 | Monica | 15 | 12:10 | 12:25 | 25 | 600 | | | | | | |
| 5 | Sasha | 15 | 12:10 | 12:25 | 25 | 625 | | | | | | |
| 6 | Somone | 1hr | 12:20 | 1:20 | 100 | 725 | | | | | | |
| 3 | Silver | 15 | 12:20 | 12:35 | 25 | 750 | | | | | | |
| 4 | Amy | 15 | 12:30 | 12:45 | 25 | 775 | | | | | | |
| 5 | Sasha | 15 | 12:35 | 12:50 | 25 | 800 | | | | | | |
| 1 | Roxann | 15 | 12:35 | 12:50 | 25 | 825 | | | | | | |
| | Yazmen | | | | | | | | | | | |
| 7 | Bella | 15 | 12:40 | 12:55 | 25 | 850 | | | | | | |
| 9 | Jenna | 15 | 12:45 | 1:00 | 25 | 875 | | | | | | |
| 10 | Skyline | 15 | 1:00 | 1:15 | 25 | 900 | | | | | | |
| 9 | Angel | 15 | 1:00 | 1:15 | 25 | 925 | | | | | | |
| 7 | Silver | 15 | 1:05 | 1:20 | 25 | 950 | | | | | | |

9-13-10

**DAILY PRIVATE SUITES/SALES REPORT**

NAME: _____

DAY: _____

DATE: _____

TOTAL # ROOMS SOLD: _____

# 15 MIN ROOMS $ _____

# 1/2 HOUR ROOMS $ _____

# 1 HOUR ROOMS $ _____

TOTAL CASH $ _____

TOTAL CK/CC $ _____

TOTAL ROOMS SOLD/PD/XFER/HOUR

| 12-1PM | 1-2PM | 2-3PM | 3-4PM | 4-5PM | 5-6PM | 6-7PM | 7-8PM | 8-9PM | 9-10PM | 10-11PM | 11-12AM | 12-1AM | 1-2AM | 2-3AM | 3-4AM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

MANAGER: _____

| SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME DUE | $ AMT | CSC OR $ | SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | CSC OR $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | Silvia | 30 | 12:15 | 12:45 | 50 | 1025 | V/10 | EDDIE | 15 | 8:15 | 8:30 | 25 | 25 |
| 9 | Naomie | 30 | 12:15 | 12:45 | 50 | 1075 | 8 | Hannah | 30 | 9:00 | 9:30 | 50 | 75 |
| 3 | Areora | 30 | 12:20 | 12:50 | 50 | 1125 | 7 | Sato | 30 | 9:05 | 9:35 | 50 | 125 |
| 10 | Devon | 30 | 12:20 | 12:50 | 50 | 1175 | 4 | Sophie | 30 | 9:05 | 9:35 | 50 | 175 |
| 2 | Veronica | 15 | 12:30 | 12:45 | 25 | 1200 | 5 | Jade | 15 | 9:55 | 10:10 | 25 | 200 |
| 11 | Kaissma | 15 | 12:35 | 12:50 | 25 | 1225 | 5 | Hope | 15 | 10:10 | 10:35 | 25 | 225 |
| 1 | Sosha | 15 | 12:35 | 12:50 | 25 | 1250 | 3 | Silvia | 15 | 10:16 | 10:30 | 25 | 230 |
| 10 | Alexusse | 30 | 12:40 | 1:10 | 50 | 1300 | 2 | Eddie | 30 | 10:30 | 11:00 | 50 | 300 |
| 9 | Samanha | 30 | 12:45 | 1:15 | 50 | 1350 | 8 | Vixen | 15 | 10:30 | 10:45 | 25 | 325 |
| A | Celeste | 30 | 1:10 | 2:10 | 50 | 1350 | 3 | Victorie | 15 | 10:30 | 10:45 | 25 | 350 |
| C | Logan | 1hr | 1:10 | 2:10 | 50 | 1560 | 10 | Paris | 15 | 10:30 | 10:45 | 25 | 375 |
| 3 | Ceshma | 1hr | 12:55 | 1:55 | 100 | 1650 | 8 | Veronica | 30 | 10:35 | 11:05 | 50 | 425 |
| 4 | Silvia | 15 | 1:05 | 1:20 | 25 | 1675 | 11 | Anna | 30 | 10:45 | 11:15 | 50 | 475 |
| 5 | Skyler | 15 | 1:10 | 1:25 | 25 | 1700 | 3 | Celeste | 15 | 10:50 | 11:05 | 25 | 500 |
| 2 | Dixie | 15 | 1:10 | 1:25 | 25 | 1725 | 3 | Silvia | 15 | 10:50 | 11:05 | 25 | 525 |
| 5 | Leah | 30 | 1:15 | 1:45 | 50 | 1775 | 1 | Demie | 15 | 10:40 | 10:55 | 25 | 550 |
| 10 | Alexus | 30 | 1:15 | 1:45 | 50 | 1825 | 2 | Vixen | 15 | 11:10 | 11:25 | 25 | 575 |
| 2 | Harley | 15 | 1:25 | 1:40 | 25 | 1850 | 5 | Sabrina | 30 | 11:15 | 11:45 | 50 | 625 |
| 9 | Billie | 15 | 1:20 | 1:35 | 25 | 1875 | 3 | Silvia | 15 | 11:15 | 11:30 | 25 | 650 |
| 10 | Smokey | 15 | 1:20 | 1:35 | 25 | 1900 | 4 | Dina Fine | 15 | 11:20 | 11:35 | 25 | 675 |
| 1 | Galli | 30 | 1:20 | 1:50 | 50 | 1950 | 10 | Logan | 15 | 11:20 | 11:35 | 25 | 700 |
| 4P | Victorie | 30 | 1:20 | 1:50 | 50 | 2000 | 4 | Kaissma | 15 | 11:40 | 11:55 | 25 | 725 |
| 4 | Carley | 30 | 1:36 | 2:06 | 50 | 2050 | 7 | Dina Fine | 15 | 11:40 | 11:55 | 25 | 750 |
| 6 | Raven | 30 | 1:40 | 2:10 | 50 | 2100 | 7 | Victorie | 15 | 11:45 | 12:00 | 25 | 775 |
| 8 | Dina Fine | 15 | 1:40 | 1:55 | 25 | 2125 | 8 | Carley | 1hr | 12:00 | 1:00 | 100 | 875 |
| 5 | Silvia | 15 | 1:40 | 1:55 | 25 | 2150 | 5 | Leah | 15 | 12:10 | 12:35 | 25 | 900 |
| 1 | Veronica | 30 | 1:45 | 2:15 | 50 | 2200 | 4 | Celeste | 30 | 12:05 | 12:35 | 50 | 950 |
| 10 | Kim | 15 | 1:45 | 2:00 | 25 | 2225 | 1 | Logan | 15 | 12:15 | 12:30 | 25 | 975 |
| 11 | Hope | 15 | 1:45 | 2:00 | 25 | 2250 | 8 | Courtaney | 15 | 12:15 | 12:30 | 25 |  |
| 6 | Jade | 15 | 1:50 | 2:05 | 25 | 2275 |  |  |  |  |  |  |  |

000234

| SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Dixie | 15 | 1:55 | 2:10 | 25 | 2800 | 6 | Roxann | 1hr | 3:40 | 4:40 | 100 | 3400 |
| 5 | Leah | 30 | 2:00 | 2:30 | 50 | 2350 | 7 | Skyline | 30 | 3:50 | 4:20 | 50 | 3450 |
| 4 | Kaessia | 30 | 2:00 | 2:30 | 50 | 2400 | | Nayeh | 30 | 4:00 | 4:30 | 100 | 3750 |
| 8 | Dine Fine | 15 | 2:00 | 2:15 | 25 | 2425 | 5 | Electra | 15 | 4:05 | 4:20 | 45 | 3775 |
| 6 | Nayeh | 1hr | 2:10 | 3:10 | 100 | 2450 | | Raven | | | | | |
| 10 | Silvia | 15 | 2:10 | 2:25 | 25 | 2575 | 7 | Skyline | 30 | 4:30 | 5:00 | 50 | 4025 |
| 11 | Bella | 15 | 2:10 | 2:25 | 25 | 3600 | 5 | Raven | 30 | 4:30 | 5:00 | 50 | 4075 |
| 7 | Calli | 30 | 2:15 | 2:45 | 50 | 2650 | | Electra | | | | | |
| 3 | Skyline (Crystal) | 15 | 2:15 | 2:30 | 25 | 2675 | | | | | | | |
| 4 | Logan | 15 | 2:20 | 2:35 | 25 | 2700 | | | | | | | |
| 4 | Electra | 30 | 2:20 | 2:50 | 50 | 2725 | | | | | | | |
| 7 | Calli | 15 | 2:25 | 2:40 | 25 | 2800 | | | | | | | |
| 11 | Hope | 15 | 2:25 | 2:40 | 25 | 2825 | | | | | | | |
| 3 | Chennel | 30 | 2:30 | 3:00 | 50 | 2875 | | | | | | | |
| 10 | Lexie | 15 | 2:30 | 2:45 | 25 | 2900 | | | | | | | |
| 3 | Sosha | 15 | 2:35 | 2:50 | 25 | 2925 | | | | | | | |
| 6 | Nayeh | 30 | 2:45 | 3:15 | 100 | 3045 | | | | | | | |
| 6 | Harley | 30 | 2:40 | 3:10 | 50 | 3075 | | | | | | | |
| 11 | Rylie | 30 | 2:45 | 3:15 | 50 | 3125 | | | | | | | |
| 5 | Courteny | 1hr | 2:50 | 3:50 | 100 | 2985 | | | | | | | |
| 7 | Kim | 30 | 3:00 | 3:15 | 25 | 3250 | | | | | | | |
| 7 | Logan | 30 | 3:15 | 3:40 | 50 | 3300 | | | | | | | |
| 8 | Amy | 15 | 3:15 | 3:30 | 25 | 3325 | | | | | | | |
| 3 | Nayeh | 30 | 3:10 | 3:40 | 100 | 3425 | | | | | | | |
| 9 | Bella | 15 | 3:25 | 3:40 | 25 | 3450 | | | | | | | |
| 3 | Silvia | 15 | 3:35 | 3:40 | 25 | 3475 | | | | | | | |
| 10 | Janna | 15 | 3:35 | 3:50 | 25 | 3560 | | | | | | | |

**DAILY PRIVATE SUITES SALES REPORT**

NAME:

DATE:

DATE:

TOTAL OF ROOMS SOLD

# 15 MIN ROOMS        100

# 1/2 HOUR ROOMS

# 1 HOUR ROOMS

TOTAL CASH $

TOTAL CC/MD $

**TOTAL ROOMS OCCUPIED PER HOUR**

| 12-1PM | |
| 1-2PM | |
| 2-3PM | |
| 3-4PM | |
| 4-5PM | |
| 5-6PM | |
| 6-7PM | |
| 7-8PM | |
| 8-9PM | |
| 9-10PM | |
| 10-11PM | |
| 11-12AM | |
| 12-1AM | |
| 1-2AM | |
| 2-3AM | |
| 3-4AM | |

MANAGER:

000235

| ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ | SUITE # | ENTERTAINER | ROOM TIME | TIME IN | TIME OUT | $ AMT | C/C OR $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KATYA | | | | | | 1 | SUMMer | Comm | 2:20 | 3:25 | $100 | 1325 |
| ELUCEREA | 15 | 8:30 | 8:45 | $25 | 25 | 2 | KITTY/BROOK | 15 | 2:25 | 2:35 | $25 | 1250 |
| VeroNica | 1hr | 10:00 | 11:00 | $100 | 125 | 3 | TYRA | 15 | 2:30 | 2:45 | $25 | 1275 |
| Deion | 30 | 10:18 | 10:33 | $26 | 173 | 3 | G.ROSE | Comm | 2:35 | 3:35 | $100 | 1500 |
| Selsey | 0.5 | 10:40 | 10:53 | 25 | 200 | 4 | HONEY | 15 | 2:35 | 2:50 | $25 | 1525 |
| cArly | 30 | 11:00 | 11:10 | 50 | 250 | 5 | TYRA | 15 | 2:35 | 2:50 | $25 | 1550 |
| Emerald | 15 | 11:00 | 11:20 | $25 | 275 | 11 | CAsi | 15 | 2:35 | 2:50 | $25 | 1575 |
| mAryJyllEE | 15 | 11:05 | 11:25 | $25 | 300 | 6 | cArly | 15 | 2:40 | 2:55 | $25 | 1600 |
| cAry | 35 | 11:25 | 11:55 | $50 | 350 | 6 | LexT | 30 | 2:40 | 3:10 | $50 | 1650 |
| VJASMIne | 50 | 11:30 | 12:20 | $50 | 500 | 4 | BRooke | 30 | 2:50 | 3:20 | $50 | 1700 |
| Slummer | 30 | 11:45 | 12:15 | $50 | 550 | 4 | BellA | 30 | 2:55 | 3:25 | $50 | 1750 |
| cawntey | 15 | 12:00 | 12:10 | $25 | 575 | 1 | Summer | 15 | 3:05 | 4:00 | $100 | 1850 |
| Honey | 15 | 2:10 | 2:25 | $25 | 600 | 11 | G.Rose | 15 | 3:05 | 3:20 | $25 | 1875 |
| JJASMIne | 45 | 12:30 | 1:15 | $35 | 635 | 5 | TYRA | 15 | 3:05 | 3:20 | $25 | 1900 |
| FIreSKY | 30 | 12:20 | 12:50 | 55 | 725 | 10 | Honey | 15 | 3:10 | 3:25 | $25 | 1925 |
| SWInAr | 30 | 12:33 | 1:06 | $50 | 775 | 6 | MIracle | 15 | 3:10 | 3:25 | $25 | 1950 |
| SKYHUT | 15 | 12:30 | 12:55 | $25 | 800 | 2 | cAlly | 15 | 3:10 | 3:25 | $25 | 1975 |
| TVRA | 15 | 1:40 | 1:55 | $25 | 825 | spring | Electra | 30 | 3:13 | 3:50 | $25 | 2050 |
| TINA | 15 | 12:50 | 1:05 | $25 | 950 | 1 | Devon | 60 | 3:26 | 4:30 | $100 | 2150 |
| FRANCE | 15 | 12:55 | 1:10 | $25 | 1000 | 1/2 | Angel | 15 | 3:30 | 3:50 | $25 | 2225 |
| cwntey | 15 | 1:00 | 1:15 | $25 | 1025 | 11 | TIna | 15 | 3:40 | 3:45 | $25 | 2225 |
| BRee | 15 | 1:15 | 1:30 | $25 | 1075 | 10 | ChAce | 15 | 3:50 | 4:35 | $25 | 2250 |
| SAphire | 30 | 1:25 | 1:55 | $50 | 1100 | 8 | TONYA | 30 | 3:50 | 4:20 | $50 | 2325 |
| BellA | 15 | 1:25 | 1:40 | $25 | 1125 | 8 | TAshA | 15 | 3:55 | 4:10 | $25 | 2325 |
| Veronica | 15 | 1:25 | 1:40 | $25 | 1150 | 9 | Alexie | 30 | 3:55 | 4:15 | $25 | 2375 |
| Elsethe | 15 | 1:45 | 2:00 | $25 | 1175 | 11 | Bella | 30 | 4:00 | 4:30 | $50 | 2425 |
| RIAnna | 15 | 1:50 | 2:15 | $25 | 1200 | 6 | HONEY | 15 | 4:00 | 4:15 | $25 | 2450 |
| AlEXIS | 15 | 2:00 | 2:15 | $25 | 1225 | 6 | LAXI | 30 | 4:00 | 4:38 | $50 | 2500 |
| RRose | 15 | 2:05 | 2:20 | $25 | 1225 | | | | | | | |

**DAILY PRIVATE SUITES SALES REPORT**

NAME: _____
DAY: _____
DATE: _____

TOTAL # ROOMS SOLD: _____
# 1/2 HOUR ROOMS: _____
# HOUR ROOMS: _____
TOTAL CASH $: _____

**TOTAL ROOMS OCCUPIED PER HOUR**

12-1PM
1-2PM
2-3PM
3-4PM
4-5PM
5-6PM
6-7PM
7-8PM
8-9PM
9-10PM
10-11PM
11-12AM
12-1AM
1-2AM
2-3AM
3-4AM

MANAGER: _____

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 263 of 279

Exhibit E

THEE DOLLHOUSE GOLDEN DOLLAR CASH IN SHEET   DAY: Mon   DATE: 7/23

| | ENTERTAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|---|
| 1 | Ashley | 20 | 2 | 18 |
| 2 | Lexi | 10 | 1 | 9 |
| 3 | Kaylyn | 5 | 1 | 4 |
| 4 | Jacinda | 150 | 15 | 135 |
| 5 | | 185 | 19 | 166 |
| 6 | Cali | 190 | 19 | 171 |
| 7 | Courtney | 25 | 3 | 22 |
| 8 | Courtney | 50 | 5 | 45 |
| 9 | Kaylyn | 10 | 1 | 9 |
| 10 | | 460 | 47 | 413 |
| 11 | Bella | 150 | 15 | 135 |
| 12 | Lexi | 20 | 2 | 18 |
| 13 | Courtney | 30 | 3 | 27 |
| 14 | VIP | 105 | 11 | 94 |
| 15 | | 765 | 78 | 687 |
| 16 | Cali | 30 | 3 | 27 |
| 17 | Jessica | 10 | 1 | 9 |
| 18 | Jacinda | 85 | 9 | 76 |
| 19 | Adrian | 30 | 3 | 27 |
| 20 | | 920 | 94 | 826 |
| 21 | Lexi | 55 | 6 | 49 |
| 22 | Courtney | 30 | 3 | 27 |
| 23 | Bella | 220 | 22 | 198 |
| 24 | Veronica | 320 | 32 | 288 |
| 25 | | 1,545 | 157 | 1,388 |
| 26 | Sarah | 10 | 1 | 9 |
| 27 | Ashley | 55 | 6 | 49 |
| 28 | Chloe | 220 | 22 | 198 |
| 29 | Sasha | 95 | 6 | 89 |
| 30 | | | | |
| | TOTALS: | 1,925 | 192 | 1,733 |

000237

_...AR CASH IN SHEET_  DAY: Thursday  DATE: 7/26/12

| ...EE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| ...od | 40 | 4 | 36 |
| Jazz | 300 | 30 | 270 |
| 3 Corey | 100 | 10 | 90 |
| 4 Carla | 50 | 5 | 45 |
| 5 | 490 | 49 | 441 |
| 6 Jarrod | 120 | 12 | 108 |
| 7 Summer | 300 | 30 | 270 |
| 8 Riley | 10 | 1 | 9 |
| 9 Devon Dawn | 350 | 35 | 315 |
| 10 | 1270 | 127 | 1143 |
| 11 Skylar | 110 | 11 | 99 |
| 12 Veronica | 30 | 3 | 27 |
| 13 Dawn | 40 | 4 | 36 |
| 14 Bella | 20 | 2 | 18 |
| 15 | 1470 | 147 | 1323 |
| 16 Colby | 100 | 10 | 99 |
| 17 Barbie | 50 | 5 | 45 |
| 18 Ava | 100 | 10 | 90 |
| 19 Elektra | 500 | 50 | 450 |
| 20 | 2230 | 223 | 2007 |
| 21 Erin | 20 | 2 | 18 |
| 22 Summer | 90 | 9 | 81 |
| 23 Colby | 470 | 47 | 423 |
| 24 | 2810 | 281 | 2529 |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |
| 29 | | | |
| 30 | | | |
| TOTALS: | | | |

000238

+2000 +3010

)-28-12

HOUSE GOLDEN DOLLAR CASH IN SHEET    DAY: _____    DATE: _____

| OWNER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| | 4405 | 444 | 3861 |
| Courtney | 50 | 5 | 45 |
| Honey | 600 | 60 | 540 |
| Alicia | 140 | 14 | 126 |
| 5 | 5195 | 523 | 4672 |
| 6 Jarrod | 10 | 1 | 9 |
| 7 Tina | 150 | 15 | 135 |
| 8 Angel | 420 | 42 | 378 |
| 9 Niomi | 255 | 26 | 229 |
| 10 | 6030 | 607 | 5423 |
| 11 Dallas | 45 | 5 | 40 |
| 12 Grace | 125 | 12 | 112 |
| 13 Chloe | 410 | 41 | 369 |
| 14 Honey | 205 | 21 | 184 |
| 15 | 6815 | 687 | |
| 16 Lacy | 570 | 57 | 513 |
| 17 Devon | 670 | 67 | 603 |
| 18 Barbie | 40 | 4 | 36 |
| 19 Skyler | 45 | 5 | 40 |
| 20 | 8140 | 820 | |
| 21 Bella | 300 | 30 | 270 |
| 22 Tasha | 90 | 9 | 81 |
| 23 Bella | 20 | 2 | 18 |
| 24 Jerry | 370 | 37 | 333 |
| 25 | 8920 | 898 | |
| 26 Tanya | 70 | 7 | 63 |
| 27 Tira | 300 | 30 | 270 |
| 28 Summer | 1600 | 160 | 1440 |
| 29 Saphire | 100 | 10 | 90 |
| 30 Seth | 20 | 2 | 18 |
| **TOTALS:** | 11010 | 1107 | 9903 |

000239

DAY: Thursday   DATE: 9-13

| ENTERTAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| Sophie | 50 | 5 | 45 |
| Amy | 150 | 15 | 135 |
| Roxann | 80 | 8 | 72 |
| Jena | 175 | 18 | 157 |
| | 455 | | |
| Amy | 300 | 30 | 270 |
| Star | 200 | 20 | 180 |
| Simone | 500 | 50 | 450 |
| Genisis | 125 | 13 | 112 |
| | 1580 | 159 | |
| Bella | 150 | 15 | 135 |
| Hope | 150 | 15 | 135 |
| Skylar | 125 | 13 | 112 |
| | 125 | 13 | 112 |
| | 2130 | 215 | |
| Mickey | 70 | 7 | 63 |
| Tina | 60 | 6 | 54 |
| Jena | 180 | 18 | 162 |
| Electra | 250 | 25 | 225 |
| | 2690 | 271 | |
| Yasmine | 150 | 15 | 135 |
| Luna | 100 | 10 | 90 |
| Chloe | 330 | 33 | 299 |
| Veronica | 350 | 35 | 315 |
| | 3620 | | |
| Missy | 150 | 15 | 135 |
| Simone | 500 | 50 | 450 |
| Sophia | 140 | 14 | 126 |
| Angel | 70 | 7 | 63 |
| Sarah | 80 | 8 | 72 |
| TOTALS: | 4560 | 458 | 4102 |

000240

THE GOLDEN DOLLAR CASH IN SHEET   DAY:           DATE:

| ER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| | 350 | 35 | 385 |
| | 300 | 30 | 330 |
| 3 | 150 | 15 | 165 |
| 4 Hope | 860 | 86 | 946 |
| 5 Holly | 100 | 10 | 110 |
| 6 | $1760 | $176 | $1931 |
| 7 Camile | 50 | 5 | 55 |
| 8 Katie | 90 | 9 | 99 |
| 9 Camile | 200 | 20 | 220 |
| 10 Alba | 175 | 18 | 193 |
| 11 Hanah | 25 | 3 | 28 |
| 12 Devin | 45 | 5 | 50 |
| 13 | 400 | 40 | 440 |
| 14 Bella | 50 | 5 | 55 |
| 15 | $1035 | $105 | $1140 |
| 16 NaNa | 30 | 3 | 33 |
| 17 Cali | 400 | 40 | 440 |
| 18 Jade mirandra | 300 | 30 | 330 |
| 19 | 70 | 7 | 77 |
| 20 Kayla | 15 | 2 | 13 |
| 21 Paris | 25 | 3 | 22 |
| 22 | $840 | $85 | $915 |
| 23 Edre | 50 | 5 | 55 |
| 24 Natasha | 380 | 38 | 418 |
| 25 Tina | 30 | 3 | 27 |
| 26 Tosha | 500 | 50 | 550 |
| 27 Tosha | 125 | 13 | 112 |
| 28 Tosha | 100 | 10 | 90 |
| 29 Bella | 50 | 5 | 45 |
| 30 Jordan | 110 | 11 | 99 |
| TOTALS: | $4980 | $501 | $XXXX |

4479

000241

DAY:　　　DATE:

| TAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
|  | 5315 | 536 | 4779 |
| Mila | 90 | 9 | 81 |
| Isis | 25 | 3 | 22 |
| Brooklyn | 25 | 3 | 22 |
|  | 5455 | 551 | 4904 |
| Meagan | 5 | 1 | 4 |
| Katie | 250 | 25 | 225 |
| Silvia | 100 | 10 | 90 |
| Mary Jane | 25 | 3 | 22 |
|  | 5835 | 590 | 5245 |
| Kristen | 175 | 18 | 157 |
| Sonya | 900 | 90 | 810 |
| Bella | 145 | 15 | 130 |
| Aubrey | 50 | 5 | 45 |
|  | 7105 | 718 |  |
| Stacey | 20 | 2 | 18 |
| Chelsey | 630 | 63 | 567 |
| Fox | 180 | 18 | 162 |
|  | 220 | 22 | 198 |
|  | 8155 | 823 |  |
| Logan | 1600 | 160 | 1440 |
| Chase | 100 | 10 | 90 |
| Jade | 545 | 55 | 490 |
| Roxanne | 580 | 58 | 522 |
|  | 10980 | 1106 | 9874 |
| Selena | 50 | 5 | 45 |
| Crystal | 120 | 12 | 108 |
| Neveah | 1080 | 108 | 972 |
| Jarrod | 10 | 1 | 9 |
| Electra | 355 | 36 | 319 |
| TOTALS: | 12495 | 1268 | 11227 |

+4000
+4000
+2000

10-12-12

DAY: Wednesday DATE: 10-17-12

| ER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| Marie | 300 | 30 | 270 |
| April | 10 | 1 | 9 |
| 3 Lina | 20 — | 2 | 18 — |
| 4 Valet | 10 — | 1 | 9 — |
| 5 | 340 — | 34 — | 306 — |
| 6 Ann Marie | 300 — | 30 — | 270 — |
| 7 Bella | 330 — | 33 — | 297 — |
| 8 Karina | 300 — | 30 — | 270 — |
| 9 Juliania | 20 — | 2 — | 18 — |
| | 1,290 — | 129 — | 1,161 — |
| Christina | 200 — | 20 — | 180 — |
| Silvia | 250 — | 25 — | 225 — |
| Mary Jane | 100 — | 10 — | 90 — |
| Selena | 125 — | 13 — | 112 — |
| | 1,965 — | 197 — | 1,768 — |
| Sassy | 10 — | 1 — | 9 — |
| Mary Jane | 30 — | 3 — | 27 — |
| Alexis | 60 — | 6 — | 54 — |
| Abby | 110 — | 11 — | 99 — |
| | 2,175 — | 218 — | 1,957 — |
| Chelsey | 10 — | 1 — | 9 — |
| Edie | 75 — | 8 — | 67 — |
| Bella | 10 — | 1 — | 9 — |
| Yazmin | 100 — | 10 — | 90 — |
| | 2,370 — | 238 — | 2,132 — |
| Mary Jane | 150 — | 15 — | 135 — |
| Julianna | 40 — | 4 — | 36 — |
| Victoria | 135 — | 14 — | 121 — |
| Mila | 50 — | 5 — | 45 — |
| Aubrey | 10 — | 1 — | 9 — |
| TOTALS: | 2,755 — | 277 — | 2,478 — |

G00243

DAY:    DATE:

| ...ER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| | 2,755 — | 277 — | 2,478 — |
| Bella | 75 — | 8 — | 67 — |
| Riley | 30 — | 3 — | 27 |
| Silvia | 40 — | 4 — | 36 — |
| | 2,900 — | 292 — | 2,608 — |
| Anne Marie | 40 — | 4 — | 36 — |
| Zoe | 150 — | 15 — | 135 — |
| Angie | 90 — | 9 — | 81 — |
| Jade | 10 — | 1 — | 9 — |
| | 3,190 — | 321 — | 2,869 — |
| Cali | 200 — | 20 — | 180 — |
| Cavanroom | 275 — | 28 — | 247 — |
| Veronica | 675 — | 68 — | 607 — |
| Haze | 50 — | 5 — | 45 — |
| | 4,390 — | 442 — | 3,948 — |
| Seth | 5 — | 1 — | 4 — |
| Angel | 10 — | 1 — | 9 — |
| Skylar | 95 — | 10 — | 85 — |
| Summer | 10 — | 1 — | 9 — |
| | 4,510 — | 455 — | 4,055 |
| Jersey | 25 — | 3 — | 22 — |
| Anne Marie | 80 — | 8 — | 72 — |
| Jersey | 125 — | 13 — | 112 — |
| Natalie | 50 — | 5 — | 45 — |
| | 4,790 — | 484 — | 4,306 — |
| Stacy | 5 — | 1 — | 4 — |
| Ron | 30 — | 3 — | 27 — |
| Cavanroom | 5 — | 1 — | 4 — |
| | | | |
| | | | |
| TOTALS: | 4,830 — | 489 — | 4,341 — |

000244

10-18-12

| | GOLDEN CASHED IN | DAY: 10% | DATE: TOTAL PAID OUT |
|---|---|---|---|
| | 115 | 12 | 103 |
| | 145 | 15 | 130 |
| cy | 20 | 2 | 18 |
| Katia | 70 | 7 | 63 |
| | 350 | 36 | |
| Savanah | 100 | 10 | 90 |
| Christina | 200 | 20 | 180 |
| | 100 | 10 | 90 |
| Edie | 50 | 5 | 45 |
| | 400 | 81 | |
| Tina | 20 | 2 | 18 |
| Alex | 200 | 20 | 180 |
| | 195 | 20 | 175 |
| | 40 | 4 | 36 |
| | 1255 | 127 | |
| Jade | 30 | 3 | 27 |
| Haze | 450 | 45 | 405 |
| Angie | 100 | 10 | 90 |
| Zoey | 75 | 8 | 67 |
| | 1910 | 193 | |
| Cali | 120 | 12 | 113 |
| Devin | 110 | 11 | 99 |
| Riley | 50 | 5 | 45 |
| Alex | 20 | 2 | 18 |
| | 2210 | 223 | |
| Bella | 170 | 17 | 153 |
| Bella | 100 | 10 | 90 |
| Jade | 180 | 18 | 162 |
| Ann Marie | 80 | 8 | 72 |
| Veronica | 760 | 76 | 684 |
| TOTALS: | 3500 | 352 | 3148 |

000245

Appeal: 17-1145    Doc: 14    Filed: 04/07/2017    Pg: 272 of 279

$3000

DAY: Thursday   DATE: 10-25-12

$4000

| TAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| Monna Li | 30 | 3 | 27 |
| Vixen | 50 | 5 | 45 |
| Brooke | 5 | 1 | 4 |
| Sophie | 150 | 15 | 135 |
|  | 235 | 24 | 211 |
| Annemarie | 120 | 12 | 108 |
| Layla | 10 | 1 | 9 |
| Karina | 25 | 3 | 22 |
| Grace | 150 | 15 | 135 |
|  | 540 | 55 | 485 |
| Edi | 120 | 12 | 108 |
| Yasmine | 1600 | 160 | 1440 |
| Celeste | 40 | 4 | 36 |
| Haze | 400 | 40 | 360 |
|  | 2700 | 271 | 2429 |
| Nana | 495 | 50 | 445 |
| Silvia | 50 | 5 | 45 |
| Crystal | 100 | 10 | 90 |
| Amy | 20 | 2 | 18 |
|  | 3365 | 338 | 3027 |
| Freddy | 30 | 3 | 27 |
| Merce | 10 | 1 | 9 |
| Bella | 35 | 4 | 31 |
| Lexi | 500 | 50 | 450 |
|  | 3940 | 396 | 3544 |
| Jade | 230 | 23 | 207 |
| Coward | 20 | 2 | 18 |
| Ixel | 10 | 1 | 9 |
| Riley | 160 | 16 | 144 |
| Chelsea | 150 | 15 | 135 |
| TOTALS | ~~5110~~ 4510 | 453 | 4657 |

000246

DAY:      DATE:

(15000 total)

10/2/12

| ENTERTAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| | 8765 | 880 | 7885 |
| Sasha | 230 | 23 | 207 |
| Amy | 150 | 15 | 135 |
| Logan | 300 | 30 | 270 |
| | 9445 | 948 | 8497 |
| Brenna | 300 | 30 | 270 |
| Chanel | 300 | 30 | 270 |
| Yasmine | 550 | 55 | 495 |
| Trina | 20 | 2 | 18 |
| | 10615 | 1065 | 9550 |
| Crystal | 170 | 17 | 153 |
| Charisma | 220 | 22 | 198 |
| " " | 285 | 29 | 256 |
| Jade | 450 | 45 | 405 |
| | 11740 | 1178 | 10562 |
| Chelsea | 30 | 3 | 27 |
| Amy | 150 | 15 | 135 |
| Lexi | 290 | 29 | 261 |
| Kim | 660 | 66 | 594 |
| | 12870 | 1291 | 11579 |
| Leah | 50 | 5 | 45 |
| Dixie | 440 | 44 | 396 |
| Bella | 75 | 8 | 57 |
| " " | 170 | 17 | 153 |
| | 13605 | 1365 | 12240 |
| Sabrina | 30 | 3 | 27 |
| Cali | 85 | 9 | 76 |
| Logan | 160 | 16 | 144 |
| Silvia | 365 | 37 | 328 |
| | eecee | | |
| TOTALS: | 14245 | 1430 | 12815 |

000247

+4000
+4000
+4000

DAY: Friday    DATE: 10-26-12

| ENTERTAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| Darrell | 10 — | 1 — | 9 — |
| Hannah L | 300 | 30 | 270 |
| Edy | 250 | 25 | 225 |
| Sophie | 300 | 30 | 270 |
|  | 860 | 86 | 774 |
| Paris | 305 | 31 | 274 |
| Vixen | 295 | 30 | 265 |
| Sunny | 130 | 13 | 117 |
| Katana | 200 | 20 | 180 |
|  | 1790 | 180 | 1610 |
| Chanel | 400 | 40 | 360 |
| Raven | 115 | 12 | 103 |
| Hannah | 40 | 4 | 36 |
|  | 120 | 12 | 108 |
|  | 2465 | 248 | 2217 |
| Logan | 1265 | 127 | 1138 |
| Slyvia | 410 | 41 | 369 |
| Sabrina | 575 | 58 | 517 |
| Brenna | 145 | 15 | 130 |
|  | 4860 | 489 | 4371 |
| Carly | 730 | 73 | 657 |
| Aurora | 300 | 30 | 270 |
| Celeste | 1130 | 113 | 1017 |
| Neriah | 1120 | 112 | 1008 |
|  | 8140 | 817 | 7323 |
| Dinafine | 360 | 36 | 324 |
| Carmen | 100 | 10 | 90 |
| Bella | 45 | 5 | 40 |
| Haze | 70 | 7 | 62 |
| Devin | 50 | 5 | 45 |
| TOTALS: | 8765 | 880 | 7885 |

000248

DAY: Saturday DATE: 10-27

| ENTERTAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT | |
|---|---|---|---|---|
| Freddy | 10 | 1 | 9 | $4,000 |
| Jason | 10 | 1 | 9 | 1,000 |
| Aurora | 150 | 15 | 135 | |
| Smokey | 40 | 4 | 36 | |
| | 210 | 21 | 189 | |
| Logan | 145 | 15 | 130 | |
| Paris | 300 | 30 | 270 | |
| Cameron | 470 | 47 | 423 | |
| Sunny | 30 | 3 | 27 | |
| | 1155 | 116 | 1039 | |
| Isis | 240 | 24 | 216 | |
| Katie | 440 | 44 | 396 | |
| Sonya | 300 | 30 | 270 | |
| Pristine | 440 | 44 | 396 | |
| | 2573 | 258 | 2317 | |
| Sabrina | 170 | 17 | 153 | |
| Hunter | 50 | 5 | 45 | |
| Mayas | 15 | 2 | 13 | |
| Abbey | 40 | 4 | 36 | |
| | 2850 | 286 | 2564 | |
| Niomi | 250 | 25 | 225 | |
| Shawla | 10 | 1 | 9 | |
| Hazeline | 50 | 5 | 45 | |
| Dia | 215 | 22 | 193 | |
| | 3375 | 339 | 3036 | |
| Simone | 30 | 3 | 27 | |
| Hailey | 80 | 8 | 72 | |
| Sasha | 120 | 12 | 108 | |
| Abby | 35 | 4 | 31 | |
| Dixie | 155 | 16 | 139 | |
| TOTALS: | 3795 | 382 | 3413 | |

DAY: Saturday DATE: 11-10-12

| TRAINER / EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| Sana | 30 | 3 | 27 |
| Ambrose | 50 | 5 | 45 |
| Ambrose | 50 | 5 | 45 |
| Katie | 40 | 4 | 36 |
| | 170 | 17 | |
| Ambrose | 45 | 5 | 40 |
| Bella | 215 | 22 | 193 |
| CS | 1000 | 100 | 900 |
| Cauley | 1000 | 100 | 900 |
| | 2430 | 244 | |
| Sylvia | 200 | 20 | 180 |
| Sylvia | 175 | 18 | 157 |
| Cali | 50 | 5 | 45 |
| | 140 | 14 | 126 |
| | 2995 | 301 | 2694 |
| Abby | 50 | 5 | 45 |
| Cali | 70 | 7 | 63 |
| Meadow | 700 | 70 | 630 |
| Ambrose | 300 | 30 | 270 |
| | 4115 | 413 | |
| Sammy | 50 | 5 | 45 |
| Trina | 50 | 5 | 45 |
| Caitlyn | 75 | 8 | 67 |
| Condra | 15 | 2 | 13 |
| | 4305 | 433 | 3872 |
| NaNa | 110 | 11 | 99 |
| Skylar | 50 | 5 | 45 |
| Caitlyn | 50 | 5 | 45 |
| Chase | 150 | 15 | 135 |
| Niomi | 75 | 8 | 67 |
| TOTALS: | 4740 | 477 | 4263 |

000250

DAY: Sunday   DATE: 11-11-12

| ENTERTAINER / EMPLOYER | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| JTP | 140 | 14 | 126 |
| Paris | 350 | 35 | 315 |
| Hailey | 1000 | 100 | 900 |
| Bella | 135 | 14 | 121 |
| | 1,625 | 163 | 1,462 |
| Keeley | 360 | 36 | 324 |
| Candy | 10 | 1 | 9 |
| Jennifer | 50 | 5 | 45 |
| Grasmie | 55 | 6 | 49 |
| | 2,100 | 211 | 1,889 |
| Anna | 170 | 17 | 153 |
| Sylvia | 25 | 3 | 22 |
| Hailey | 500 | 50 | 450 |
| Zohn | 10 | 1 | 9 |
| | 2,805 | 282 | 2,523 |

| | | | |
|---|---|---|---|
| TOTALS: | 2,805 | 282 | 2,523 |

000251

DAY: Friday    DATE: 11-16-12

| EMPLOYEE | GOLDEN CASHED IN | 10% | TOTAL PAID OUT |
|---|---|---|---|
| sey | 280 | 28 | 252 |
| Roxane | 310 | 31 | |
| Holly | 350 | 35 | 315 |
| Roxane | 310 | 31 | |
| | 1250 | 125 | |
| Trina | 600 | 60 | 540 |
| Bella | 600 | 60 | 540 |
| Karina | 150 | 15 | 135 |
| Holly | 300 | 30 | 270 |
| | 2900 | 290 | |
| Makayla | 150 | 15 | 135 |
| | 350 | 35 | 315 |
| Karissma | 500 | 50 | 450 |
| CJ | 400 | 40 | 360 |
| | 4300 | 430 | 3870 |
| Lexi | 25 | 3 | 22 |
| Anna | 50 | 5 | 45 |
| Holly | 400 | 40 | 360 |
| Veronica | 300 | 30 | 270 |
| | 5075 | 508 | 4567 |
| Jersey | 300 | 30 | 270 |
| | 100 | 10 | 90 |
| Nicole | 70 | 7 | 63 |
| Paige | 170 | 17 | 153 |
| | 5715 | 572 | |
| Chelsea | 80 | 8 | 36 |
| Alexis | 50 | 5 | 45 |
| Harley | 15 | 2 | 13 |
| Yasmine | 100 | 10 | 90 |
| Miranda | 40 | 4 | 36 |
| TOTALS: | 5960 | 597 | 5363 |

000252

GOLDEN DOLLARS CASH IN SHEET    DAY: Monday    DATE: 3-25-13

| ENTERTAINER / EMPLOYEE NAME | GOLDEN DOLLARS CASHED IN | MINUS 10% | TOTAL PAID OUT |
|---|---|---|---|
| Jen | 50 — | 5 — | 45 — |
| Danielle | 30 — | 3 — | 27 — |
| Nana | 1,365 — | 137 — | 1,229 — |
| Danielle | 5 | | 4 |
| | 1,450 — | 146 — | 1,304 — |
| Kayla | 10 — | 1 — | 9 — |
| Michelle | 300 — | 30 — | 270 — |
| Dorrel | 10 — | 1 — | 9 — |
| | 1,770 — | 178 — | 1,592 — |
| Smokey | 170 — | 17 — | 153 — |
| Bella | 70 — | 7 — | 63 — |
| Veronica | 365 — | 37 — | 328 — |
| Victoria | 40 — | 4 — | 36 — |
| | 2,415 — | 243 — | 2,172 — |
| John (Bathroom) | 10 — | 1 — | 9 — |
| Couchroom | 510 — | 51 — | 459 — |
| Natasha | 70 — | 7 — | 63 — |
| Riley | 175 — | 18 — | 157 — |
| Veronica | 200 — | 20 — | 180 — |
| Farrah | 60 — | 6 — | 54 — |
| | 3,440 — | 346 — | 3,094 — |
| Morgan | 500 — | 50 — | 450 — |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTALS: | 3,940 — | 396 — | 3,544 |

000253